UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**                               Case No. C2-05-CR-11
                                                    JUDGE GREGORY L. FROST

    v.

**DARYL LAWRENCE,**

      **Defendant.**

## ORDER

**I.  FACTS**

This matter came on for a hearing this 26th day of September, 2005 upon the Motion To Suppress (Doc. # 55) filed by Defendant on August 29, 2005, upon the Government's Response (Doc. # 67) filed on September 9, 2005, upon the Supplemental Memorandum (Doc. # 84) filed by Defendant on October 3, 2005, and upon the Government's Response to the Supplemental Memorandum (Doc. # 89) filed on October 11, 2005.  At the hearing three witnesses testified on behalf of the Government and one witness testified for Defendant.  From the testimony presented and the evidence admitted, the Court finds the facts to be as follows:

On January 9, 2005 Officers Fitzpatrick and Brown of the Columbus Police Department were dispatched to assist Tammy Gunell retrieve clothing from a residence located at 913 East 21st Avenue, Columbus, Franklin County, Ohio.  Apparently Ms. Gunell had previously resided at the residence and she had requested police assistance to accompany her to obtain her clothing from the premises.  At the time the two officers first met with Ms. Gunell they were unaware of any relationship she had with Defendant.

While en route to the premises, Ms. Gunell advised the officers that she had been involved with Defendant and that she had been cooperating with law enforcement authorities in the fatal shooting of Columbus Police Officer Bryan Hurst.  She told the officers that Defendant may be present at the residence where she and the officers were going to retrieve her clothes.  As a result of that information Officers Fitzpatrick and Brown requested additional back-up officers to assist.

Upon arriving at the residence, Ms. Gunell was escorted to the back of the residence by other officers.  Officers Fitzpatrick and Brown entered the residence through the unlocked front door and announced their presence.  Officer Fitzpatrick testified that he immediately heard a voice, saw Defendant in the hallway area, and heard Defendant shout, "I give up, I did it, It's me." On cross-examination Officer Fitzpatrick admitted that the police summary of the incident indicated that Defendant said, "Don't shoot, don't shoot, I give up," and that the summary was more accurate than his testimony.  Defendant was ordered to the floor and handcuffed.  By that time several other officers had entered the residence.  No one advised Defendant of his *Miranda* rights.

Officer Fitzpatrick asked Defendant, "Where's the gun?" and Defendant replied, "They got rid of it."  Without prompting or questioning from the officers, Defendant voluntarily advised the officers of a journal he had been keeping and the journal was later located and seized.

Officer Fitzpatrick testified that he observed Defendant's bandaged arm.  According to Officer Fitzpatrick, Defendant appeared to be in slight pain.  Emergency medical personnel were not called to administer any aid.  After talking with detectives on the telephone, the officers

placed Defendant in a police vehicle to transport him to the Columbus Police Department. Officer Fitzpatrick did not hear anyone advise Defendant of his *Miranda* rights before he was transported from the residence.

Officer Nicole Prysock and another officer were dispatched to the residence to transport Defendant to the police station.  As Defendant was placed in the transport van, Officer Prysock noticed that Defendant was handcuffed behind his back and that his left hand and arm were bandaged.  She testified that she did not ask any questions and did not advise Defendant of his *Miranda* rights.  While in the transport van before it left the scene of the apprehension, Defendant voluntarily stated, without prompting, that he did not mean to kill the officer and said that he was sorry.  When Officer Prysock was advised by Defendant of the written journal he had been keeping, Officer Prysock advised the other officers on the scene.

Officer Prysock indicated that Defendant did appear to be in some discomfort but that he did not say anything about pain.  Defendant explained his injuries and admitted that he had been treated at a hospital in Washington, D.C.  Defendant was transported to the Columbus Police Department which took approximately five minutes.  During the transport Defendant said nothing. Upon arriving at the station, Defendant was escorted through the building.  He apologized for shooting Officer Hurst to at least three different officers as he passed them in the corridors of the police station.

