IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case Number 2:05-CR-00011 |
| | ) | |
| | ) | JUDGE GREGORY L. FROST |
| DARYL LAWRENCE | ) | |
| Defendant | ) | |

## MOVANT DARYL LAWRENCE'S MOTION FOR SUBPOENAS TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS AND INCORPORATED MEMORANDUM

Comes now Daryl Lawrence, respectfully and through undersigned counsel, and pursuant to Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), Rule 17 of the *Federal Rules of Criminal Procedure* ("Fed. R. Crim. Pro. 17"), and the Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, moves this Honorable Court for subpoenas to produce documents, information or objects. The requested subpoenas are essential to guarantee Mr. Lawrence a full and fair opportunity to timely raise all cognizable claims under 28 U.S.C. § 2255 concerning his conviction and/or sentence. The grounds for this request are set forth in the following memorandum.

Respectfully submitted,

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

## MEMORANDUM

### I.    Introduction

Mr. Lawrence respectfully moves the Court to subpoena records whose disclosure is necessary for the full development and presentation of claims challenging his conviction and death sentence pursuant to 28 U.S.C. § 2255. Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6") and Rule 17 of the Federal Rules of Criminal Procedure confer subpoena authority.

First, Habeas Rule 6 gives this Court express authority to order discovery:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.

Habeas Rule 6(a). The rule incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same); *see also Rules Governing Section 2254 Cases in the United States District Courts*, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*"). [1]

Although the undersigned acknowledges that historically some courts have not permitted Rule 6 discovery prior to the filing of the § 2255 motion, *see, e.g., United States ex rel. Nunes v. Nelson*, 467 F.2d 1380 (9th Cir. 1972) ("Appellant is not entitled to a discovery order to aid in the preparation of some future habeas corpus petition."); *Calderon v. United States Dist. Court*,

---

[1] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases in the United States District Courts* are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts*.

98 F.3d 1102, 1106-07 (9th Cir. 1996) ("[P]re-petition discovery is impermissible…"), and that such pre-motion discovery is still generally disfavored by the courts, *see, e.g., United States v. Sampson*, 2009 U.S. Dist. LEXIS 130664 at *2-*3 (D. Mass. May 6, 2009) (dismissing motion for pre-petition discovery "without prejudice to consideration of a motion seeking similar discovery, or a motion to amend based on information received in discovery, after his § 2255 petition is filed."); *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("There is no pre-motion discovery in a Section 2255 case, as there is in summary judgment proceedings in a civil case."), Mr. Lawrence respectfully submits that such law is not controlling in light of the strictures imposed on habeas litigants by *Mayle v. Felix*, 545 U.S. 644, 650 (2005). That is, the strict one-year statute of limitations period for raising claims that governs these proceedings requires Mr. Lawrence to allege any and all cognizable claims in his timely-filed § 2255 motion. Under *Mayle v. Felix*, any subsequent claims that Mr. Lawrence wishes to raise in an amended motion, except in limited circumstances, must "relate back" to the claims pled in the original motion; otherwise those subsequent claims can be deemed time-barred. *See Mayle v. Felix*, 545 U.S. at 650. Thus, pre-motion discovery is warranted here so that Mr. Lawrence has an adequate opportunity in the first instance to discover and plead all available claims in his original motion, before the one-year statute of limitations period has run.

A court may grant leave to conduct discovery when "good cause" for doing so is shown. According to the Supreme Court, such "good cause" for discovery in habeas proceedings is established "where specific allegations before the court show reason to believe that the petitioner

3

may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).[2]

Pursuant to Habeas Rule 6, a court may authorize the issuance of subpoenas to produce documents, information or objects. *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *O'Neal v. Lampert*, 199 F.Supp.2d 1064, 1065 (D. Or. 2002) (granting motion for subpoenas to produce records under Habeas Rule 6); *In re Braxton*, 258 F.3d 250, 255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall*, 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other physical items); *Ross v. Kemp*, 785 F.2d 1467, 1469, 1478-79 (11th Cir. 1986) (subpoenas issued to clerk of jury commission); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).[3]

---

[2] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous -- i.e., the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

[3] *See also Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14-15 (1992) (O'Connor, J., dissenting) ("once a claim is properly before the district court ... a habeas petitioner [should be treated] ... like any civil litigant" for purposes of "right to a hearing [or, presumably, any other fact-development procedure] where [the procedure] is necessary to prove the facts supporting his claim").

