IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case Number 2:05-CR-00011 |
| | ) | |
| | ) | JUDGE GREGORY L. FROST |
| DARYL LAWRENCE | ) | |
| Defendant | ) | |

**MOVANT DARYL LAWRENCE'S MOTION FOR LEAVE TO CONDUCT
DISCOVERY AND INCORPORATED MEMORANDUM**

Comes now Daryl Lawrence, respectfully and through undersigned counsel, and pursuant

to Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts*

("Habeas Rule 6"), and the Fourth, Fifth, Sixth, and Eighth Amendments to the U.S.

Constitution, moves this Honorable Court for leave to conduct discovery. The requested

discovery is essential to guarantee Mr. Lawrence a full and fair opportunity to timely raise all

cognizable claims under 28 U.S.C. § 2255 concerning his conviction and/or sentence. Because

this request is time-sensitive, Mr. Lawrence respectfully requests that, pursuant to this Court's

inherent authority and S.D. Ohio Civ. R. 1.1(c), the Court truncate the response time to this

motion to seven days. The grounds for this request are set forth in the following memorandum.

Respectfully submitted,

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

**MEMORANDUM**

## I.      Introduction

Mr. Lawrence respectfully moves the Court for leave to conduct discovery. The requested discovery is necessary for the full development and presentation of claims challenging Mr. Lawrence's conviction and death sentence pursuant to 28 U.S.C. § 2255. Discovery is permitted in § 2255 proceedings pursuant to Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), which states in pertinent part:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.

Habeas Rule 6(a). The rule incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same); *see also Rules Governing Section 2254 Cases in the United States District Courts*, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*"). [1]

Although the undersigned acknowledges that historically some courts have not permitted Rule 6 discovery prior to the filing of the § 2255 motion, *see, e.g., United States ex rel. Nunes v. Nelson*, 467 F.2d 1380 (9th Cir. 1972) ("Appellant is not entitled to a discovery order to aid in the preparation of some future habeas corpus petition."); *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1106-07 (9th Cir. 1996) ("[P]re-petition discovery is impermissible…"), and that

---

[1] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases in the United States District Courts* are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts*.

such pre-motion discovery is still generally disfavored by the courts, *see, e.g., United States v. Sampson*, 2009 U.S. Dist. LEXIS 130664 at \*2-\*3 (D. Mass. May 6, 2009) (dismissing motion for pre-petition discovery "without prejudice to consideration of a motion seeking similar discovery, or a motion to amend based on information received in discovery, after his § 2255 petition is filed."); *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("There is no pre-motion discovery in a Section 2255 case, as there is in summary judgment proceedings in a civil case."), Mr. Lawrence respectfully requests that he be permitted to do so here and to not have to wait until after his specific claims have been pled. This is a capital case, necessitating special procedures, and Mr. Lawrence must raise all claims available to him within the statute of limitations. While he is aware of the practice in other § 2255s, Mr. Lawrence files this motion now to preserve his rights in this capital case, and to ensure that he does not run afoul of the dictates of *Mayle v. Felix*, 545 U.S. 644, 650 (2005).

A court may grant leave to conduct discovery when "good cause" for doing so is shown. According to the Supreme Court, such "good cause" for discovery in habeas proceedings is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).[2]

---

[2] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous -- i.e., the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

3

## II.    The "Good Cause" Standard

The *Bracy* Court's detailed discussion of the application of Habeas Rule 6 to the facts is instructive as to what constitutes "good cause."

William Bracy was convicted of capital murder and sentenced to death before Cook County Circuit Judge Thomas J. Maloney in 1981. *Bracy v. Gramley*, 81 F.3d 684, 687 (7th Cir. 1995), *rev'd*, 520 U.S. 899 (1997). Judge Maloney accepted bribes from criminal defendants in his court, and in return for the bribes, he arranged for the defendants to be acquitted or convicted of lower-grade offenses. *Bracy*, 520 U.S. at 906-08; *see also United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996).

