# Exhibit 31:

# Leondra Lawrence Franklin County Probation Record Log Excerpt

**P.O. NOTES**

| LEONDRA LAWRENCE | PAGE 22 |
|---|---|

4-23-93  I checked there a couple of times after 0900 and Dennis had not been there.

Defendant's hearing was set for 1330 on 5-11-93.

CSH

5-11-93  First hearing: Stipulation to probable cause.  Second hearing set for 1330 on 5-25-93.

Bond set at $10,000.00 Surety, $1,000.00 Recognizance.

CSH

5-25-93  Second hearing: Geoff Bobbitt and defendant wanted an evidentiary hearing.  Myself and defendant were the only two who testified.

Defendant was found to be in violation and her probation was revoked.  The original sentence of 18 months was modified to 12 months and she was granted 144 days of jail-time credit.

SUMMARY:

Same story as found in the four previous reassessments.  Defendant has exhibited no motivation to change her life and she continues to abuse drugs even after getting on Methadone which she got on because she said was tired of living the lifestyle that she is continuing to live.

A very poor adjustment that involved her creating illnesses and altering/falsifying a doctor's letter to help "legitimize" her non-compliance with meeting requirements of mine and her drug counselor's.

CASE CLOSED.

CSH

FES4013                    PC11700

**LEONDRA LAWRENCE**                                                                      **PAGE 21**

4-21-93      OV (1150): I took defendant's photograph and placed her under
             arrest.  Amy McCollister and Marie Scott assisted with the arrest
             and Amy and I escorted defendant to jail.

             Defendant got very upset and began crying and shaking.

             While at the jail, the following prescription medications were found
             in defendant's purse:

             1) Methadone (liquid), Dr. S.L. Brody (empty)
             2) Prozac (20mg), Dr. Incas E. Smith, date of Px: 4-20-93
             3) Pamelor (75mg cap), Dr. Incas E. Smith, date of Px: 4-13-93
             4) Pamelor (75mg cap), Dr. Incas E. Smith, date of Px: 4-13-93
             5) Docusate  NA (100mg), Dr. Ratliff, date of Px: 4-5-93
             6) Ibuprofen (800mg tab), Dr. Ratliff, date of Px: 4-5-93

             In addition to the preceding, four small red capsules with the
             markings "GG 850" were found loose in defendant's raincoat and one
             loose Motrin was found loose in defendant's purse.

             The red capsules are apparently psychotropic drug manufactured by
             Geneva.

             Also found were three one dollar bets on the Lottery's Pick 3 for
             4-20-93.

             Defendant stated that the reason for her last dirty urine was she
             tried to commit suicide.  She told the deputies that her son came
             to her place with a "bag" of various drugs, including cocaine, and
             she took it all in an attempt to kill herself.

             The jail would not take the five loose pills mentioned previously
             nor would they take several items found in defendant's purse.  These
             items included a razor blade dispenser with razor blades, a long,
             narrow screwdriver, a short knife-like item, a large, narrow, metal
             cross, and a metal scouring pad.

                                          PAD

4-22-93      Freddie Palmer (driver's license copy in file) came in to claim the
             property not left a the jail.  I gave Mr. Palmer a manilla envelope
             with the screwdriver, etc. in it, defendant's keys (4) hour CMHA
             building's security key card and folder with CMHA paperwork.
             Defendant signed a lease with CMHA on 4-20-93 for 272 S. Gift Street
             (Sunshine Terrace), Apt. 405.

             I made a copy of her lease and of an information sheet on Fluoxetine
             from Franklin Park Medical Pharmacy.

             TCF Dennis Day: He is filling in for Julie VanDerMarr and wanted to
             discuss bond for the defendant.  I told him I felt she was safest
             where she is and I would be against any recognizance only bond.

             We discussed defendant and agreed to meet in Judge Travis' chambers
             at 0830 tomorrow.