Defendant was taken to the sixth floor of the Columbus Police Department and placed in an interrogation room.  Detective James McCoskey and F.B.I. Special Agent Harry Trombitas conducted the interview of Defendant.  Detective McCoskey estimated that Defendant was arrested at the East 21st Avenue residence at approximately 9:30 a.m.  The videotaped interview

began at 10:42 a.m.  Prior to the interview Defendant appeared to be in some pain but after Detective McCoskey and Special Agent Trombitas entered the room and during the entire interview Defendant did not evince any pain or discomfort that was readily observable on the videotape.  Defendant admitted to consumption of marijuana within twenty-four hours before the interview but Defendant did not appear from the videotape to be under the influence of any drugs or alcohol.  Detective McCoskey asked Defendant to read the *Miranda* warnings.  Defendant read them verbatim.  The detective asked Defendant if he understood his rights and Defendant responded in the affirmative and then asked what time it was.  Detective McCoskey then read the waiver portion of the form to Defendant but Defendant declined to sign it by saying that he had written everything down in his journal.  Although Defendant did not sign the waiver form, Detective McCoskey indicated that he believed that Defendant had waived his rights through his actions.  Thereafter, a one hour interview was conducted.

Detective McCoskey admitted that he was aware of Defendant's injuries but the detective also testified that he had no information that Defendant needed immediate medical attention.  Detective McCoskey added that Defendant never asked for medical assistance, that Defendant did not appear to be in pain during the interview, that Defendant was afforded a break at two separate times during the interview and declined both times, that Defendant replied to the officers that he was alright, and that the only request made by Defendant was that he be provided more water which was afforded to him.

Molly Konkler, a registered nurse at Grant Medical Center, testified on behalf of Defendant at the hearing.  Ms. Konkler was working on the trauma floor on January 9, 2005 and did not specifically remember Defendant.  She, however, did state that she prepared a patient

4

admission assessment regarding Defendant.  She testified that the assessment form indicated that Defendant complained of constant and burning pain and noted that Defendant had a problem relating to cognition or perception.  Defendant related to Nurse Konkler that he rated his pain, on a scale of ten being the worst, at nine.  Nurse Konkler took this assessment at 9:20 p.m., which was almost twelve hours after Defendant's arrest and almost eleven hours after the commencement of the interrogation.

## II.  STANDARD

It is well settled that statements made by a defendant as the result of custodial interrogation are subject to suppression unless the Government can show a knowing, voluntary, and intelligent waiver of the defendant's constitutional privileges.  *Miranda v. Arizona*, 384 US. 436, 444 (1996).  A defendant has the initial burden to prove by a preponderance of the evidence that he or she was subjected to custodial interrogation.  *Colorado v. Connelly,* 479 U.S. 157, 167-168 (1986).  Once this burden is met, the burden then shifts to the Government to prove by a preponderance of the evidence a knowing, intelligent, and voluntary waiver.  *Connelly*, 479 U.S. at 167-168;  *United States v. Bentley*, 726 F.2d 1124, 1126 (6th Cir. 1984).  To satisfy its burden, the Government must show that, under the totality of the circumstances, the defendant was aware of the "nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412 (1986).  However, an express written or oral statement of waiver of *Miranda* rights is not essential to establish a waiver.  *North Carolina v. Butler*, 441 U.S. 369, 375-376 (1979).  Waiver can be inferred from the actions and words of the person interrogated.  *Id.* at 373.  If after being advised of the *Miranda* warnings an individual responds willingly to questions without requesting an attorney, waiver may be inferred.  *United States v.*

*Boon Son Chong,* 829 F.2d 1572, 1574 (11th Cir. 1987)**.**

Of course, spontaneous exclamations while a defendant is in custody are not subject to being suppressed because no interrogation prompted the utterance.  *See Pa v. Muniz*, 496 U.S. 582, 602-606 (1990); *United States v. Henry*, 447 U.S. 264, 276 (1980).  And, as a corollary, statements made by a defendant before the defendant is placed in custody are not subject to being suppressed because no "custodial" interrogation occurred. *Berkemer v. McCarty*, 468 U.S. 420 (1984).  Finally, as it applies to this case, *Miranda* rights need not be repeated after a break in the questioning.  *Wyrick v. Fields*, 459 U.S. 42 (1982).