## II.    The "Good Cause" Standard

The *Bracy* Court's detailed discussion of the application of Habeas Rule 6 to the facts is instructive as to what constitutes "good cause."

William Bracy was convicted of capital murder and sentenced to death before Cook County Circuit Judge Thomas J. Maloney in 1981. *Bracy v. Gramley*, 81 F.3d 684, 687 (7th Cir. 1995), *rev'd*, 520 U.S. 899 (1997). Judge Maloney accepted bribes from criminal defendants in his court, and in return for the bribes, he arranged for the defendants to be acquitted or convicted of lower-grade offenses. *Bracy*, 520 U.S. at 906-08; *see also United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996).

The judge fixed cases tried shortly before Mr. Bracy's case and shortly after, in each case skewing his rulings in order to ensure the acquittal (or the conviction on reduced charges) of murder defendants. *Id*. Mr. Bracy did not bribe Judge Maloney. *Id*. In his habeas petition, Mr. Bracy alleged that Judge Maloney had ruled against him on several discretionary matters in order (1) to "compensate" for his pro-defendant rulings in cases that had been fixed; and (2) to encourage criminal defendants to bribe him in fear of what would happen to them if they did not. *Bracy*, 81 F.3d at 684. Mr. Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at [his] trial." *Id*. at 690. To that end, Mr. Bracy sought access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's behavior in the cases where he did not receive bribes, and for evidence from the federal prosecution of Judge Maloney that would establish the judge's behavior in non-bribe cases.

The Seventh Circuit upheld the district court's decision to deny all three forms of discovery. The circuit court conceded the "appearance of impropriety" but reasoned that Mr. Bracy's theory of "compensatory bias": provided only a weak basis on which to suggest the result of the trial was unreliable; though "plausible," was not "compelling" enough to presume prejudice; and otherwise lacked good cause because evidence that the judge had ruled leniently in other cases did not mean he had ruled more harshly in Mr. Bracy's case. 81 F.3d at 690. The Seventh Circuit freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners," but rationalized that the "defendants are speculating too." *Id.*

The Supreme Court acknowledged as true the Seventh Circuit's characterization that Mr. Bracy's theory of compensatory judicial bias was "quite speculative," *id.* at 905 (quoting *Bracy*, 81 F.3d at 689-90), but the Court noted that the proper focus of a Habeas Rule 6 discovery request is not the probability that the requested discovery will yield anything, but whether the sought-after facts, if true, would help establish a claim for relief. *Id.* at 905 ("[D]ifficulties of proof aside, there is no question that, *if it could be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment."). The Court explained the proper application of Habeas Rule 6:

> In *Harris* [*v. Nelson*, 394 U.S. 286 (1969)], we stated that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." 394 U.S. at 300. Habeas Corpus Rule 6 is meant to be "consistent" with *Harris*. . . . It may well be, as the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to . . . [prove his claim], but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good cause" for discovery.

6

*Bracy*, 520 U.S. at 908-09. [4]

Under *Bracy*, a movant who has (1) made specific allegations warranting relief, and (2) shown why the requested information is essential to the adequate factual development of his claims, has established "good cause" under Habeas Rule 6. If the petitioner has properly alleged a cognizable claim and asked for probative evidence, he has shown "good cause" for discovery.[5] *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's