The judge fixed cases tried shortly before Mr. Bracy's case and shortly after, in each case skewing his rulings in order to ensure the acquittal (or the conviction on reduced charges) of murder defendants. *Id*. Mr. Bracy did not bribe Judge Maloney. *Id*. In his habeas petition, Mr. Bracy alleged that Judge Maloney had ruled against him on several discretionary matters in order (1) to "compensate" for his pro-defendant rulings in cases that had been fixed; and (2) to encourage criminal defendants to bribe him in fear of what would happen to them if they did not. *Bracy*, 81 F.3d at 684. Mr. Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at [his] trial." *Id*. at 690. To that end, Mr. Bracy sought access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's behavior in the cases where he did not receive bribes, and for evidence from the federal prosecution of Judge Maloney that would establish the judge's behavior in non-bribe cases.

4

The Seventh Circuit upheld the district court's decision to deny all three forms of discovery. The circuit court conceded the "appearance of impropriety" but reasoned that Mr. Bracy's theory of "compensatory bias" provided only a weak basis on which to suggest the result of the trial was unreliable; though "plausible," was not "compelling" enough to presume prejudice; and otherwise lacked good cause because evidence that the judge had ruled leniently in other cases did not mean he had ruled more harshly in Mr. Bracy's case. 81 F.3d at 690. The Seventh Circuit freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners," but rationalized that the "defendants are speculating too." *Id.*

The Supreme Court acknowledged as true the Seventh Circuit's characterization that Mr. Bracy's theory of compensatory judicial bias was "quite speculative," *id.* at 905 (quoting *Bracy*, 81 F.3d at 689-90), but the Court noted that the proper focus of a Habeas Rule 6 discovery request is not the probability that the requested discovery will yield anything, but whether the sought-after facts, if true, would help establish a claim for relief. *Id.* at 905 ("[D]ifficulties of proof aside, there is no question that, *if it could be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment."). The Court explained the proper application of Habeas Rule 6:

> In *Harris* [*v. Nelson*, 394 U.S. 286 (1969)], we stated that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." 394 U.S. at 300. Habeas Corpus Rule 6 is meant to be "consistent" with *Harris*. . . . It may well be, as the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to . . . [prove his claim], but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good cause" for discovery.

*Bracy*, 520 U.S. at 908-09. [3]

Under *Bracy*, a movant who has (1) made specific allegations warranting relief, and (2) shown why the requested information is essential to the adequate factual development of his claims, has established "good cause" under Habeas Rule 6. If the petitioner has properly alleged a cognizable claim and asked for probative evidence, he has shown "good cause" for discovery. [4] *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's

---

[3] The Supreme Court's decision in *Bracy* clearly rejects any requirement of a "prima facie" case for relief in advance of discovery. First, *Bracy* omits any reference to *Harris*'s "prima facie" language, relying instead on a considerably more liberal formulation of the "good cause" rule taken from the same case, which requires only some "*reason to believe* that the petitioner *may*, *if* the facts are fully developed, be able to demonstrate that he is ... entitled to relief." 520 U.S. at 908-09 (emphasis added). In addition, the Court rejected the court of appeals' conclusion that discovery was properly denied "because petitioner had failed to uncover any evidence of actual bias without discovery," so that "the probability is slight that a program of depositions aimed at crooks and their accomplices ... will yield such evidence." *Id.* at 903. Finally and most importantly, *Bracy* held that denying discovery was an abuse of discretion even though the petitioner's factual allegation of unconstitutional, case-specific judicial bias was concededly "quite speculative," "only a theory at this point," "not supported by any solid evidence," and premised on facts that "might be equally likely" to support an inference contrary to the one the petitioner advanced. *Id.* at 905, 909.

[4] In this respect, the scope of discovery under Habeas Rule 6 is similar to the scope of discovery in conventional civil actions. A plaintiff who makes specific allegations which, if proven, would entitle him to legal relief is entitled, *without more*, to access to the fact-development procedures necessary to flesh out his claims without undue interference. *Cf. Neitzke v. Williams*, 490 U.S. 319 (1989) ("What [Fed.R.Civ.P.] 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.").

6

blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).