                                          PAD

*FES4014*                                                        PC11701

LEONDRA LAWRENCE                                                              PAGE 20

3-2-93       OV: Defendant claims she has not missed any reports/sessions with
             Lisa and also claims she has had no dirty urines (other than
             Methadone) since December.

             Defendant said she got put back on the bottom of the list because
             she did not let them (CMHA) know in time.  She also said they wante
             to give her an efficiency when she was "certified for a one
             bedroom".  She said the efficiency was too small.

                                        CSH

3-9-93       HV: Defendant said she is on her way down to her appointment with
             Lisa (CompDrug).  She claimed no changes and all of the usual
             problems.
                                        CSH

3-29-93      TCT: Lisa at CompDrug (returned her call which came while I was in
             Court).  Defendant tested positive for cocaine on 3-9 and 3-25-93!
             Defendant called 1/2 hour later today to reschedule her session with
             Lisa.  Lisa rescheduled defendant for tomorrow at 1400.  I asked
             Lisa to call me when the defendant gets there.

             I also told Lisa that I will discuss the latest with Judge Travis
             but my intentions at this point are to arrest defendant and revoke
             her probation.
                                        CSH

3-30-93      TCT: Lisa Lavelle (1410): Defendant has not yet shown up.  I will
             let Lisa know if and when I catch up with defendant.  Lisa said she
             will do the same.

             I spoke with Judge Travis and he agreed with my intention to arrest
             Defendant.
                                        CSH

3-30-93      TCF Lisa (1420): Defendant showed up late and is there now.  I asked
             Lisa to get a urine from defendant and told her I was on my way to
             arrest defendant.

             CV to CompDrug (700 Bryden Road) with Officer Demopoulos: Lisa
             advised that defendant has just left.  She vomited in Lisa's
             wastebasket and hurried out.  Lisa said she did not get a urine from
             the defendant.  She did, however, schedule another appointment with
             defendant.

             HV 2208 Avalon Place: No one home.  I left my card with a note
             telling defendant to contact me as soon as possible.

                                        CSH

4-5-93       TCF Defendant (0245): She said she heard that I was trying to
             contact her.  She asked if she was going to get a chance to explain
             about the dirty urines.

             I told her yes and asked what she was doing now.  She said she was
             going to an appointment with her attorney at 0900.  I told her to
             report after that.
                                        CSH

# Exhibit 32:

# 01-25-05 Letter from Nolder to Judge Frost

**FEDERAL PUBLIC DEFENDER**
SOUTHERN DISTRICT OF OHIO
**Eastern Division Office**
*Headquarter's Office*
One Columbus
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Tel: (614) 469-2999
Fax: (614) 469-5999

Steven R. Keller
*Federal Public Defender*

Gordon G. Hobson
Steven S. Nolder
Alan J. Pfeuffer
Alison M. Clark
*Assistant Federal Public Defenders*

January 25, 2005

Judge Gregory L. Frost
United States District Court                    **HAND DELIVERED**
85 Marconi Blvd., Room 349
Columbus, Ohio 43215

> RE: *United States v. Lawrence*
> Case No. 2:05-CR-111; Judge Frost

Dear Judge Frost:

As you are undoubtedly aware, you have drawn the above-captioned case and the arraignment is scheduled for January 27, 2005 at 2:00 p.m. This prosecution began with the government filing a criminal complaint on January 8, 2005 alleging that on January 6, 2005, Mr. Lawrence committed an armed bank robbery and that he discharged a firearm during the course of that robbery. After the grand jury returned its indictment last Thursday, this case became a potential capital case.

After pondering the appointment of our office to act as counsel in the *Lawrence* case, I consulted *The Guide to Judicial Policies and Procedures* to divine whether we can genuinely undertake this monumental task. I have concluded that we can remain as counsel in this case; however, only if some accommodation can be made that allows us to conclude both the mitigation investigation and trial of a pending capital case in which I am "second counsel" prior to commencing our mitigation investigation in the *Lawrence* case. In the event that this accommodation cannot be made, I regret to inform you that because of the "serious disruption" that our office would experience if we remained as counsel in this case, we could not undertake the representation of Mr. Lawrence. Consequently, I would respectfully request you to appoint both "lead counsel" as well as "second counsel," pursuant to 18 U.S.C. § 3005.