With those parameters in mind, the Court will analyze the statements made by Defendant in this matter.

## III.  ANALYSIS

The statements made by Defendant can be separated into five distinct categories: statements made by Defendant before he was placed in custody and before any interrogation; statements made by Defendant after he was placed in custody and in response to questions asked but before *Miranda* rights were read to Defendant; spontaneous statements made by Defendant while in custody; statements made by Defendant while in custody and in response to interrogation after *Miranda* rights were read to Defendant; and statements made to Agent Trombitas after Detective McCoskey concluded his examination.  The Court will analyze each in turn.

### A.  Statements Before Custody

Upon entering the premises, Officers Fitzpatrick and Brown encountered Defendant and before they ordered him to the floor, Defendant stated, "Don't shoot.  Don't shoot.  I give up."

The Defendant was not, at that time, in custody and therefore his non-custodial declarations will not be suppressed.

In determining whether an individual was in custody, a court must examine all of the circumstances but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam)* (quoting *Oregon v. Mathiason,* 429 U.S.492, 495-497 (1977)).

It is obvious in this case that Defendant was not yet in custody when he made the statement, "Don't shoot. Don't Shoot. I give up." Defendant's presence had just been revealed to the officers and sufficient time had not elapsed for the officers to even formulate an intent to arrest Defendant before the statements were made.

### B. Statements After Custody As A Result Of Interrogation But Before *Miranda*

Defendant was immediately ordered to the floor once he was discovered by the officers. He was handcuffed and several officers, some with guns drawn, were guarding Defendant. At that time, Officer Fitzpatrick asked "Where's the gun?" and Defendant responded "They got rid of it." Both the question and the response must be suppressed and the Government concedes as much.

Defendant was obviously in custody whether Defendant was advised that he was under arrest or not. Because both parties agree that Defendant was in custody from that point of time there is no point in citing to all the legal authority for the proposition that, under the facts of this case, Defendant was then in custody. Suffice it to say that when a "suspect's freedom of action is curtailed to a degree associated with a formal arrest," the suspect is "in custody" for *Miranda*

7

purposes.  *Berkemer,* 468 U.S. at 440.

Law enforcement officers must give "*Miranda* warnings" before interrogating individuals in custody.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that an individual in police custody many not be interrogated until and unless he is first advised that he has the right to remain silent; that anything he says may be used against him; that he has the right to an attorney; and that an attorney will be appointed for him if he cannot retain one.  *Id.* The Court characterized the warnings as "absolute prerequisite to interrogation" and the fruits of a custodial interrogation are inadmissable at trial without them.  *Id.* at 467.  The Supreme Court held that:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege....  But unless and until such warnings are demonstrated..., no evidence obtained as a result of interrogation can be used against him.

*Id.* at 478-479.  *Miranda* thus creates procedural safeguards to secure the Fifth Amendment privilege against self-incrimination while a person is subject to custodial interrogation.

Once in custody, it was incumbent upon the officers to advise Defendant of his *Miranda* rights before any questioning began.  Failure to comply with this elementary requisite requires suppression.

### C.  Spontaneous Statements After Custody

Defendant made several spontaneous statements that were not the result of any interrogation.  The statements were made while in custody.  Those statements are not suppressed.

Defendant was placed in custody and with the exception of the one inquiry about the location of the gun no other inquiry was made of Defendant until he was interrogated by Detective McCloskey and Special Agent Trombitas at the Columbus Police Department. During this time and without prompting or questioning, Defendant made several statements. Specifically, he advised the officers at the scene and the transportation officer about the journal he had been keeping. He said that he was sorry and that he did not mean to kill Officer Hurst. Once Defendant arrived at the police station, he apologized for his actions to several officers. All of these statements were not the result of interrogation.