---

[4] The Supreme Court's decision in *Bracy* clearly rejects any requirement of a "prima facie" case for relief in advance of discovery. First, *Bracy* omits any reference to *Harris*'s "prima facie" language, relying instead on a considerably more liberal formulation of the "good cause" rule taken from the same case, which requires only some "*reason to believe* that the petitioner *may*, *if* the facts are fully developed, be able to demonstrate that he is ... entitled to relief." 520 U.S. at 908-09 (emphasis added). In addition, the Court rejected the court of appeals' conclusion that discovery was properly denied "because petitioner had failed to uncover any evidence of actual bias without discovery," so that "the probability is slight that a program of depositions aimed at crooks and their accomplices ... will yield such evidence." *Id.* at 903. Finally and most importantly, *Bracy* held that denying discovery was an abuse of discretion even though the petitioner's factual allegation of unconstitutional, case-specific judicial bias was concededly "quite speculative," "only a theory at this point," "not supported by any solid evidence," and premised on facts that "might be equally likely" to support an inference contrary to the one the petitioner advanced. *Id.* at 905, 909.

[5] In this respect, the scope of discovery under Habeas Rule 6 is similar to the scope of discovery in conventional civil actions. A plaintiff who makes specific allegations which, if proven, would entitle him to legal relief is entitled, *without more*, to access to the fact-development procedures necessary to flesh out his claims without undue interference. *Cf. Neitzke v. Williams*, 490 U.S. 319 (1989) ("What [Fed.R.Civ.P.] 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.").

7

blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).

**III.     Discovery Is Especially Warranted In Capital Cases**

The policies favoring discovery are even stronger in capital cases than in noncapital because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). Because habeas corpus discovery is designed to aid courts in determining the validity of the movant's claims, it is indispensable to the reliability of habeas corpus proceedings in capital cases. For this reason, liberal use of discovery is appropriate in such cases. *See Bracy*, 520 U.S. at 904-09 (denial of capital habeas corpus petitioner's discovery request abused district court's discretion); *Wilson* v. *Butler,* 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims."); *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) ("more liberal discovery is appropriate in capital cases where the stakes for prisoners are so high"); *United States ex rel. Brisbon v. Gilmore*, 1997 U.S. Dist. LEXIS 8314, at *8 (N.D. Ill. June 10, 1997) ("The Court agrees that, in light of the heavy burden Brisbon bears in petitioning for habeas relief from his death sentence, potentially corroborating evidence constitutes good cause for limited discovery"). Because this is a death penalty case, broad discovery is necessary to ensure that extra measure of process which is demanded under the circumstances.

## IV.    The Requested Discovery

Among the cognizable claims which a litigant may raise in a post-conviction proceeding, two of the most common are: (1) ineffective assistance of trial counsel ("IAC"), and (2) government misconduct. With respect to IAC claims, a litigant must establish that trial counsel rendered "deficient performance" and that but for that deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different (the "prejudice prong"). *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's failure to pursue reasonable avenues of investigation is perhaps the most basic form of deficient performance because there are few strategic reasons that can account for such a failure. In order to demonstrate that the failure to investigate prejudiced the litigant, he or she must show what counsel would have learned of value to the defense, had counsel conducted an appropriate investigation.

With respect to claims of government misconduct, a litigant must establish that there is evidence favorable to the accused either because it is exculpatory or because it impeaches a government witness; that the evidence was suppressed by the prosecution (either willfully or inadvertently); and that the suppression of the evidence resulted in prejudice to the accused. *See Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, a litigant must establish that the government argued or permitted evidence to be presented that it knew to be false. *Napue v. Illinois*, 360 U.S. 264 (1959).

Mr. Lawrence requests records in the possession of federal, state and/or local agencies that participated in the investigation, arrest, and/or prosecution of Mr. Lawrence that he believes will support IAC and prosecutorial misconduct claims he intends to raise in his § 2255 Motion.

His request is also directed at private entities that investigated these incidents and assisted law enforcement in this case.