### III.    Discovery Is Especially Warranted In Capital Cases

The policies favoring discovery are even stronger in capital cases than in noncapital because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). Because habeas corpus discovery is designed to aid courts in determining the validity of the movant's claims, it is indispensable to the reliability of habeas corpus proceedings in capital cases. For this reason, liberal use of discovery is appropriate in such cases. *See Bracy*, 520 U.S. at 904-09 (denial of capital habeas corpus petitioner's discovery request abused district court's discretion); *Wilson* v. *Butler,* 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims."); *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) ("more liberal discovery is appropriate in capital cases where the stakes for prisoners are so high"); *United States ex rel. Brisbon v. Gilmore*, 1997 U.S. Dist. LEXIS 8314, at *8 (N.D. Ill. June 10, 1997) ("The Court agrees that, in light of the heavy burden Brisbon bears in petitioning for habeas relief from his death sentence, potentially corroborating evidence constitutes good cause for limited discovery"). Because this is a death penalty case, broad discovery is necessary to ensure that extra measure of process which is demanded under the circumstances.

**IV.     The Requested Discovery**

Habeas rules and case law limit the universe of claims that are cognizable in post-conviction proceedings. Most of the issues that can be raised in § 2255 fall under the rubric of ineffective assistance of counsel ("IAC") or prosecutorial misconduct.  With respect to IAC claims, a litigant must establish that trial counsel rendered "deficient performance" and that but for that deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different (the "prejudice prong"). *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's failure to pursue reasonable avenues of investigation is perhaps the most basic form of deficient performance because there are few strategic reasons that can account for such a failure. In order to demonstrate that the failure to investigate prejudiced the litigant, he or she must show what counsel would have learned of value to the defense, had counsel conducted an appropriate investigation.

With respect to claims of government misconduct, a litigant must establish that there is evidence favorable to the accused either because it is exculpatory or because it impeaches a government witness; that the evidence was suppressed by the prosecution (either willfully or inadvertently); and that the suppression of the evidence resulted in prejudice to the accused. *See Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, a litigant must establish that the Government argued or permitted evidence to be presented that it knew or should have known to be false. *Napue v. Illinois*, 360 U.S. 264 (1959).

Mr. Lawrence requests materials in the possession of the United States Attorney's Office for the Southern District of Ohio that he believes will support IAC, prosecutorial misconduct and other claims he intends to raise in his § 2255 Motion. Before articulating the "good cause" for

8

the requested materials, the undersigned will briefly recount the undersigned's attempts to obtain these materials from the Government by way of informal discovery.

### A.  Communications with the USA Concerning Informal Discovery

After spending months becoming familiar with the record, gathering what records could be obtained without court intervention, consulting with experts, and beginning to determine what claims might be raised in the § 2255 motion, counsel for Mr. Lawrence sent a letter, dated September 23, 2015, to Assistant United States Attorney David DeVillers requesting informal discovery of the following items:

1.  A complete set of all reports, records, files, witness statements, documents and tangible objects that were produced by the Government to trial counsel in connection with the proceedings in United States v. Daryl Lawrence, No. CR-2-05-11 (S. D. Ohio).

2.  Copies of any and all written, audio- or video-recorded statements (as well as transcriptions thereof) of witnesses (both testifying and non-testifying) to:
    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

3.  Copies of any and all FBI-302 reports pertaining to:
    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

4.  Copies of all rough drafts of reports or rough notes made by FBI agents pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:
    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

5.  Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession prepared by other federal, state, or local law enforcement agencies

9

(e.g., Columbus Police Department, F.D.I.C.) pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:

    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

6. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession that the banks themselves prepared during internal investigations pertaining to:

    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

7. Copies of any and all written, oral, video or electronic forensic reports, tests and/or data in the Government's possession produced in connection with the investigation, arrest and prosecution of Mr. Lawrence pertaining to:

    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

8. Copies of any and all communications in the Government's possession between any of the jurors or alternate jurors selected in Mr. Lawrence's case (including, but not limited to, Alternate Juror #205, who is discussed at *United States v. Lawrence*, 735 F.3d 385, 441-442 (6th Cir. 2013)) and any other parties associated with Mr. Lawrence's case (including, but not limited to, Mrs. Marissa Hurst, other members of Officer Bryan Hurst's family, representatives or employees of the Delaware County Sheriff's Office, representative or employees of the Columbus Police Department, and/or any witnesses).

9. Copies of any and all communications between the Government and any other parties concerning communications those other parties had with any of the jurors or alternate jurors selected in Mr. Lawrence's case.

10. Color copies of any and all photographs and/or video-recordings of the crime scenes pertaining to:

    a. The Sky Bank robbery on September 8, 2004.
    b. The Key Bank robbery on August 12, 2004.
    c. The Fifth Third Bank robbery on January 21, 2004.
    d. The Fifth Third Bank robbery on January 6, 2005.