For your review, I have enclosed two documents addressing the appointment of counsel in capital cases, both of which were copied from Volume VII of *The Guide to Judiciary Policies and Procedures*. As you know, our Columbus office is currently staffed by three attorneys (Alison Clark, Gordon Hobson, and myself) and I speak for all when I state that we have burgeoning caseloads. Alan Pfeuffer is our only investigator; but even he carries a small caseload. Even though our case assignments for the 2004 fiscal year exploded, we have continued to conscientiously represent our clients without compromising the quality of representation. Moreover, budgetary restrictions have prohibited our office from hiring any additional attorneys to handle the endless stream of cases with which our office is confronted.

**TC38898**

Judge Gregory L. Frost                                                                                   Page 2
January 25, 2005

In appointing counsel in federal death penalty cases, *The Guide to Judiciary Policies and Procedures* references both "lead counsel" and "second counsel." Even though I am proud of the thorough nature of the representation that is afforded to indigent defendants in this district, none of our staff lawyers have the credentials to serve as "lead counsel" in a federal capital trial as we are not "learned." In sum, we lack "distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation." Consequently, if our office remains involved in the *Lawrence* case, it could only serve as "second counsel."

I am currently "second counsel" in the first capital case that was ever filed in this district-- *United States v. Mayhew*, Case No. CR-2-03-165, Judge Marbley. The *Mayhew* case is scheduled for trial on August 1, 2005 and it has been an incredible burden of time on Alan, who has acted as the guilt/innocence-phase investigator. Moreover, there has been a considerable time commitment on my end and I fully expect this commitment to increase exponentially as the trial date draws nearer. As fate would have it, I drew the *Lawrence* case when our office was appointed on January 10, 2005; given my experience in the *Mayhew* case, I have acted as Mr. Lawrence's attorney to date.

Over this past weekend, I reviewed the enclosures to this letter and was struck by the recommendations that were made by the Administrative Office of the United States Courts (AO) to district courts wrestling with the issue of the appointment of counsel in capital cases. In particular, the AO made the following recommendations to district courts when deciding to appoint Federal Defender Organizations in capital cases:

> [W]hether as lead or second counsel, a federal defender organization should not be required to undertake more than one federal death penalty representation at a time unless the head of the organization believes such an arrangement is appropriate. Recommendations 4(a) and (b) acknowledge that capital cases inevitably and seriously disrupt the normal functioning of an office. To undertake too much death penalty litigation would seriously threaten the effective performance of a defender organization's overriding responsibility to provide representation to a substantial number of financially eligible criminal defendants in its district each year.

Section 4, p. I-11 of Appendix I.

Given our commitments to existing cases, our burgeoning caseloads, and in my opinion, the abject shortage of attorneys in the office, the addition of the *Lawrence* case to our inventory would, to put it mildly, "seriously disrupt the normal functioning of our office." I believe that this disruption could be mitigated; but only if many of the responsibilities that are thrust on defense counsel in capital cases could be deferred until after the *Mayhew* case is tried.

**TC38899**

Judge Gregory L. Frost
January 25, 2005

Page 3

To be brutally candid, my experience in the capital litigation field has been a "mixed bag." The mitigation expert that was originally hired in December 2003 in the *Mayhew* case resigned unexpectedly in October 2004; to complicate matters even more, this decision was not communicated to me until December 2004. A new mitigation expert has been recently hired and he is currently working feverishly to complete the mitigation work that is necessary to ready this case for trial. I have been impressed by our new expert's work and if our office remains involved in the *Lawrence* case and this expert is willing to undertake a new mitigation investigation, I think that he would be a marvelous addition to the defense team. However, given his responsibility to the *Mayhew* team, this mitigation expert could not realistically begin work on the *Lawrence* case until mid-Summer 2005.