Where a defendant makes a voluntary statement while in custody without being questioned or pressured by the police, the statements are admissible despite the absence of *Miranda* warnings. *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997); *United States v. Koubriti*, 199 F. Supp. 2d at 656, 666-67 (E.D. MI 2002). "[I]t is well settled that a volunteered statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *United States v. Thornton*, 17 F. Supp. 2d 686, 693 (E.D. Mich. 1998).

Further, simply riding to the police station in a police transportation vehicle accompanied by uniformed officers after being placed under arrest is not the functional equivalent of interrogation. If it were, *Miranda's* prohibition against unwarned statements made in response to custodial interrogation would be transformed into a blanket prohibition against the admission of any statements made in custody prior to *Miranda* being warnings given. In fact, *Miranda* simply does not prohibit admission of statements made in custody unless they are the product of questioning or interrogation or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291,

9

300-301 (1980); *Koubriti*, 199 F. Supp. 2d at 666-67.

> **D.  Statements Made While In Custody In Response To Interrogation After *Miranda* Warnings**

The briefs and arguments of counsel do not accurately portray what occurred in the interrogation room.  This Court has reviewed the videotape and specifically finds the following to be the correct recitation of the facts:

Defendant is placed in the interrogation room by himself initially.  Before anyone else enters the room, Defendant appears to be in some pain or discomfort.  Detective McCoskey and Special Agent Trombitas enter the room, sit down and introduce themselves.  Detective McCoskey indicates to Defendant that they know he is in pain.  Detective McCoskey then asks Defendant if he knows why he is there and Defendant replies, "It's all on paper."  Defendant was advised that, at least for the present, he is charged with bank robbery.  Detective McCoskey next inquired if Defendant has any problem with the officers talking to him to which Defendant responds, "I gave them my full cooperation.  I'm sorry.  I have family, too.  Let's get this over with."  Detective McCoskey then asked Defendant about this educational background, his ability to read and write, whether he had any hearing problems, and whether he wore glasses.  Detective McCoskey then inquired if Defendant had consumed alcohol or narcotics within the last twelve to twenty-four hours.  As Defendant was responding to that question, a glass of water was brought in the room for Defendant.  Detective McCoskey then re-inquired if Defendant considered himself under the influence of alcohol or narcotics.  Defendant answered, "Perfectly fine."

Detective McCoskey requested that Defendant read the *Miranda* rights form.  Defendant

10

read all of his rights in a voice that was understandable and clear.  Then Detective McCoskey explained each of the rights to Defendant and asked Defendant "Do you understand your rights?"  Defendant answered, "Yes, I have a question.  What time is it?"  After being told the correct time, Detective McCoskey then read the rights waiver form to Defendant.  After completing the reading of the waiver form, Detective McCoskey asked if Defendant understood the waiver form.  Defendant nodded his head in the affirmative.  Detective McCoskey asked if he had, "any problem with that," apparently referring to the waiver and Defendant stated, "I've already written everything down."  Not satisfied with Defendant's answer, the detective stated, "Again, we want to talk to you.  You can sign the waiver if you want.  You don't have to sign it."  Defendant then responded by saying, "I don't want to sign anything.  I'll talk to you guys."

      Thereafter, an approximately one hour interrogation occurred during which Defendant confessed to the shooting of Officer Hurst and to committing other blank robberies.  At no time during the interrogation did Defendant indicate that he was in pain or that he wanted medical attention, or that he wanted an attorney.

      Pursuant to *Miranda*, a person who is taken into custody or otherwise significantly deprived of his freedom and subjected to interrogation by law enforcement officials must be informed of certain constitutional rights "and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible" as evidence against him. *Miranda*, *supra*.