### A.      Federal Bureau of Investigation ("FBI")

At trial, the Government argued that Mr. Lawrence shot Officer Hurst execution-style from close range while he was crouched defensively behind the teller counter, attempting to remove his own firearm from its holster.[6] According to the Government's argument, this close-range shot proved: that Mr. Lawrence possessed the requisite *mens rea* to be convicted of a specific-intent crime; that Mr. Lawrence was guilty of the statutorily enumerated capital intent factors under 18 U.S.C. § 3591(a) to make him eligible for a death sentence; and that Mr. Lawrence had the requisite moral culpability to justify a death sentence under 18 U.S.C. § 3593.[7] The defense theory at trial was that Mr. Lawrence was not aware that there was an officer on duty when he entered the bank; that the fatal shooting occurred during a chaotic exchange of gunfire as Mr. Lawrence attempted to flee the bank; and that there was reasonable doubt Mr. Lawrence had the requisite *mens rea* or moral culpability the Government attributed to him, and reasonable doubt that he was guilty of the enumerated capital intent factors.[8]

Prior to trial, however, the Government produced to trial counsel a computer-generated reconstruction of the fatal shooting at Fifth Third Bank on January 6, 2005, created with the assistance of the FBI. This animated reconstruction purported to show what the prosecution's crime reconstruction team believed occurred during the shooting – specifically, Mr. Lawrence's

---

[6] *See, e.g.,* Trial Tr. Vol. 6 at 25; Trial Tr. Vol. 10 at 25, 29, 64.

[7] *See, e.g.,* Trial Tr. Vol. 10 at 31, 68; Trial Tr. Vol. 12 at 10; Trial Tr. Vol. 17 at 21, 30, 33-34.

[8] *See, e.g.,* Trial Tr. Vol. 6 at 35-36; Trial Tr. Vol. 10 at 48, 52; Trial Tr. Vol. 11 at 42-44; Trial Tr. Vol. 12 at 29, 36-37; Trial Tr. Vol. 17 at 46-47.

movement in the bank, from entrance to exit. In this reconstruction, the shooter is shown running first towards the teller counter, then over to a hallway area south of the teller counter, and then fleeing the bank. Witnesses found Officer Bryan Hurst's body in the hallway area at the bank.

This crime reconstruction video directly contradicts the representation the Government made at trial as to Mr. Lawrence's movements and conduct after entering the bank, and undermines the Government's assertion that Mr. Lawrence shot Officer Hurst at point-blank range, while he was in a vulnerable position behind the counter, attempting to unholster his gun. That video appears to suggest that Officer Hurst was shot while in the hallway, which is consistent with a statement given by a bank employee who, when interviewed by the bank on the day of the robbery, said she saw Officer Hurst come out from behind the teller counter into that small hallway, and fire shots at Mr. Lawrence from that location.[9]

In addition, the video footage from cameras positioned around the bank on the day of the shooting, produced to the defense in discovery, provides no support to suggest that Mr. Lawrence ran over to the hallway in which Officer Hurst's body was found, but the fact that the prosecution team originally placed Mr. Lawrence in that area in its *reconstruction* video suggests that Officer Hurst was not fatally shot while he was behind the teller counter, as the Government claimed at trial, but rather that he was shot when he was in the hallway. This scenario would have undermined the Government's arguments that Mr. Lawrence shot Officer Hurst at close range while he was maximally vulnerable. Moreover, this alternate scenario would have

---

[9] Every other bank employee who witnessed the robbery was interviewed by multiple police enforcement agencies, including the FBI and Columbus Police Department. For this one witness, only the statement she gave the bank was produced. Law enforcement records may produce missing interviews with her (and potentially others) or explain why the decision was made not to interview her (and others) or call them to testify at trial. All such documents are likely to support an IAC or prosecutorial misconduct claim.

11

supported the theory the defense argued at trial that there was reasonable doubt as to the statutory intent findings at the eligibility stage and would have supported an argument at the penalty phase that Mr. Lawrence was not deserving of a death sentence because the shooting was the result of chaotic, albeit tragic, exchange of gunfire rather than an intentional, execution-style killing.