11.     Color copies of any and all photographs generated in connection with the autopsy and medical examination of Officer Bryan Hurst.

12.     To the extent that your office is in possession of trial exhibits or other physical evidence not maintained by the Clerk's Office, we request access to inspect those items.

After several phone calls and email exchanges, the parties eventually agreed that representatives from the undersigned's office would travel to the U.S. Attorney's Office in Columbus to inspect the Government's file on October 28, 2015. Prior to scheduling that visit, AUSA DeVillers initially informed the undersigned that he would make his entire file available for inspection; after further dialogue with post-conviction counsel, AUSA DeVillers clarified that a number of items would not be produced as part of the file, including any agents' notes.

The file that was produced for inspection on October 28, 2015, consisted of a banker's box containing a Bates-Stamped set of documents which the Government previously provided to trial counsel – i.e., Item 1 of undersigned counsel's informal discovery request. In other words, the balance of the items sought in the undersigned's letter was not produced for inspection by the Government on October 28, 2015.

**B.     Items Being Requested Pursuant to Rule 6**

In light of the fact that the undersigned was unable to obtain the requested materials through informal negotiations of the parties, Mr. Lawrence respectfully requests leave to conduct discovery pursuant to Rule 6. There is "good cause" for the requested discovery. For ease of reference, the undersigned will refer to the items being requested by their number in the previously mentioned 9/23/15 letter from the undersigned to the Government.

**1. Items 2, 3, 4, 5, 6, 7, 10, and any and all records known to, or under the control of, the Government pertaining to Mr. Lawrence and its investigation into the four incidents at Sky Bank, Key Bank, and Fifth Third Bank.**

At trial, the Government argued that Mr. Lawrence shot Officer Hurst execution-style from close range while he was crouched defensively behind the teller counter, attempting to remove his own firearm from its holster.[5] According to the Government's argument, this close-range shot proved facts essential to its case at all three phases, including that Mr. Lawrence possessed the requisite *mens rea* to be convicted of a specific-intent crime; that Mr. Lawrence was guilty of the statutorily enumerated capital intent factors under 18 U.S.C. § 3591(a) to make him eligible for a death sentence; and that Mr. Lawrence had the requisite moral culpability to justify a death sentence under 18 U.S.C. § 3593.[6]

The defense theory at trial was that Mr. Lawrence was not aware that there was an officer on duty when he entered the bank; that the fatal shooting occurred during a chaotic exchange of gunfire as Mr. Lawrence attempted to flee the bank; and that there was reasonable doubt Mr. Lawrence had the requisite *mens rea* or moral culpability the Government attributed to him, and reasonable doubt that he was guilty of the enumerated capital intent factors.[7]

Prior to trial, however, the Government produced to trial counsel a computer-generated reconstruction of the fatal shooting at Fifth Third Bank on January 6, 2005, created with the assistance of the FBI. This animated reconstruction purported to show what the prosecution's crime reconstruction team believed occurred during the shooting – specifically, Mr. Lawrence's

[5] *See, e.g.,* Trial Tr. Vol. 6 at 25; Trial Tr. Vol. 10 at 25, 29, 64.

[6] *See, e.g.,* Trial Tr. Vol. 10 at 31, 68; Trial Tr. Vol. 12 at 10; Trial Tr. Vol. 17 at 21, 30, 33-34.

[7] *See, e.g.,* Trial Tr. Vol. 6 at 35-36; Trial Tr. Vol. 10 at 48, 52; Trial Tr. Vol. 11 at 42-44; Trial Tr. Vol. 12 at 29, 36-37; Trial Tr. Vol. 17 at 46-47.

movement in the bank, from entrance to exit. In this reconstruction, the shooter is shown running first towards the teller counter, then over to a hallway area south of the teller counter, and then fleeing the bank. Witnesses found Officer Bryan Hurst's body in the hallway area at the bank.

This crime reconstruction video directly contradicts the representation the Government made at trial as to Mr. Lawrence's movements and conduct after entering the bank, and undermines the Government's assertion that Mr. Lawrence shot Officer Hurst at point-blank range, while he was in a vulnerable position behind the counter, attempting to unholster his gun. That video appears to suggest that Officer Hurst was shot while in the hallway, which is consistent with other evidence collected during the investigation.