I find it necessary to burden you with this information because the nuances of the federal death penalty authorization process allows defense counsel to meet with the local United States Attorney in an effort to convince him why the case should not be authorized for capital prosecution. If defense counsel is unsuccessful in persuading the local United States Attorney, then they are afforded an audience with a committee, staffed by designees of the Attorney General of the United States; defense counsel is then tasked to persuade this committee as to why the case under consideration does not merit a federal capital prosecution. Under federal law, the Attorney General of the United States is vested with the discretion to determine whether the government will seek the death penalty in a case. If after weighing the relevant considerations the Attorney General decides to seek the death penalty, he will authorize the local Assistant United States Attorneys to file a "notice of intention to seek death" at which time Mr. Lawrence will be formally on notice of the government's intention. Until that notice is formally filed, the government is barred from seeking the ultimate punishment in this case.

To make these meetings with either the local United States Attorney or the Attorney General's committee on potential capital cases meaningful, some mitigation investigation must be completed so that anything that is discovered that might support a decision to not authorize a capital prosecution can be provided to both decision-makers. Because of the strict time-table under which we are working in the *Mayhew* case, I must candidly inform you that if we remain as counsel in the *Lawrence* case, the mitigation investigation would be relegated to the backseat so that the *Mayhew* case is properly prepared for trial. Such a delay would inevitably delay our presentation to the local United States Attorney as well as the committee staffed by the designees of the Attorney General of the United States. Furthermore, such a delay in the commencement of the mitigation investigation would also delay the scheduling of the trial in this case.

I realize that these delays might be unacceptable to either you or to the public, which might be clamoring for a speedy trial in this case; however, I feel compelled to broach this subject before our office's participation in the *Lawrence* case progresses too far.

**TC38900**

Judge Gregory L. Frost                                                                              Page 4
January 25, 2005

In the *Mayhew* case, the parties agreed to withhold establishing a scheduling order until the authorization process was completed; I believe that such an agreement makes sense as it is not genuinely known whether either a capital or non-capital case is on the docket until the official word filters out of Washington D.C. Moreover, like the *Mayhew* case, I would expect a formal waiver of both the statutory and constitutional right to a speedy trial to be entered by Mr. Lawrence so that any delay is attributable to him under the Speedy Trial Act.

To say the least, my continued participation in the *Lawrence* case presents me with quite a conundrum. On one hand, I have already established an excellent rapport with Mr. Lawrence and I am keenly interested in his plight. Furthermore, I do not want Mr. Lawrence to feel that he is being abandoned by me as I was the original counsel who was appointed to represent him. Counterbalancing these considerations would be the deadlines under which I am currently obligated in the *Mayhew* case, which prohibit me from putting Mr. Lawrence's case on the "front burner." This, in turn, will cause a considerable delay in the trial of the *Lawrence* case. Moreover, my involvement in the *Lawrence* case will further reduce my participation in the draw of other "routine" federal criminal cases, thereby increasing Gordon's and Alison's caseloads. Eventually, my involvement in the *Lawrence* case might even result in our office declining new appointments until this crisis passes.

After you have considered all of these compelling issues, I will respect your wisdom and judgment that you bring to bear on this important decision.

Sincerely,

Steven S. Nolder
First Assistant Federal Public Defender

CC:    David DeVillers, Esquire

TC38901

# Exhibit 33:
# 03-25-05 To Do List

NOTES TO THE FILE
UNITED STATES V. DARYL LAWRENCE
CASE No. 2:05-CR-11

March 25, 2005

TO: KORT GATTERDAM
MARTHA PHILLIPS
MATT SAUER
BERTHA DURAN
ERIC

THINGS TO DO

MARTHA PHILLIPS:
1) Interview Daryl's Hand Therapist at Ross
County Jail
(I think his therapist may only be working
with him for a few more weeks thus, I think
we should interview this potential
mitigation witness sooner rather than
later.)