      A suspect may waive his *Miranda* rights if his waiver is knowing and voluntary. *Edwards v. Arizona,* 451 U.S. 477, 483 (1981).  The Supreme Court explained in *Butler*:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably

11

> either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights: the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Butler*, 441 U.S. at 373.

The issue of waiver is determined by the totality of the circumstances in each case, including the defendant's background, experience, and conduct. *Id.* The government is required to prove only that appellant waived his right to remain silent by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157 (1986).

Upon review of the evidence presented at the suppression hearing and after closely reviewing the videotape of the interrogation, this Court is convinced that Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights and agreed to talk with the officers.

Initially, Detective McCoskey satisfied himself and this Court that Defendant possessed sufficient intellect to understand the position Defendant found himself in and to understand the rights that Defendant had. Defendant also indicated that although he had consumed some marijuana within the last twelve to twenty-four hours, he was "perfectly fine." The videotape confirms Defendant's sober state as well. Defendant appears to be alert, his voice is strong, and he does not slur his words. Not only did Defendant competently read the rights form, Detective McCoskey then explained each of the rights to Defendant. When asked if he understood his rights, Defendant answered in the affirmative. The detective next read the waiver form to Defendant. Defendant indicated that he understood the form. Although Defendant did not want

to sign the waiver form, Defendant did indicate the he would talk with the officers. Not only does this Court find that Defendant understood and appreciated his rights, but the Court also holds that he knowingly, voluntarily, and intelligently waived those rights. The Court further finds that the totality of the circumstances evidences Defendant's overall desire to waive his rights and to admit to the crimes he had committed.

Defendant argues that his injuries and resultant pain prevented him from voluntarily waiving his rights. The videotape disputes that argument. After initially showing some symptoms of pain or discomfort when the Officers were not present in the interrogation room, Defendant at no other time indicated to the officers or showed any signs of pain during the interview. To the contrary, Defendant was alert and answered all of the officers' questions. Although he was given the opportunity to take breaks, Defendant declined to do so. Defendant never requested any medical attention and, from the videotape, the Court concludes that he did not need any medical attention. Nurse Konkler's report of Defendant eleven hours later does not persuade this Court to the contrary.

All of the statements made by Defendant to Detective McCoskey and Agent Trombitas during the videotaped interview will be admitted at trial and will not be suppressed.

### E. Statements Made To Agent Trombitas After Detective McCoskey's Interrogation.

In an effort to be complete and because the issue was raised at one time during the hearing, the Court will finally address whether law enforcement was required to re-advise Defendant of his *Miranda* rights when Detective McCoskey completed his interrogation and before Special Agent Trombitas began his interrogation.

The officers were not required to re-advise Defendant of his *Miranda* rights under the

13

circumstances of this case.

It is also well-established that a suspect who receives adequate *Miranda* warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation. *Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982). Officers are not required to readminister the *Miranda* warnings when a relatively short period of time has elapsed since the initial warnings. In determining whether initial warnings remain effective for subsequent interrogations, courts look to the totality of the circumstances. *Id.*

The totality of the circumstances in this case do not support a constitutional violation. Special Agent Trombitas began questioning Defendant immediately after Detective McCoskey finished. There was no break in between. The entire interrogation session lasted only one hour and there is no indication that Defendant wanted to invoke his rights at any time. To the contrary, it appears to the Court that Defendant wanted to make a full confession of all of his wrongdoings and wanted to do so without the benefit of any of the rights afforded to him.

### IV.  CONCLUSION

The Court **GRANTS** in part and **DENIES** in part the Motion to Suppress (Doc. # 55). The Court suppresses the statement Defendant made to Officer Fitzpatrick in response to Officer Fitzpatrick's "Where's the gun?" inquiry–specifically, "They got rid of it." All other statements made by Defendant at the scene of his arrest, during transport, and at the Columbus Police Department will not be suppressed.

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT COURT**