The FBI was one of the main agencies that assisted the Government in its investigation and prosecution of Mr. Lawrence.[10] The FBI worked in conjunction with the prosecution in this case to produce the video animation that was then not used at trial. FBI case agents were also at the scene of Fifth Third Bank on January 6, 2005, and assisted the Columbus Police Department ("CPD") with the investigation of the attempted robbery and fatal shooting.[11] The FBI collected evidence, which was subsequently analyzed by FBI examiners, and case agents interviewed eyewitnesses on that same day.[12] An FBI case agent also participated in the interrogation of Mr. Lawrence after his arrest at CPD headquarters, and case agents interviewed other witnesses connected to the investigation and prosecution of Mr. Lawrence.[13]

Given the FBI's involvement in the crime-scene reconstruction, Mr. Lawrence has good cause to believe that the FBI's files may contain information that supports an alternate scenario of the crime, and which, in turn, would support claims of ineffective assistance of counsel and of prosecutorial misconduct. As to the former, information in the FBI's file might establish that the alternate scenario for how the shooting occurred was based on facts that were readily available to trial counsel, but that trial counsel unreasonably failed to investigate and develop. Moreover,

---

[10] *See, e.g.,* Trial Tr. Vol. 9 at 72.

[11] *Id.*

[12] *Id.* at 18, 100, 154.

[13] *Id.* at 72.

inasmuch as such information was exculpatory or could have been used to impeach Government witnesses at trial, the Government was under an obligation to disclose it to trial counsel and its failure to do so would help establish claims of prosecutorial misconduct.

To be clear, any information in the FBI's files that the fatal shooting at the Fifth Third Bank happened differently from the way it was portrayed by the Government during trial would support both an IAC claim and/or a government misconduct claim and help establish cognizable claims for relief in Mr. Lawrence § 2255 proceeding.

The FBI also investigated the robberies at Sky Bank (12/8/04), Key Bank (8/12/04) and Fifth Third Bank (1/21/04).  The Government used Mr. Lawrence's participation in each of these robberies at the eligibility phase of the trial as circumstantial evidence regarding Mr. Lawrence's intent during the 2005 Fifth Third Bank robbery, as well as during the punishment phase of trial to prove a non-statutory aggravating circumstance. [14] Any information contained in FBI files that challenged the manner in which these robberies took place, including the level of violence Mr. Lawrence used or threatened during these events, would further support claims of IAC and prosecutorial misconduct.

Mr. Lawrence has attempted to obtain relevant records through open records laws. On January 30, 2015, the undersigned sent a FOIA request to the FBI requesting a copy of all records maintained by the FBI pertaining to Mr. Lawrence and its investigation into the four incidents at Sky Bank, Key Bank, and Fifth Third Bank. On April 23, 2015, the FBI sent a response noting that it had located approximately 1,619 pages of records that were potentially responsive to the FOIA request. On April 30, 2015, the FBI sent an additional response denying the undersigned's request for expedited processing and release of those materials. On May 15,

---

[14] *See, e.g.,* Trial Tr. Vol. 12 at 12; Trial Tr. Vol. 17 at 64.

2015, the undersigned appealed the denial of the request for expedited processing. On June 16, 2015, the undersigned received a response that the appeal had been granted, and that the matter was being remanded to the FBI for expedited processing of the original FOIA request. To date, the FBI has produced no records.

Undersigned counsel respectfully requests that the FBI be ordered to produce to undersigned counsel a copy of all records it maintains pertaining to Mr. Lawrence and its investigation into the four incidents at Sky Bank, Key Bank, and Fifth Third Bank. There is good cause for this request, and the FBI should accordingly be ordered to produce its files to the undersigned. [15]

## B.    Fifth Third Bank

The Fifth Third Bank conducted its own internal investigation of the attempted robbery and fatal shooting at its Columbus branch on January 6, 2005. As part of its investigation, officers and/or agents of Fifth Third bank obtained contemporaneous handwritten statements from its employees who were present at the bank that day and witnessed the incident. Because bank robberies are not covered by FDIC insurance, Fifth Third would have had to submit a claim to a private insurer to be reimbursed for any losses (including property damage) that were sustained during the January 6, 2005 incident. [16]

---

[15] The FBI should be ordered to produce its <u>entire</u> file – that is, all information it obtained during the course of its investigation, not merely that information that was formally memorialized in FBI-302 reports. This includes all rough notes, drafts of reports, communications (oral, written and/or electronic) among the prosecution team, with other law enforcement agencies assisting in the case, and with both testifying and non-testifying witnesses, and any information that the FBI obtained from other federal, state or local agencies or other third parties, such as agents or officers of Key Bank, Sky Bank, and/or Fifth Third Bank.