In addition, the video footage from cameras positioned around the bank on the day of the shooting, produced to the defense in discovery, provides no support to suggest that Mr. Lawrence ran over to the hallway in which Officer Hurst's body was found, but the fact that the prosecution team originally placed Mr. Lawrence in that area in its *reconstruction* video suggests that Officer Hurst was not fatally shot while he was behind the teller counter, as the Government claimed at trial, but rather that he was shot when he was in the hallway. Presenting this alternate set of circumstances to the jury would have undermined the Government's arguments that Mr. Lawrence shot Officer Hurst at close range while he was maximally vulnerable. Moreover, this scenario would have supported the theory the defense argued at trial that there was reasonable doubt as to the statutory intent findings at the eligibility stage and would have supported an argument at the penalty phase that Mr. Lawrence was not deserving of a death sentence because the shooting was the result of chaotic, albeit tragic, exchange of gunfire rather than an intentional, execution-style killing.

Given the FBI's computer generated crime-scene reconstruction video, Mr. Lawrence has good cause to believe that the Government's files may contain information that supports a description of the crime materially different from that which the prosecution presented at trial, and which, in turn, would support claims of ineffective assistance of counsel and of prosecutorial misconduct. As to the former, information in the Government's file might establish that this alternate understanding of how the shooting occurred was based on facts that were readily available to trial counsel, but that trial counsel unreasonably failed to investigate and develop. Moreover, inasmuch as such information was exculpatory or could have been used to impeach Government witnesses at trial, the Government was under an obligation to disclose it to trial counsel and its failure to do so would help establish claims of prosecutorial misconduct.

To be clear, any information in the Government's files that the fatal shooting at the Fifth Third Bank happened in a manner that was less aggravating than the way it was portrayed by the Government during trial could support an IAC claim and/or a government misconduct claim and help establish cognizable claims for relief in Mr. Lawrence § 2255 proceeding.[8]

The Government also prosecuted the robberies at Sky Bank (12/8/04), Key Bank (8/12/04) and Fifth Third Bank (1/21/04). The Government used Mr. Lawrence's participation in each of these robberies at the eligibility phase of the trial as circumstantial evidence regarding Mr. Lawrence's intent during the 2005 Fifth Third Bank robbery, as well as during the

---

[8] Mr. Lawrence recognizes that not every contradiction of the evidence the Government presented about the offense might have resulted in a different outcome. But given that the Government's arguments for the death penalty rested primarily on its portrayal of Mr. Lawrence's actions and his purported intent, and that the "circumstances of the offense" are a key element in any capital sentencing determination -- *see* 18 U.S.C. § 3592; *Lockett v. Ohio*, 438 U.S. 586 (1978) -- this is a vital area for inquiry.

14

punishment phase of trial to prove a non-statutory aggravating circumstance.[9] Any information contained in Government's files that challenged the manner in which these robberies took place, including the level of violence Mr. Lawrence used or threatened during these events, would further support claims of IAC and prosecutorial misconduct.

Undersigned counsel respectfully requests that the Government be ordered to produce to undersigned counsel a copy of all records – oral, written and/or electronic – that it maintains pertaining to Mr. Lawrence and its investigation into the four incidents at Sky Bank, Key Bank, and Fifth Third Bank. The undersigned also specifically requests all such records that pertain to the FBI's computer-generated crime scene reconstruction video, as they are likely to suggest additional challenges to the theory the Government presented as to how the shooting occurred. There is good cause for this request, and the Government should accordingly be ordered to produce its files to the undersigned.[10]

### 2. Items 8 and 9

Shortly after Mr. Lawrence's trial concluded, the Government disclosed that one of the alternate jurors had sent an email to Officer Hurst's widow, Mrs. Marissa Hurst, stating that he was friends with a Columbus Police officer, that he had apparently communicated with this

---

[9] *See, e.g.,* Trial Tr. Vol. 12 at 12; Trial Tr. Vol. 17 at 64.