2) Interview Chaplain Dale Bennet (sp?) and
Chaplain Morales w/"On-call Pastors". Both
men met with Daryl, at his request, while he
was at Grant Hospital. Morales saw Daryl
on 1/10.05 and Bennet saw him on 1/12/05.
Interview from a mitigation and
investigation angle (if they will tell you
what was discussed. Might need a release.)

The phone number listed for Chaplain Morales
is 618-0709.

3) Interview Juan Woods, Pastor. Yolanda has
the contact info

4) Interview Debbie Richardson - family friend

1

TC28304

5) Interview Carol Pope. Family friend who lives near Yolanda.

6) Interview the Following Coaches for Mitigation Purposes:

   a. Coach Tower
   b. Coach Geir
   c. Coach Ramsey (Coach and Religion instructor)

7) Create Phone & Address List of all potential Mitigation Witnesses. Email document to attorneys.  No need to specify relation of person to Daryl – just include contact information.

MATT SAUER:

1) Interview Malene Kambon (850.339.5223)
   - She is 29 years of age.  Daryl's friend that lives in Washington D.C.
   - Malene saw Daryl while at Howard hospital and also received numerous calls from Daryl while he was on the run from Columbus after the killing of Officer Hurst.
   - Malene asked Daryl about his involvement.
   - Malene took Daryl from the area of Howard Univ. Hospital to a rest stop two hours away where they met Tammy. Tammy then drove Daryl back to Columbus.

   THIS INTERVIEW IS BOTH INVESTIGATION AND MITIGATION

2) Interview Makia Kambon

2

TC28305

- She is younger sister of Malene. (Poss. 18-20 years old)
- Makia visited Daryl while he was at Howard Hospital.
- Also likely spoke with Daryl on the phone while he was on the run.

Home: 202.612.9765 Cell:    614.332.4007

THIS INTERVIEW IS MORE INVESTIGATIVE THAN MITIGATIVE IN NATURE.  SINCE SHE WAS NOT DARYL'S AGE WE PRESUME THAT SHE AND DARYL WERE NOT THAT CLOSE.

3)    Interview Tiffany Sanders
- Tiffany is Malene's Roomate.  May confirm or verify the information that Malene gives us.

Home: 410.721.0176      Cell: 850.339.3812

4)    Interview Nate Jones
- Daryl refers to Nate as his "brother"
- AFter the shooting Daryl was at Lisa's house for a period of time.  Eventually Nate comes over and drives Daryl from Lisa's house to Tammy's house. Tammy then takes Daryl from there to D.C.
- Nate may have information reg. Darly's involvement. He specifically asked Daryl what happened.
- Also, Nate may have information regarding Daryl's relationship with Tammy.  We know little about Tammy so get some information on her and/or her relationship with Daryl.
- Determine if he has been questioned by police.

Pager: 614.520.8408     Home: 614.258.0126

3

TC28306

5) Interview Brian (mobile 614.354.3548)
   - Brian was driving by the bank when he saw Daryl fall through the bank door.
   - Called 911 from his cell phone
   - Took vest off of Officer Hurst at the direction of the 911 operator.
   - Might know names of other people in the bank.
   - Use him for investigative leads.  Ask him what the other people in the bank were saying during the aftermath of the shooting.  How were they describing the incident?  Were they saying what Daryl said, did…etc.?

   LISTEN TO THE 911 TAPE PRIOR TO DOING THIS INTERVIEW. ALSO, SEE ATTACHED NOTES.

6) Interview Erica Arnold (Fifth Third Bank Employee)
   - Erica worked downstairs of the bank.
   - Called 911 when she heard shots fired.
   - Use her for other names of people in the bank.

   LISTEN TO 911 TAPE PRIOR TO DOING THIS INTERVIEW.  ALSO, SEE ATTACHED NOTES.