[16] As the FDIC explains on its website, losses that result from a robbery are not insured by the FDIC and "[s]tolen funds may be covered by what's called a banker's blanket bond, which is a

Pretrial discovery established that agents of Fifth Third Bank took handwritten statements from its own employees about the incident, and it is reasonably likely that the bank gathered additional information about the incident for purposes of filing an insurance claim. As noted above, information that would establish that the victim was not fatally shot in the manner that the Government presented at trial might give rise to an IAC and/or government misconduct claim. Thus, there is good cause for this request, and Fifth Third Bank should be ordered to produce its entire investigatory file into the 2005 attempted robbery and fatal shooting, as well as any materials it submitted as a part of an insurance claim arising out of that incident.

### C.     Sky Bank

At trial, the Government introduced evidence from the 2004 Sky Bank robbery, including the testimony of Lucas Hunter.[17] Mr. Hunter testified about being taken into the vault of the bank at gunpoint, being threatened with his life if he did not cooperate with the robber's demands, and almost being shot after an accidental discharge of the robber's gun.[18] The Government used this evidence to demonstrate to the jury that when Mr. Lawrence robbed banks, he did so with an intent to kill, which tended to support the Government's argument that Mr. Lawrence had the

---

multi-purpose insurance policy a bank purchases to protect itself from fire, flood, earthquake, robbery, defalcation, embezzlement and other causes of disappearing funds." *See FDIC: Insured or Not Insured? A Guide to What Is and Is Not Protected by FDIC Insurance* (available online at: https://www.fdic.gov/consumers/consumer/information/fdiciorn.html) (last visited on 10/19/15).

[17] *See* Trial Tr. Vol. 6 at 107-132 .

[18] *Id.* at 111-115; Mr. Hunter did not identify Mr. Lawrence as the perpetrator.

requisite intent to be convicted of the 2005 Fifth Third Bank murder and be eligible for the death penalty under the enumerated statutory intent factors.[19]

There were, however, other employees in the bank at the time of the incident who were eyewitnesses, but who did not testify at the trial. As with Fifth Third Bank, Sky Bank likely conducted an investigation into the robbery and gathered evidence in order to submit a claim to its insurer for any losses suffered as a result of that robbery, and such an investigation would presumably have included obtaining statements from its other employees who were present during the robbery. Any information obtained by Sky Bank that was inconsistent with Mr. Hunter's account would be relevant to establishing an IAC claim and/or a government misconduct claim. With respect to the former, if any such exculpatory or impeachment information in Sky Bank's file existed and could have been located or obtained prior to trial by trial counsel, such information would support a claim of deficient performance for failure to investigate and present material evidence to rebut the Government's case against Mr. Lawrence.

With respect to the latter, if such information was known or reasonably could have been known by any law enforcement agency participating in the prosecution against Mr. Lawrence, it would establish a claim of government misconduct for failing to disclose material exculpatory or impeachment information. Thus, there is a good cause for this request, and Sky Bank should be ordered to produce its entire investigatory file into the 2004 robbery, as well as any materials it submitted as a part of an insurance claim arising out of that robbery.

---

[19] *See, e.g.,* Trial Tr. Vol. 10 at 13, 18, 27, 58-60; Trial Tr. Vol. 12 at 12.

### D.    Key Bank

At trial, the Government introduced evidence from the 2004 Key Bank robbery, including the testimony of Wendy Sues.[20] Ms. Sues testified about being taken into the vault of the bank at gunpoint and being threatened with her life if she did not cooperate with the robber's demands.[21] The Government used this evidence to demonstrate to the jury that when Mr. Lawrence robbed banks, he did so with an intent to kill, which tended to support the Government's argument that Mr. Lawrence had the requisite intent to be convicted of the 2005 Fifth Third Bank murder and be eligible for the death penalty under the enumerated statutory intent factors.[22]

There were, however, other employees in the bank at the time of the incident who were eyewitnesses, but who did not testify at the trial – including one eyewitness named "Santha" who Ms. Sues testified was also in the vault area of the bank.