[10] Mr. Lawrence respectfully moves the Court to order the Government to produce its entire file – that is, all information it obtained during the course of its investigation, not merely that information that was formally memorialized in its own reports or the reports of other agencies assisting in the investigation and prosecution of Mr. Lawrence (e.g., FBI-302s). This includes all rough notes, drafts of reports, communications (oral, written and/or electronic) among the prosecution team, with other law enforcement agencies assisting in the case, and with both testifying and non-testifying witnesses, and any information that the Government obtained from other federal, state or local agencies or other third parties, such as agents or officers of Key Bank, Sky Bank, and/or Fifth Third Bank.

officer, as well as apparently a number of other friends and one relative who were police officers, prior to and/or during the trial, that he had been in favor of a death sentence for Mr. Lawrence on both capital counts, and that he and the other jurors "were on your side." Given the extraordinary nature of this juror's attempt to get in contact with Mrs. Hurst, as well his expressed alliance with and bias for law enforcement personnel, it is reasonable to believe that this juror may have sent communications to other parties associated with Mr. Lawrence's case. Such communications may yield evidence that the alternate juror had pre-judged the case, had received extraneous information about the case from his law enforcement friends, and shared that extraneous information with the other jurors. If true, this would give rise to a cognizable claim of juror misconduct. Thus, there is good cause for this request.

Additionally, in the aforementioned communication between the alternate juror and Mrs. Hurst, it was evident that the alternate juror went through a third party in order to contact Mrs. Hurst. For the reasons presented above, it is reasonably likely that Mrs. Hurst is not the only person the alternate juror contacted about Mr. Lawrence's case. Such communications may yield evidence that the alternate juror had pre-judged the case, had received extraneous information about the case from his law enforcement friends, and shared that extraneous information with the other jurors. If true, this would give rise to a cognizable claim of juror misconduct. Thus, there is good cause for this request.

### 3. Materials concerning jury selection

Mr. Lawrence, who is African-American, was tried by an all-white jury. During jury selection, the Government exercised three peremptory strikes on African-American members of

the venire – Jurors 72, 115, and 194. [11] Mr. Lawrence challenged these strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits purposeful discrimination in the selection of the jury, but Mr. Lawrence's *Batson* challenges were denied by the District Court. [12] Those rulings were affirmed on direct appeal. Mr. Lawrence respectfully requests leave to conduct discovery of the Government's files for any materials pertaining to jury selection.

As recent *Batson* cases have confirmed, contemporaneous notes in the prosecution's file shed important light on the plausibility of the race-neutral reasons proffered for exercising peremptory strikes against African-American members of the venire. [13] The undersigned respectfully submits that, given the record of jury strikes by the Government in this case, good cause warrants a grant of discovery of the Government's jury selection notes in Mr. Lawrence's case for evidence that the Government's reasons for striking these three African-American members of the venire were pretextual and not race-neutral. Indeed, when Juror 115 was struck by the Government, Mr. Lawrence's *Batson* challenge was initially sustained by the District Court, which acknowledged a concern about a pattern developing in the Government's strikes. [14]

---

[11] Trial Tr. Vol. 5 at 146, 157-58, 179.

[12] Trial Tr. Vol. 5 at146-148, 170, 179-81.

[13] See, e.g., Robert Barnes, *Supreme Court To Examine Racial Divide In Jury Selection*, Washington Post, Oct. 25, 2015 (discussing pending Supreme Court case *Foster v. Chatman*, in which the petitioner's lawyers obtained the prosecutor's jury selection notes that contained evidence of racial bias in jury selection) (available online at https://www.washingtonpost.com/politics/courts_law/supreme-court-to-examine-racial-divide-in-jury-selection/2015/10/25/005ecc56-774d-11e5-a958-d889faf561dc_story.html) (last visited Nov. 5, 2015).

[14] Trial Tr. Vol. 5 at170.

And, in fact, the Government went on to exercise a peremptory strike against the next African-American member of the venire, Juror 194, as the defense predicted it would.[15]

Additionally, Mr. Lawrence respectfully requests discovery from the Government of relevant information concerning the history of its use of peremptory strikes in all felony trials it has prosecuted in the Southern District of Ohio in the fifteen years[16] preceding Mr. Lawrence's trial.[17] This includes information such as the case name and docket number of every felony case in which the Government has exercised peremptory strikes during *voir dire*; the strike sheets from those cases; the race of the venire-member against whom the peremptory strike was made; and in the event that there was a *Batson* challenge, the race-neutral reason that was provided by the prosecutor in response to the challenge, and the outcome of the challenge.