7) Visit Auto Pawn USA @ 1560 Harrisburg Pike
   - Daryl would pawn his cars there and then pick them back up.
   - Get any and all records related to Daryl. Find out how many times he pawned the cars there.
   - Cops took pictures of his Chrysler and Mercedes that were there at the time of the murder.

**BERTHA DURAN:**

4

**TC28307**

1)   Find an Contact Bureau of Prisons person to testify about LWOP and Federal Death Row

2)   Continue to Follow-up on Mitigation Records Collection Requests.  Provide chart of mitigation records to attorneys at the beginning of every month.

ERIC:

1)   Research names of genealogy expert that could do a family tree for trial purposes. OSU might be a good place to start.  Once you find an expert of two call them and ask them how much they would charge to do a family tree/chart.

2)   Follow up with Lisa @ Public Defenders' Office about news Articles on Daryl Lawrence's case.

3) Call phone chart

k6 + Om
1. Go to Bank (s)
2 krw full
3 Go See Eileen's house

5

**TC28308**

# Exhibit 34:

# 04-25-05 Email from Phillips to DM & KG

**Diane Menashe**

| | |
|---|---|
| **From:** | "Martha Phillips" <marthaphillips@mac.com> |
| **To:** | "Diane Menashe" <menashe@columbus.rr.com>; "kort gatterdam" <kgatterdam@kravitzlawnet.com> |
| **Sent:** | Monday, April 25, 2005 4:55 PM |
| **Subject:** | daryl lawrence to do list |

Hi. Here's the status of the to do list:

1. I've talked to 2 of Daryl's physical therapists. Well actually one. The other one called and left a message. She said she only met with Daryl once and not for long. I've called the third therapist who spend the most time with him, but haven't talked to him.

2. I've interviewed Grant Hosp. chaplains Dale Bennett and Donna Morley (not Morales). Despite offering to provide a signed release from Daryl, the two would not go into details about what they talked about w/Daryl. They were friendly but felt the release didn't release them from their own confidentiality oaths. I did get some info, thought. Bennett less favorable than Morley. Bennet said Daryl was sorry but more for himself than the victim. Morley thought Daryl's remorse was genuine. Bennett absolutely doesn't want to testify (we wouldn't want him to anyway), but Morley said she would. She was still hesitant so I left it as something we would discuss down the line in the coming months.

3. I've left a few mssgs for Pastor Juan Woods. He called me back, but I missed him. Will continue w/that effort.

4. Debbie Richardson will not talk to us. I interviewed Eileen and Alita Lopez (Daryl's adopted mom and sister) today. Eileen was going to give me Debbie's ph. # , but she said that she asked Debbie about it, and she told Eileen that she doesn't want to be involved.

5. I interviewed Carol Pope last week. Nice woman but not around Daryl that much. Her son in and out of trouble so she could relate to problem of having kids whom you try your best with but succumb to peer pressure (drugs,etc).

6. I've called coaches numerous times. Coach Tower- no return call. Coach Geir called and left a mssg. He said that he doesn't remember Darly and doesn't have a record of him playing football for him. Coach Ramsey is dead according to school office at Bishop Hartley.

7. Will get mit. witness list together.

I'll also work on getting write ups of intvs done.

TC19897

Martha


--
Martha Phillips
P.O. Box 06613
Columbus, OH 43206
614-506-7118

# Exhibit 35:

# SEALED

# Exhibit 36:

# 10-06-05 Email from DM to Phillips

## Diane Menashe

| | |
|---|---|
| **From:** | "Diane Menashe" <menashe@columbus.rr.com> |
| **To:** | "MARTHA PHILLIPS" <marthaphillips@mac.com> |
| **Cc:** | "Diane Menashe" <menashe@columbus.rr.com>; "Kort Gatterdam" <kgatterdam@kravitzlawnet.com> |
| **Sent:** | Thursday, October 06, 2005 9:31 AM |
| **Subject:** | DARYL LAWRENCE |

Martha -

Daryl called me yesterday and we discussed the GED.
Please follow-up on this. It is imperative that we get him into some GED class or program for mitigation purposes.
We are already just four months out from trial.