As with Fifth Third Bank, Key Bank likely conducted an investigation into the robbery and gathered evidence in order to submit a claim to its insurer for any losses suffered as a result of that robbery, and such an investigation would presumably have included obtaining statements from its other employees who were present during the robbery. Any information obtained by Key Bank that was inconsistent with Ms. Sues's account would be relevant to establishing an IAC claim and/or a government misconduct claim. With respect to the former, if any such exculpatory or impeachment information in Key Bank's file existed, and could reasonably have been located and obtained by trial counsel, it would establish a claim of deficient performance

---

[20] *See* Trial Tr. Vol. 6 at 91-95.

[21] *Id*. at 93; Ms. Sues did not identify Mr. Lawrence as the perpetrator.

[22] *See, e.g.,* Trial Tr. Vol. 10 at 13, 18, 27, 58-60; Trial Tr. Vol. 12 at 12.

for failure to investigate and present material evidence to rebut the Government's case against Mr. Lawrence. With respect to the latter, if such information was known or reasonably could have been known by any law enforcement agency participating in the prosecution against Mr. Lawrence, it would establish a claim of government misconduct for failing to disclose material exculpatory or impeachment information.

Thus, there is a good cause for this request, and Key Bank should be ordered to produce its entire investigatory file into the 2004 robbery, as well as any materials it submitted as a part of an insurance claim arising out of that robbery.

### E.    Columbus Police Department ("CPD")

The CPD was the lead investigative agency of the January 6, 2005, attempted robbery and fatal shooting at the Fifth Third Bank. It processed the crime scene, collected evidence, interviewed eyewitnesses and other witnesses, conducted searches and seizures, conducted forensic examinations, and ultimately arrested and interrogated Mr. Lawrence. The CPD worked closely with both the FBI and the Government in this case, and several CPD officers testified at Mr. Lawrence's trial.

The CPD also investigated and opened case files on the 2004 robbery of Fifth Third Bank and the 2004 robbery of Sky Bank, and processed and examined the physical evidence from these other bank robberies that linked Mr. Lawrence to the 2005 Fifth Third Bank offense.

On October 8, 2015, the undersigned sent a request to the CPD pursuant to the Ohio Open Records Law (Ohio Revised Code § 149.43 et seq.), requesting a copy of all records maintained by the CPD pertaining to Mr. Lawrence and its investigation into the incidents at Sky Bank, Key Bank, and Fifth Third Bank. On October 23, 2015, the undersigned received a letter response from the CPD (dated October 14, 2015) indicating that the request was denied. The

18

CPD letter claimed that the requested records were exempt from disclosure, citing a provision of the Ohio Open Records Law that permits public offices to withhold "Confidential Law Enforcement Investigatory Records" ("CLEIR exemptions") under Ohio Revised Code § 149.43(1)(h).

Mr. Lawrence respectfully requests that the CPD be ordered to produce to undersigned counsel a copy of its investigative file pertaining to Mr. Lawrence and its investigation into the incident at Fifth Third Bank for the same reasons outlined with regard to his request for the FBI's files and Sky Bank's files. There is good cause for this request.[23]

**CONCLUSION**

WHEREFORE, Daryl Lawrence respectfully requests that this Honorable Court grant the foregoing Motion and instruct the Clerk of the Court to issue to undersigned counsel subpoenas to produce documents, information or objects pursuant to Fed. R. Crim. Pro. 17.

Respectfully submitted,

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

---

[23] As with the FBI, the CPD should be required to produce its entire file.

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing was sent on November 2, 2015 through the Court's ECF system to:

David DeVillers, Esq.
Michael John Burns, Esq.
United States Attorney's Office
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
Email: dave.devillers@usdoj.gov
Email: michael.burns@usdoj.gov

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender, District of
        Maryland CT Office
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org