Mr. Lawrence also requests that the Government disclose materials and information related to any training programs in which its staff participated, regarding how to exercise peremptory challenges, as well as any interoffice communications about the same.[18]

---

[15] Trial Tr. Vol. 5 at 168.

[16] To the best of the undersigned's information and belief, the Southern District of Ohio had a low number of cases that went to trial between 1991 and 2006.

[17] The history of the prosecution's use of peremptory strikes is highly relevant to a *Batson* challenge. *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 253 (2005) (in finding *Batson* violation, Court notes appearance of discrimination confirmed by "general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller–El's jury was selected"); *see also Swain v. Alabama*, 380 U.S. 202 (1965) (discussing equal protection challenge that may arise from historical data demonstrating a prosecution office's pattern or practice of exercising peremptory strikes against racial minorities over time).

[18] *See, e.g., Miller-El v. Dretke*, 545 U.S. at, 264-266 (discriminatory training manual on exclusion of African Americans from juries constituted evidence supporting finding of *Batson* violation); *Wilson v. Beard*, 426 F.3d 653, 669-670 (3d Cir. 2005) (videotape of seminar given by District Attorney on how to strike African Americans from the venire in the wake of *Batson* constituted evidence supporting finding of *Batson* violation); Nina Totenberg, *Supreme Court*

18

Although Mr. Lawrence did not prevail under the legal standard of *Batson* to establish prosecutorial bias in jury selection at the time, he did not have access to the Government's notes or historical data about the office's use of peremptory strikes when bringing that initial challenge.[19] Discovery of these notes would likely be an important contemporaneous source of evidence available to support a *Batson* claim. Moreover, previously undisclosed evidence of racial impropriety in the jury selection process could give rise to an independently cognizable claim that Mr. Lawrence's prosecution was impermissibly tainted by racial bias. *See McCleskey v. Kemp*, 481 U.S. 279 (1987). Additionally, to the extent that evidence of extant historical data, trainings, and/or interoffice communications regarding the exercise of peremptory strikes demonstrates a pattern or practice of racial bias, such evidence may give rise to an IAC claim for

---

*Takes On Racial Discrimination In Jury Selection*, NPR (Nov. 2, 2015) (discussing "infamous training video made in Philadelphia in the late 1980s after the court's decision in *Batson*" teaching prosecutors how to create the appearance of a race-neutral reason for exercising a peremptory strike against an African American juror) (available online at: http://www.npr.org/2015/11/02/452898470/supreme-court-takes-on-racial-discrimination-in-jury-selection) (last visited Nov. 6, 2015).

[19] In these post-conviction proceedings, the standard under Rule 6 for obtaining discovery to support a *Batson* claim is altogether different and much lower. Indeed, in *Bracy*, the petitioner's discovery request for materials to establish the factual allegation of judicial bias was granted despite the fact that the allegation was "quite speculative," "only a theory at this point," "not supported by any solid evidence," and premised on facts that "might be equally likely" to support an inference contrary to the one the petitioner advanced. 520 U.S. at 905, 909. Here, the relationship between the existing record of the Government's pattern of peremptory strikes is at least as closely related to Mr. Lawrence's claim of racial bias in jury selection and/or improper racial considerations in his prosecution as was the relationship between the record of Judge Maloney's rulings and the claim of judicial bias Mr. Bracy sought to establish at the time he requested discovery to support his claim. Thus, good cause has been established for this request.

19

failure to request such materials prior to trial and proffer them during the *Batson* hearings on the excluded jurors. [20]

### 4.    Materials concerning the decision to prosecute Mr. Lawrence federally

Mr. Lawrence's charged offenses occurred entirely in Franklin County, Ohio, and could have been prosecuted capitally in Ohio state court under Ohio law. [21] Mr. Lawrence has previously argued that the Government's decision to pursue capital charges in federal court, rather than permit Mr. Lawrence to be prosecuted in state court, was improperly motivated by racial considerations. [22] Specifically, he argued at trial that prosecuting the case in federal court with a venire drawn from the entire Eastern Division of the Southern District of Ohio, rather than from only Franklin County, would result in drastically reducing the proportion of African-Americans in the jury pool. (In fact, as the Court is aware, Mr. Lawrence was tried by an all-white jury.) In support of his claim, Mr. Lawrence provided census data demonstrating that by bringing the charges federally, the Government effectively reduced the number of African-