Chief Morris should be a good contact person for this.
If there is no one at the jail giving lessons please see if we can independently hire someone.
I can then ask the Court to appropriate the funds.

Diane

TC19927

10/6/2005

# Exhibit 37:

# 11-18-05 (AM) Email from DM to Phillips

## Kort Gatterdam

**From:** Diane Menashe [menashe@columbus.rr.com]
**Sent:** Friday, November 18, 2005 7:52 AM
**To:** MARTHA PHILLIPS; Kort Gatterdam
**Cc:** Diane Menashe
**Subject:** Fw: Lawrence interview trip

Dear Martha & Kort

Below you will find Dr. Cunningham's fight arrival and departure schedule. As written, he will be spending the day of December 1, 2005 with Daryl and then December 2, 2005 with family.

Martha, if you could help coordinate family members for the 2nd I would greatly appreciate it. At a minimum we need Eileen and Yolanda to come in. (I may ask that you assist with the transportation of Eilene). I think we should also get some people from Leondres family too. Her sister etc.

I intend to get you a full list of the necessary witnesses as soon as possible. I will handle Connie; she will have to take the day off from work.
If people can't do Friday day then we can likely ask Cunningham to do Thursday night.

I have cleared my schedule to be free during these times (although I have a sentencing late Friday afternoon at 3pm). Otherwise, I am on deck to do whatever is necessary. Kort will likely be in a death penalty trial so Martha, it is you and me.

Let's talk about this via telephone.
Thanks
Diane


----- Original Message -----
**From:** admin
**To:** menashe@columbus.rr.com
**Sent:** Thursday, November 17, 2005 10:16 AM
**Subject:** Lawrence interview trip

Dear Diane,

Please see below for Mark's flight schedule. He would like to do the client interview on December 1st and finish up all family/ third party interviews on December 2nd. I will be in touch with you for additional scheduling details.

Sincerely,
Cera Hammond


FLIGHTS
11/30/05  AA 3597 DFW to CMH, 5:12PM - 8:32PM
12/02/05  AA 2029 CMH to DFW, 5:16PM - 7:05PM


11/20/2005

**TC28421**

# Exhibit 38:

# 04-25-05 Letter from DM to Lawrence

### DIANE M. MENASHE
#### ATTORNEY AT LAW

536 SOUTH WALL STREET   SUITE 300
COLUMBUS, OHIO 43215

OFFICE: 614.221.6500
FAX: 614.224.9258

menashe@columbus.rr.com

April 25, 2005

Daryl Lawrence
Ross County Jail
28 North Paint Street
Chillicothe, Ohio 45601

**RE:   United States v. Daryl Lawrence**
**Case No. CR2-05-11**

Dear Daryl:

Please be advised that I will visit you at on **Friday April 25, 2005** in the early morning hours.  I have a plea and sentencing in Common Pleas court at 10:30 am that day; I will visit with you beforehand. I will bring a copy of the discovery with me for you to keep.

It would be beneficial if, prior to Friday, you make a list of questions and/or concerns you have about your case.  My time with you will be somewhat limited and so I want to make the most of it.

(Please note that Friday the 29th is the only day I can possibly manage a visit given that I start a federal trial on April 25, 2005 that is expected to last two weeks; Judge Marbley, the sitting judge does not hold court on Fridays so that is my only opportunity to have a visit with you and also handle my other professional responsibilities.   Upon the conclusion of my federal trial I start a rape case in Licking County and then another rape case in Franklin County. These cases are literally set back to back.)