---

[20] Any claims of privilege as to any such materials that evince racial bias are presumptively invalid; federal law prohibits race from playing any part in the determination of a death sentence, see 18 U.S.C. § 3593(f), and even discussions between jurors during deliberations are subject to disclosure if the subject matter concerned racial bias. *See, e.g., Spencer v. Georgia*, 500 U.S. 960, 114 L. Ed.2d 727, 111 S. Ct. 2276 (1991) (Kennedy, J., concurring in denial of cert.) (noting need to examine juror deliberations where racial bias at issue).

[21] See, e.g., *State v. Jester*, 512 N.E.2d 962 (Ohio 1987) (murder of bank security guard during bank robbery); Ohio Rev. Code Ann. § 2929.04A)(6)-(7)(2005) (establishing as aggravating factors that the victim of a murder was a law enforcement officer and that the murder was committed during an aggravated robbery).

[22] *See, e.g.,* Doc. No. 114 ("Defendant's Motion to Dismiss the U.S. Attorney's Request for the Death Penalty Because of Racial Discrimination and for Discovery of Information Pertaining to the Government's Capital Charging Practices"); Appellant's Brief (USA v. Daryl Lawrence), No. 06-4105, Doc. No. 006110535420 (filed April 27, 2010).

Americans in the jury pool by roughly 50%.[23] Mr. Lawrence also cited additional evidence that federal capital charging decisions appeared often to have been motivated by race, including a study released by the Department of Justice in 2000 that presented data strongly suggesting that the federal death penalty had been disproportionately sought against minority-group defendants,[24] and that all six capital cases involving bank robberies, prosecuted by the federal government at the time of Mr. Lawrence's trial, that resulted in death sentences, involved African-American defendants and white victims.[25]

Mr. Lawrence therefore respectfully requests leave to conduct discovery of the Government's files for materials concerning the Government's decision to prosecute him in federal court. Although Mr. Lawrence did not previously prevail on his claim of improper racial bias in the Government's charging decision, the standard for establishing good cause to obtain discovery is altogether different and much lower under Rule 6 and *Bracy*. As with the jury selection allegation above, here the extant record regarding racial disparity in the federal capital prosecution of American-American defendants, as well as the particularly disparity between the racial composition of the Franklin County venire and the relevant federal venire, has a much

---

[23] See Appellant's Brief (USA v. Daryl Lawrence), No. 06-4105, Doc. No. 006110535420 (filed April 27, 2010) at 203 (noting that African Americans constituted 17.6% of Franklin County's population, as compared to 9.0% of the population of the thirty counties that make up the Eastern Division of the Southern District of Ohio).

[24] *Id*. at 199-200.

[25] *Id*. at 202 n.26.

closer nexus to the theory of improper racial bias than Judge Maloney's record did to Mr.

Bracy's theory of judicial bias. Thus, good cause has been established for this request. [26]

## CONCLUSION

WHEREFORE, Daryl Lawrence respectfully requests that this Honorable Court: (1)

grant the foregoing Motion and permit Mr. Lawrence to conduct discovery of the materials

requested herein pursuant to Habeas Rule 6; and (2) truncate the response time to this instant

motion from twenty-one days, as set forth in S.D. Ohio Civ. R. 7.2(a)(2), to seven days.

Respectfully submitted,

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org

---

[26] *See McCleskey v. Kemp*, 481 U.S. 279 (1987) *(*while rejecting the defendant's claim of race bias because it was supported by statistical evidence that race was a determining factor in the outcome of cases in which a black defendant killed a white victim, indicating that a defendant would prevail if he or she could prove discrimination particular to his or her case).

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing was sent on November 9, 2015 through the Court's ECF system to:

David DeVillers, Esq.
Michael John Burns, Esq.
United States Attorney's Office
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
Email: dave.devillers@usdoj.gov
Email: michael.burns@usdoj.gov

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender, District of
       Maryland CT Office
265 Church St., Suite 702
New Haven, CT 06510
301.344.2337 (phone)
301.344.0019 (fax)
E-mail: Miriam_Gohara@fd.org