Sincerely,

Diane M. Menashe
Attorney at Law

**TC38926**

# Exhibit 39:

# 08-26-05 Email from KG to DM

## Diane Menashe

**From:** "Kort Gatterdam" <kgatterdam@kgbllc.com>
**To:** "'menashe'" <menashe@columbus.rr.com>
**Sent:** Friday, August 26, 2005 8:44 AM
**Subject:** RE:

I'm filing motion for a continuance until Monday on the motions. I need the weekend to finish this b/c I'm headed to Mansfield in a couple of hours. ▇▇▇ juvey kid wants a trial ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

Kort Gatterdam, Esq.
Kravitz, Gatterdam & Brown
145 East Rich Street
Columbus, OH 43215
(614) 464-2000
(614) 464-2002 (fax)
kgatterdam@kgbllc.com

Confidentiality Notice: This e-mail message is intended by Kravitz, Gatterdam & Brown for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or by calling (614) 464-2000 (collect). Thank you.

-----Original Message-----
**From:** menashe [mailto:menashe@columbus.rr.com]
**Sent:** Friday, August 26, 2005 8:45 AM
**To:** Kort Gatterdam
**Subject:** Re:

**dont file that motion though until i have a chance to confirm that the fingerprints come in through a means other than the actual finger itself.**

**i see where they found a footprint on the counter but still looking for print results. i will letyou know.**

----- Original Message -----
**From:** Kort Gatterdam
**To:** 'Diane Menashe'
**Sent:** Friday, August 26, 2005 7:50 AM

Can you order Joe Reid's Daubert exam in the Watkins case? If we can't use it as an expense for the Lawrence case, I'll split the cost of the transcript with you.

Kort Gatterdam, Esq.

Kravitz, Gatterdam & Brown

145 East Rich Street

Columbus, OH 43215

(614) 464-2000

(614) 464-2002 (fax)

**TC39209**
8/26/2005

kgatterdam@kgbllc.com

Confidentiality Notice: This e-mail message is intended by Kravitz, Gatterdam & Brown for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail or by calling (614) 464-2000 (collect). Thank you.

**TC39210**
8/26/2005

Exhibit 40:

11-28-05 Email from Roder to DM

## Diane Menashe

| | |
|---|---|
| **From:** | "Scott G. Roder" <scottroder@gmail.com> |
| **To:** | "Diane Menashe" <menashe@columbus.rr.com> |
| **Sent:** | Monday, November 28, 2005 12:55 PM |
| **Subject:** | Re: the fbi challanges video |

understood.

I am changing that video up anyway. I'll have a refined version by friday. Would it be alright if I submit an invoice for time spent in November? When do you need it to get it submitted? The 2nd of Dec or earlier?

Thanks,

Scott

On 11/28/05, Diane Menashe <menashe@columbus.rr.com> wrote:
> no. i am fu---ing swamped w/work.
> my co-counsel is in a death penalty case so I am doing everything on
> lawrence plus running my own practice (wihtout a secretary).
>
> i will try to get to it today.
> our expert from texas is coming in wed-friday so i am focused on that.
> sorry.
>
> ----- Original Message -----
> From: "Scott G. Roder" <scottroder@gmail.com>
> To: "Diane" <Menashe@columbus.rr.com>
> Sent: Monday, November 28, 2005 8:49 AM
> Subject: the fbi challanges video
>
>
> Diane,
>
> Did you get the chance to download the video I posted?
> --
> Scott G. Roder, Trial Consultant
> Roder Evidence Consulting
> 1459 Lincoln Avenue
> Lakewood, Ohio 44107
> (216) 326-7562
> www.roderev.com
>
>
>
>

--

**TC39873**

Scott G. Roder, Trial Consultant
Roder Evidence Consulting
1459 Lincoln Avenue
Lakewood, Ohio 44107
(216) 326-7562
www.roderev.com

TC39874

# Exhibit 41:

# Notes on Cunningham

Damaging or Impairing Factors — high

greater damaging
impairing → choice → lower level
of moral culpability — law

So much
information
that most
visual aids

Dr. Cunningham
prepared
autopsy slides → address

Man know what questions

Important credible
BUT science

Opening statement
Mark Cunningham
- many
3rd parties, interviewed

TC20218