IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 2:05-CR-00011 |
| | ) | |
| | ) | |
| DARYL LAWRENCE, | ) | |
| *Defendant.* | ) | |

---

**APPENDIX IN SUPPORT OF**

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF,**

**TO VACATE, SET ASIDE, OR CORRECT SENTENCE,**

**AND FOR A NEW TRIAL**

---

Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender, District of MD
Connecticut Office
265 Church St., Suite 702
New haven, CT 06510
(301) 344-2337 (phone)
(301) 344-0019 (fax)

# TABLE OF CONTENTS: EXHIBITS

**Exhibit No.**    **Document**

1. Russ Stetler Declaration
2. Bob Stinson Declaration
3. Siddhartha Nadkarni Declaration
4. John Nixon Declaration
5. Charles Wetli Declaration
6. Patrick Fardal Declaration
7. Dan Clark Declaration
8. Robert Tressel Report
9. Florencia Walker Declaration
10. Alana Robinson Declaration
11. Eileen Lopez Declaration
12. 11-28-05 Email from M. Phillips to D. Menashe
13. 11-18-05 (PM) Email from D. Menashe to M. Phillips
14. SEALED
15. 11-04-05 Letter to E. Anderson from D. Menashe re Records
16. 11-19-05 Email from E. Anderson to D. Menashe
17. 12-01-05 Email from D. Menashe to E. Anderson
18. 01-25-06 Email from D. Menashe to E. Anderson
19. 02-21-06 Letter to E. Anderson from D. Menashe re Records
20. 02-20-06 Email from D. Menashe to E. Anderson
21. 08-16-05 Memo from B. Duran to D. Menashe re record requests
22. 03-07-05 Email from M. Phillips to D. Menashe
23. SEALED
24. 07-26-05 Email from M. Phillips to D. Menashe
25. 11-29-05 Email from D. Menashe to M. Phillips
26. 02-14-06 Summary of M. Cunningham Intvws.
27. M. Cunningham PP Slide on Lopez Family Tree
28. Aleta Lopez OSU Medical Records Excerpts
29. Aleta Lopez Probate Court Records Excerpt
30. Leondra Lawrence FCDJS Records, Running Records Comments
31. Leondra Lawrence Franklin County Probation Record Log Excerpt

32.	01-25-05 Letter from S. Nolder to Judge Frost
33.	03-25-05 To Do List
34.	04-25-05 Email from M. Phillips to  D. Menashe  & K. Gatterdam
35.	SEALED
36.	10-06-05 Email from  D. Menashe  to M. Phillips
37.	11-18-05 (AM) Email from  D. Menashe  to M. Phillips
38.	04-25-05 Letter from  D. Menashe to Lawrence
39.	08-26-05 Email from K. Gatterdam to  D. Menashe
40.	11-28-05 Email from S. Roder to  D. Menashe
41.	Notes on M. Cunningham
42.	SEALED
43.	SEALED
44.	11-09-05 Letter from  D. Menashe  to B. Stinson
45.	11-04-05 Letter from D. Menashe  to Cunningham
46.	SEALED
47.	01-13-06 Email from D. Menashe to Hammond (Cunningham asst.)
48.	02-15-06 Email from  D. Menashe to M. Cunningham
49.	SEALED
50.	SEALED
51.	02-14-06 J. Nixon Report
52.	Columbus Dispatch article on Driving Park
53.	12-08-05 Mitigation Requests Memo
54.	Children's Hospital Records Excerpt
55.	Mt. Carmel Hospital Records Excerpt
56.	St. Charles Prep Records Excerpt
57.	Sonshine Christian Academy Record
58.	Sonshine Christian Disciplinaries
59.	Corpus Christi School Record
60.	Daryl, Leondra, Ricco, Djuana Xmas 1984 Photo
61.	Leondra Lawrence Mt. Carmel Medical Records Excerpt
62.	Algenon Lopez Death Certificate
63.	Franklin County Adult Probation Records Excerpt
64.	01-20-06 Govt. Witness List
65.	Cunningham PP Slide on Violent Victimization
66.	09-26-05 FBI Animation Video Memo
67.	06-02-05 Letter from DM & KG to Lockhart (USA)
68.	DOJ Presentation Outline

69.     Eileen Lopez SSA Earnings Statement Excerpt
70.     SEALED
71.     Grant Hospital Records Excerpt
72.     FBI Scale Drawing of Fifth Third Bank
73.     Crime Lab Report of Uniform Shirt
74.     B. Dickerson Handwritten Statement
75.     B. Dickerson FBI Statement
76.     D. Rader CPD Summary
77.     M. Johnson Handwritten Statement
78.     E. Arnold Handwritten Statement
79.     E. Kinney Handwritten Statement
80.     D. Rader Handwritten Statement
81.     M. Large Handwritten Statement
82.     A Ross Handwritten Statement
83.     H. Clifton Handwritten Statement
84.     W. Cox Handwritten Statement
85.     A Goodman CPD Summary
86.     A Ross CPD Summary
87.     W. Cox CPD Summary
88.     A Karst FBI Statement
89.     H. Clifton FBI Statement
90.     M. Large FBI Statement
91.     E. Kinney CPD Summary
92.     E. Arnold CPD Summary
93.     SEALED
94.     SEALED
95.     SEALED
96.     SEALED
97.     SEALED
98.     SEALED
99.     SEALED
100.    SEALED
101.    SEALED
102.    SEALED
103.    SEALED
104.    SEALED
105.    SEALED
106.    SEALED
107.    Coroner's Report
108.    Toxicology Report

109.     FBI Animation Video (On DVD)
110.     Michelle Johnson Video (On DVD)
111.     Front Door Camera Video (On DVD)
112.     Teller 5 Camera Video (On DVD)
113.     Bishop Hartley HS Record
114.     SEALED

# Exhibit 1:
# Stetler Declaration

## DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

### *Summary of Opinions*

1. I was asked by federal habeas corpus counsel for Daryl Lawrence to summarize the prevailing professional norms in the investigation and presentation of mitigation evidence at the time of Mr. Lawrence's prosecution and trial (2005-06), and then to review the performance of his trial counsel in light of those norms. I was also asked to address the standard of care in capital mental health evaluations, with particular attention to the importance of the social history investigation.

2. The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly. Counsel's duty to conduct a thorough mitigation investigation was well established at the time of Mr. Lawrence's prosecution. The U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), had underscored counsel's duty to conduct thorough mitigation investigation. In that decision, the High Court acknowledged the critical role of the nonlawyer whose post-conviction mitigation investigation provided the proof of how Mr. Wiggins had been prejudiced by the deficient performance of his trial counsel. The High Court also cited the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (1989) as "well-defined norms." 539 U.S. at 524. The ABA Guidelines were revised in 2003 and published that summer in 31 HOFSTRA L. REV. 913 (2003). That widely read symposium edition of the law review contained additional articles stressing the importance of teamwork and the critical role of the mitigation specialist in the defense team. *See* Jill Miller, *The Defense Team in Capital Cases*, 31 HOFSTRA L. REV. 1117 (2003), and Pamela Blume Leonard, *A New Profession*

1

*for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143 (2003). The U.S. Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), reiterated the importance of thorough mitigation investigation, finding trial counsel ineffective in a case where they had engaged the services of three mental health experts but had failed to conduct the thorough investigation that is essential to reliable assessments and effective mitigation.[1]

3. The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding Georgia's death penalty statute constitutional in part because it allowed for mercy based on individualized consideration); *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding mandatory statute unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass). Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face, one-on-one interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. A thorough social history investigation also provides

---

[1] The case was decided on June 20, 2005, and should have alerted Mr. Lawrence's trial counsel to the importance of thorough life-history investigation, not only for potential mitigating evidence but for reliable mental health assessments.

2

the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. Based on the materials I have reviewed (summarized *infra* ¶ 41), it is my considered professional opinion that Mr. Lawrence's trial counsel failed to conduct the thorough mitigation investigation required by the prevailing professional norms of 2005-06, and the resulting penalty-phase presentation fell far below those norms. A team existed on paper, but its members did not meet regularly or function as a team. The mitigation investigation was superficial and haphazard. In many ways, trial counsel's effort was a textbook example of how *not* to investigate mitigation or develop reliable and credible mental health evidence. The sentencing phase presentation was a quantitative illusion: thirty witnesses, an expert with 266 PowerPoint slides, and a list of forty-nine mitigating factors. Beneath this illusion was a reality that lacked consistent and thorough investigation, in-depth mitigation interviews, basic multigenerational record gathering, and effective consultation with experts appropriate to the specific needs of the case.

4. The need to investigate mental disorders and impairments in the context of mitigating evidence was also well established at the time of Mr. Lawrence's prosecution. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[2] Without the social history that results from a

---

[2] The High Court noted that "[m]any states, as well as the Federal Government currently

3

thorough mitigation investigation, trial counsel could not make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of Mr. Lawrence's possible mental disorders or impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation, so consultations without such background information are inevitably futile. At trial, counsel presented a generic expert whose testimony was unsupported, and sometimes even contradicted, by the family members who testified. The expert's testimony, in turn, undermined any potential humanizing impact of Mr. Lawrence's family and friends by referring to most of them generically as criminals.

### *Background and Qualifications*

5. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, www.capdefnet.org. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[3] In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

---

make psychiatric assistance available to indigent defendants," citing, among other statutes, OHIO REV. CODE ANN. § 2941.51 (SUPP. 1983).

[3] *See* Jon B. Gould & Lisa Greenman, Report to the Committee on Defender Services, Judicial Conference of the United States, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases, 111-112, September 2010 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

4

6. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated the appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

8. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of indigent defense agencies. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen

5

death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in most of the other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past two and a half decades, I have lectured at over three hundred fifty continuing legal education programs around the country (including five capital defense trainings in the State of Ohio), as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

10. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over the past twenty-five years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand

6

practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2015. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at more than a dozen capital defense seminars throughout the country under the auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop under the auspices of the federal Habeas Assistance and Training Counsel Project, held annually since 2012.

11. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003), 31 HOFSTRA L. REV. 913 (2003), available at ambar.org/2003guidelines. At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV. 1157 (2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their

7

symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008). At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009). I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence. One was written in collaboration with Professor W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013). The second, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, appeared in 82 UMKC L. REV. 407 (2014). The third was written with Aurélie Tabuteau, *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA LAW REVIEW 731 (2015).

12. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY (2d ed.) (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008).

13. I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over one hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California,

8

Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness twenty-five times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Middle District of Louisiana, the Western District of Missouri, and the District of Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South Carolina, and Wyoming. I have also testified as an expert witness on mitigation standards in the state and federal trial courts of various states.

14. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including Ohio, and on numerous federal death penalty cases.

### *Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 2005-06*

15. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases in 1980, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980), Standard

9

4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" *Id.* at 4:53 (emphasis added). The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id.* at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.[4] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

16. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." Dennis N. Balske, *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331, 358 (1979). In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the

---

[4] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

10

defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983). Writing again in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984) at 40, 42. *See also* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, (August 1986) at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.

11

Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience.[5]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence – ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine FORUM in 1987.[6]  The national defense bar magazine, THE CHAMPION, discussed the use of social workers in developing mitigating evidence in 1986.[7]  The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[8]

18. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior

---

[5] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982) (emphasis added). This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982). *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (Nov.-Dec. 1984) at 31-33.

[6] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM (Jan.-Feb. 1987) at 22, 26.

[7] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, CHAMPION (June 1986) at 26, 26-29.

[8] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, CHAMPION (June 1987) at 33, 36.

relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See, e.g.*, John Hill & Mike Healy, *The Death Penalty and the Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

19. Over the past decade and a half, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried in 1993, more than a dozen years before Mr. Lawrence's trial. In *Williams*, the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their

13

investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Id.* at 39 (citation omitted). Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id.* at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id.* at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case remains in post-conviction litigation as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[9] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately

---

[9]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

14

based on time already served.[10]  On August 13, 2007, the Lehigh County (Pennsylvania) District

Attorney's Office stipulated to a life sentence for Ronald Rompilla.[11]  On July 21, 2010, the

Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George

Porter, Jr., to be resentenced to life.[12]  All five cases involved mental health evidence, including

brain damage or cognitive impairment, that was not discovered and presented at trial.


### *The Need for a Qualified Mitigation Specialist*

20.  In a capital case, competent defense counsel have a duty to conduct a thorough life-

history investigation, but generally lack the skill to conduct the investigation themselves. *See,*

generally, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't*

*Be Delegated,* THE CHAMPION (March 2007) at 61.  Moreover, even if lawyers had the training,

skills, and patience, they do not have the time to conduct thorough mitigation investigation

because of all the other work that is demanded of them in representing a capital client.  Besides,

it is more cost-effective to employ those with recognized expertise in developing mitigation

evidence.  Competent capital counsel have long retained a "mitigation specialist" to complete a

detailed, multigenerational social history to highlight the complexity of the client's life and

identify multiple risk factors and mitigation themes.  The Subcommittee on Federal Death

Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States,

for example, noted in 1998 that mitigation specialists "have extensive training and experience in

the defense of capital cases.  They are generally hired to coordinate an investigation of the

---

[10] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.

[11] *See* Associated Press, *Death Row Inmate Gets New Life Term,* USA TODAY, usatoday.com/news/topstories/2007-08-13-477084247_x.htm.

[12] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row,* FLA. TODAY (July 21, 2010).

defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The Commentary also stated that, as of 1998, the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case." *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary. FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998) (commonly known as "the Spencer Report"), *available at* americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/Natio nal/federal_judicial_conference_recommendations.authcheckdam.pdf. As noted *supra* ¶ 17, even before the term "mitigation specialist" was coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

21. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." 1989 Guideline 11.4.1.C. The 1989 Guidelines also required counsel to

16

retain experts for investigation and "preparation of mitigation." 1989 Guideline 11.4.1.D(7). Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." 1989 Guideline 11.4.1.C.

### *Evolution of Prevailing Norms*

22. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense. NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocumen ts/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985. With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards." Each black-letter guideline is explained by a commentary, with references to supporting authorities. *See* Introduction to ABA Guidelines, 1989 ed.

23. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As

17

Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (such as the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

24. The Commentary to the 2003 edition of the ABA Guidelines explained in detail why mitigation specialists are vital members of the capital defense team:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .
>    . . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating

18

> themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

31 HOFSTRA L. REV. at 959 (citations omitted). SUPPLEMENTARY GUIDELINES FOR THE

MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, published in 36 HOFSTRA

L. REV. 677 (2008), discuss these skills in even more detail.[13] Supplementary Guideline 5.1.B,

for example, specifies the need for someone with

> the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

*Id.* at 682.

25. Supplementary Guideline 5.1.C continues: "Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with

---

[13] Although published after Mr. Lawrence's trial in 2006, the Supplementary Guidelines reflect the long-evolving practice of capital defense teams engaged in the mitigation function. *See* Sean D. O'Brien, *When Life Depends on It*, 36 HOFSTRA L. REV. 693 (2008) (noting that the survey and national review process for the Supplementary Guidelines was well under way by the time of Mr. Lawrence's trial). The draft of these Supplementary Guidelines was circulated and discussed at numerous national training programs in the years leading up to publication, such as those discussed *infra* ¶ 70.

witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance." *Id.* A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." *Id.* at 683.

26. Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for a juror to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert & David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

20

27. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Records are sometimes mistakenly presumed destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to visit. Great diligence is required to ensure compliance with appropriate requests. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

28. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . . The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ." 31 HOFSTRA L. REV. at 1024-25.

29. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found

21

the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

529 U.S. at 395, n.19. This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story that even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

30. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for social history investigation. They are helpful in preparing witnesses to testify.

31. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family

22

members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

32. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45. *See also* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143, 1154 (2003) (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation"); David DeMatteo et al., FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

33. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[14] Attorneys may too readily overlook symptoms of impairment,

---

[14] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital*

23

attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity. Diversity in capital defense team is of practical importance. An all-white defense team representing a capital defendant of color will face enhanced barriers to disclosure of sensitive life-history information. *See supra* ¶ 31.

34. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

35. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently. It is an objective scientific fact. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

36. Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country. I have provided evidence as an

---

*Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over one hundred fifty cases around the country. *See supra* ¶ 13. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume et al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation,* 36 HOFSTRA L. REV. 1035, 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *id.* at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

### *Standard of Care in Capital Mental Health Evaluations*

37. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the

25

alleged offense).[15] *See, e.g.*, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997) (finding that two-thirds of the witnesses jurors thought "backfired" were defense experts). Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[16] Expert

---

[15] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age eleven, reading just above a second grade level; at fourteen, just above fourth grade; and at seventeen, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

[16] It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the

26

testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

38. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

39. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. At the same time, it is important that counsel not prematurely rule out disorders and impairments simply because they have not observed florid symptoms. The signs of mental disorders typically wax and wane, and many clients are skilled at masking stigmatized impairments and conditions. It is not at all uncommon for capital defendants to present well, striving to avoid the potential shame and embarrassment of being labeled "crazy" or "retarded." Only after the social history data have

best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, CHAMPION (Apr. 1988) at 34, 38.

27

been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few. To make informed decisions about the kinds of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

40. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis." H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985). The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members." *Id.* at 488. Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware." *Id.* This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant

28

> tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980). Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

### *Review of the case of Daryl Lawrence*

41. At the request of federal habeas corpus counsel for Mr. Lawrence, I have reviewed the following materials: the direct appeal opinion affirming Mr. Lawrence's conviction and sentence of death, *United States v. Daryl Lawrence*, 735 F.3d 395 (2013); the trial docket and accompanying documents and transcripts in the United States District Court for the Southern District of Ohio, Eastern Division, Case No. CR-2-05-11, before the Hon. Gregory L. Frost, Judge; trial counsel's pre-authorization work product, including their letter to the local United States Attorney and the outline of their presentation to the Attorney General's Death Penalty Review Committee at Main Justice; the transcripts of the penalty phase proceedings, volumes 12-17, March 2-9, 2006; the verdict sheet regarding mitigating factors; billing records of trial counsel, mitigation specialist Martha Phillips, investigator Matt Sauer, and forensic psychologists Bob Stinson, Psy.D., and Mark Cunningham, Ph.D.; Dr. Cunningham's PowerPoint files and other work product prepared in connection with this case; work product of psychologist Bob Stinson, Psy.D.; and pretrial e-mails, correspondence, and mitigation work product, including interview reports and records obtained.

29

*Trial counsel's pretrial preparation*

42. On January 6, 2005, Daryl Lawrence attempted to rob a bank in Columbus, Ohio. *United States v. Lawrence*, 735 F.3d 385, 398 (2013). During the course of this attempted robbery, Mr. Lawrence shot and killed Columbus Police Officer Bryan Hurst. *Id.* Officer Hurst also fired his gun, and Mr. Lawrence was injured. *Id.* He fled and was arrested a few days later. *Id.* He confessed to the attempted robbery, as well as three earlier bank robberies in central Ohio during January, August, and September 2004. *Id.* An eight-count indictment was filed on January 20, 2005. *Id.*

43. Federal Public Defender Steven Scott Nolder was appointed to represent Mr. Lawrence on January 10, 2005. Docket, document #3. A "not guilty" plea was entered at the arraignment on January 27, 2005, and trial was set for March 15, 2005. *Id.*, document #10. On January 31, 2005, Mr. Nolder moved to withdraw. *Id.*, document #12. According to the motion, Mr. Nolder was scheduled to try another federal capital case, *United States v. Mayhew*, on August 1, 2005. *Id.* Prior to the arraignment, the parties met and the Government stated that it wanted to conclude pre-authorization meetings within 90 to 120 days of the arraignment (that is, by late April or May 2005). *Id.* Because of his commitments in *Mayhew*, Mr. Nolder sought to have the pre-authorization process held in abeyance, but a lengthy delay was unacceptable to the Court and the Government. *Id.*[17] In his motion, Mr. Nolder asked to withdraw because he did not believe he could provide effective assistance, including the requisite factual and mitigation

---

[17] I have reviewed data maintained by the Federal Death Penalty Resource Counsel Project indicating that the average time between indictment and the defense presentation to the United States Attorney and Main Justice is a little more than one year, and the average time between indictment and a death penalty trial is a little more than two years. *See* Declaration of Russell Stetler, filed March 4, 2011, in *United States v. Jared Loughner*, District of Arizona, Case 4:11:cr-00187-LAB, Document 133-1, at 26.

30

investigations, prior to the pre-authorization meetings with the local U.S. Attorney and the capital case committee at Main Justice. *Id.* On January 31, 2005, the Court granted the motion to withdraw and appointed two private lawyers, Kort Gatterdam and Diane Menashe to represent Mr. Lawrence. *Id.*, document #13. The Court noted their prior experience in state death penalty cases. *Id.*

44. On February 3, 2005, the Court issued a scheduling order, setting oral hearings for September 26 on all non-capital motions and for November 8 on all capital motions. The trial date was set for February 13, 2006. *Id.*, document #14. Alberto Gonzales was also sworn in as the new Attorney General on February 3, 2005, thereby ending a period where authorization decisions might be delayed. *See* Gonzales biography available at: www.whitehouse.gov/government/gonzales-bio.html. The reality of executions was well established by this time. Three prisoners had already been executed under the federal death penalty (Timothy McVeigh, June 11, 2001; Juan Garza, June 19, 2001; and Louis Jones, March 18, 2003). There had been fifteen executions in the State of Ohio, including seven in 2004. *See* Death Penalty Information Center, Execution Database, *available at:* http://www.deathpenaltyinfo.org/views-executions.

45. *Initial mitigation investigation.* On February 11, 2005, trial counsel filed under seal an *ex parte* motion for approval of an initial litigation budget. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ The Court approved the proposed budget except for the

31

future dangerousness expert and the psychiatrist, neither of whom had been identified by name and whose hourly rates were therefore unknown at the time trial counsel applied for funding. The Court indicated that it would reconsider these two requests if it had more information about who the experts were and what credentials they might have. Docket, documents #23 and #24. The Court also noted that both trial counsel would be paid at the capital compensation rate because the Government had already indicated informally its intent to request authorization to seek the death penalty. Docket, document #24.

46. On paper, there was a team consisting of two lawyers, a fact investigator, and a mitigation specialist; and there was early contact with some potential mitigation witnesses. However, the mitigation specialist relied almost exclusively on the telephone to arrange or conduct interviews, or meetings by appointment in a lawyer's office, rather than visiting family members in the homes and neighborhood where Mr. Lawrence had grown up. She participated in interviews with one family member at Mr. Gatterdam's office on February 23, 2005, and with two other family members at Ms. Menashe's office on February 26. She did an interview by telephone with another family member on March 10, 2005. She participated in two more interviews in Mr. Gatterdam's office on March 10 and 14, 2005, and another in Ms. Menashe's office on March 11, 2005. The fact investigator also participated in two interviews with potential mitigation witnesses at Ms. Menashe's office on February 23 and 25, 2005.

47. As noted *supra* ¶ 3, mitigation investigation requires multiple, in-person, face-to-face, one-on-one interviews with life-history witnesses. Writing in 1999, I noted that "[w]itnesses should always be interviewed in person" because "[t]he information needed in mitigation is simply not disclosed to strangers over the telephone." Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, THE CHAMPION (January-February 1999) at 35, 39. I also

pointed out that reluctant witnesses find it easier to hang up the telephone than to refuse to speak

to someone in person, and they often cancel interviews that have been set up by telephone. *Id.* at

39. *See also* Supplementary Guideline 10.11.C, The Defense Case: Requisite Mitigation

Functions of the Defense Team:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

36 HOFSTRA L. REV. at 689. Professor Sean O'Brien has noted the importance of interviewing

mitigation witnesses in their own homes:

> While the capital defense practice borrows established interview protocols from the mental health field, there is one substantial difference. Mitigation specialists conduct interviews in the field. By going to the home of a witness or family member, the mitigation specialist will observe things about the interview subject that would not be visible in the office, thus providing a deeper perspective: "The home visitor often has greater opportunity to meet the client's friends and family; see family pictures; note relationships with cherished pets and neighbors that the client may not think to mention in the office; and experience the way the client puts together, develops, and protects living space. . . . [We] note the client's environment and the messages it conveys about the client and his or her situation."

Sean D. O'Brien, *Supplementary Guidelines for the Mitigation Function of Defense Teams in*

*Death Penalty Cases: When Life Depends on It*, 36 HOFSTRA L. REV. 693, 746 (2008) (quoting

BIANCA CODY MURPHY & CAROLYN DILLON, INTERVIEWING IN ACTION: PROCESS AND PRACTICE

28 (1998)).

48. I had also discussed the need for in-person interviews in the witnesses' homes back

in the 1990s:

> Full disclosure comes only in person with great patience, no matter how skilled

33

> the interviewer.
>
> Life-history witnesses should generally be interviewed in the setting which is most likely to evoke memories of the client – in the home, in the case of family members; at school, in the case of teachers; at work, if the witness is a former employer; etc. The goal of the visit is always to gather documents, snapshots, artwork, report cards, and other memorabilia, as well as to conduct the interview. The home environment or the school the client attended is itself a rich source of information about the client's social milieu.

Russell Stetler, *Mitigation Evidence in Capital Cases*, THE CHAMPION (January-February 1999)

35, 38-39.

49. Other commentators have also emphasized the importance of visiting the location

where a capital defendant lived in order to obtain records and to see with one's own eyes

whether witnesses' descriptions of the home environment are even accurate:

> Whoever conducts the mitigation investigation must travel to every location where the accused lived to seek birth, adoption, health, education, pre-military employment, and criminal records. . . . While visiting the various locations where records are located, the mitigation investigator must also interview family, friends, neighbors, teachers, coaches, and anyone else with knowledge of the accused's history. To be successful in obtaining accurate and complete information, these interviews must be done in person, not by telephone. In many death penalty cases, the accused's "family is dysfunctional. Both the family and the client may confabulate, cover up, forget, and otherwise make it difficult for the lawyer to construct a persuasive case in mitigation." In one military capital case, for example, the trial defense counsel failed to obtain crucial mitigating evidence about the accused's adoptive home because they accepted the family's description of a "good Christian home" rather than visiting the house and interviewing neighbors to obtain an accurate account of the accused's highly dysfunctional upbringing. Only by traveling to locations where the accused grew up and lived can the mitigation specialist hope to gain an accurate picture of the accused's true history.

Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, and Cheryl Pettry, *Raising the Bar:*

*Mitigation Specialists in Military Capital Litigation*, 12 GEO. MASON U. CIV. RTS. L.J. 199, 213-

214 (2002) (citing Alan W. Clarke, *Procedural Labyrinths and the Injustice of Death: A Critique*

*of Death Penalty Habeas Corpus (Part One)*, 29 U. RICH. L. REV. 1327, 1374 (1995) and *United*

*States v. Curtis*, 38 M.J. 530, 536-39 (N.M.C.M.R. 1993) rev'd, 46 M.J. 129 (C.A.A.F. 1997)

(finding ineffective assistance of counsel)).

50. In Mr. Lawrence's case, the mitigation specialist displayed early impatience and frustration with his family members, rather than attempting to meet with them in their own homes to build relationships and establish rapport. Her overreliance on the telephone is documented in numerous e-mails to trial counsel:

> Also called Dwight Lopez. . . . He supposedly lives with his mom. . . . Some woman answered the phone with something like "God bless" (not hello). I thought it was an answering machine and waited before I realized it was a person. I asked for Dwight. She said he didn't live there and hung up before I could say anything else. Now, they won't answer the phone. I'll try again later. What the hell?

March 7, 2005. She gave up easily, decided witnesses were "worthless," and ended with sarcasm:

> Just so you have a record of this. I've now called Daryl's adopted mom's (Eileen Lopez) house 3x. I've left 2 mssgs. . . . No call back.
>
> Also, as I've indicated before, I've called Djuna (Daryl's bio sister) about 4x and lft mssgs – no call back. . . .
>
> I've called cousins Martize and Manuel Powell (Tanya's sons) once and left messgs but no return call. These guys are probably worthless at this point anyway. . . .
>
> Yolanda has no time.
>
> Can't wait till we need some witnesses to testify.

March 9, 2005.

51. In another e-mail, the mitigation specialist described Mr. Lawrence's biological siblings as "less than helpful." March 15, 2005. She had "called [Djuana] several times and no call back. . . . [Ricco] showed up early for his [interview] with Kort [Gatterdam] and me and then left. I've called him since, but no return call." *Id.* The mitigation specialist did another interview by telephone because the witness "doesn't have much spare time and lives in

35

Groveport." *Id.* According to Google Maps, Groveport is less than twelve miles from Columbus, normally an eighteen-minute drive. The mitigation specialist's reluctance to go to the witness's home is apparent from another e-mail in March. Alana Robinson had a broken foot and was not mobile, so there had been no interview. (That witness was ultimately interviewed by trial counsel eleven months later – during trial, on February 16, 2006.) Effective capital defense teams have long recognized that mitigation investigation cannot be done by appointment, but it instead requires personal visits to the homes of witnesses, as well as patience and persistence to build the rapport necessary for in-depth interviews.

52. The mitigation specialist conducted two interviews on her own in April 2005, including one at the home of Mr. Lawrence's adoptive mother, Eileen Lopez, in which three other family members came in and out at different times. This flurry of activity from February to April 2005 represents the bulk of the mitigation specialist's work on Mr. Lawrence's case. The mitigation specialist conducted one more mitigation interview between late April and October 2005. She made a few unsuccessful attempts to reach potential witnesses by telephone, but with little to no persistence. For example, she called a Pastor Juan Woods at some point in April, but when he returned the call, she missed it. She promised to "continue that effort" to reach Pastor Woods, but no one actually met with him until two law clerks contacted him three days after the trial started (on February 16, 2006).

53. On March 10, 2005, trial counsel provided the mitigation specialist with the name and address of Debbie Richardson, a family friend, and told the mitigation specialist she might be able to obtain the friend's phone number through Mr. Lawrence's maternal cousin, Yolanda Tolliver. More than a month later, the mitigation specialist told trial counsel on April 25, 2005, that "Eileen [Lopez] was going to give me Debbie's ph. #, but she said that she asked Debbie

36

about it, and she told Eileen that she doesn't want to be involved." I have seen no evidence that anyone from the defense ever attempted to contact Ms. Richardson. Trial counsel should not abandon efforts to interview a potential mitigation witness simply because of a vague third-party report of the witness's reluctance "to be involved." As I wrote back in 1999, "Always ask witnesses to suggest others who may have useful information, but never let one witness control or limit our access to others." The witness "who is least invested in preserving secrets is the one you need to find, and concealing family members will discourage us from finding that key witness." Russell Stetler, *Mitigation Evidence in Capital Cases*, THE CHAMPION (January-February 1999) 35, 39. Even if the family member has no ulterior motive about discouraging contact with the witness, she is ill-equipped to explain to the witness what information the defense is seeking, and why. It is common for mitigation witnesses not to want "to be involved," but such attitudes do not suspend counsel's obligation to conduct thorough mitigation investigation.

54. The mitigation specialist met with Mr. Lawrence himself on February 11 and March 3, 2005. Ms. Menashe wrote her in late July to indicate that she and co-counsel

> would appreciate it if you would go see [one of their other capital clients] at the Jail in the near future. Also, a visit to Daryl. Kort and I talked this weekend and we both feel as if visiting the clients more regularly is very important particularly given that both of these cases are likely to go to trial; both of these clients are likely to testify. So we would appreciate it if you would start to visit them on a regular basis in an effort to build a rapport and also obtain additional mitigation information.

The mitigation specialist replied, "Yeah, I've been bad about the visits. Sorry. I'll try to get down to see them in the next 2 weeks." However, neither the mitigation specialist's billing records nor jail logs reflect any visits (or, for that matter, any other work on the case) in August 2005. The mitigation specialist ultimately saw Mr. Lawrence one more time, on September 22,

37

2005, according to the jail logs. The mitigation specialist interviewed one witness in July – her only interview on Mr. Lawrence's case between the end of April and October 2005.[18]

55. As noted *supra* ¶ 3, "Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face, one-on-one interviews." In Mr. Lawrence's case, the record gathering was as deficient as the interviewing. Contrary to the prevailing norms at the time of trial (*see supra* ¶¶ 27-30), there was no attempt to gather the life-history records of anyone except Mr. Lawrence himself. *See,* especially, Commentary to ABA Guideline 10.7, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children . . ." 31 HOFSTRA L. REV. at 1024. *See also* Supplementary Guideline 5.1.F, "Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others." 36 HOFSTRA L. REV. at 683. In Mr. Lawrence's case, record gathering was delegated to a law clerk, Bertha Duran, rather than drawing on the skills of an experienced mitigation specialist. (Ms. Duran was a recent law graduate, who was admitted to the bar on May 9, 2005, according to the Public Attorney Information on the web site of the Supreme Court of Ohio.) Trial counsel did collect *criminal* records of multiple family members, but there were no records even to document psychiatric disorders (a cousin's schizophrenia) or the alcohol and substance abuse of multiple family members that were reported in interviews. Trial counsel obtained some employment records of Mr. Lawrence, but failed to obtain the single most important summary of his work history, the earnings records maintained by the Social Security Administration. The earnings

---

[18] The mitigation specialist was working on another death penalty case with both trial counsel during the pendency of Mr. Lawrence's case. *See* e-mails mentioning waivers for both clients (February 9, 2005); mitigation specialist visits with Mr. Lawrence and their other client (March 9, 2005; March 30, 2005); mitigation specialist's work on both cases (March 15, 2005); possible DNA expert for both cases (June 29, 2005); and potential need for help with the other client's family (August 29, 2005).

38

records of Mr. Lawrence's caretakers would also have provided hard and credible documentation of family income during his developmental years.

56. *Initial consultation with forensic psychologist.* Local forensic psychologist, Bob Stinson, Psy.D., began work on the case with a half-hour telephone conference with both trial counsel on March 3, 2005. Stinson Invoice, May 5, 2005. An undated handwritten note in his file appears to memorialize the conversation. Dr. Stinson noted that mitigation interviews were under way and trial counsel wanted "mitig picture by mid May – June 1 is attys deadline" for pre-authorization meetings with "Greg Lockhart [the local U.S. Attorney] here" and Main Justice in the District of Columbia. *Id.* Dr. Stinson also had a ten- or fifteen-minute telephone consultation with mitigation specialist Martha Phillips on March 11, 2005. Stinson Invoice, May 5, 2005; and handwritten notes dated March 11, 2005. Trial counsel subsequently transmitted records received and reports of mitigation interviews, as well as the indictment, police reports, and Mr. Lawrence's handwritten journal, to Dr. Stinson. Memos to trial counsel from her law clerk Bertha Duran itemized all the records requested (sixteen as of March 28, 2005, and a total of eighteen as of August 16, 2005). Dr. Stinson ultimately received reports of eight mitigation interviews between February 23 and October 5, 2005. Half were conducted in a lawyer's office. Dr. Stinson's handwritten annotations on Ms. Duran's list of mitigation records requested and received as of August 18, 2005, indicated that he was not provided the Children's Hospital records that trial counsel received on May 31, 2005, but Ms. Menashe was "to get for me, 10-24-05." They had a final case meeting on that date (*see infra* ¶ 68), but a review of Dr. Stinson's file indicates that he never received or reviewed the Children's Hospital records.

2005. Stinson Invoices, May 5 and August 15, 2005. Trial counsel received Mr. Lawrence's Children's Hospital records on May 25, but apparently did not transmit them to Dr.

39

Stinson even though they documented Mr. Lawrence's history of headaches, head injuries, and nosebleeds requiring medical attention. Although Dr. Stinson's testing report indicates that Mr. Lawrence was referred for evaluation "because of neurological problems," specifically "for brain insult (e.g., toxic, metabolic, cerebral vascular), suspected/known drug use and consequences of other neurological disorder(s)," trial counsel had not retained a qualified neuropsychologist who could administer a complete neuropsychological test battery. Dr. Stinson administered only the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III) and the Working Memory Scale – Third Edition (WMS-III). Although Mr. Lawrence's obtained WAIS-III test scores were in the "average" range, there was scatter (or significant variation in subtest scores) in multiple subtests, including those used to compute both Verbal and Performance IQ, the Auditory Immediate Index, the Auditory Delayed Index, the Visual Immediate Index, the Visual Delayed Index, the Processing Speed Index, Logical Memory, and Faces and Family Pictures. *See also* Dr. Stinson's WAIS-III Raw Data, May 3, 2005. For example, Mr. Lawrence had high scores in Faces I – Recognition, raw score 47, maximum score 48 and Word List II, raw score 24, maximum score 24. However, he had very low subtest scores in Digital Symbol Coding, raw score 54, maximum score 133; Logical Memory I – Recall, raw score 32, maximum score 75; and Logical Memory II – Recall, raw score 18, maximum score 50. According to Dr. Stinson's WAIS-III WMS-III Interpretive Report (May 5, 2005), in Mr. Lawrence's case, the average Full Scale IQ "is less meaningful because there are large discrepancies between the scores that compose either the Verbal scale or the Performance scale." On June 17, 2005, Dr. Stinson had a fifteen-minute "phone consult" with trial counsel and the mitigation specialist. He did nothing further on the case until he met with them on October 24, 2005. *See infra* ¶ 68.

58. *Pre-authorization presentations.* On June 2, 2005, two weeks before the brief

40

"phone consult" with Dr. Stinson, trial counsel wrote to Gregory Lockhart, the U.S. Attorney for the Southern District of Ohio, requesting that the Government not seek the death penalty in Mr. Lawrence's case. This three-page letter made six points weighing against seeking death: the circumstances of the shooting ("less than 30 seconds elapsed"); Mr. Lawrence's lack of violent criminal history (just one prior conviction for receiving stolen property); immediate acceptance of responsibility and remorse (including his admission to other bank robberies); his "upbringing and background" (born in prison and raised by an "adopted family" lacking necessary financial resources, guidance, discipline, and time); Mr. Lawrence's two children (Kennedy and Gabriel); and his being "unlikely to be a high-risk inmate" in light of his good conduct in jail, his amputated finger, and the near incapacitation of his left arm. The local U.S. Attorney was not persuaded, but trial counsel had one last opportunity to proffer reasons why Attorney General Gonzales should not authorize a death penalty prosecution.

59.  Trial counsel's subsequent pre-authorization presentation to the Department of Justice Death Penalty Review Committee in Washington was memorialized in a five-page internal memorandum and three pages of handwritten notes. Trial counsel's first argument was that Mr. Lawrence had no intent to kill Officer Hurst: "28 seconds from start to finish. No intent to do anything but to avoid being killed." "He did not go in shooting at people. He returned fire and the officer was killed as a result." *Id.* Trial counsel also disputed the appropriateness of the pecuniary gain aggravator, arguing, "This aggravator doesn't fit. It fits murders for hire, murders for insurance proceeds, etc. but not going into a bank, getting into a gunfight and a person gets killed." *Id.* They argued that the other aggravator, alleging grave risk to one or more persons in addition to the decedent, did not apply because "[e]veryone else was down on the ground during the gunfight." This "throw away aggravator" would seemingly apply to "every gun case where

41

death results.  Too arbitrary." *Id.*  Trial counsel also urged that Mr. Lawrence be prosecuted in state court since the case "[i]nvolved a local cop, not a federal official, doing private security work in a bank." *Id.*  They also mentioned the high cost of a federal capital prosecution and the statistics indicating "[r]acial disparity in federal death penalty" cases.  Mitigation was a minor point, summarized in a single paragraph at the end of the memorandum: only one prior nonviolent felony conviction; "no gun charges, no drug charges, no offenses of violence"; rapid incident, with no time to think or plan; prior robberies did not involve gunfire, hostages, or cops; "[n]o real family growing up . . . no guidance or discipline growing up," "gifted athlete," "has children . . . who need him."  They also noted acceptance of responsibility and remorse, as well as his likelihood of adjustment in prison.  The final conclusory point reiterated, "This is a very local case involving a local officer and a first time violent offender." *Id.*

60.  Anticipating the Attorney General's authorization of a capital prosecution, on August 25, 2005, trial counsel filed under seal a second *ex parte* request for additional expert expenses.  Three of the experts were guilt-phase consultants on forensic science, DNA, and a computer-generated reconstruction of the shooting at the bank.  The other two experts related to sentencing issues. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There was no longer any request for a psychiatrist (or any other expert) specializing in trauma, addiction, or adolescent development.

61.  A form in Dr. Cunningham's file reflected that his office was initially contacted on

42

July 27, 2005, requesting "RA only" (i.e., Risk Assessment only).[19] Forensic Case Referral. A CV, fee statement, and unspecified articles were forwarded to trial counsel by e-mail on July 28. *Id.* The form designated the case type as capital, with a handwritten note indicating, "Not yet, but a notice will be filed by August 5th, at which time they will try to get MDC appointed."

62. *Post-authorization preparation.* The Government did not file its formal notice of intent to seek the death penalty until September 6, 2005. Docket, document #57. On September 14, 2005, the Court ordered trial counsel to give notice under Rule 12(b) "of Defendant's intention to introduce expert evidence relating to a mental disease or defect or any other mental condition bearing on the issues at the trial phase or the sentencing phase." *Id.*, document #77. The Court set a deadline of October 14, 2005, for the mental condition notice. *Id.* The Court's order seems to have been *sua sponte*. There were no Government motions or other prior pleadings referring to mental health evidence.

63.



---

[19] The form was later amended, crossing out "RA only" and writing in "Mitigation only. No allegation of f.d [future danger]." *See* ¶¶ 66-69 *infra.*

64.  The case remained set for trial in February 2006 – only five months after the Government's formal notice of intent to seek the death penalty,[20] but trial counsel filed no motions to continue the trial date in order to give them more time to prepare.  Looking ahead, on September 29, 2005, the Government submitted a proposed jury questionnaire.  *Id.*, document #83.[21]  Trial counsel e-mailed the mitigation specialist in September seeking to arrange GED classes for Mr. Lawrence, but received no response.  On October 6, 2005, trial counsel e-mailed the mitigation specialist to say that it was "imperative" to arrange the GED classes because they were "already just four months out from trial."  Trial counsel did request additional time to file their capital motions, first a four-day extension and then another two weeks.  Docket, documents #90 and #92.  The Court granted the extensions of time.  *Id.*, documents #91 and #93.  Although the filing deadline was extended until October 28, trial counsel filed their capital motions on October 17.  *Id.*, documents #93-114.

65.  *New role for Dr. Cunningham.*  In light of the Government's decision not to allege future dangerousness, trial counsel elected to broaden the referral questions that Dr. Cunningham would address.  In fact, he became their expert for all purposes. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[20] As noted *supra* note 17, the average interval between indictment and federal death penalty trials was twice the amount of time in Mr. Lawrence's case.  The data that I have reviewed also indicate that federal capital trials commence, on average, sixteen months after the notice of intent has been filed.

[21] Trial counsel subsequently offered their own proposed jury questionnaire on November 2, 2005.  *Id.*, document #139.

44



45

66. On October 20, 2005, there was an *ex parte* status conference in which trial counsel

sought additional funding for experts.  Dr. Anderson was described as an expert

who would educate the jury about the developmental impact of Mr. Lawrence's upbringing as an

African-American male raised in an impoverished neighborhood. The motion also explained

that Dr. Cunningham's role had changed. Trial counsel originally retained him to do a Violence

Risk Assessment. When the Government elected not to allege future dangerousness as a non-

statutory aggravator in its notice of intent to seek the death penalty, trial counsel decided to

expand the scope of Dr. Cunningham's assignment "to conduct an entire 'mitigation workup' as

opposed to simply a Violence Risk Assessment." He would need to travel to Ohio at least twice

to meet the client, interview family members, and ultimately testify. Docket, documents #116

and #117.



*Id.*, document #117 at 16.

67.

*Id.*

68. On October 24, 2005, trial counsel met with Dr. Stinson, but apparently concluded that he offered nothing beyond what Dr. Cunningham could cover. *See infra* ¶ 74. Dr. Stinson had also been working with both trial counsel on another death penalty case in 2005, but that case was resolved through a negotiated disposition. *See* e-mail from Dr. Stinson to Diane Menashe, on May 6, 2005, noting that he would "use the other half of the day" to meet the other client "while I'm down there," and e-mail from Ms. Menashe to Dr. Stinson on August 29, 2005, referring to both cases.

69. On October 25, 2005, the Court filed under seal an *ex parte* order granting the defense second supplemental motion for expert expenses,

Docket, document #118. On the same date, trial counsel filed their notice pursuant to Fed. R.

47

Crim. P. 12.2 stating that they did not intend to introduce any evidence that implicated the provisions of the Rule. They advised the Government that they were "consulting with clinical and forensic psychologist, Dr. Mark Cunningham, to see what, if any, expert testimony will be introduced, pursuant to 12.2(b), that relates to the issue of punishment in this case. If during Dr. Cunningham's work in this case testing is conducted and counsel, as a result of those tests, intends to introduce expert evidence pursuant to 12.2(b), counsel will forthwith file an amended notice." *Id.*, document #121. Trial counsel and Dr. Cunningham had an eighteen-minute telephone conference on October 26, 2005. Cunningham Invoice, November 1, 2005.

70. The Federal Death Penalty Resource Counsel Project held its annual Strategy Session in Pittsburgh, Pennsylvania, November 3-5, 2005, and trial counsel Diane Menashe initially registered to attend but "couldn't make Pittsburgh work out," as she later advised the organizer of the program. E-mail from Ms. Menashe to Margaret O'Donnell, September 8, 2006. There were numerous other death penalty training programs focused on the national standard of practice that year, including the National Association of Criminal Defense Lawyers, Teams for Life: Winning Cases through Mitigation, New Orleans, Louisiana, in February; the National Legal Aid and Defender Association, Life in the Balance, also in New Orleans, in March; the Administrative Office of the U.S. Courts, Second National Seminar on the Development and Integration of Mitigation Evidence, Salt Lake City, Utah, in April; and the National Association of Criminal Defense Lawyers, Making the Case for Life, Oklahoma City, Oklahoma, in October. The Pittsburgh program was the closest and most directly relevant, but I have found no evidence that either trial counsel attended any of these programs.

71. *Final mitigation investigation.* Ms. Menashe attempted to enlist the help of the mitigation specialist in November 2005, but acknowledged by e-mail that the mitigation

specialist was busy with her co-counsel in another capital trial: "I know you are [on] trial with Kort but there are a couple of things that need to be done by the time [Dr.] Cunningham arrives. . . . Overall, I have realized today that the mitigation presentation of this case is very far from being complete." On November 18, 2005, Ms. Menashe outlined specific help she would need from the mitigation specialist when Dr. Cunningham came to Columbus. Mr. Gatterdam was likely to be in a capital trial when Dr. Cunningham visited, so Ms. Menashe told the mitigation specialist bluntly, "Martha, it is you and me." *Id.* On November 27, 2005, Ms. Menashe asked the mitigation specialist to prepare a timeline of Mr. Lawrence's life history for Dr. Cunningham.

72. The chronology or timeline is a standard working document in the mitigation tool kit that mitigation specialists routinely prepare without being asked. *See*, for example, Supplementary Guideline 5.1.D: "The mitigation specialist must be able to furnish information in a form useful to counsel and any experts through methods including, but not limited to: genealogies, *chronologies*, social histories, and studies of the cultural, socioeconomic, environmental, political, historical, racial and religious influences on the client in order to aid counsel in developing an affirmative case for sparing the defendant's life." 36 HOFSTRA L. REV. at 682-83 (emphasis added). Not only should the mitigation specialist have prepared a chronology routinely, as a work in progress as information was digested from life-history records, but trial counsel should have demanded this routine work product on their own, not simply because Dr. Cunningham understandably requested it.

73. On November 28, 2005, the mitigation specialist apologized that she had "really screwed up," but had been out of town. Ms. Menashe did the timeline herself, and her seven-page document was deficient in multiple ways. It cited no sources and ignored the practical

49

chronology convention of listing dates, events, and sources. It ignored the need for multigenerational detail, listing only the birth of Mr. Lawrence's mother as a reference to an earlier generation. It was superficial, missing for example the reference to a history of headaches and head injuries in the Children's Hospital records, while noting only that Mr. Lawrence visited for "nose bleeds," had blood work, and reported "first sex at age 12."[24] Some dates were simply wrong: it listed 1984 as the year of Manuel Lopez's death when he had in fact died in 1981. *See infra* note 27. In preparing the timeline, Ms. Menashe "discovered" that Mr. Lawrence lived on ▮▮▮▮▮▮▮▮▮▮ before moving to ▮▮▮▮▮▮▮▮ at age nine. Chronologies that reflect a thorough multigenerational mitigation investigation are typically over a hundred single-spaced pages – and often longer.

74. On November 9, 2005, trial counsel wrote to Dr. Stinson to terminate his services: "After several conversations with Dr. Cunningham it appears that if you were to continue on this case much, if not all, of your work would be duplicative." Moreover, trial counsel found Dr. Stinson's testing results "have little to no value towards the presentation of our mitigation case" because they were "not illustrative of any neurological impairment or significant mental defect." *Id.* Dr. Stinson replied four days later that the decision "makes good sense." As noted *supra* ¶ 57, only IQ and memory tests had been administered by Dr. Stinson. Neither test was appropriate for ruling out neurological impairment or significant mental defect. Moreover, the scatter in the IQ subtests in itself suggested the need for a battery of neuropsychological tests to assess potential impairment and dysfunction.

75. At the time when Dr. Stinson was terminated, Dr. Cunningham had not even met Mr.

---

[24] Dr. Cunningham later confirmed "sex age 12" with a Post-it note on the Children's Hospital record for February 20, 1990, but apparently also missed the history of headaches, head injuries, and nosebleeds requiring medical attention in this record.

50

Lawrence or any of the mitigation witnesses. He was initially scheduled to come to Columbus during the first week of December, but had to postpone because of a family emergency. Ms. Menashe began interviewing mitigation witnesses herself; later her law clerks occasionally assisted. Mr. Gatterdam was busy with another death penalty case. Most of the mitigation interviews took place from December 2005 through trial.

76. Dr. Cunningham flew to Columbus on December 7, 2005,  Cunningham Invoice, January 1, 2006. Dr. Cunningham interviewed Mr. Lawrence the following day. *Id.* The jail visit on December 8, 2005, was the only time that Dr. Cunningham interviewed Mr. Lawrence, Summary of MDC Conducted Intervws., February 14, 2006. Dr. Cunningham interviewed Mr. Lawrence's maternal uncle, Daryl Walker, the same day *Id.* On December 9, 2005, Dr. Cunningham interviewed ten of Mr. Lawrence's friends and family members, seven of whom later testified in the selection phase of the penalty proceeding. *Id.*[25] All the interviews of these lay witnesses took place at the offices of one of the lawyers, *Id.* However, the interview of family friend Pandora Peoples and that of his cousin/stepsister Yolanda Tolliver Dr. Cunningham subsequently conducted one interview by telephone the night before he testified. *Id.*

77. A third and final supplemental motion for expert funding was filed *ex parte* under seal on January 9, 2006. Docket, document #151.

---

[25] The seven who testified were Eileen Brown (Tr., March 7, 2006, at 56), James Kuster (Tr, March 6, 2006, at 171), Eileen Lopez (Tr., March 8, 2006, at 69), Pandora Peoples (Tr., March 6, 2006, at 178), Yolanda Tolliver (Tr., March 8, 2006, at 42), Daryl Walker (Tr., March 8, 2006, at 20), and Florencia Walker (Tr., March 6, 2006, at 7).

51



78.  Diane Menashe conducted a few interviews on her own in December 2005, and then she and law clerks conducted at least fourteen last-minute interviews between February 8 and March 5, 2006.  Jury selection began on February 13, and the first mitigation witness was called on March 6, 2006.  Trial counsel conducted interviews even after the trial began.  Nine of the interviews took place during the trial.

79.  On Friday, February 10, 2006, trial counsel finally moved to continue the trial –

---

[26] Dr. Cunningham's file contained reports of two subsequent interviews conducted by Ms. Phillips, on November 28 and December 1, 2005, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

when jury selection was set to begin on Monday, February 13. Only trial counsel Kort Gatterdam appeared at the hearing on that date because co-counsel Diane Menashe was "trying to interview some witnesses on the government's theory on pecuniary gain." Tr., February 10, 2006, at 3. Mr. Gatterdam sought more time because "the government has been providing to us, within the last two weeks – I guess the best term I can think of is 'an avalanche of discovery on the eve of trial.'" *Id.* He said he could not give an opening statement without knowing what his evidence is, and he asked the Court either to grant a continuance or to exclude the belatedly disclosed evidence. *Id.* at 19. He contrasted the staffing resources: "The government, obviously, has at their disposal in this case three AUSAs here, probably, as I recall, three or four in D.C. They have the Columbus police force. They have the FBI." *Id.* at 24. He asked for a continuance, an individualized assessment of each piece of belatedly disclosed evidence, and that the government be precluded from introducing "anything that they haven't provided, anything that wasn't provided long ago." *Id.* at 24-25. There was no mention of the need for more time to investigate mitigation or prepare the selection phase of the sentencing proceeding. On the contrary, according to Mr. Gatterdam, "We thought we were ready to go forward," and their only reason for seeking more time was the late disclosure of prosecution evidence. *Id.* at 25.

*The trial: guilt/innocence and eligibility phases*

80. Jury selection began on February 13, 2006, exactly 54 weeks from the date when trial counsel were appointed to represent Mr. Lawrence. Docket, document #182. Eight days later, the jury was empaneled and sworn in. *Id.*, document #190. Opening statements began on February 22, and closing arguments on February 28, 2006. *Id.*, documents #191 and 196. The jury returned guilty verdicts on all eight counts of the indictment. *Id.*, document #196.

Eligibility proceedings occurred on March 1-3, 2006. *Id.*, documents #199-203. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ The selection proceedings immediately followed. *Id.*, document #203.

*The defense presentation in the selection proceedings*

81. *Defense opening statement.* Trial counsel Diane Menashe began the opening statement of the selection proceedings of the penalty phase by promising the jury that she would tell them about Daryl Lawrence's life. Tr., March 3, 2006, at 126. She specified that she would begin his life story nine months before he was born by talking about his mother, Leondra Lawrence, who was a prostitute and heroin addict. *Id.* Leondra was married to Edward Lawrence, but had sex with Jerry Hall, "possibly in exchange for drugs or money," and became pregnant with Daryl. *Id.* at 127. When she was three months pregnant with Daryl, Leondra was convicted of forgery and sent to prison. *Id.* She gave birth to Daryl while in prison. *Id.* at 128. The baby was picked up by an aunt and during the next three or four months Daryl lived in "pure and utter poverty" and suffered heroin withdrawal. *Id.* Eventually Daryl was sent to his grandmother's house and then to the home of her brother, Manuel Lopez. *Id.* at 129.

82. Trial counsel promised that Manuel's widow, Eileen Lopez, would testify that she had a hard time putting food on the table or a roof over their head when she took in Daryl. *Id.* Eileen thought she would be taking care of Daryl for just one night, but neither his mother Leondra nor his grandmother ever came back to get him. *Id.* at 130. Trial counsel told the members of the jury that she would show that Daryl was affected by the reality of being born in prison and not knowing with certainty who his father was. *Id.* at 130-131. She conceded that

54

Daryl had choices and made the wrong ones, but she said the question at this point is why he did so. *Id.* at 132. The jury must ask itself, "What diminished his ability to control himself?" *Id.* at 133.

83. Trial counsel reiterated that Daryl Lawrence had a choice, and the focus now was on what had shaped his choices, what shaped his ability to make good choices, and what shaped his morality and value system. *Id.* Her final two questions were, "How did Daryl get here, facing the death penalty?" and "How is he damaged?" *Id.* Trial counsel stated one more time that Daryl did have choices, "but now we have to figure out why he didn't do them right." *Id.* Trial counsel warned the jury that Daryl's life cannot be explained in a day, and implored them to be patient. She told them that Dr. Elijah Anderson would relate to them what it is like to be an African-American in the inner city in a family of criminals with no mother or father. *Id.* at 134. She explained that four out of his five aunts and uncles had been to prison, and that every immediate relative had spent hard time in prison for drug trafficking. *Id.* at 137. Without providing any further detail on the testimony of his friends and family members, trial counsel jumped ahead to her second of two experts, Dr. Mark Cunningham, stating that he would discuss the "damaging and impairing factors." *Id.* at 138. Trial counsel addressed the jurors' possible concern that "if he's so messed up then he's not worth saving," by promising to show that Daryl was a model inmate who had helped other inmates. *Id.* at 139-40. Trial counsel asserted that Daryl was absolutely worth saving and that evidence from experts, family members, religious people, doctors, nurses, and a GED instructor would support the fifty mitigating factors offered by the defense. *Id.* at 140. She assured the jury that after hearing about Daryl's "different culture and his life," they would give him a life sentence and allow him to die in prison. *Id.* at 141.

84. *Inner-city poverty and its effects on the African-American community.* Dr. Elijah Anderson was the first witness to testify in the selection proceedings. A professor of sociology at the University of Pennsylvania, Dr. Anderson taught ethnography and had published three books discussing life on a Chicago street corner, gentrification in Philadelphia, and inner-city poor communities in post-industrial America. *Id.* at 141-44. Dr. Anderson did not interview Mr. Lawrence but reviewed records to learn about his general background. *Id.* at 146.

85. Dr. Anderson testified that while there are more African-American middle class people than ever before, there is increasingly an underclass of black urban poor people who do not have the human capital to make a decent living. *Id.* at 149. As a result, the underground economy of drug dealing and hustling has emerged, and in the inner city the ghetto economy rests on welfare payments, low wage jobs, drug dealing, hustling, bartering, begging, exchange and street crime. *Id.* at 150. The black middle class leaves the ghetto as soon as it can, and takes with it an important piece of social capital. The result is that there are no role models for those left behind, and there is a sense of isolation. *Id.* at 151. The job market becomes very competitive for the remaining jobs. There is an underclass that is no longer marrying; many men talk about their inability to play house. *Id.* at 152. Many men cannot be breadwinners so they do not marry but do still procreate because it is humanly natural. These men stay at home with their mothers and have girlfriends who have babies. *Id.* at 153. The success stories are people who have had someone help them. *Id.* at 156. There are decent people, and there are profoundly alienated people who buy into the oppositional culture of street justice, the urban uniform, anything to show they are abiding by the code of the street. *Id.* at 158.

86. On cross-examination Dr. Anderson acknowledged that he had not studied Columbus. *Id.* at 161. He testified that even if some role models, like the mayor, police chief,

56

and others, are African-American, they are abstractions for people living in concentrated urban poverty. Better role models would be those living next door – pastors, coaches, Boy Scout leaders, etc. *Id.* at 166. Although Dr. Anderson provided a hypothetical context based on his research in other cities, he offered nothing to humanize or individualize Mr. Lawrence – and no information specific to his neighborhood, or even to the city of Columbus. Ultimately, when viewed in the light of the rest of the penalty-phase testimony, Dr. Anderson's testimony only reduced Mr. Lawrence to a faceless ghetto stereotype.

87. *Biological parents: lack of involvement with Daryl, criminality.* Florencia Walker, Daryl's maternal aunt, testified that her sister Leondra, Daryl's mother, started using heroin at age nineteen or twenty, later combining it with cocaine and alcohol. Tr., March 6, 2006, at 12. Leondra used drugs while pregnant with Daryl and gave birth to him while she was in prison. *Id.* at 14. Florencia took care of Daryl as a newborn, while pregnant herself and caring for five other children as a single mother. *Id.* at 16. Daryl could not stop crying in pain as a baby and threw up all his food. *Id.* Florencia's mother took Daryl away and gave him to Manuel and Eileen Lopez when he was three months old. *Id.* at 17.

88. Sheila Lopez, the wife of Daryl's cousin Ricky Lopez, testified that Daryl never knew his father and that he never had a good parent-child relationship with his mother. *Id.* at 131. Daryl went to visit his mother when she was dying of cancer but the visits were shallow and "did not produce results." *Id.*

89. Tanya Powell, another maternal aunt, testified that Daryl did not know his father, Jerry Hall, and Edward Lawrence was listed on Daryl's birth certificate as the father. Tr., March 9, 2006, at 115. Daryl was close to his cousin, Tanya's son, as a child, and he remained very special to Tanya. *Id.* at 117. Leondra was a beautiful person, but that changed around age thirty

57

when she started using drugs and became addicted to heroin. *Id.* at 117-18.

90. Daryl Walker, Sr., Leondra's brother and Daryl's uncle, testified that Leondra used heroin, cocaine, alcohol, marijuana, pills, "everything under the sun." Tr., March 8, 2006, at 29. She supported her drug habit by stealing and selling drugs. *Id.* at 30. Leondra's first husband, Edward Lawrence, was a felon. *Id.* at 31. Jerry Hall was Leondra's boyfriend for many years, and he was married. *Id.* Jerry Hall was also "a criminal, a sneak thief and a robber." *Id.* at 32. He gambled and did not have a job. *Id.*

91. *The Lopez family environment.* Kevin Robinson, grandson of Manuel and Eileen Lopez and son of Alana Robinson, testified that the two neighborhoods where they lived when Daryl was growing up were bad. Tr., March 6, 2006, at 34. The uncles organized bare-fisted boxing matches in which boys were injured. *Id.* at 38. Manuel Lopez was a champion for Kevin and Daryl, and his death hugely impacted ten-year-old Daryl. *Id.* at 40.[27] Yolanda's husband, Greg Tolliver, was a church pastor and role model. He died three years ago, and Daryl also took his death hard. *Id.* at 42. On cross-examination Kevin testified that Manuel and Eileen Lopez tried to keep Daryl away from his mother's family because they made choices to do things that got them into trouble. *Id.* at 52. On redirect Kevin explained that Daryl spent time with cousins from his mother's family even though Eileen did not want him to. *Id.* at 59. He did so even more after Greg Tolliver died. *Id.* at 60. Kevin Robinson had been interviewed by Ms. Menashe

---

[27] Manuel Lopez actually died in November 1981. *See Columbus Dispatch*, Nov. 5, 1981 and Attorney Work Product, Obituaries and/or Records of Deaths for Family Members and/or Friends of Daryl Lawrence. As noted *supra* ¶ 30, "The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for the social history investigation. They are helpful in preparing witnesses to testify." Trial counsel did not use the records they gathered to interview witnesses more effectively or prepare them to testify more accurately. In fact, the time line prepared by trial counsel for Dr. Cunningham, *supra* ¶ 73, inaccurately listed 1984 as the year of Manuel Lopez's death.

58

on February 11, 2006.

92. Dwight Anthony Lopez, Manuel and Eileen Lopez's son, testified that he was twenty-two years older than Daryl and that he left home for the military when Daryl was only one year old. Tr., March 6, 2006, at 112. Manuel Lopez drank a lot and was physically violent toward Eileen. *Id.* Manuel was convicted of domestic violence charges. *Id.* Dwight testified that his friends were not good and that if he had not joined the military at age eighteen he would have gone to jail or died. *Id.* at 113. Daryl did not receive discipline from Manuel and Eileen Lopez. By the time they were raising Daryl, they were "up there in age." *Id.* at 116. On cross-examination Dwight testified that the Lopezes were a close-knit family and that included Daryl. *Id.* at 123. On redirect Dwight testified that the Lopezes failed to keep Daryl away from his mother's side of the family. *Id.* at 124. Dwight Lopez had been interviewed by two law clerks, Bertha Duran and Sarah Schregardus, on February 16, 2006. (Ms. Schregardus was a recent law graduate, who was admitted to the bar on November 6, 2006, according to the Public Attorney Information provided on the web site of the Supreme Court of Ohio. Ms. Duran was admitted on May 9, 2005; *see supra* ¶55.)

93. James John Kuster, partner of Alana Robinson, stated that Dwight Lopez, who had testified a short while earlier, was not dependable or reliable. Tr., March 6, 2006, at 175. But he, too, said that the Lopezes were a close-knit family. *Id.* at 176. James testified that Daryl was like one of his own children. *Id.* at 177.

94. Eileen Brown, a daughter of Manuel and Eileen Lopez, testified that her parents raised Daryl from the time he was three months old. They worked, but the family was poor. Tr., March 7, 2006, at 59. Daryl's mother Leondra sometimes visited the house, but not often. *Id.* Manuel was an alcoholic. *Id.* at 60. Daryl liked to pretend he was a superhero. One time he

59

thought he could fly and hit his head so hard on the wall that a chunk of wall broke off. *Id.* at 62. Eileen had a heart attack when Daryl was a baby. *Id.* at 64.

95. Martize Powell, son of Tanya Powell and Daryl's first cousin, testified that Eileen and Tanya went to Aunt Conchita's house every day. (Conchita was Manuel Lopez's sister.) A group of cousins around the same age, ten or eleven, played there together. *Id.* at 86. A group of five cousins leaned on each other. Martize said he was there for Daryl. *Id.* at 90. They had no father figures or uncles as role models to help them make the right choices in life. *Id.* at 92.

96. Alana Robinson, another daughter of Manuel and Eileen Lopez, testified that in the early years of her parents' marriage her father had a problem with alcohol. Manuel and Eileen sometimes separated for three to five years. *Id.* at 137. The family was very poor. *Id.* at 138. Eileen had a heart attack right before taking Daryl in. Afterward, her entire income was SSI benefits. *Id.* Leondra never contributed financially for Daryl. *Id.* Alana testified that her sister Alita is schizophrenic and was verbally abusive to Daryl when he was a child. *Id.* at 139. Alana said that her brother Dwight, who also testified, was transient and not a good role model. *Id.* at 141. Ms. Menashe had interviewed Alana Robinson on February 16, 2006.

97. *Aftermath of the murder.* Mark Douglas Wells, M.D., was a plastic and hand surgeon at Grant Medical Center in Columbus. Tr., March 6, 2006, at 148. In January 2005, Dr. Wells treated Daryl in the emergency room for his gunshot wounds and completed the amputation of his left ring finger. *Id.* at 159. He testified that the injury might result in paralysis of the intrinsic muscles of Daryl's thumb and a sensory defect in his ring and index fingers.

98. Donna Morley was a staff chaplain at Grant Medical Center in Columbus. *Id.* at 130. She visited with Daryl after his hand surgery. He expressed remorse for what he had done, and she believed he was sincere. *Id.* at 132. She had only been interviewed by telephone prior to

60

testifying.

99. *Daryl Lawrence's prison adjustment.* Jill Roberts testified that she taught GED classes to Daryl in Ross County Jail starting around September 2005. Tr., March 7, 2006, at 98. Daryl's performance on social studies, science and literature placement tests indicated that he was ready to take the GED test, but he needed more work on math and English. *Id.* at 100-104. Daryl's demeanor during the testing sessions was fine; he was polite. He asked questions. *Id.* at 105. She said she believed that Daryl would be able to take the GED test in federal prison. *Id.* at 106.

100. Mark Herud Stroh testified that he was a deputy U.S. Marshal. *Id.* at 148. He had been responsible for transporting Daryl to and from court since first taking custody of him in the Grant Medical Center. *Id.* at 149. Daryl had not given him any problems at all. *Id.* at 150. Daryl's demeanor reflected his attitude that all the marshals, including Dep. Stroh, have a job to do. Daryl had always been polite, courteous, and respectful. *Id.*

101. John Mosley was a correctional officer at Ross County Jail until 2004. Tr., March 8, 2006, at 5. He testified that he knew Daryl when he was an inmate there. *Id.* at 7. Correctional Officer Mosley and Daryl had a verbal argument after there was a fight in the pod and while Correctional Officer Mosley was trying to get the inmates to lock down. As a consequence, Daryl was locked down for three to five days. *Id.* at 8. Other than that, Correctional Officer Mosley had no problems with Daryl and used him as a mediator for the pod. *Id.* at 8-9. Correctional Officer Mosley often saw Daryl in his cell reading his Bible, and he regularly wanted to have church services. *Id.* at 9. Daryl had adapted well to his circumstances in jail. *Id.* On cross-examination, Correctional Officer Mosley testified that Mr. Lawrence made a polite written request to reinstate pizza night. *Id.* at 14. Another time Mr. Lawrence

61

commented that the water did not have ice in it. *Id.* at 15. Correctional Officer Mosley also testified that Mr. Lawrence and other inmates went on a hunger strike. *Id.* at 17. On a written request form, Mr. Lawrence requested a TV for the pod. *Id.* at 18. On redirect the witness explained that inmates often complain about various conditions. *Id.* at 19.

102. *Mercy, execution impact.* Wendy Ann Poches, a former girlfriend, testified that she met Daryl in summer 1999. Tr., March 6, 2006, at 63. Wendy and Daryl lived together for one year. Daryl cleaned and took care of the kids, but the fact that he did not have a job was a major problem. *Id.* at 64. They had Daryl's daughter Kennedy with them on weekends. *Id.* at 65. Daryl tried to be a good father and was a good person and companion. *Id.* at 67. Wendy testified that she cared for Daryl. He had made a lot of mistakes which he could only pay for if he were alive. *Id.* at 69-70.

103. Ricco Lawrence is Daryl's older half-brother. *Id.* at 78. Ricco was raised by his mother Leondra until age six and then by his aunts and grandmother. *Id.* at 80. Leondra did not hide her drug habit from her kids; Ricco saw her shoot up. *Id.* at 81. Leondra went to private school but later was convicted of a felony and served time in prison. *Id.* at 83. When she was dying of pancreatic cancer, Leondra lived in a filthy high-rise. *Id.* Ricco told the jury that he wanted them to have mercy on Daryl. He asked, "On the day of reckoning, when asked 'where was your mercy?' what will you say?" *Id.* at 91. On cross-examination, Ricco stated that he never went to private school and did not have the luxury of being raised by Manuel and Eileen Lopez. *Id.* at 93. He also testified that "we were a family then" and that the Lopezes tried to isolate them after Manuel's death. *Id.*

104. Mahlon Williams Ransom, Daryl's first cousin and the son of his maternal aunt Florencia, testified that he had been shot at age twenty-four and was paralyzed from the waist

62

down. *Id.* at 105. Mahlon and Daryl had spent "good time together" as children and adults, not always doing "law-abiding things." *Id.* at 106. Mahlon did not talk to defense counsel before the day he testified because he "just couldn't talk to you." *Id.* He testified that he loved Daryl and it would really hurt him if Daryl were executed. *Id.* at 107. He was one of three last-minute witnesses who had not been interviewed in the year before he testified.

105. Nikisha Fountain testified that she was Daryl's cousin, the daughter of Yolanda and Greg Tolliver. *Id.* at 168. Daryl helped her grandmother, Eileen Lopez, take care of the little cousins, and was loving and caring. *Id.* at 169. His execution would have a big impact on the family. *Id.* at 170. Ms. Fountain had also not been interviewed in the year before she testified.

106. Pandora Marie Peoples knew Daryl through working at Jim Kuster's deli for five or six years. *Id.* at 178. She testified that Daryl was like a son to her and she loved him. *Id.* at 181. His execution would be devastating. *Id.*

107. Greg Higginbotham provided physical therapy to Daryl for his injured hand in Ross County Jail starting in mid-January 2005. Tr., March 7, 2006, at 17. He stopped in April 2005 when there was a plateau in Daryl's progress. *Id.* at 19. Mr. Higginbotham had discussions with Daryl about their shared Christian faith. *Id.* at 25.

108. Bonita Valdez, is a granddaughter of Manuel and Eileen Lopez. *Id.* at 29. Bonita spent a lot of time at her grandparents' house, and she and Daryl had a brother-sister relationship. *Id.* at 30. Daryl and his girlfriend lived with Bonita and her husband, but left due to tension with the girlfriend. *Id.* at 33. Daryl later apologized, and his relationship with Bonita became even better. *Id.* at 34. Daryl counseled Bonita that her mate should not be physically or verbally abusive. *Id.* at 40. If Daryl were executed, Bonita said, "it's going to kill us." *Id.* at 41. On cross-examination Bonita explained that she had not been to visit Daryl because she did not have

63

transportation. *Id.* at 42. She testified that Daryl had a child by Natalie Liggins, and he did not support the child. Natalie did not want Daryl to provide financial support for their child. *Id.* at 44-45. The family did help to take care of Daryl's daughter Kennedy financially. *Id.* at 50.

109. Adrian Basil testified that she believed that Daryl is the father of her one-year-old daughter. *Id.* at 66. She said she wanted her daughter to know her father. *Id.* at 68. Adrian contacted defense counsel the Saturday before she testified to say that she wanted to come and help. *Id.* It would be very hard on her as a mother to have to explain to her daughter why the state decided to put her father to death. *Id.* Ms. Basil was a final walk-on witness who had not been interviewed in the year prior to her testimony.

110. Carol Anita Pope testified that she was a friend of the family who had known Daryl for about twenty years. *Id.* at 79. She said that she loved him like her own son. *Id.* at 82. She said it would be devastating for Eileen Lopez if Daryl were executed. *Id.*

111. Yolanda Tolliver, a daughter of Manuel and Eileen Lopez, described them as the "greatest parents in the world." Tr., March 8, 2006, at 44. Her lengthy testimony did not really say anything mitigating, nor did she ask for mercy. When asked about the impact on the family if Daryl were executed, she testified that it would be a devastating blow for their community because the community is "used to seeing our men being put in that kind of pool," and it would be harmful for her mother. *Id.* at 55. It would also be hard on Daryl's daughter, Kennedy, who "worships the ground he walks on." *Id.* at 56. On cross-examination Yolanda testified that when Daryl was not "walking according to the way the word of God said he was supposed to," she counseled him "about how to do things right," as she did with everyone in the family. *Id.* at 59. Sometimes Daryl became angry and frustrated and explained that he had to find a job, but he was fired when they found out that he had a criminal record. *Id.* at 60.

64

112. Kim Moore is Daryl's cousin, Manuel and Eileen Lopez's granddaughter, and the daughter of Alana Robinson. She testified that the time she spent with Daryl when they were children was wonderful; he was more like a little brother than a cousin. *Id.* at 65. If Daryl were executed, she would not be able to take it. A part of her would be dead. *Id.* at 68.

113. Eileen Lopez is Daryl's adoptive mother. She testified that the family was and had been poor; it was hard to get food at times. Eileen worked two jobs. Her husband came back from the service as a changed man and was an alcoholic. *Id.* at 71. Her family spent time with Daryl's fiancée Connie and their son Gabriel every Sunday. *Id.* at 73. Daryl had withdrawals as a baby and he writhed in pain. *Id.* at 75. Sometimes Daryl's mom and dad came around when he was a baby, bringing money for diapers or milk. After they got into the car to leave, Daryl's mother came back inside to ask to get some of the money back. She could not take care of herself. *Id.* at 76. When asked about the impact if Daryl were executed, Eileen testified that "[i]t is hard to lose anybody, but a child, I guess, it is the worst thing a mother could go through. I don't think he deserves it. He's a good kid. He had a good heart. Even all through his life, he had a hard time. He had a hard time." *Id.* at 77.

114. Virgil Starks was a pastor at Oakley Full Gospel Baptist Church and had been Daryl's high school and youth football coach. *Id.* at 81. Mr. Starks coached Daryl on the Westgate Hawks team when Daryl was around twelve or thirteen. *Id.* at 82. Daryl played running back. It was a good team and Daryl was a great athlete. They won the National Junior Super Bowl one year. *Id.* at 83. Mr. Starks also coached Daryl at Bishop Ready High School, and Daryl was again a good player and a great teammate. *Id.* at 85. Mr. Starks had been interviewed by Ms. Menashe on February 15, 2006.

115. *Dr. Cunningham's mitigation summary.* Trial counsel relied on board-certified

forensic psychologist Mark D. Cunningham, Ph.D., to summarize the adverse life events that had put Mr. Lawrence at risk (his "trajectory," "how we got here") and also the factors that would make him likely to adjust well in the highly structured and well-managed environment of federal prison ("where do we go from here"). Tr., March 8, 2006, at 95, 97. Dr. Cunningham had previously testified over two hundred times and was accepted as an expert without objection or *voir dire*. *Id*. at 96. The materials he had reviewed included all the life-history records that trial counsel had gathered (Mr. Lawrence's school, medical, employment, past criminal records, and reports relating to the capital offense, as well as criminal records of other family members[28]), summaries of defense interviews with nineteen "family members and third parties."[29] He prepared demonstrative aids in the form of two files of PowerPoint slides, introduced collectively as Defense Exhibit 21, consisting of 188 slides on development history and risk and 78 on likely adjustment to prison. *Id*. at 99, 265.

116. When opened in Notes Page View, the PowerPoint files display not only the slides that were shown to the jury, but also the "speaker notes" that Dr. Cunningham provided to counsel as a script for his direct examination. Slide 2 of the first file is an example of what was provided to trial counsel to accompany the slide that the jurors were seeing:

---

[28] Dr. Cunningham referred in his testimony to "medical and criminal" records about the family (*id*. at 97), but the summary of records reviewed in his internal file contained only criminal records of other family members. Records Received and Reviewed by Dr. Mark Cunningham, Ph.D., 2/14/2006. I have seen no evidence of any other records obtained for other family members. *See supra* ¶ 55.

[29] Dr. Cunningham's internal summary included memos of these nineteen individuals and another memorandum summarizing interviews with Ross County Inmates & Deputies. Records Reviewed, 2/14/2006.

US v Daryl Lawrence



Dr. Cunningham, before you begin to discuss Daryl's history and the meaning that that history may have for the jury's determination, let me ask you something: If you accept the jury's verdict that Daryl committed this offense, did he have a choice in whether he engaged in this conduct? (yes)

If he had a choice, then what difference does his history or background have with the jury's determination of his moral culpability or blameworthiness? (Because we don't all have the same choices)

Please explain that – how do we not all have the same choices?

*This may simply roll as a narrative without attorney prompting – I have provided prompts if there is an early "ask and answer" objection.*

*After structure is complete, then ask:*

Can someone like this choose to have one of the bad outcomes?

Mark D. Cunningham, Ph.D., ABPP

*See* Cunningham Mitigation PowerPoint, 2-24-06.ppt, at 2. Dr. Cunningham acknowledged that

he had used similar demonstrative aids in other cases, but said he adopted them to make them

67

case-specific: "There's substantial economy to the Court if I don't sit down and remake every slide." *Id.* at 240.

117. Dr. Cunningham offered a framework that equated mitigation with "moral culpability," which he translated as "the angle of the ramp that the choices were made from" in his graphic representation comparing the choices of individuals with and without family histories of addiction, maltreatment, and developmental trauma.[30] *Id.* at 104. *See* slides 18 and 21, respectively:



---

[30] *See also* Dr. Cunningham's later testimony: "The way the scales are loaded is what we call mitigation or moral culpability." *Id.* at 126. While diminished moral culpability is definitely mitigating, the Eighth Amendment jurisprudence of the U.S. Supreme Court makes clear that the two are not coextensive. *See*, for example, *Tennard v. Dretke*, 542 U.S. 274, 288 (2004) ("Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately."); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (inferences about future conduct would not relate specifically to petitioner's culpability at the time of the crime, but "would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'"); *Jurek v. Texas*, 428 U.S. 262, 267 (1976) (history of steady employment and caring for family is mitigating). *See also* Dr. Cunningham's more recent book, EVALUATION FOR CAPITAL SENTENCING 214 (2010) (mitigation is "any factor or reason for a less severe sentence" than death). "A factor jurors may consider is known as moral culpability." *Id.* at 34.

118. Dr. Cunningham employed a framework identified by the Department of Justice over the preceding thirty years as risk factors for "delinquency and violence." *Id.* at 106. He then began checking boxes for the risk factors that he believed applied to Mr. Lawrence. Unfortunately, trial counsel did not address the critical need for proof that each factor existed. In other words, Dr. Cunningham might have been perfectly competent to provide an expert opinion about brain damage, for example, as a developmental risk factor, but trial counsel could not expect jurors to accept his belief that Mr. Lawrence was actually brain damaged absent evidence from a neuropsychologist, neurologist, or neuroradiologist. Dr. Cunningham put a "plus/minus" beside brain damage because he had been told that Mr. Lawrence was exposed to alcohol *in utero*. *Id.* at 107. He acknowledged that he could not be certain:

> There is no safe amount of alcohol consumed during pregnancy. But at the same time, there was not a neuro-psychological assessment that was done of him, an MRI or those kind of things, in early childhood. So, although we have reasonable inference from his mom's drug and alcohol abuse during pregnancy, in the absence of some finding about that, I have got a plus/minus next to it.

*Id.* at 108. In addition, trial counsel had failed even to establish through the testimony of lay witnesses or documentary records direct evidence of Mr. Lawrence's mother's drinking during pregnancy. If lay witnesses discussed her drinking with Dr. Cunningham, but failed to mention it when they testified, even the issue of exposure to alcohol *in utero* had not been subjected to adversarial testing. Florencia Walker vaguely testified that Leondra used heroin, cocaine and alcohol before Daryl was born. Tr., March 6, 2006, at 15. Daryl Walker Sr. mentioned Leondra drinking alcohol, but did not even tie it to her pregnancy with Mr. Lawrence. Tr., March 8, 2006, at 29.

119. A thorough investigation of fetal alcohol and drug exposure would have required interviews with multiple witnesses who knew Leondra at the time of her pregnancy and could

69

discuss her drinking and drug use in detail (i.e., what she drank, what drugs she used and how she ingested them, whether she drank or used drugs daily, whether she binged, etc.); testimony on this point from the witnesses; an attempt to gather prenatal medical (including prison medical) records of Leondra; and a review of all the available information by someone with specialized expertise in Fetal Alcohol Spectrum Disorders and perhaps a neonatologist to review Mr. Lawrence's pediatric records and the lay recollections of his behavior in infancy that led some family members to conclude that he was born addicted. Instead, trial counsel simply relied on Dr. Cunningham as an all-purpose expert on Fetal Alcohol Syndrome, Fetal Alcohol Effects, and brain damage. *Id.* at 132-34. He reported that "[t]he family identified Daryl as a drug baby, their description of Daryl as inconsolably crying." *Id.* at 135. Dr. Cunningham said he was told that as an infant, Daryl had "digestive problems, cried constantly, and had sleep disturbance." *Id.* at 136.

120. Trial counsel went on checking boxes (nineteen out of twenty-two, twenty out of twenty-six, nineteen out of twenty-four), and Dr. Cunningham opined about the "catastrophically cumulative" impact of so many risk factors. *Id.* at 111, 116, and 119. Trial counsel seemed oblivious to the need to establish the existence of each factor through testimony that would harmonize the lay and expert evidence, or objective documentary records created years before Mr. Lawrence faced capital prosecution. In one area after another where specialized expertise was needed, trial counsel relied solely on Dr. Cunningham to assert that specific events occurred (as recounted to him by Mr. Lawrence or his family members), then to draw inferences about resultant conditions, and finally to describe the complex global consequence. For example, Dr. Cunningham related a childhood event where Daryl as a toddler drove his Big Wheel off the basement steps; characterized his behavior under the rubrics hyperactivity, restlessness, and risk

70

taking; and concluded that all these reflected a "hard-wiring issue," *Id.* at 113, 117-18. He reported one head injury diagnosed as a mild concussion at Children's Hospital and multiple others based on family reports. *Id.* at 138-40. Dr. Cunningham even described the neuroanatomical aspects of head injuries ("diffuse axonal shearing"). *Id.* at 142. Venturing further into neuroscience, Dr. Cunningham also discussed "neurobehavioral inhibition" and problems with "executive function" that arise out of the frontal lobes – which he said are also needed for "impulse control" and, perhaps most importantly from a mitigation perspective, capacity for "empathy."

121. Trial counsel also elicited testimony that turned the constitutional requirement of individualized capital sentencing (*see* discussion of *Woodson v. North Carolina, supra* ¶ 3) on its head. Instead of keeping the testimony focused on Daryl Lawrence in his developmental years, Dr. Cunningham posited that Daryl had a "third wiring insult" which he described as "probably attention deficit hyperactivity disorder" (ADHD). *Id.* at 143. Dr. Cunningham conceded that he needed to use the word "probable" because "there was no diagnosis of this during childhood." *Id.* Dr. Cunningham then began referring to a hypothetical group of children with similar behaviors who did have the diagnosis:

> Often they aren't just hyperactive. They also have a behavior disorder that's going along with that by the time they get to their teens. They're either oppositional, in about 59 percent of the cases, or they have conduct disorder, which is disturbed conduct of a major degree. In other words, you aren't just stealing, but you're confronting people, like a little strong-armed robbery. You know, this is beyond typical childhood or teen misconduct.

*Id.* at 145-46. He continued, "*These children* are at substantially higher risk for all kinds of negative outcomes: psychiatric, social, legal, academic, family functioning, all kinds of things." *Id.* at 146 (emphasis added). Trial counsel then elicited the sort of description of the resultant adult criminal that is more usually a prosecution theme: "You're more likely to end up with

71

alcoholism or with sociopathic, or sort of lack of socialized, law-abiding kind of concerns." *Id.* at 147. According to Dr. Cunningham, with childhood hyperactivity, an individual is seven times more likely to end up with a diagnosis of Antisocial Personality Disorder, which is "characterized by doing things that are grounds for arrest, behaving recklessly, not telling the truth, being kind of exploitative of others, those kinds of things, or having a drug abuse problem." *Id.* at 147-48. Once again, trial counsel should have consulted a neuropsychologist or neurologist, rather than introducing harmful, speculative testimony about ADHD.

122. Trial counsel also elicited the sweeping generalization that virtually the entire maternal lineage had personality disorders reflected in their criminal behavior. Dr. Cunningham testified that the family has "classical mental illness kinds of things, as well as rampant personality disorder and criminality and very bad parenting and that kind of stuff that's associated with sort of a fundamental life-adjustment problem." *Id.* at 155. He had been informed that an aunt was diagnosed as schizophrenic and a cousin as schizotypal,[31] but the vast majority seemed to him to have personality disorders, including the father, the maternal great-grandfather, the maternal great-grandmother, the maternal great aunt and uncles, the maternal grandmother, the mother, three maternal uncles, three maternal aunts, two half sisters, and one half-brother – "all of those individuals whose lives show significant personality-related maladjustment criminality issues, and then numerous maternal cousins." *Id.* at 155-57. Dr. Cunningham made clear that he had not diagnosed or tested them personally, but "[t]he life

---

[31] This information would have prompted any reasonable attorney to obtain documentary evidence of these diagnoses, lest Dr. Cunningham have to rely solely on hearsay from witnesses who did not testify to the diagnoses they had reported to the expert. *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (distinguishing cases where "potentially powerful mitigation evidence stared [trial counsel] in the face," as in *Wiggins*, or "would have been apparent from documents any reasonable attorney would have obtained," as in *Rompilla*," from cases where there was no such triggering information). *See supra* ¶ 55 on the failure to gather records from family members.

72

patterns that are described are consistent with personality-related disorders or their experience of major mental illness has been reported to me." *Id.* at 159. Trial counsel had obtained no medical or mental health records to document any of these conditions, only various criminal records showing pervasive criminality. Of course, Dr. Cunningham's characterization of Mr. Lawrence's family members as criminals also undermined not only their credibility as witnesses, but also the feelings they expressed when they testified for Daryl.

123. It was problematic enough that Dr. Cunningham repeatedly relied entirely on anecdotal information rather than documentary evidence, but he said he had tried to check the client's self-reports against reports from other family members and found that Mr. Lawrence seemed reasonably reliable. *Id.* at 185-86. However, trial counsel undermined the expert's credibility by eliciting testimony based solely on Daryl's report of an implausible incident that ostensibly occurred when he was only four years old:

> There is one instance that Daryl remembered, when he is about four years old, that Manuel [Lopez, his surrogate father] is so drunk driving home that he goes up over the curb, drives through a fence, and ends up in somebody's back yard, and is too drunk to get the car in reverse. So, Daryl has been sitting on his lap, sometimes, when they drive. So, Daryl, sits on his lap, helps him get the car in reverse, and helps him back out of the fence area.

*Id.* at 163-63. This is a classic example of the common memory distortion observed in clinical interviews, as noted *supra* ¶ 40, where past personal history is often distorted "by the patient's memory of events and by knowledge that the patient obtained from family members." In this example, the implausible incident not only undermined Dr. Cunningham's credibility but may even have cast Mr. Lawrence in a negative light simply because he had incorporated and repeated family lore as though it was his own recollection.

124. Trial counsel continued to elicit testimony from Dr. Cunningham that seemed to suggest that Mr. Lawrence would inevitably become a violent criminal. Daryl had been

73

subjected to bare-knuckle prize fighting between ages nine and twelve. *Id.* at 139. An FBI Behavioral Science Unit study of a set of homicides found that "bad glue between family members, and particularly between children and parents" was a "core cause." *Id.* at 167-68. According to Dr. Cunningham, lack of parental structure and discipline contributes to aggressiveness "and it predisposes to violence in the community." *Id.* at 177. Daryl had been told his father was a "bank robber and a heist man," so he was expected to follow in his father's footsteps. *Id.* at 194. Trial counsel did nothing to emphasize Mr. Lawrence's lack of violent criminal conduct prior to the bank robberies – or to identify a turning point in his life that led Mr. Lawrence to these crimes. Dr. Cunningham instead simply suggested that all the risk factors in Mr. Lawrence's life had an impact on his "value system, moral development," so that he adopted "lower class values along the way." *Id.* at 205, 212. "These are not the values that Daryl thought of. These are the values of the lower class inner city that is a completely different value set than we walk around with in the middle class, if you will." *Id.* at 213.

125. Dr. Cunningham reported that Mr. Lawrence began to abuse alcohol and drugs as a teenager. *Id.* at 147. He illustrated the familial genetic risk or inherited predisposition for alcohol or drug dependence with a genogram color coded in yellow to indicate alcohol or drug abuse:



59

Cunningham Mitigation PowerPoint, 2-24-06.ppt, at 59.  Unfortunately, there had been no in-depth investigation of Mr. Lawrence's own use of alcohol and drugs, and only one juror believed that he was drug dependent.  *See infra* ¶ 137.

126.  There were two other mental health areas that cried out for analysis by individuals with specialized expertise: trauma, generally, and male sexual trauma, in particular.  Mr. Lawrence had informed Dr. Cunningham that many of his childhood peers died violent deaths as teenagers and young men.[32]  By the time she had reached these slides in Dr. Cunningham's testimony, trial counsel was rushing to finish, so she simply asked him, "I don't want to go through all of those, but is it fair to say that Daryl knew people, friends, people in the community, that have been shot, stabbed, killed?"  Tr., March 8, 2006, at 204.  Dr. Cunningham had correctly identified community violence and rampant victimization as another developmental risk factor, but these deaths needed to be understood in terms of their direct individual impact on Mr. Lawrence at the time.[33]  Trauma affects memory, cognition, emotion, and even biology; it is more than an abstract risk factor for adverse developmental outcomes.  Trial counsel should have consulted a mental health expert with specific expertise in the area of trauma.  In addition, testimony about the impact of these traumatic losses could have helped to humanize Mr. Lawrence.

---

[32] Dr. Cunningham's mitigation PowerPoint listed by name two friends killed in car accidents, a mother stabbed to death by her son just before eighth grade graduation, nine acquaintances who had been shot to death, another who had been stabbed to death, and a former girlfriend who was abducted, tortured, raped, and murdered.  One of Mr. Lawrence's cousins was paralyzed after being shot-gunned in the back.  Cunningham Mitigation PowerPoint, 2-24-06.ppt, at 123-38.

[33] Trial counsel collected obituaries of five natural deaths in the family and three deaths of peers, but there was no investigation of the impact these deaths had on Mr. Lawrence.

127. Male survivors of sexual trauma constitute another highly specialized area of mental health expertise. Dr. Cunningham's single interview of Mr. Lawrence identified multiple aspects of sexually traumatic exposures and abuse, including Daryl's exposure to graphic sexual behavior on the Playboy channel at ages seven to thirteen, the sexually perverse family atmosphere in which an uncle had fathered two of Mr. Lawrence's siblings, his own premature sexualization with a peer-aged girl at age eleven,[34] and direct physical sexual abuse by a nineteen-year-old female when Daryl was fourteen. *Id.* at 195-96. This triggering information should have prompted counsel to investigate in detail all of these events and then to consult a mental health expert with clinical and research expertise in this unique subcategory of trauma.

128. Dr. Cunningham completed his testimony with his separate set of slides on prison adjustment. The key individual factors indicating a likelihood of adjusting well were Mr. Lawrence's age, thirty years, ten months; his past adjustment; his years of schooling which were roughly the equivalent of completing high school; his continued relationship and visitation with his family; and the fact that he would be serving a sentence of life without possibility of release. *Id.* at 215. Visits with his family would give Mr. Lawrence "better anchoring to community values." *Id.* at 221.

129. The cross-examination of Dr. Cunningham was brief, and the Government called no rebuttal expert. Dr. Cunningham acknowledged that he had only testified for the defense in capital cases, ███████████████████████████████ ███████

████████████████████████████████████

███ Dr. Cunningham said he was not concerned if the witnesses who testified did not confirm

---

[34] As noted *supra* note 24, the Children's Hospital records similarly reported Daryl's premature sexualization at age twelve, and Dr. Cunningham had attached a Post-it note to that record: "Sex at twelve."

what they had told him, as long as they did not contradict what they had said in their interviews. *Id.* at 245. The prosecutor noted that the Department of Justice risk factors were developed in the study of juvenile delinquency, but Mr. Lawrence had no criminal justice contact until he was twenty-five years old. *Id.* at 249. Dr. Cunningham responded, "He was simply never apprehended." *Id.*

*Closing arguments at sentencing*

130. The closing arguments were on March 9, 2006. The prosecutor reiterated the two statutory aggravating factors found by the jury in the eligibility phase: grave risk of death to others and pecuniary gain. Tr., March 9, 2006, at 8. He then asserted that the Government had established two non-statutory aggravating factors in the selection phase: the three bank robberies committed in the year prior to the capital crime, and the impact of the victim's murder on his friends, family and community. *Id.* at 8-9. The prosecutor argued that evidence presented by the defense was "not really mitigation but rather unmitigated minimization" (*id.* at 9), and that it fit into five basic categories: the criminality of and lack of involvement by the defendant's biological parents (*id.* at 12); the Lopez family environment (*id.* at 13); the murder and its aftermath (*id.* at 17-23); defendant will be a good prisoner (*id.* at 24); and the personal appeals for mercy (*id.* at 24-25). The prosecutor characterized Dr. Cunningham as a "professional witness" (*id.* at 26) and reduced his testimony to an argument that because the defendant is without a moral compass, the jury should sentence him to life imprisonment. *Id.* at 29. He criticized Dr. Cunningham for diagnosing the entire family without testing, evaluation or reviewing records (*id.* at 26), using DOJ predictors of juvenile delinquency even though Mr. Lawrence was twenty-nine years old when he started committing bank robberies (*id.* at 27), and

77

ignoring the fact that Mr. Lawrence's relatives all grew up in the same neighborhood, but they are not bank robbers or murderers (*id.* at 28).

131. In her closing argument trial counsel Diane Menashe stated that defense counsel were not trying to mitigate, minimize, excuse or justify the actions of Mr. Lawrence. *Id.* at 34. She did not offer an overall explanation of Mr. Lawrence's life and how it contributed to the crime. Instead she presented rebuttals to many of the prosecution's statements. In response to the prosecutor's argument that the testimony of family members was inconsistent, defense counsel argued that it is common sense that people will remember traumatic events, such as Mr. Lawrence's life, differently. *Id.* at 38. She asserted that there was in fact extreme poverty in Daryl's life. *Id.* Trial counsel argued that love from the adoptive family was not enough to counter the existing risk factors and that biological parents cannot simply be replaced by someone else who raises the child. *Id.* at 40. Daryl did not have his parents to take care of him and guide him through life. His father was a robber and a thief, and his mother was a heroin addict who had served time in prison. *Id.* at 42. Trial counsel argued that it was mitigating that so many of Mr. Lawrence's relatives went to prison. She disputed the prosecution's claim that their crimes only involved drugs and property and were therefore not serious. *Id.* Trial counsel argued that Mr. Lawrence was drug dependent, based on the testimony of his brother Ricco, and that the Government wanted the jury to impose middle class values on Mr. Lawrence's life and deny that he was drug dependent. *Id.* at 43. Daryl's parents abandoned him, and trial counsel argued that this would lead anyone to ask what he had done wrong and whether anyone can love him if his own mother does not. *Id.* at 43-44. Trial counsel asked the jury to imagine knowing that your mother was only ten minutes away yet wants no relationship, and that her biggest deathbed regret was not abandoning her children but being raped by her uncle. *Id.* at 44. Even

though Eileen Lopez should not be blamed for Mr. Lawrence's crime, she was unable to provide strong parental influence because she was fifty years old when Daryl was dropped off at her house, her husband died of cancer six years later, she had a paranoid schizophrenic daughter, and they were very poor. *Id.* at 45.

132. Even though Mr. Lawrence has been convicted of first degree murder, trial counsel argued that the fact that he was shot when he entered the bank mitigated the crime. *Id.* at 47. She noted that many people had testified on Mr. Lawrence's behalf, and their facial expressions showed their emotions toward him. *Id.* at 49. Mr. Lawrence proved over the last year that he can be good while incarcerated, in the structured setting in prison. *Id.* at 49. She asserted that rehabilitation is possible, as evidenced by the former prisoner family members who testified, and that even inside a prison cell Daryl's life has value. *Id.* at 50-51.

> So, if Daryl dies via execution, that's because of your verdict. And so, the fact that he is human is incredibly important and should carry incredible weight. Because you know what? Daryl breathes. Daryl smiles. Daryl has a stoic look. Daryl moves. Daryl walks. Daryl breathes. And to end that movement and to end that breath and to end that life, how could you not consider that he is a human? Because that's what they are asking you to kill.

*Id.* at 51. In addition to being human, Daryl was a father, even though the Government claimed he was an irresponsible one. *Id.* at 52.

133. Finally, at the end of her closing, trial counsel explained what the defense lawyers were trying to do. *Id.* at 53. They were asking the jury to save Daryl Lawrence. *Id.* She singled out a photograph of Daryl and said, "Look at that baby in the bathtub. . . . This is who we are asking you to save." *Id.* She asked the jury to let him live and be a father to his children. *Id.* Trial counsel concluded by begging the jury for mercy and not to kill Daryl Lawrence. *Id.* at 54.

134. The Government's rebuttal immediately discounted the notion that they were asking the jury to kill a baby: they were asking the jury to kill a grown man for what he did. *Id.* at 54.

79

The prosecutor urged the jury to be the voice of the community and say that it will hold individuals both legally and morally responsible for their conduct. *Id.* The prosecutor focused his rebuttal on further criticism of Dr. Cunningham's testimony, calling him a box checker who finds ways to check the risk factor boxes and who "travels the nation anointing individuals who are convicted of capital crimes immune from moral responsibility and gets rich doing so." *Id.* at 55-56. Furthermore, his testimony was inconsistent with the testimony of the family members in many ways, not based on sufficient evidence, or simply not convincing. No one testified that Daryl had a drinking problem (*id.* at 57), only Ricco testified that Daryl smoked pot (*id.*), Dr. Cunningham inferred that Daryl had a personality disorder because his aunt might have one (*id.*), Daryl suffered from bad parenting because his mother was a prostitute and heroin addict and his father was a robber (*id.* at 57-58), the abuse and neglect in his mother's family all happened before Daryl was even conceived (*id.*), parental neglect as mitigation was not convincing since Eileen and Manuel Lopez were a mother and father who loved and hugged Daryl (*id.* at 58), everyone in the Lopez family took care of Daryl but he squandered the opportunities he had, such as going to private school (*id.*), Daryl only had only one documented concussion (*id.* at 59), and there is no hard evidence that he had ADD (*id.*).

135. The prosecutor argued that the "vast majority" of the Lopez family worked, served in the military, and did what they were supposed to do even though they had the same genes as Daryl Lawrence. *Id.* at 60. He conceded that some of the Lawrence family members had problems, but he assured the jury that they were held morally responsible. *Id.* at 60-61. He challenged the defense's argument that Mr. Lawrence's fatherhood is mitigating by claiming that he owed $17,000 in child support and that even though he made almost $300,000 in tax-free money he gave only $800 to his daughter and her mother. *Id.* at 61. The prosecutor also pointed

out that Daryl's daughter Kennedy had not visited him once since his arrest (despite family members' claims that she was very close to her father). *Id.* He mocked the notion that the death of his biological mother in 2003 could be considered a mitigating factor given that Daryl barely knew her. *Id.*[35] He concluded by arguing that some "crimes are so detrimental" that the offenders "forfeit their right to exist." *Id.* at 70.

*Sentences and verdict sheet*

136. The jury began its sentencing deliberations at 11:44 A.M. on March 9, 2006, and adjourned for the day at 4:50 P.M. Tr., March 9, 2006, at 113-14. They returned at 8:30 A.M. on Friday, March 10, 2006. At 3:54 P.M., they announced their verdicts, sentencing Mr. Lawrence to life in prison without any possibility of release on Count 7 and to death on Count 8. Tr., March 10, 2006, at 15, 20. Signed verdict sheets were also filed with the Court on that date.

137.

---

35 ███████████████████████████████████████ Trial counsel had failed to explain through lay testimony and Dr. Cunningham the powerful emotional connection between Mr. Lawrence and his mother even though they did not live under the same roof. Mr. Lawrence grew up knowing who she was and that she lived nearby, and he had a child's natural desire to understand why he did not have the love, attachment, and support that most of his peers experienced. One wonders how he answered other children when they asked why his mother did not raise him. Trial counsel simply did not develop these points.

81





83



138.



*The "red flags" that were not investigated*

140. It is appropriate to pause here to review some of the deficiencies in the 2006 sentencing proceeding and to identify the "red flags" that should have prompted more thorough investigation. The Supreme Court has consistently stressed the importance of pursuing leads. In *Wiggins*, cited *supra* ¶ 2, nothing that trial counsel had uncovered suggested that mitigation would be fruitless: "To the contrary, the many red flags . . . would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. at 525. Similarly, in *Rompilla*, also cited *supra* ¶ 2, the Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. at 391. In fact, post-conviction experts

"found plenty of 'red flags' pointing up the need" for further investigation. *Id.* at 392. In *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009), the Court distinguished the weak claim of ineffectiveness in that case from the compelling claims in *Wiggins* and *Rompilla*, because it was "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face [citation omitted], or would have been apparent from documents any reasonable attorney would have obtained [citation omitted]."

141. There were numerous red flags requiring consultation with a medical doctor, ranging from Mr. Lawrence's potential *in utero* exposure to alcohol and other drugs and the headaches documented in his Children's Hospital records to his interrogation in the capital case between hospital visits for his gunshot wounds. In addition, trial counsel needed a physician to review the injuries that Mr. Lawrence suffered in the bank shootout, his subsequent medical treatment (including the amputation of a finger), and the long-term physical consequences of these conditions. Medical advice would have been useful in guiding a thorough investigation of the *in utero* exposure to alcohol and other neurotoxins and assessing the symptomatology that prompted family members to describe Daryl in his infancy as a drug baby. *See supra* ¶ 119. A physician might then have advised about whether it was necessary to consult additional specialized experts, such as a neonatologist and experts on Fetal Alcohol Spectrum Disorders. I have already discussed *supra* ¶¶ 118-120 the importance of consulting one or more experts with expertise in brain damage, such as a neuropsychologist, neurologist, or neuroradiologist, given all the reported instances of head trauma as well as the *in utero* exposure to neurotoxins. It was also critical to conduct an in-depth investigation of Mr. Lawrence's alcohol and drug history.

142. Trial counsel was also on notice that Mr. Lawrence had been exposed to severe community violence in his developmental years, so there was a need to investigate the

community itself and the impact of the specific traumatic impact of the numerous homicides that took the lives of Mr. Lawrence's friends and acquaintances. *See supra* ¶ 126. There was a similar need for specialized expertise in male survivors of sexual abuse. *See supra* ¶ 127. Even the poverty of the family that raised Mr. Lawrence was a red flag that should have prompted trial counsel to obtain hard evidence of what they lived on, through detailed earnings information from the Social Security Administration, or documentation that they had trouble paying parochial school tuition.

### Conclusions

143. In summary, trial counsel failed to conduct a thorough and expansive investigation of Mr. Lawrence's potential mitigating evidence, and in particular failed to investigate the numerous "red flags" outlined *supra* ¶¶ 140-142. The mitigation investigation did not obtain multigenerational records or generate the routine work product such as chronologies and genograms that were the basic tools of the trade required under the prevailing norms of 2005-2006. Trial counsel failed to retain a mental health expert with specific expertise on chronic trauma and its developmental impact. Trial counsel failed to obtain neuropsychological testing, neurological assessment, or neuroimaging to evaluate potential brain damage. Trial counsel failed to investigate fetal alcohol exposure or its effects. Trial counsel failed to investigate the institutional failures that denied Mr. Lawrence the intervention that might have protected him from the alcoholism, physical violence, deprivation, perverse sexual exposure, and neglect that characterized his home environment. As in the *Wiggins* case, cited *supra* ¶ 2, counsel "abandoned [their] investigation" of Mr. Lawrence's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. They

87

chose the least credible witnesses – poorly prepared lay witnesses and an expert who had been rushed to the stand without an opportunity to review their testimony – to recount his life history, and the lay witnesses sometimes completely contradicted the expert and generally failed to support his conclusion. They had no objective, credible lay witnesses, such as teachers, employers, co-workers, classmates, neighbors, and counselors, to discuss what was happening in Mr. Lawrence's developmental years. The totality of the presentation failed to humanize Mr. Lawrence, in the sense that it did not create the empathic identification that would allow jurors to recognize him as a member of their human community.[36]

144. It is my considered professional opinion that trial counsel's performance in Mr. Lawrence's case fell far below the prevailing norms of 2005-2006 in the investigation and presentation of mitigation evidence. It is also my considered professional opinion that the mental health evidence presented in 2006 lacked the foundational social history that is essential to both reliability and credibility and that counsel failed to engage the services of experts on trauma and brain functioning despite numerous indications of the need to explore those areas.

145. As the Supreme Court of the United States has noted, "The right to the effective assistance of counsel at trial is a bedrock principle in our justice system. It is deemed as an 'obvious truth' the idea that 'any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.'" *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) (citation omitted).

146. The harm in this case is not just to Mr. Lawrence, whose life is in jeopardy, but to

---

[36] This need for empathic identification was noted in *Witherspoon v. Illinois*, 391 U.S. 510, 520 n.17 (1968), when the High Court quoted the writer Arthur Koestler: "The division is not between rich and poor, highbrow and lowbrow, Christians and atheists: it is between those who have charity and those who have not. . . . The test of one's humanity is whether one is able to accept this fact – not as lip service, but with the shuddering recognition of a kinship: here but for the grace of God, drop I." KOESTLER, REFLECTIONS ON HANGING 166-167 (1956).

the jurors who rendered a life-and-death decision with insufficient information to produce a morally reliable result and to the justice system itself, which holds the public's trust only to the extent that its proceedings are fair and "appear fair to all who observe them."[37]

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the States of California and Ohio, that the foregoing is true and correct and was executed this _1_ day of December 2015 at Oakland, California.

RUSSELL STETLER

---

[37] This is Chief Justice Rehnquist's language in a case where he noted "the institutional interest in the rendition of just verdicts" as being just as important as the rights of the criminally accused. *Wheat v. United States*, 486 U.S. 153, 160 (1988). *See also* Justice Marshall's comment in *Ake v. Oklahoma*, 470 U.S. at 79: "The State's interest in prevailing at trial – unlike that of a private litigant – is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases."

# Exhibit 2:

# Bob Stinson Declaration

Declaration of Bob Stinson

1. My name is Bob Stinson. I am a licensed forensic psychologist. I have been practicing since 1999 in state hospitals and correctional agencies and have had a private practice in Columbus, Ohio since 2000. I received my doctorate in Psychology in 1999 from Wright State University.

2. In 2005, Columbus attorneys Diane Menashe and Kort Gatterdam retained me in the federal capital case of *United States v. Daryl Lawrence*.

3. I was recently contacted by Mr. Lawrence's current counsel and, in preparation for a discussion with them, I reviewed my files from the *Lawrence* case. I also reviewed an additional set of documents (comprised of 86  pages, plus a two-page visit summary) provided to me on November 12, 2015 by one of Mr. Lawrence's attorneys, Miriam Gohara. These additional records were Daryl Lawrence's medical records from Children's Hospital in Columbus which recorded treatment provided to Mr. Lawrence from the 1970s until the 1990s.  After carefully reviewing these documents, I am confident that I have never previously seen these records before Ms. Gohara provided them to me.  They also, were not part of my *Lawrence* file prior to trial.

4. Mr. Lawrence's current attorneys have asked me to provide this declaration to explain the scope and limitations of my role in Mr. Lawrence's case at trial.

5. My billing records reflect that I spent 37.25 hours on Mr. Lawrence's case, between March and October of 2005.  I met Mr. Lawrence three times, for a total of 9.75 hours, and administered several psychological tests. I also reviewed records that Mr. Gatterdam and Ms. Menashe provided me, including some of Mr. Lawrence's employment records, medical records, and school records. I also reviewed eight interviews and a family tree by Mr. Lawrence's lawyers or their investigator.

6. Upon reviewing my billing records, I saw that I met with Mr. Lawrence on April 2, 2005 for 2.75 hours, May 3, 2005 for 5 hours, and on May 21, 2005 for 2 hours. On each occasion I met with Mr. Lawrence at the Ross County Jail. On June 17, 2005, I talked with the attorneys and their mitigation investigator, Martha Phillips, over the phone for fifteen minutes.

7.  In August of 2005, Mr. Lawrence's lawyers and I corresponded about how much more time I estimated I would need for my assessment of Mr. Lawrence and for trial preparation. In October, Ms. Menashe informed me that the court had approved additional funding for my work on the case.

8.  On October 24, 2005, I met with Ms. Menashe and Ms. Phillips. This was my only in-person meeting with the attorneys (or other team members) about Mr. Lawrence's case.

9. Before the October 24 meeting, I had received a memo dated August 16, 2005, enumerating a number of records that the team had collected. I made hand-written notes on that memo and

1

circled the records that I had received from the team. Because I had not received the Children's Hospital records (list item number 6), I did not circle it. I did, however, note: "Diane to get for me, 10-24-05."

10. At the October 24 meeting, I remember Martha Phillips providing me with some records but not the Children's Hospital records, which I believe Ms. Menashe then told me she would U.S. Mail me at a later date. I never received the Children's Hospital records. (I presume this is because, as noted below, they then decided to go with a different expert.) Had I received them, I would have documented that on the August 16 records memo. Moreover, after review of my files, I can confidently state that they are not part of my *Lawrence* trial case file.

11. Before our October team meeting, I prepared a case summary, based on my review of the records I had received and the testing of Mr. Lawrence that I conducted. In that summary, which I presented to Mr. Lawrence's trial lawyers, I outlined the psychological instruments I administered to Mr. Lawrence and reported their results. Those tests were the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), the Wechsler Memory Scale – Third Edition (WMS-III), and the Woodcock-Johnson Tests of Achievement – Third Edition (WJ-III).  This limited battery of tests is sometimes useful for screening for cognitive impairment and can provide a broad assessment of a person's cognitive functioning. I also noted what I called "Significant inter-test scatter" in seven areas. I noted that scatter and pointed it out in my summary, because it indicated a possible neuropsychological deficit in Mr. Lawrence, or what I would call a "soft sign" of impairment. A soft sign usually refers to a finding that indicates a potential abnormality but cannot by itself establish a diagnosis or reveal its etiology. Soft signs inevitably require further, more specific, evaluation and testing.  Mr. Lawrence's test results also indicated a deficit in his "working memory." Once I pointed these soft signs of impairment out to Mr. Lawrence's lawyers, I would have explained that while my general cognitive testing of Mr. Lawrence did not find any "silver bullet" that they should be aware of in developing Mr. Lawrence's mitigation, if they had wanted to explore this possible deficit further, they could pursue a full neuropsychological assessment or neurological exam.

12. At the October 24 meeting, we discussed the team's engagement of Dr. Mark Cunningham, a psychologist who was already known for his testimony in death penalty trials, especially those involving federal capital cases.  (I was a relatively new practitioner then, and had not testified in any federal death penalty cases.) During our October 24 meeting, we agreed that Dr. Cunningham's work and mine might overlap in some areas and so it may not make sense for me to continue working on Mr. Lawrence's case.

13. I later received a letter from Ms. Menashe, dated November 9, 2005, in which she memorialized our October 24 discussion about Dr. Cunningham's involvement in Mr. Lawrence's case rendering my work duplicative and letting me know that my services would no

longer be necessary. I wrote Ms. Menashe back on November 13, 2005, saying that her decision made good sense to me, and wished the team luck on the remainder of Mr. Lawrence's case.

14. Although Ms. Menashe's November 9, 2005 letter says that Mr. Lawrence's results on the tests I administered were not "illustrative of any neurological impairment or significant mental defect," nothing I reported to the team could have ruled out or foreclosed the possibility that Mr. Lawrence had neurological deficits. In fact, the test scatter that I reported to the team based on my broad-based assessment pointed to the possibility of such deficits.

15. When I reviewed the Children's Hospital records provided to me by Mr. Lawrence's current attorneys, I saw a number of notations in them of head injuries, headaches and nose bleeds requiring medical attention, and high blood pressure, all of which would have prompted me to suggest to Mr. Lawrence's trial lawyers that they consult a medical doctor who could do a physical examination of Mr. Lawrence, including neurological testing. Because I am not a medical doctor, those exams are outside my area of expertise.

16. Some of the Children's Hospital notes that I would have flagged for Mr. Lawrence's trial lawyers as a basis for recommending that they consult a medical doctor include the following:

a. On April 3, 1978, when Mr. Lawrence was two years and eleven months old, Mr. Lawrence fell on his head, and was reported lethargic and wanting to sleep. He was reported to have fallen down three steps and landed on his head, and there was a notation about a mild concussion.

b. On July 21, 1980, when Mr. Lawrence was four years and eleven months old, he was seen for a nosebleed at one hospital the previous night and had then gone to Children's Hospital for follow up because his nose was packed but there was still bleeding through the packing. Mr. Lawrence was reported to have a history of high blood pressure as well as nosebleeds.

c. On August 13, 1980, when Mr. Lawrence was four years and four months old, he was reported to have a history of epistaxis, or nose bleeds.

d. On February 8, 1983, when Mr. Lawrence was seven years and eight months old, he was taken into the hospital with a high fever, lethargy, and vomiting, and was reported to get bad nose bleeds after heavy exercise. He was noted to have a loss of appetite and be very lethargic.

e. On November 1, 1986, when Mr. Lawrence was eleven years and seven months old, he was taken into the hospital immobilized on a backboard after being hit in a football game, receiving a helmet to the abdomen. His blood pressure was 140/80.

f. On March 15, 1989, when he was thirteen years and eleven months old, Mr. Lawrence went to the hospital with a blood pressure of 132/71 and the notation said that he had a history of

3

high blood pressure, nosebleeds, and headaches. The note ordered that Mr. Lawrence's blood pressure be taken daily by the school nurse, and taken twice during headaches if possible.

g. On October 26, 1989, when Mr. Lawrence was fourteen years and six months old, he went to the hospital complaining of a headache from the day before, following a three-hour practice. A history of hypertension and headaches was noted. He was reported to have had two nosebleeds since his last visit. The notes also indicated headaches twice each week, reported dizziness and throbbing pain at his vertex.

h. On November 8, 1989, when Mr. Lawrence was fourteen years and seven months old, he was taken to the hospital to have his high blood pressure checked. He reported no nosebleeds but occasional headaches. He was also noted to have a history of headaches, nosebleeds, and hypertension.

i. On February 20, 1990, Mr. Lawrence was at the hospital for a nosebleed and reported that he had a history of headaches after working out hard. He reported dull pain in the parietal area. The note also reports a history of nosebleeds, four heavy bleeds per year, difficult to stop bleeding, borderline hypertension.

j. On December 15, 1992, when Mr. Lawrence was seventeen years and eight months old, he went to the hospital reporting a right-sided headache and difficulty sleeping.

k. In an undated record, Mr. Lawrence is reported to have a history of headaches following strenuous exercise, a history of hypertension, and a history of nosebleeds.

17. I declare under penalty of perjury that the foregoing is true and correct.

_Bob Stinson_ Psy.D.

_____

Bob Stinson, Psy.D., J.D., LICDC-CS, ABPP
Board Certified Forensic Psychologist


Executed on 11-24-15.

4

# BOB STINSON
## PSY.D., J.D., LICDC-CS, ABPP

### Ψ

**Board Certified Forensic Psychologist**
**Attorney at Law**
**Licensed Independent Chemical Dependency Counselor – Clinical Supervisor**

| | |
|---|---|
| Stinson & Associates, Inc. | Forum Ohio, LLC |
| 7440 Rolling Ridge Way | 20 S. Third Street |
| Westerville, OH 43082 | Columbus, OH 43215 |
| (614) 309-9727 | (614) 309-9727 |
| Stinson@StinsonAndAssociates.com | Stinson@ForumOhio.com |

## Education

**Doctor of Psychology**
Psy.D., September 1999
Wright State University
School of Professional Psychology
Full APA Accreditation
Dayton, Ohio

**Juris Doctor**
J.D. (Law), January 2011
Capital University Law School
Summa Cum Laude
Criminal Litigation Concentration
Dispute Resolution Concentration
Columbus, Ohio

**Bachelor of Science**
B.S. in Psychology, June 1995
Summa Cum Laude
With Honors in Liberal Arts
With Distinction in Psychology
Minor:  Criminology and Criminal Justice
The Ohio State University
Columbus, Ohio

**Deaf Studies**
Studies in American Sign Language (ASL) and Deaf culture
Sinclair Community College
Dayton, Ohio

**BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP**
**PAGE 2 OF 20**

## Special Credentials

**Licenses**
- Ohio Psychology License Number 5715, 9-22-00
- Ohio Supreme Court Registration #0087267, 5-9-11
- Ohio Chemical Dependency Professionals Board #131166, 8-23-13

**Specialty Board Certification**
- Board Certified Forensic Psychologist by the American Board of Professional Psychology (ABPP), April 2008 - Present

**National Register**
- National Register of Health Service Psychologists #50833 (Previously, National Register of Health Service Providers in Psychology) 2004 – Present

**Hospital Privileges**
- Twin Valley Behavioral Healthcare (2000-2014) Active Full Member of the Medical Staff Organization Privilege Level III (Full Privileges) Additional Forensic Evaluation Privileges (Special Privileges) Chair, Ethics Committee (Member, 2009-2014; Chair, 2013-2014) Member, Medical Staff Executive Committee (MSEC) (2013-2014)

**University Affiliations**
- The Ohio State University, Adjunct Professor Moritz College of Law

- The Ohio State University, Adjunct Assistant Professor, Dept. of Psychology;  Pre-Doctoral Clinical Training Supervisor

- Wright State University School of Professional Psychology – Clinical Associate Professor, Clinical Competency Examiner, & Clinical Training Supervisor

- Union Institute and University, Adjunct Faculty (Inactive), Pre-Doctoral Clinical Training Supervisor

- Fielding Graduate University, Doctoral Program in Clinical Psychology, Clinical Training Supervisor (Inactive)

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 3 of 20

## Professional Affiliations

- ► Diplomate, American Board of Professional Psychology (ABPP)

- ► Fellow, American Academy of Forensic Psychology (AAFP)

- ► Board of Directors & Ethics Committee Chair, Ohio Psychological Association (OPA)

- ► President-Elect (2014-2015), Ohio Psychological Association

- ► Former President, Central Ohio Psychological Association (COPA)

- ► Member, American Psychological Association (APA)

- ► Member, The Division of School Psychology, Division 16 of the APA

- ► Member, The Division of Psychologists in Public Service, Division 18 of the APA

- ► Member, The American Psychology-Law Society, Division 41 of the APA

- ► Member, Ohio State Bar Association (OSBA)

## Committees / Advisory Boards

- ► Sex Offender Certified Treatment Program Board (2014-Present)

- ► Executive Committee, Ohio Psychological Association (OPA) (2014-2017; President-Elect, 2014-2015; President, 2015-2016; Past President, 2016-2017)

- ► Finance Committee, Ohio Psychological Association (OPA) (2013-Present)

- ► Ethics Committee, Ohio Psychological Association (OPA) (2009-Present; Chair, 2011-2014)

- ► Ethics Committee, Twin Valley Behavioral Healthcare Medical Staff (2009-2014; Chair, 2013-2014)

- ► Attorney General Task for on Criminal Justice and Mental Illness / Mental Health and the Courts Sub-Committee (2012-Present)

- ► Ohio Mental Health and Deafness Advisory Council (Inactive)

- ► Wright State University SOPP Mental Health and Deafness Advisory Board (Inactive)

- ► Deaf Off Drugs and Alcohol (DODA) Statewide Steering Committee (Inactive)

- ► Wright State University SOPP – Academy of Psychology, Board of Directors (Inactive)

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
## PAGE 4 of 20

## Professional Experiences

**Ohio Department of Youth Services**                                June 2014-Present
Chief of Behavioral Health Services
Columbus, Ohio

Population:         ► Adolescent and young adult males and females committed to the Ohio
                      Department of Youth Serivces

Responsibilities:   ► Clinical and administrative oversight of behavioral health services at all
                      Department of Youth Services facilities.
                    ► Review and write policies.

**Twin Valley Behavioral Healthcare-Columbus Campus**               July 1999-June 2014
Psychologist (Started as a Post-Doctoral Resident for one year)
Columbus, Ohio

Population:         ► Multicultural male and female adult (and some adolescent) psychiatric
                      inpatients who present with a broad range of problems, including legal
                      issues and severe psychopathology; civil & forensic patients

Responsibilities:   ► Complete psychological evaluations.
                    ► Perform intellectual, neuropsychological, personality, and forensic
                      assessments.
                    ► Conduct initial clinical risk assessments and risk assessment updates.
                    ► Provide individual and group psychotherapy.
                    ► Train and supervise pre- and post-doctoral residents, and master-level
                      psychology assistants.
                    ► Serve as a psychological consultant.
                    ► Lead research, publish articles, and provide community education.
                    ► Serve as a consultant to other disciplines including medical, nursing, and
                      social work.
                    ► Chair or participate as a member of various committees (including, for
                      example, the Ethics committee, a competency to stand trial committee, an
                      NGRI committee, a patient assaultiveness reduction committee, the HCR-20
                      Risk Assessment Implementation Committee, and a web development
                      committee).
                    ► Fulfill various administrative responsibilities.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
**PAGE 5 of 20**

**Stinson & Associates, Inc. (Previously Bob Stinson, Psy.D., Inc.)**   September 2000-Present
Private Practice, Psychologist, Specializing in Forensic Psychology
Westerville, Ohio

Population:
- ▶ Multicultural male and female adults and children/adolescents in need of clinical and/or forensic psychological evaluations.

Responsibilities:
- ▶ Provide psychological consultations to courts, attorneys, and various Forensic Diagnostic Centers.
- ▶ Complete forensic evaluations (e.g., competency to stand trial, sanity, sexual offender risk assessments, sentencing evaluations, and other psycho-legal issues), including reviewing records, interviewing individuals, and psychologically testing and evaluating defendants.
- ▶ Write forensic reports.
- ▶ Provide expert testimony.

**The Ohio School For the Deaf**   October 2001-Present
Contract Psychologist
Columbus, Ohio

Population:
- ▶ Deaf and Hard of Hearing children enrolled at the Ohio School for the Deaf or another school throughout the state of Ohio

Responsibilities:
- ▶ Provide and supervise the provision of psychological and psychoeducational evaluations as part of a multifactored evaluation (MFE) team.
- ▶ Provide psychological consultation to the multifactored evaluation team.
- ▶ Provide consultation / outreach services to parents and schools with deaf or hard of hearing students in the state of Ohio.

**Forum Ohio, LLC**   March 2014-Present
Co-Owner; Forensic Psychologist
Columbus, Ohio

Population:
- ▶ Multicultural male and female adults and children/adolescents in need of clinical and/or forensic psychological evaluations.

Responsibilities:
- ▶ Manage all business operations and personnel matters
- ▶ Provide psychological consultations to courts, attorneys, and various Forensic Diagnostic Centers.
- ▶ Complete forensic evaluations (e.g., competency to stand trial, sanity, sexual offender risk assessments, sentencing evaluations, and other psycho-legal issues), including reviewing records, interviewing individuals, and psychologically testing and evaluating defendants.
- ▶ Write forensic reports and provide expert testimony.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 6 OF 20

**Bureau of Disability Determination**                                   Jan. 2001 – Dec. 2004
Psychological Consultant
Columbus, OH

Population:        ▶ Multicultural male and female adults and children applying for Title II
                     and/or Title XVI disability benefits under the Social Security Act.

**Bureau of Disability Determination (Continued)**
Responsibilities:  ▶ Evaluated medical evidence to determine its adequacy for making disability
                     determinations.
                   ▶ Assessed the severity of impairments and described the functional capacities
                     or limitations imposed by such impairments.
                   ▶ Discussed with examiners and other staff members ways to resolve
                     problems in getting evidence of record.
                   ▶ Reviewed requests for consultative examinations to assured necessity and
                     described alternatives as needed.
                   ▶ Evaluated medical/psychological questions and made recommendations for
                     improvement to obtain proper evidence.
                   ▶ Discussed with staff members ways to improve relations with the medical
                     profession, enlarge consultative examiner panels, and minimize processing
                     time.
                   ▶ Discussed with training staff ways to improve examiner understanding and
                     use of medical evidence.
                   ▶ Reviewed consultative reports for deficiencies in content and recommended
                     ways to avoid deficient reports.
                   ▶ Participated in vocational rehabilitation screening and referral processes
                   ▶ Reviewed determinations to assure integrity of decisions based on medical
                     evidence.
                   ▶ Provided in-service and open-to-the-public trainings and seminars.

**Columbus Colony Elderly Care**                                         Aug. 2001-Aug. 2003
Director and Supervisor of Psychological Services
Contract Psychologist
Westerville, Ohio

Population:        ▶ Multicultural male and female deaf, deaf-blind, hearing, and hard of hearing
                     nursing home residents

Responsibilities:  ▶ Completed psychological evaluations and provided individual
                     psychotherapy.
                   ▶ Provided consultation and in-service training to nursing home staff members
                     and administration.
                   ▶ Developed, trained, and supervised a mental health treatment team.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 7 OF 20

## Professional Experiences (Continued)

**Drs. Gibeau & Hrinko (Private Practice)**  September 1998-September 2000
Pre-Doctoral and Post-Doctoral Psychology Assistant
Springfield, Ohio
Clinical Hours:   8 hours per week

Population:  ► Multicultural male and female child, adolescent, and adult outpatients  who presented with a variety of psychological and  emotional problems

Responsibilities: ► Completed psychological evaluations and assessments (including BVR, BDD, parental fitness, custody, and other forensic evaluations).
► Completed psychoeducational assessments and served as the psychology representative on a multifactored evaluation (MFE) team.
► Conducted individual and group psychotherapy.
► Developed and implemented an anger management group for the Clark County Juvenile Court.
► Provided community education.
► Served as a psychological consultant.

**Wright State University, School of Professional Psychology**  September 1998-August 1999
**Residency Program (Full APA Accreditation)**
Pre-doctoral Psychology Resident
Dayton, Ohio
Hours:  40 hours per week; total hours = 2000

*1st Rotation:  Twin Valley Psychiatric System-Dayton Campus*  September 1998–February 1999
Rotation Hours:  40 hours per week; total hours = 1000

Population:  ► Multicultural male and female adult psychiatric inpatients who presented with a broad range of problems, including severe DSM-IV Axis I and Axis II psychopathology; civil and forensic patients

Responsibilities: ► Completed psychology section of multidisciplinary assessments.
► Conducted initial risk assessments and risk assessment updates.
► Participated in competency to stand trial and sanity evaluations.
► Developed and implemented a problem solving group.
► Participated as a member of a multidisciplinary treatment team.
► Wrote multidisciplinary treatment plans.
► Taught a section on psychotherapy to medical students.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 8 OF 20

## Professional Experiences (Continued)

*2nd Rotation:  Ellis Human Development Institute*  March 1999-August 1999
Rotation Hours:   40 hours per week; total hours = 1000

Population:
- ▸ Multicultural male and female children, adolescents and adults who presented with a broad variety of outpatient problems

Responsibilities:
- ▸ Provided individual, couples, family, and group psychotherapy.
- ▸ Completed cognitive, personality, and academic assessments.
- ▸ Co-facilitated a domestic batterers group (PATH).
- ▸ Served as Resident On-Call.
- ▸ Supervised graduate level trainees.
- ▸ Participated in weekly staffings.

**Center for Psychological Services, Wright State University**  September 1997-August 1998
**Office of Disability Services, Wright State University**
Pre-doctoral Psychology Trainee
Dayton, Ohio
Practicum Hours:  17 hours per week; total hours = 815

Population:
- ▸ Multicultural and diverse college students experiencing mood, anxiety, and adjustment disorders; academic difficulties and learning disabilities; drug and alcohol problems; relationship difficulties; gender identity issues; eating disorders; and/or personality disorders

Responsibilities:
- ▸ Conducted short and long term psychotherapy.
- ▸ Completed cognitive, personality, educational, and neuropsychological assessments.
- ▸ Co-facilitated a stress management and relaxation group.
- ▸ Provided psychoeducational presentations.
- ▸ Served as the psychological liaison and consultant with the athletic and recreation departments.
- ▸ On-call for crisis intervention; initial screenings, and consultations.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 9 OF 20

## Professional Experiences (Continued)

**Male Responsibility Program, Dayton Urban League**          May 1996-August 1998
Pre-doctoral Psychology Assistant, Student Supervisor
Dayton, Ohio
Practicum Hours:  4 hours per week; total hours = 300

Population:
- ► Adolescent males, primarily African American, experiencing behavioral problems; academic difficulties; learning disabilities; and mood, anxiety, and adjustment difficulties

Responsibilities:
- ► Supervised first and second year graduate students who participated in the tutorial portion of the Male Responsibility Program.
- ► Consulted other professionals, including school personnel.
- ► Co-developed a behavioral incentive program.
- ► Conducted individual and group counseling.
- ► Administered academic and psychological assessments.
- ► Engaged in research design, data collection, and data analysis.

**London Correctional Institution, State Prison**          September 1996-August 1997
Pre-doctoral Psychology Trainee
London, Ohio
Practicum Hours:  17 hours per week; total hours = 860

Population:
- ► Multicultural male inmates presenting with personality disorders, anxiety disorders, adjustment disorders, psychotic disorders, sexual disorders, and substance-related disorders

Responsibilities:
- ► Developed and facilitated a weekly anger management group.
- ► Performed pre-parole evaluations and provided written reports.
- ► Consulted with and participated as a member of the Local Control Committee (overseeing a disciplinary segregation unit).
- ► Assisted in forensic evaluations (e.g., competency to be executed, competency to stand trial, and juvenile bind-over cases).
- ► Conducted short and long term individual psychotherapy.

**BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP**
**PAGE 10 OF 20**

## Professional Experiences (Continued)

**Frederick A. White Health Center, Wright State University**      November 1996-January 1997
Pre-doctoral Psychology Trainee
Dayton, Ohio
Practicum Hours:  Total hours =  25

Population:            ▶   University students suspected of having a learning disability

Responsibilities:      ▶   Completed learning disability assessments and reports.

**Mental Health and Deafness Program**                          September 1995-June 1996
Pre-doctoral Psychology Assistant
Dayton, Ohio
Practicum Hours:  5 hours per week; total hours = 230 hours

Population:            ▶   Deaf children and their families; presenting problems included adjustment disorders, hyperactivity, and behavioral problems

Responsibilities:      ▶   Provided short and long term individual and family psychotherapy.
                       ▶   Gained experience and supervision in working with deaf clients, their families, and sign language interpreters.

**Suicide Prevention Services, North Central Mental Health Center**      September 1994-May 1995
Undergraduate Psychology Volunteer
Columbus, Ohio
Service Hours:  6 hours per week; total hours = 145 hours

Population:            ▶   Individuals in the central Ohio community who phoned in to the crisis intervention hotline

Responsibilities:      ▶   Completed 50 hours of instruction and training.
                       ▶   Serviced a crisis intervention hot line.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
**PAGE 11 OF 20**

## Classroom Teaching Experiences

**The Ohio State University, Moritz College of Law**                    August 2014 - Present
Position:            Adjunct Faculty
Courses:             Forensic Mental Health Law
Responsibilities:    Instructor of the Forensic Mental Health Law course

**Wright State University, School of Professional Psychology**          August 2013 - Present
Position:            Clinical Associate Professor
Courses:             Forensic Assessment
                     Forensic Practicum
                     Dissertation
Responsibilities:    Instructor of the Forensic Assessment (Criminal) course
                     Supervision of practicum students
                     Member of dissertation committees
                     Member of Clinical Competency Examination (CCE) committees

**Union Institute and University**                                      April 2002 – January 2008
Position:            Adjunct Professor
Courses:             Social Bases of Behavior
                     Consultation and Supervision
                     Forensic Practicum
                     Dissertation
Responsibilities:    Served as a voting member of dissertation committees
                     Read and responded to material presented by Union Institute learners
                     Provided in-depth analysis of learner performance
                     Assisted in guaranteeing the use of appropriate research methodologies
                     Encouraged the acquisition of specific disciplinary knowledge
                     Evaluated students and the Union Institute process

**Wright State University, School of Professional Psychology**          September. 1998-June 1999
Position:            Teaching Assistant
Courses:             Personality Assessment II:  Rorschach Administration
Instructor:          Eve M. Wolf, Ph.D.
Responsibilities:    Provided individual tutorials as needed.
                     Taught sections on Rorschach Administration.
                     Evaluated students on their ability to validly administer the Rorschach.

**Wright State University, School of Professional Psychology**          January 1998-March 1998
Position:            Teaching Assistant
Courses:             Behavioral Interventions II:  Cognitive Therapy
Instructor:          Robert D. Friedberg, Ph.D.
Responsibilities:    Facilitated didactic and experiential review sessions with doctoral students.
                     Presented selected class material to second year doctoral students.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
## PAGE 12 OF 20

## Classroom Teaching Experiences (Continued)

**Wright State University, School of Professional Psychology**     September 1997-December 1997

Position:          Teaching Assistant
Courses:           Behavioral and Social Learning Theories of Personality, Psychopathology and Psychotherapy
Instructor:        Robert D. Friedberg, Ph.D.
Responsibilities:  Conducted didactic and experiential review sessions for second year doctoral students.
                   Responded to individual needs of students as requested

## Honors and Awards

- Capital University Law School, 2011 Graduating Class Dean's Award

- Order of the Curia

- Presidential Merit Scholarship, Capital University Law School, 2008-2011

- Dean's Excellence Award, Capital University Law School, 2008-2011

- Capital University Law School – Evening Honors Program, 2010 Keynote Speaker

- Excellence in General Practice of Psychology Award, WSU-SOPP, 1999

- Psychologists For Social Responsibility (PsySR) Peacework Award, 1997

- Phi Kappa Phi National Honorary

- Golden Key National Honor Society

- Phi Eta Sigma National Honor Society

- Alpha Lamda Delta National Honor Society

- Scarlet and Gray Academic Scholarship

- Ohio State University Arts and Science Honors Research Scholarship

- Alkire Memorial Research Scholarship

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 13 OF 20

## Media Interviews

► **The National Psychologist**: 10-30-13. "Most psychologists misinformed on 'duty to warn.' Summarized portions of a presentation delivered at the Annual Ohio Psychological Association Convention.

► **Fox28 News: Good Day Columbus**: 9-4-13. Live in-studio interview. Addressed the suicide of Ariel Castro, who was sentenced to life in prison plus 1,000 years after holding captive and victimizing three women in his Cleveland home for years.

► **The Columbus Dispatch**: 8-25-13. "Risks don't deter child predators." Addressed the issue of on-line sex offending despite the publicity of police stings.

► **Fox28 News: Good Day Columbus**: 8-2-13. Live in-studio interview. Addressed  issues pertaining to Ariel Castro, who held 3 women captive in his Cleveland home for years.

► **Fox28 News: Good Day Columbus**: 7-25-13. Live in-studio interview. Addressed recent study suggesting "sex addiction" is not really an "addiction."

► **The Columbus Dispatch**: 6-26-11. "Counseling offers often unheeded, banks say." Addressed the issue of "learned helplessness" in those going through home foreclosures.

► **The Columbus Dispatch**: 11-26-10. "Horrific killings raise perplexing issue of evil." Addressed evil acts in the context of allegations that Matthew Hoffman killed Tina Hermann, Kody Hermann, and Stephanie Sprang in Knox County, Ohio before kidnapping and raping a teenage girl.

► **10TV News (CBS, Columbus, OH)**: 4-23-09. Live in-studio interview. Addressed psychopathy in the context of the so-called "Craig's List Killer" case of Phillip Markoff.

► **10TV News (CBS, Columbus, OH)**: 4-14-09. Live in-studio interview. Addressed the issue of "Women Who Kill" in the so-called "Sunday School Teacher" case where Melissa Hucklebee was suspected in the murder of Sandra Cantu.

► **BBC News**: 7-25-05. "Killer's fate hanging on his IQ." Addressing issues of IQ in the case of Daryl Atkins. See Atkins v. Virginia, 536 U.S. 304 (2002).

## BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 14 OF 20

## Scholarly Activities

**<u>Professional Publications:</u>**

Stinson, B., Hrinko, D. <u>Capacity to consent to sex evaluations</u>. Manuscript in preparation.

Ignelzi, J., **Stinson, B.**, Raia, J., Osinowo, T., Ostrowski, L., Schwirian, J. (2007).  Utilizing risk-of-violence findings for continuity of care.  <u>Psychiatric Services, 58,</u> 452-454 (Best Practices Article).

Burns, K., Raia, J., & **Stinson, B.** (2002).  Firearms risk management: In reply.  <u>Psychiatric Services, 53.</u>

Sherman, M., Burns, K., Ignelzi, J., Raia, J., Lofton, V., Toland, D., **Stinson, B.**, Tilley, J., & Coon, T. (2001).  Firearms risk management in psychiatric care: Innovative approaches. <u>Psychiatric Services, 52,</u> 1057-1061.

Barriga, A. Q., Landau, J. R., **Stinson, B. L.,** Liau, A. K., & Gibbs, J. C. (2000).  Cognitive distortion and problem behaviors in adolescents.  <u>Criminal Justice and Behavior, 27,</u> 36-56.

Stinson, B. L., Friedberg, R. D., Cusack, M. J., Page, R. A. (2000).  Improving athletic performance and motivating athletes:  One thought at a time.  In L. VandeCreek (Ed.), <u>Innovations in clinical practice:  A source book (Volume 18).</u>  Sarasota, FL:  Professional Resource Press.

Friedberg, R. D., Viglione, D. J., **Stinson, B. L.,** Beal, K. G., Fidaleo, R. A., Lovette, J., Street, G., Yerka, E., & Celeste, B. (1999).  Perceptions of treatment helpfulness and depressive symptomology in psychiatric inpatients on a cognitive therapy unit.  <u>Journal of Rational-Emotive & Cognitive Behavior Therapy, 17,</u> 33-50.

Stinson, B. L. (1997).  <u>The relationship between attributional style, athletic performance, and dropping out in college athletes:  Implications for the recruiter, coach, athlete, and sport psychologist.</u>  Doctoral dissertation, Wright State University School of Professional Psychology, Dayton, OH.

Stinson, B. L. (1995).  <u>Relations between cognitive distortions and externalizing / internalizing behavioral disorders in anti-social youth.</u>  Undergraduate Honor's Thesis, The Ohio State University, Columbus, OH.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 15 OF 20

**Presentations:**

Stinson, B. (2014, June). <u>A comprehensive biopsychosocial assessment training.</u> Two one-day presentations for the Ohio Department of Youth Services (DYS):  the first day for Psychologist and Social Work Supervisors; the second day for social work "line staff." (6.00 MCEs).

Stinson, B. (2014, June). <u>Advanced topics in forensic practice: Specialized issues in competency to stand trial evaluations and ethics in forensic evaluations.</u> Presentation at the 36th Annual June Continuing Education Conference, sponsored by the Ohio Department of Mental Health and Addiction Services, Bureau of Criminal Justice and Forensic Services; Northeast Ohio Medical University (NEOMED); and the Association of Ohio Forensic Psychiatric Center Directors. (3.00 MCE Credits).

Stinson, B. (2014, May).  <u>Psychological impact of hearing loss in children and adults</u>. Presentation as part of Nationwide Children's Hospital Audiology Conference.

Stinson, B. (2014, May). <u>Juvenile corrections:  Applying mental health law and ethics</u>. Presentation for the clinical staff of the Ohio Department of Youth Services (DYS). (4.00 MCE Ethics Credits).

Ashbrook, R., Bowman, M., Muller-Held, C., Ross, R., **Stinson, B.**, & Swenson, E. (2014, April). <u>Psychology law, rules and ethical dilemmas: An update and discussion</u>. Presentation at the Ohio Psychological Association Spring Convention. (3.00 MCE Ethics Credits).

Stinson, B. (2014, April; 2014, January; 2013, November, October, August, February, January; 2012, December, October, September, August, May, April). <u>Avoiding ethical and legal pitfalls in mental health practice</u>. Sponsored by Cross Country Education (Alexandria, VA; Frederick, MD; Baltimore, MD; Raleigh, NC; Richmond, VA; Norfolk VA; Nashville, TN; Knoxville, TN; Ashville, NC; Fort Knox, KY; Birmingham, AL; Columbus, GA; Atlanta, GA; Jackson, MS; New Orleans, LA; Mobile, AL; Salt Lake City, UT; Las Vegas, NV; Reno, NV; Indianapolis, IN; Cincinnati, OH; Columbus, OH; Pittsburgh, PA; Canton, OH; Cleveland, OH; Madison, WI; Appleton, WI, Milwaukee, WI; Schaumburg, IL; Bloomington, IL; Naperville, IL; Wichita, KS; Kansas City, MO; St. Louis, MO; Jacksonville, FL; Savannah, GA; Columbia, SC) (6.00 CE Credits).

Ashbrook ,R., Imar, T., **Stinson, B.**, & Swenson, E. Ethics committee webinar: <u>Access to and charging for records</u>. Sponsored by the Ohio Psychological Association. (1.00 MCE Credit).

Stinson, B. (2013, December). <u>HCR-20$^{v3}$ updates</u>. Invited Presentation at the 2013 Mental Health and Addictions Conference: Coming Together for a Healthy Ohio. Columbus, Ohio. (1.50 CE & CLE Credits).

Stinson, B. (2013, October). <u>Mental health law and ethics: The duty to protect, the suicidal client, and mandatory reporting statutes in Ohio</u>. Invited Presentation to Harbor Behavioral Healthcare, the largest mental health provider in northwest Ohio. (4.00 MCE Ethics Credits)

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
## PAGE 16 OF 20

**Presentations (Continued):**

Stinson, B. (2013, October). <u>Psychology and the law in integrated healthcare in Ohio.</u> Presentation at the Ohio Psychological Association's 2013 Convention. (3.00 MCE Ethics Credits)

Ashbrook, R., Bowden, M., Imar, T., Mack, K., Shuman, J., & **Stinson, B.**, (2012, October). <u>The ethical and legal practice of psychology.</u> Panel presentation at the Ohio Psychological Association Annual Convention, Columbus, OH (3.00 MCE Ethics Credits).

Stinson, B. (2012, May). <u>Deafness, not mental illness.</u>  Invited presentation to the staff of Twin Valley Behavioral Healthcare (TVBH) as part of its week-long Celebration of Culture, Columbus, OH (1.00 Hour).

Smith, D., Soehner, D., & **Stinson, B.** (2012, April). <u>Regional forensic training:  Hospital procedures – movement levels, risk assessment, and conditional release planning.</u> Invited presentation at the Regional Forensic Training, sponsored by the Ohio Department of Mental Health, the Ohio Association of County Behavioral Health Authorities, the Ohio Council of Behavioral Health and Family Services Providers, and the Ohio Judicial Conference, Columbus, OH (5.50 CE & CLE Credits).

Ashbrook, R., Bowden, M., Imar, T., Mack, K., Shuman, J., & **Stinson, B.**, (2011, October). <u>The ethical and legal practice of psychology.</u> Panel presentation at the Ohio Psychological Association Annual Convention, Columbus, OH (3.00 MCE Ethics Credits).

Ashbrook, R., Bowden, M., Imar, T., Levine, K., Mack, K., Shuman, J., **Stinson, B.**, & Swenson, E. (2010, November). <u>The ethical and legal practice of psychology.</u> Panel presentation at the Ohio Psychological Association Annual Convention, Columbus, OH (3.00 MCE Ethics Credits).

Ashbrook, R., Orcutt, M., Ross, R., & **Stinson, B.** (2010, August).  <u>The last word on ethics and professional conduct for Ohio psychologists.</u>  Presentation sponsored by the Central Ohio Psychological Association, Columbus, OH (3.00 MCE Ethics Credits).

Stinson, B. (2010, June).  <u>Practicing ethically in the university counseling center.</u>  Invited presentation to the Counseling and Consultation staff at The Ohio State University. Columbus, OH (3 Hours).

Stinson, B. (2010, May).  <u>Psychological testing in the Deaf community.</u>  Invited presentation at the National Association of Disability Examiners' (NADE) Great Lakes Regional Training Conference, Columbus, OH.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 17 OF 20

**Presentations (Continued):**

Stinson, B. (2009, October; 2009, June; 2009, April; 2009, January).  WAIS-IV:  Administration, scoring, and interpretation updates.  Presentation sponsored by the Central Ohio Psychological Association, Columbus, OH (January and April 2009). Presentation Sponsored by the Dayton Area Psychological Association, Dayton, OH (June 2009). Presentation at the Ohio Psychological Association Annual Convention, Columbus, OH (3.00 MCE Credits).

Ashbrook, R., Bowden, M., Imar, T., Knapp-Brown, S., Mack, K., Schafer, M., **Stinson, B.**, Swenson, M., & Traver, M. (2009, October).  Ethics Roundtable on Colleague Assistance: Prevention, Identification and Referral. Panel presentation at the Ohio Psychological Association Annual Convention, Columbus, OH (3.00 MCE Ethics Credits).

Stinson, B. (October, 2009).  Ethics vignette:  Inpatient hospitalization and patients' sexual behaviors.  In-service presentation to the psychology staff at Twin Valley Behavioral Healthcare, Columbus, OH.

Ross, R., Smalldon, J., Broyles, J., & **Stinson, B.** (Moderator) (2009, April).  Forensics 101 for non forensic psychologists.  Presentation sponsored by the Central Ohio Psychological Association, Columbus, OH (3.00 MCE Ethics Credits).

Stinson, B. (2009, March; 2008, May).  Introduction to forensic psychology with deaf defendants.  Invited presentation to the Mental Health and Deafness program at Wright State University School of Professional Psychology, Dayton, OH.

Stinson, B. (2008, February).  Introduction to forensic psychology.  Invited presentation to first year graduate students at Wright State University – SOPP, Dayton, OH.

Stinson, B. (2009, February; 2008, February).  The integration of clinical and forensic psychology: Private practice and beyond.  Invited presentation to the Pre-Doctoral Psychology Interns at Wright State University – School of Professional Psychology, Dayton, OH.

Hoffman, R., Drogosz, L., Hammond, B., Scott-Johnson, B., **Stinson, B.** (2007, October).  Opportunities for mental health professionals in a correctional setting.  Presentation at the Annual Convention of the Ohio Psychological Association, Columbus, OH. (1.00 MCE Credit).

Stinson, B. (2007, March).  Practicing ethically as a treatment provider and forensic evaluator in a behavioral healthcare organization.  Presentation to the Medical Staff Organization of Twin Valley Behavioral Healthcare, Galloway, Ohio.

Stinson, B. (2006, August).  Forensic evaluator and treatment provider:  The irreconcilable conflict.  Presentation at the 2006 Annual Forensic Conference sponsored by the Ohio Department of Mental Health and the Northeastern Ohio Universities College of Medicine, Huron, OH. (Contributed to 6.75 MCEs the first day).

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 18 OF 20

**Presentations (Continued):**

Patel, R., & **Stinson, B.** (2006, April).  Ethical decision making in forensic evaluations of deaf clients:  A case study.  Invited presentation to the Pre-Doctoral Residency Program at Wright State University School of Professional Psychology, Dayton, OH.

Stinson, B. (2006, February).  Psychological evaluation instruments update:  Vineland Adaptive Behavior Scale – 2nd Edition and the Bender Visual-Motor Gestalt Test – 2nd Edition.  Invited presentation at the Ohio Rehabilitation Services Commission's Bureau of Disability Determination.  (3.00 MCE Credits).

Stinson, B. (2006, February; 2005, February).   Forensic and clinical issues:  Inherent conflicts.  Invited presentation to the Pre-Doctoral Residency Program at Wright State University School of Professional Psychology, Dayton, OH.

Stinson, B. (2004, December).  The Validity Indicator Profile (VIP):  Administration, scoring, and interpretation.  In-Service training for the psychology staff at Twin Valley Behavioral Healthcare-Columbus Campus.  Columbus, OH.

Stinson, B. (2004, June).  Overview of understanding depression and preventing suicide.  Invited presentation at the 2nd Annual Mental Health and Deafness Statewide Conference sponsored by CSD of Ohio and Statewide Mental Health and Deafness Advisory Council.  Worthington, OH. (Contributed to 7.8 MCE Credits).

Stinson, B. (2004, May).  Interpreting the new IQ scores:  What happens when tests are revised?  Invited presentation given at the Great Lakes Association of Disability Examiners (GLADE) Annual Regional Conference.  Columbus, OH.

Stinson, B. (2004, March; February 2005; February 2006; March 2007).  Forensic issues with deaf clients:  An Overview for clinicians and interpreters.  Invited presentation given to the Mental Health and Deafness Program at Wright State University School of Professional Psychology. Dayton, Ohio.

Stinson, B. (2004, February).  Test of Memory Malingering (TOMM):  Administration, scoring, and interpretation.  In-Service training for the psychology staff at Twin Valley Behavioral Healthcare-Columbus Campus.  Columbus, OH.

Stinson, B. (2003, March).  Effectively Managing Your Stress.  Invited presentation given to Montgomery County Special Educators Department.  Kettering, OH.

Stinson, B. (2003, February; 2001, November; 2001, January; and 2000, June).  Cognitive-Behavioral Treatment of Obsessive Compulsive Disorder.  Scholarly presentation to the Pre-Doctoral Residency Program at Wright State University School of Professional Psychology as part of their Empirically Validated Treatment Seminar Series, Dayton, OH.

# BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 19 OF 20

**Presentations (Continued):**

Raia, J., Haskins, K., **Stinson, B.**, & Pawlarczyk, D. (November, 2002).  Mental status assessment & DSM-IV-TR diagnostic skills improvement conference.  Sponsored by the Ohio Dept. of Mental Health and Twin Valley Behavioral Healthcare.  Columbus, OH (6.0 MCEs).

Stinson, B. (July, 2002).  Mental impairments:  Understanding the language and statistics, and applying them to disability claims.  Presentation to the Bureau of Disability Determination's disability examiner class. Columbus, OH.

Stinson, B., & Haskins, K. (April, 2002).  Medical and psychological impairments updates:  Critical disability determination issues. Columbus, OH (4.25 CLEs).

Stinson, B. (2002, January).  Mental retardation and the Social Security Administration's Bureau of Disability Determination: Problem areas and issues.  Columbus, OH.

Raia, J., **Stinson, B.**, Pawlarczyk, D., Matyi, C., DeMuth, D., Craft, L., Casterline, V., Gozs, J., Hollander, R., Kennedy, T. M., & Johnson, K. (2001, December).  Quality assurance and performance improvement: Understanding quality assurance issues and applying improvement strategies at the Bureau of Disability Determination.  Columbus, OH.  (5.0).

Raia, J., Johnson, K., Craft, L., Gozs, J., Hollander, R., Kennedy, T., **Stinson, B.**, Demuth, D., Casterline V., & Pawlarczyk, D. (2001, May & June).  Disability evaluations for mental impairments:  How to accurately assess, test, and report mental evaluation findings.  Presentation delivered to psychological consultants of the Social Security Administration's Bureau of Disability Determination, Columbus, OH (4.0 MCE Credits).

Stinson, B. (2000, August).  A forensic system emerging.com.  Poster presented at The Ohio Department of Mental Health's *A Forensic System Emerging: How Do We Survive In It* two-day conference, Columbus, OH.

Raia, J., Lofton, V., Toland, D., Coon, T., & **Stinson, B. L.** (1999, August).  Firearms assessment, control and treatment process.  Poster presented at The Ohio Department of Mental Health and the Northeastern Ohio Universities College of Medicine's *Working With Challenging Forensic Populations* two-day conference, Cambridge, OH.

Stinson, B. L., & Aronoff, J. (1998, November).  Ethical and legal responsibilities when others are in peril:  Who, when and how?  Grand Rounds presentation delivered to the Wright State University School of Professional Psychology doctoral students and staff, Dayton, OH.

Friedberg, R. D., & **Stinson, B. L.** (1998, April).  Focusing the mind's eye:  Using cognitive strategies to enhance athletic performance.  Presentation to Xenia City Schools faculty and staff, Xenia, OH.

Stinson, B. L. (1997, December).  Sports, school, and holidays, oh my!  How to handle all the stress.  Presentation to the Wright State University Men's Basketball Team.  Wright State University, Dayton, OH.

## BOB STINSON, PSY.D., J.D., LICDC-CS, ABPP
### PAGE 20 OF 20

**Presentations (Continued):**

Stinson, B. L., & Page, R. (1997, November).  To play or not to play:  The relationship between causal attributional style and athletic performance in college athletes.  Presentation delivered at the Ohio Psychological Association Fall Convention, Columbus, OH.

Stinson, B. L., & Klontz, B. T. (1997, November).  The total package:  Wellness for your body and mind!  Presentation to Wright State University staff and students.  Sponsored by Wright State University Center for Psychological Services and the Office of Campus Recreation, Dayton, OH.

Stinson, B. L. (1997, October).  Stress and the college student:  How to cope.  Presentation to Wright State University Resident Services, Dayton, OH.

Stinson, B. L. (1997, September).  Academics, athletics and stress:  How to survive.  Presentation delivered at the first annual RAIDER S.K.I.L.L.S. Student-Athlete Convention.  Wright State University, Dayton, OH.

Stinson, B. L. (1997, September).  Recovering from athletic injuries one thought at a time.  Presentation delivered at the first annual RAIDER S.K.I.L.L.S. Student-Athlete Convention.  Wright State University, Dayton, OH.

Stinson, B. L., & Friedberg, R. D. (1997, May).  Show me the causes:  The relationship between causal attributional style and athletic performance in college athletes.  Poster session presented at the Scholarship Recognition Conference of the Honor Society of Phi Kappa Phi, Dayton, OH.

Stinson, B. L. (1996, October).  Stress:  How to live with and without it!  Presentation delivered to Wright State University's varsity women's softball team, Dayton, OH.

Friedberg, R. D., & **Stinson, B. L.** (1996, July).  If you build it...Learned optimism as a mental strategy for improving athletic performance.  Presentation to Vandalia High School Athletic Program Vandalia, OH

Stinson, B. L., & Celeste, B. (1996, April).  Stress management and athletics.  Presentation delivered to the Wright State University Athletic Department, Dayton, OH.

# Exhibit 3:

# Siddhartha Nadkarni Declaration



**Siddhartha Nadkarni, MD**
Assistant Professor of Neurology and Psychiatry
Program Director Clinical Neurophysiology Fellowship
Program Director Combined Residency in Neurology and Psychiatry
Program Director Epilepsy Research Fellowship
Director Epilepsy Clinic NYU Langone Medical Center
Director Neuroscience Curriculum Psychiatry Residency
NYU School of Medicine, NYU Langone Medical Center
223 East 34th Street, New York, NY  10016
646-558-0807 (phone)          646-385-7166 (fax)

**Re:  Lawrence, Daryl**

November 30, 2015

Dear Ms. Gohara,

I am writing at your request after reviewing extensive medical, educational, and legal records and examining Mr. Daryl Lawrence in the capacity of performing an Independent Medical Examination (IME). My focus in conducting the IME was to identify physical, neurological, psychiatric, social, familial, cultural, religious and environmental factors that played an important role in shaping Mr. Lawrence's development and functioning. I met with Mr. Lawrence on October 20, 2015 at the United States Penitentiary in Terre Haute, Indiana where he is on death row pursuant to a conviction for capital murder. I explained the limits of confidentiality for this evaluation to Mr. Lawrence and let him know that no traditional doctor-patient relationship arises from our contact. I informed him that I am working for his attorneys in his case and this evaluation would serve as a basis for a written report to be delivered to his defense team and possibly filed with the Court.

In addition to my examination of Mr. Lawrence, I have considered and relied upon the following sources of information:

1) United States v. Daryl Lawrence, 735 F.3d 385 (6th Cir. 2013) (Direct Appeal Opinion)

2) Daryl Lawrence school records, including Bishop Hartley High School, Columbus State Community College, Sonshine Academy, Bishop Ready High School,   Corpus Christi School, St. Charles's Prep School

3)  Medical Records

a) Ross County Jail medical records

b) Grant Hospital Medical Records

c) Howard University Hospital Records

d) Children's Hospital Records

e) Union Hospital (Terre Haute, Indiana) Records

f) Federal Bureau of Prisons Medical Records

g) Mt. Carmel Hospital Records

h) Riverside Hospital Records (Florence Perkins)

i) Mt. Carmel Hospital Records (Leondra Lawrence)

j) Twin Valley Psychiatric Records (Aleta Lopez)

4) Trial Transcripts, including transcript of Daryl Lawrence police interview, punishment phase testimony

5) Trial File of Defense Psychologist Bob Stinson, including Shawnee Forensic Center Psych Testing Intake Form; WAIS-III Testing Data and Reports, WMS-III, Woodcock-Johnson III Response Booklet and Test Record; Compuscore Reports

6) Daryl Lawrence Birth Certificate

7) Daryl Lawrence Maternal Family Tree

8) Witness interview memos, including:

a) Sheila Lopez

b) Tanya Powell

c) Florencia Walker

d) Wendy Poches

e) Eileen Lopez

f) Elizabeth Jones

g) Yolanda Tolliver

h) Ricky Lopez

i) Alana Robinson

j) Aleta Lopez

k) Donald Branch

l) Kevin Robinson

m) Kimberly Moore

n) Eileen Brown

o) Ricco Lawrence

2

p) Umar Khadir, aka Paul Perkins, Jr.

q) George Miller

r) Reita Bynum Smith

s) Edward Tye

t) Kharimasud Olufemi

u) Liz Dean

v) Felicia Southern

w) Carol Pope

x) Luis Brent

y) Daryl Walker

z) Malene Kambon

aa) Connie Logan

bb) Adrian Basil Foss

9) Employment records, including CBS Personnel, IKON, Kmart, Nationwide Employment, The Limited, Inc.

10) Prior RSP conviction records

11) Probation Records

12) Leondra Lawrence Probation Records

13) Aleta Lopez Probate Records

14) Franklin County Social Service Records (Eileen Lopez, Florencia Walker, Leondra Lawrence)

1. **Clinical assessment and review of relevant records**

Mr. Lawrence is a 40 year-old, right-handed, single man who is incarcerated on Death Row at the United States Penitentiary in Terre Haute, Indiana. He was born in Union County, Ohio on April 19, 1975 to Leondra Lawrence, a 30-year-old heroin addict then serving a sentence of 1-5 years in the Ohio Reformatory for Women in Marysville, Ohio for forgery. Daryl's family report that he was born addicted. (8(c) Florencia Walker; (e) Eileen Lopez).[1] As a baby, he cried uncontrollably and could not be soothed. (8(c) Florencia Walker; (h) Ricky Lopez). He also had difficulty eating and vomited frequently. (8(c) Florencia Walker).

---

[1] This report cites to the relevant document in the "materials relied on" list by noting the number of the document in the list of materials (above) and a brief reference to the source of the information.

3

Baby Daryl was passed between the homes of various relatives initially, and the man believed to be his biological father refused to accept responsibility for him. (8(c) Florencia Walker; (o) Ricco Lawrence; (n) Eileen Brown). He was ultimately sent to live with his great aunt and uncle Eileen and Manuel "Pee Wee" Lopez, whom he considered parents. (8(e) Eileen Lopez; (i) Alana Robinson). Their biological daughter, Aleta, also lived in the house, and Daryl grew up with her and considered her a sister. Aleta is severely mentally ill with schizophrenia. (3(j)-Twin Valley records; 8(i) Alana Robinson). Aleta had also been forced to surrender her own new born for adoption by her parents, and family report that she therefore resented Daryl because her parents were willing to raise him. (8(h) Ricky Lopez; (j) Aleta Lopez). She was very hostile toward Daryl as a result, subjecting him to verbal abuse and unprovoked physical attacks, including one time shocking him with raw electrical wires. (8(i) Alana Robinson; (h) Ricky Lopez).

After Pee-Wee died when Mr. Lawrence was around 6 years old, Daryl was taken care of primarily by his aunt Eileen and his cousin Aleta. (8(n) Eileen Brown).

Mr. Lawrence describes his childhood as "fun and lonely." He considered the Lopezes' other grown children to be his siblings although they were much older and not living in the home. His childhood was marked by poverty and the constant presence of violence and danger. Mr. Lawrence reports that he got "banged up" a lot as a child. Mr. Lawrence was also repeatedly exposed to traumatic events during his developmental period. He recalls witnessing numerous violent events, including shooting, robberies, beatings, accidents and domestic violence. Among those were:

- Mr. Lawrence was robbed at gunpoint and shot at when he was age 11 or 12.
- He witnessed his cousin shot in the head with a pellet gun, running into the house with blood coming from his head. Mr. Lawrence recalls being quite young when he observed this event.
- He saw people "beaten bloody" over money several times.
- When Mr. Lawrence was 10 or 11, he was walking to the corner store for a snack and saw someone get shot and killed; the perpetrator picked up the victim's body and threw him in a dumpster.
- When he was in middle school, his classmates and he heard a car accident outside their school and ran out to see a school friend of theirs thrown from the car, decapitated, with the friend's head lying some distance from the body.
- He witnessed another person shot in the head and killed.
- He saw someone else getting shot in the head over a basketball game and that person died as well.
- In his twenties he saw a drive-by and a "guy got his head blown off."
- He was shot at in front of a pizza shop with AK's and handguns.
- He saw a friend get shot 5 – 7 times by police during an arrest coming out of a night club.

Daryl's caregivers, from birth and throughout his childhood, raised him in extreme poverty. They subsisted on government assistance or low-paying scattered employment, and small contributions from other family members. (8(c) Florencia Walker; 8(i) Alana Robinson). The low-income neighborhoods where he spent his childhood were unsafe and marked by frequent violence. (8(l) Kevin Robinson).

4

Exposure to neighborhood and personal violence has well-known developmental and behavioral consequences that persist without treatment and support. Mr. Lawrence's exposure to violence was not limited to members of the community. Mr. Lawrence knows of at least two cousins who were molested by family members. He grew up being put up to bare-fisted, organized fights with cousins in matches organized by the older cousins. These matches were a routine part of family culture, with the older cousins each putting forward their own younger cousin as his representative and the fights typically resulting in injuries, bleeding, and sometimes loss of consciousness. (8(l) Kevin Robinson).

In addition, many of Mr. Lawrence's cousins and friends were involved in selling drugs, and the neighborhood in which he was raised, this was common. (8(l) Kevin Robinson; 8(m) Kimberly Moore). Mr. Lawrence started selling marijuana at around 12 or 13 years old for pocket money because of adoptive family's dire poverty. His older cousins, again, drew him into drug selling. (8(m) Kimberly Moore).

*Social Behavior*

Mr. Lawrence has a history of sleep disturbance and frequently slept only around four (4) hours without feeling tired. (8(h) Ricky Lopez; (a) Connie Logan). When smoking THC, Mr. Lawrence could go a couple days without sleeping and not feel tired. Much of his childhood he had a "heavy miserable" feeling, "like sadness I would say." He reported "a lot of times feeling alone as a kid." Starting when he was around 10 years old, Mr. Lawrence was frequently uneasy and on edge, especially in his house on Winner Avenue. For Mr. Lawrence, that house produced "an eerie feeling" and he disliked it so much that "any opportunity I got to leave, I would take it," starting before the age of 12. This resulted in him spending a lot of time outside the house, in the neighborhood streets, and without proper adult supervision.

Mr. Lawrence struggled to sit still as a kid, and continued to have trouble with this into adulthood. (8(i) Alana Robinson; (d) Wendy Poches). He often was in trouble at school, starting in elementary, where school records show that he was subjected to corporal punishment. (2-School Records; 8(i) Alana Robinson) He got kicked out of his first high school for an off-campus fight with another student whose parents were wealthy and well-connected. (2-School Records; 8(n) Eileen Brown; (o) Ricco Lawrence; (h) Ricky Lopez). Records note that he appeared to be academically capable but he never did well in school, though he believed he tried hard. (2-School Records).

As Mr. Lawrence grew older, he exhibited poor decision-making skills. He engaged in risky behavior such as riding a motorcycle at high speeds. He had multiple sexual partners and conceived at least 6 children with 6 different women, several within a short amount of time. He had a history of gambling (often frequently) and would sometimes spend his winnings the same day he received them. He reportedly would also spend money extravagantly on parties, trips, and hotels. (8(y) Daryl Walker).

Mr. Lawrence also had substance abuse issues. (8(h) Ricky Lopez; (bb) Adrian Basil Foss). His main drug was THC and he "rolled 5 blunts for the day." Mr. Lawrence reported he was "addicted to THC." He smoked and drank alcohol socially and when he would go to bars. For a period of time leading up to the offense, he was drinking every day and night.

Mr. Lawrence had difficulty maintaining steady employment. (8(l) Kevin Robinson; (n) Eileen Brown). He lost his job at K-Mart after a short time for failing to report that he had a felony and became discouraged and frustrated at his inability to maintain legal employment. He

expressed this frustration by reporting that "Every time I tried to do the right thing it goes wrong."

*Family History*

Many of Mr. Lawrence's relatives suffer from psychological and/or neurological impairments. Mr. Lawrence's second cousin, Lorenzo, had epilepsy from a young age and possibly also has schizophrenia. (8(c) Florencia Walker; (i) Alana Robinson; (k) Donald Branch). His cousin Aleta, with whom he was raised and considers a sister, has schizophrenia and has been institutionalized on several occasions. (3(j)-Twin Valley records; 8(i) Alana Robinson). Mr. Lawrence's maternal aunt has been diagnosed with bipolar disorder and his maternal grandmother was prescribed valium at some time. (3(h)-Riverside Hospital Records; 8(c) Florencia Walker). His biological half-sister Djuana has been described as being "always been up and down." (8(c) Florencia Walker; (k) Donald Branch). Felicia (his older biological half-sister) had what was described as a nervous breakdown and "very serious" psychiatric problems. (8(n) Eileen Brown). Mr. Lawrence's own biological mother had severe substance abuse issues and possibly bipolar disorder. (8(c) Florencia Walker; (n) Eileen Brown). There is no known history of completed suicide, however, his schizophrenic cousin/sister, Aleta, has attempted suicide. (13-Aleta Lopez Probate Records). Currently he has a cousin, Qwan, who is homeless. Dwight, another cousin with whom he was raised as a brother, was crack-addicted and homeless for some time. (8(i) Alana Robinson).

*Medical History*

Mr. Lawrence has a long and complicated history of neuropsychiatric problems and medical conditions which cause functional impairments. A brief summary of key conditions follows.

a) *Polycythemia Vera*

Mr. Lawrence suffers from Polycythemia Vera (PV), a rare, chronic, progressive myeloproliferative neoplasm characterized by an overproduction of red blood cells. PV symptoms include nosebleeds, headaches, fatigue, vision problems, high blood pressure, dizziness, bleeding or clotting and more. Although he was not officially diagnosed with PV until his current incarceration, review of his medical records shows the presence of symptoms since early childhood. Hospital records show, for example, that at age 4 years, 3 months he was treated for a severe nosebleed and was diagnosed with high blood pressure. (3(d) Children's Hospital Records). The medical history during treatment revealed multiple occurrences of nosebleeds. These episodes continued through Mr. Lawrence's childhood and other hospital records document epistaxis (nosebleeds) after heavy exercise, in conjunction with lethargy, high blood pressure, headaches, and dizziness. (3(d) Children's Hospital Records). He is currently receiving phlebotomy treatment at USP Terre Haute. When he is treated regularly, he has fewer headaches. However, when he's overdue for a treatment, Mr. Lawrence feels fatigued and has a heavy feeling in his chest.

Polycythemia is associated with cognitive impairments, including impairments in executive functioning and episodic memory, and may result in deterioration of cognitive functioning when untreated.

b) *Head Injuries*

According to hospital records, Mr. Lawrence (at age 2 years, 11 months) suffered a mild concussion after falling "down 3 steps and land[ing] on head." The medical note describes him as lethargic and wanting to sleep at 11:30 a.m. in the hospital. Mr. Lawrence recalled numerous other instances of possible head trauma including when he hit his head while running about the age of 4 to 5. He does not remember if he lost consciousness on this occasion. Before the age of 10, he was being swung around by an adult, slipped, and then awoke on the couch. In the 7th Grade while playing football, he had his "bell rung" and needed to be helped off the field. Mr. Lawrence recalls seeing flickers of light and having trouble with balance. He suffered from a headache the rest of the night. Around age 10, Mr. Lawrence was in a bad car accident during which the other driver ran a red light and hit the passenger side of the car. Mr. Lawrence was in the front seat and ended up on the ground (he's not sure if he hit his head). Mr. Lawrence's school records also report two head injuries that occurred in 1990. The first, in March, 1990 has no further description. The second, in May, 1990 described a "goose egg" lump over Mr. Lawrence's left eye. (2-School Records). In his late 20's (26 or 27), he was hit in the back of the head by what he thinks it was a punch. At the age of 28 (Spring 2004), he was in a motorcycle accident that totaled his bike and cracked his helmet. Although he was not treated or evaluated after this accident, he suffered from a headache.

c) *History of headaches*

Medical records show that Mr. Lawrence has suffered from headaches since childhood. Mr. Lawrence used to have headaches for "days at a time." He attempted to control his headaches through diet. Often the headaches were throbbing and on the left side of the head and were accompanied by upset stomach and/or nausea but no photophobia or phonophobia. Medical records from Mr. Lawrence's childhood confirm the frequent headaches but show the pain was sometimes in different areas of the head. One record from March 15, 1989 notes that he had been having headaches for 2-3 weeks with pain in his right temple. These headaches were described as usually occurring in the afternoon and sometimes causing nausea without vomiting. (3(d) Children's Hospital Records). Other hospital records show headaches occurring twice a week with "throbbing pain at vertex" and dizziness. (3(d) Children's Hospital Records). At age 14 years, 10 months, medical records show a history of headaches occurring "after working out hard (lifting wts, running)." The pain is described as dull, in the "parietal area," and lasting for half an hour. The medical records suggest that these headaches had been occurring for 5-6 months. (3(d) Children's Hospital Records).

d) *Memory functioning*

Mr. Lawrence has struggled with memory impairment throughout much of his life. He sometimes cannot recall conversations that he has had recently. He reports that "I lose focus a lot" and "I just drift off." Mr. Lawrence also has marked trouble with concentration and focus. His struggle with memory and concentration continue since his incarceration. He provided several recent examples of memory impairment and reported that his reading speed has gotten considerably worse. During his job as an "orderly" on the range at USP Terre Haute, people will ask him to do something for them and he will forget immediately what he was asked to do and have to ask again. He is trying to learn Spanish, but "it's frustrating" because he can't remember vocabulary, no matter how much he studies the same words repeatedly.

7

e) *Social history reports of other neurological issues*

His school records and family history show that Daryl always had trouble learning. Although family reported that he would study and try very hard, he struggled to consistently do well. (2-School Records; 8(i) Alana Robinson). This is a common academic problem for people whose attention and concentration are impaired or who have specific learning disabilities or who are unable to settle their autonomic nervous system within a necessary time frame.

f) *Hallucinations*

Mr. Lawrence reports stereotypical episodes beginning in elementary school in which he experienced tactile hallucinations while awake in which he believed people were clawing at him. He also experienced the sensation of something grabbing him when he was asleep, "like a bad dream," which was disturbing enough to wake him and leave him frightened. With no functional adult to comfort him, Daryl would pray until he could go back to sleep.

In grade school, Mr. Lawrence had episodes where he had to ask himself if "I was really here," "looking at myself" from outside himself. One time he went to the bathroom to look in the bathroom mirror to make sure he was really there.

Mr. Lawrence describes episodes of "paranoia." As a young adult, Daryl was described as always looking over his shoulder and being careful never to sit with his back to the door in restaurants. (8(n) Eileen Brown). In later years when he had money, he was convinced people wanted to rob him.

g) *Neuropsychological testing at the time of trial*

At the time of trial, the limited neuropsychological testing battery revealed relative deficiencies in some frontal and temporal functions. (5-Dr. Bob Stinson File). Mr. Lawrence's performance on these tests points to an abnormality and relative weakness in the functioning of these areas of the brain. Although standing alone these tests are not definitive, they do point to a pattern of meaningful cognitive weakness which should have led to follow-up assessment. It is important to be clear that neuropsychological testing can answer two different types of questions: 1) these tests can be used to place a person's functioning within the national normative performances of age peers (i.e., academic performance testing which compares a sixth grader to all other sixth graders); or 2) these tests can be used to understand the strengths and weakness of an individual and how those abilities affect daily functioning (e.g., an elderly person's declining memory function can be identified and tracked compared to how he or she is expected to perform at his or her current age).

In relation to the first type of questions, Mr. Lawrence's test performance generally falls with the normal range compared to his peers. However, on the second type of question, Mr. Lawrence's testing demonstrates important weaknesses which are seen to affect his daily functioning and capacity. Specifically, he has trouble with areas of short-term memory, verbal memory, and working memory that is out of proportion to the rest of his testing. Using his overall performance on these tests as a reference point, one would expect his performance on these areas of functioning to be better. In fact, his performance in these domains is surprising. By way of analogy, a child may have two legs which are both within the normal length, but one is at the maximum length of normal and the other at the shortest length of normal. This child's measurements will be within normal limits, but the difference between his legs will have a direct effect on his ability to walk and move through the world. Similarly, Mr. Lawrence performs

8

generally within normal limits, but in the above mentioned domains he has much lower ability and those domains directly affect his everyday ability to function. It is my opinion that these test results demonstrate real deficits. It is also relevant to note that these areas of impairment implicate the frontal and temporal lobes, their connections, and suggest localization to the left hemisphere of Mr. Lawrence's brain.

Given the social history and the relative weaknesses on neuropsychological testing, Mr. Lawrence appears to suffer from a frontal lobe syndrome that has been present since early childhood at least. My neurological exam, described below, supports this indication.

h) *Other medical issues*

Mr. Lawrence had an episode after a phlebotomy in the past few months where his feet became numb and had pins and needles. He reports no history of weakness outside left arm.

Mr. Lawrence had surgery on his left hand/arm due to a gunshot wound. (3(c) Howard University Medical Records).

At the time of the current assessment, Mr. Lawrence was prescribed the following medications:

> Lisinopril 5 mg
> ASA 81 mg
> Atenolol 10
> Phlebotomies every three to four months

i) *Psychiatric History*

Mr. Lawrence reported never having seen a psychiatrist or therapist, nor been on psychotropic medications.

## 2. Neurological Examination

On October 20, 2015, I conducted a neurological examination of Mr. Lawrence in a visiting room at USP, Terre Haute. Lighting was adequate for the evaluation and we were not disturbed during the examination. Mr. Lawrence was not shackled during the evaluation.

Mental Status:   He is a well-groomed 40-year-old man who appears his stated age and is in prison attire.  He is forthright, cooperative and well-related.  Eye contact is good.  Speech is normal in prosody, rate, and syntax.  He is psychomotor neutral.

Mood:  Mr. Lawrence reported that his mood is "not great sometimes, o.k."

Affect:  Euthymic to dysphoric, appropriate, congruent, reactive.

Thought Content:  Mr. Lawrence reported no suicidal ideations, homicidal or violent ideations, active hallucinations or delusions, obsessions, compulsions, or untoward preoccupations.

Thought Process:  Sequential.

Cognition: He was awake, alert, and fully oriented but he scored a 24/30 on the Montreal Cognitive Assessment, missing one repetition of a sentence and all 5 delayed recall items. He had difficulty abstracting 2 out of 3 straightforward aphorisms or sayings. This is an impaired score.

Cranial Nerves:

| | |
|---|---|
| I. | Grossly intact |
| II. | Normal |
| III. | Intact |
| IV. | Intact |
| V. | Intact |
| VI. | Intact |
| VII. | There appears to be a central right facial weakness |
| VIII. | Intact |
| IX. | Intact |
| X. | Intact |
| XI. | Intact |
| XII. | Intact |

Motor: There are subtle decreased fine finger movements of the right hand, otherwise intact bulk/tone and strength without adventitious movements.

Sensory: Pinprick, Light Touch are grossly intact throughout (even in regions of his Gun Shot Wound), but vibration is significantly decreased to ankles and even in the finger tips bilaterally. Gross cortical sensation is intact throughout.

Coordination: Grossly intact throughout.

Gait: Normal

Reflexes:

Right: Biceps 3, Triceps 2+, Brachioradialis 3, Knee 3, ankle 2
Left: Biceps 2+, Triceps 2, Brachioradialis 2, Knee 2, ankle 1+
Right toe was mute to equivocal and Left toe appeared downgoing.
There is a mild bilateral Palmo-mental sign.
There was no significant grasp/snout/root/glabellar sign.
Romberg sign was negative.

In summary, my neurological examination found a number of abnormal and impaired neurological signs and symptoms. These include abnormal reflexes and cranial and peripheral nerve damage, as well as psychiatric impairments such as the impaired performance on the Montreal Cognitive Assessment on which he performed in the impaired range (a score below 26). In sum, the findings of my neurological examination indicate substantive dysfunction.

### 3. Summary and opinions

Overall, based upon the neurological exam, history by report and collateral records, and my clinical observations, it is my opinion to a reasonable degree of medical certainty, that Mr. Lawrence suffers from several conditions that conspire to produce marked neuropsychiatric and cognitive deficits, which are primarily long-standing in origin, and which have affected his

development and functioning as an adult. Each of the following conditions could result in dysfunction and impairment. As a result of the overlapping symptoms and longitudinal course of these numerous factors, it is not possible to parse each behavior and symptom and associate it with a specific cause and etiology. Nor would such an effort be useful because these conditions are co-occurring and only in the complex interaction of the conditions do Mr. Lawrence's symptom pattern and impairments become medically, psychiatrically and neurologically meaningful.

The conditions of note include:

1)      Polycythemia Vera

This disease results in an abnormally increased number of red blood cells in the blood, causing increased viscosity of the blood and resulting in a plethora of pathologies including deep venous and arterial thrombosis ("blood clots"), poor venous drainage from tissues, damage to blood vessels, poor oxygenation of tissues, and increased blood pressure to name a few. These in turn can produce end-organ damage, such as splenomegaly, hepatomegaly, Deep Vein Thromboses particularly in the lower extremities, secondary hypertensive heart disease, pulmonary embolism, and varied Central Nervous System manifestations. In this last group there are often two primary presentations: acute ischemic events and chronic ischemia with resultant indolent neural function deterioration. Often, these patients suffer unilateral headaches over prolonged periods and both hemi-sensorimotor deficits, peripheral neuropathies, and broad neuropsychiatric sequelae.

As discussed above, Mr. Lawrence had just such headaches prior to diagnosis and treatment; from a very early age, he also had nosebleeds, hypertension and elevated hematocrit values, and his family took him to the hospital fearing sickle cell anemia which was ruled out; he has cognitive impairments (memory and abstraction) consistent with this disorder; and, he has motor weakness of the right face, hyperreflexia in the lower extremities, and a sensorimotor polyneuropathy mostly affecting his feet which may be associated with this condition.

In my opinion, Mr. Lawrence had the childhood onset of polycythemia, along with the associated symptoms of hypertension and elevated hematocrit values. The persistent headaches are indicative of increased intracranial pressure from congestion of the intravascular space as is seen in Polycythemia Vera. Chronic increased intracranial pressure can lead to cognitive slowing, poor decision making, impulsivity, informational processing problems and other focal neurological and neuropsychiatric problems. Mr. Lawrence has experienced all of these symptoms.

This illness had particular impact at the time of the incident leading to his conviction and incarceration. His concentration of red blood cells ("hematocrit") at that time according to hospital records was relatively low, documented at 33.9 at 1:57 p.m. on January 9, 2005 and 24.2 on the afternoon of January 10, 2005. (3(b) Grant Hospital Records). This number is abnormally low for men with normal blood who do not suffer from Polycythemia Vera. For someone whose hematocrit normally runs in the mid-50's, as Mr. Lawrence's does and doubtless did at the time (as he was undiagnosed at that time and was not receiving treatment), it is extremely low and indicates a severe loss of blood over a very short period of time. Normal hematocrits for most men are around 40 – 45 and a drop of 10 points acutely (over days) would certainly lead to many symptoms,

11

especially cognitive ones. Mr. Lawrence most likely lost around 20 points given his baseline hematocrit.  Losing that much as fast as he did, especially in someone with special oxygenation needs such as those produced by Polycythemia, is devastating.  A drop of 3 points of hematocrit acutely is a hematologic emergency and, if repeated, often requires a blood transfusion.  Three points or 3% drop in hematocrit generally requires at least "1 unit" of blood (most units are 300 cc's and 3 points correlates more with 500 cc's).  Losing 20 points, or, at least six times that much, as Mr. Lawrence did when he was wounded, would require 7 – 8 units of blood for transfusion for him to be able to perfuse his tissues, including his brain, for them to function at a baseline level.  It is very likely that a person whose hematocrit level had fallen as rapidly as Mr. Lawrence's appears to have would have been markedly encephalopathic or "delirious." Although such symptoms may not be obvious to a person not medically trained, such a large drop of hematocrit would result in symptoms such as hypotension and an acute change of mental status. A patient in such a condition would be far from his or her normal state of mind, very confused, and in no position to make complex decisions. This change in mental status would be further compounded by pain from physical injury.

2)       Multiple Traumatic Head Injuries

A single incident of mild traumatic brain injury (TBI) can cause long-term neuropsychiatric impairment. Multiple or repetitive TBI typically cause worse damage as the injuries accumulate. As a result the physiological mechanism of TBI, two types of injury predominate: shearing injuries and blunt-force injuries. Thus, TBI preferentially produces frontal lobe damage, especially as for Mr. Lawrence who is reported to have direct impact to the forehead and face area. People with a history of TBI typically exhibit social disinhibition, impulsivity, distractibility, dysexecutive problems, and problems modifying and initiating thoughts and feelings.  Mr. Lawrence suffers from many of these, as detailed above, including impulsivity, marked poor judgment, and trouble with modulation of emotional states. Without adequate history, the symptoms which result from TBI and multiple TBI can often be misdiagnosed as ADHD or certain types of behavioral problems. With appropriate history, TBI can be identified, and treatment can assist people with recovery and adaptive skills needed to overcome the effect of the injuries. Based on my review of materials, it appears that Mr. Lawrence's caregivers, health care providers, and educational administrators never identified him as suffering from the effects of TBI, and therefore never provided him with appropriate treatment or intervention.

Mr. Lawrence's multiple TBI resulted in impairments to the critical neural networks involved in executive functioning and memory, including impaired comportment, judgment, contextual impulse control, and appropriate social inhibition. These impairments are observed throughout Mr. Lawrence's adult life, and these deficits have a direct effect on Mr. Lawrence's every day functioning. He is unable to assess situations correctly, has a difficult time adjusting to unexpected stimuli or changes which he is not expecting, is more likely to act without being able to fully evaluate his options and alternatives, and is more likely to act reflexively and impulsively. This is an area of relative weakness for him as born out on the neuropsychological testing at the time of trial.

As mentioned above, TBI is one of a complex of neuropsychiatric factors which affect Mr. Lawrence. It is a critical piece of understanding how he functions in the world and what supports and treatment he needs in order to function better. In effect, people with executive functioning impairment as a result of TBI are able to function at a pre-

12

injury level when they have routines, rules and expectations are clear and unchanging, and the environment is contained and holds few novel or unexpected stimuli.

3)      History of physical trauma and exposure to violence

As noted briefly above, Mr. Lawrence's social history points to an exceptional amount of exposure to violence, witnessed and experienced personally. During my clinical interview, I observed the flattened affect and emotional dysregulation which is common in people who have been exposed to repeated episodes of violence. Mr. Lawrence observed a number of extraordinary events (the decapitation of a friend and many beatings and shootings) and he was physically abused (primarily by his mentally ill sister), and he knew of sexual abuse in the household perpetrated by adults who were responsible for his care and protection. These experiences have resulted in lifelong symptoms, including dissociative states. These affective states, which result from exposure to violence and trauma, have been shown in the research literature to influence the developmental course and lifelong behavior adaptability.

4)      Neurological and psychiatric symptoms

As discussed previously, Mr. Lawrence has a history of stereotyped episodes of feeling "clawed at," or "grabbed," associated with feeling scared, and then going to sleep. These were often nocturnal and recurrent. These symptoms are consistent with those experienced by patients of partial epilepsy. His social history likewise reveals many risk factors for epilepsy including family history, head injuries, chronic hypoxemia from Polycythemia, and in-utero toxic exposure.

In addition, Mr. Lawrence has a long history of behavioral symptoms which include mood lability (sustained depression and brief periods of elevated mood); hypomania or mania (binges of spending, gambling, heightened sexuality and exuberance); prolonged anxiety states; and periods of self-injurious and reckless risk-taking. These symptoms are consistent with a psychiatric illness such as a major mood disorder. As with TBI, the premorbid and prodromal symptoms of mood disorders, especially the elevated mood states, can often be misdiagnosed as ADHD when inadequate social history is available. In addition, these symptoms overlap with the common symptoms of TBI and exposure to trauma.

Finally, Mr. Lawrence was at high risk to develop a major psychiatric disorder, as a number of close family members have been diagnosed with conditions which have a high genetic load and aggregate in families. While differential diagnosis is difficult in such a complex overlay of exposures, the pattern of functional impairment and serious symptoms of psychiatric and neurological disorder are clearly present in Mr. Lawrence.

5)      *In utero* exposure to substances

Mr. Lawrence was born to an incarcerated mother known to be addicted to heroin. In addition, various reports indicate that she may have used alcohol during pregnancy as well. Following birth, Mr. Lawrence was passed between relatives, a result of his mother's incarceration and unavailability to raise him. *In utero* exposure to maternal polysubstance abuse is strongly associated with cognitive and behavioral dysfunction. Longitudinal studies show that *in utero* opioid exposed children, compared to unexposed controls, have poorer performance on measures of language, school readiness skills,

impulse control, and visual attention span/sequencing. As noted above for other conditions, *in utero* exposure to opioids and the behavioral consequences for the developing child are often misdiagnosed, especially as was the situation for Mr. Lawrence early in life, where the biological mother has no parenting role and is not in contact with teachers and social workers and others who seek social history information.

Again, the complex overlap of risks and outcomes for Mr. Lawrence make differential diagnosis and etiology difficult, but *in utero* exposure to opioids and other substances are an important piece of the causal puzzle in his case.

6.      Poverty and neglect

As noted above, Mr. Lawrence was raised in a hard-working but severely impoverished family home. Poverty, limited nutritional intake and quality, lack of parental supervision and neighborhood characteristics shaped Mr. Lawrence's life course. The effects of these factors on cognition and behavior are well-known and well-documented. Here, they are a core piece of the environment which shaped Mr. Lawrence, and they likely significantly contributed to his impairments in cognitive and psychiatric functioning.

Individually, each of these six factors can cripple normal development and brain function. Taken together, interacting with each other and untreated during the developmental period, a person bearing the weight of these multiple exposures and injuries has little chance of normal, healthy development and life course. Instead, as is the case with Mr. Lawrence, the impairments in functioning are evident across a host of domains: psychically, psychiatrically, neurologically, socially and neurocognitively.

Conclusion

To a reasonable degree of medical certainty I attest that Mr. Lawrence has longstanding brain injury and dysfunction compounded by psychological and psychiatric pathology that has not previously been significantly elucidated or explained, either in his interactions with medical professionals, or in his case. Mr. Lawrence has the multiple pathologies of environmental exposures which cause neurodevelopmental impairments, brain and behavior dysfunction, as well as multiple acquired brain injuries. In addition, he has neurological and psychiatric signs and symptoms of trauma and major mood disorder. These are evidenced in both his neuropsychological examination and neurologic assessment and corroborated by his medical history (including *in utero* drug exposure and polycythemia vera) and symptomatology. He is markedly brain-injured and is disabled by diffuse brain damage. These conclusions are based on my examination of Mr. Lawrence and information that existed at the time of his capital trial. If I had been asked to provide an opinion at that time, I would have reached the same conclusions as I have in this report.

Mr. Lawrence's brain injury has protean and pervasive manifestations whose root causes are:
 1.) *In utero* exposure to maternal polysubstance abuse
 2.) Polycythemia Vera with chronic cerebral hypoxemia
 3.) Repeated Traumatic Brain Injuries (TBI)
 4.) Chronic poverty and neglect
 5.) Exposure to violence and abuse

14

6.) Psychiatric and neurological disorders, including symptoms consistent with a major mood disorder and partial epilepsy

Although he comes across superficially as relatively intact, it is my opinion that Mr. Lawrence is severely brain-injured, and those injuries manifest in both neurological and psychiatric symptoms and deficits.

Thank you for the opportunity to allow me to participate in his case. Please contact me should you have any questions about it.

Sincerely,

_____

Siddhartha S. Nadkarni, M.D.
Assistant Professor, Neurology and Psychiatry
Program Director, Clinical Neurophysiology Fellowship
Program Director, Combined Residency in Neurology and Psychiatry
Program Director, Epilepsy Research Fellowship
Director, Neuroscience Curriculum Psychiatry Residency Training Program
NYU School of Medicine

15

# Exhibit 4:

# John Nixon Declaration

## Declaration of John Nixon

1. My name is John Nixon. I have been performing technical work on guns, ammunition, and weapons systems since 1986, and have worked in a forensic capacity since 1995. I have a first class honors degree in mechanical engineering and a master's degree in business administration. I completed residential technical courses in guns, ballistics, and explosives at the Royal Military College of Science (RMCS). I previously worked as a scientist and professional engineer for the UK government, where my duties included design, development, performance assessment, mid-life improvement, reverse engineering of weapons systems, and forensics. Those weapons systems covered small arms & ammunition, artillery, tank armament, missile systems, and explosives. My work included incident scene reconstruction and ballistics (internal, external, and terminal, including wound ballistics). I am an NRA Certified firearms and personal protection instructor, and I teach concealed carry qualification courses. I qualified as a factory certified SIG firearms law enforcement armorer with 100% test scores[1]. I am a Fellow of the American Academy of Forensic Sciences (F-AAFS), a Fellow of the Institution of Mechanical Engineers (FIMechE), a Fellow of the Chartered Management Institute (FCMI), a Member of the American Society of Mechanical Engineers (ASME), and a former adjunct professor at the Indiana Institute of Technology. have published and/or presented numerous scientific/technical papers – some of which related to firearms toolmarks, gunshot residue, and muzzle to target distance determinations. I have delivered many technical forensic training courses to scientists, engineers, investigators, attorneys, law enforcement, and students. My courses have been approved for continuing legal education credit in numerous jurisdictions, and by the Indiana Supreme Court. I have been qualified as an expert in firearms, ballistics, shooting incident reconstruction, and wound ballistics in California, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, New York, Ohio, Texas, Washington, D.C., and in federal courts in numerous jurisdictions.

2. In January of 2006, I was retained by Attorney Diane Menashe to provide expert assistance in the area of firearms examination and ballistics in the case of USA v. Daryl Lawrence. My understanding when I was retained was that the trial was scheduled to begin in February of 2006. At the time, I had other obligations in other cases in which I was also retained as a firearms and ballistics expert, and both of us were under tight schedules.

3. Ms. Menashe sent me case materials to review by mail and facsimile. During the course of my work on this matter, I never met with Ms. Menashe in person to discuss Mr. Lawrence's case or my work on the case. I find it is often useful to meet in person with

---

[1] An armorer is someone who is certified to inspect, assess, and repair problems with firearms.

lawyers with whom I consult so I can demonstrate for them the operation of firearms and they can better visualize what I describe in my eventual report.

4.  Ms. Menashe requested that I perform an ejection pattern analysis for the type of gun that Mr. Lawrence fired in the 2005 incident, a 40 caliber Mini Firestorm. (This particular handgun has a magazine capacity of 10 +1 in the chamber, meaning that it can fire eleven rounds before having to reload.) An ejection pattern analysis determines the distance and direction in which a firearm ejects spent cartridge cases given appropriate case specific parameters.

5.  I had some difficulty obtaining a 40 caliber Mini Firestorm because it is not a common handgun sold in the United States; it is manufactured in Argentina. I took delivery of the handgun on February 10, 2006, shortly before I performed the ejection pattern analysis on February 14, 2006. I produced my final report on February 22, 2006.

6.  My ejection testing determined that when the Mini Firestorm is held upright – grip vertical - (at 0 degrees), with one hand, with an aiming point 59 inches above the ground, the spent cartridge cases are ejected up, backwards and to the right. The average distance the cartridge cases travelled to the right was approximately 148 inches, with a range of 74 inches to 200 inches to the right, when the test was repeated 15 times.

7.  My ejection testing also determined that when the Mini Firestorm is held with the grip horizontal with the ejection port pointing skyward (at 90 degrees) with one hand, with an aiming point 59 inches above the ground, the spent cartridge cases are ejected up, backwards, and to the left. The average distance the cartridge cases travelled to the left was approximately 97 inches, with a range of 65 inches to 131 inches to the left, when the test was repeated 15 times.

8.  My ejection testing also determined that when the Mini Firestorm is held at 0 degrees, with two hands, with an aiming point 48 inches above the ground, the spent cartridge cases are ejected up, usually backwards, and to the right. The average distance the cartridge cases travelled to the right was 158 inches, with a range of 116 inches to 204 inches to the right. The average distance the cartridge cases travelled backward was 30 inches, with a range of 65 inches backward to 4 inches forward, when the test was repeated 15 times.

9.  These testing parameters were chosen to simulate the most relevant possibilities to the way the Mini Firestorm may have been fired during the incident in question: a 5'5" man firing from shoulder height with his arm straight in front of him holding the gun in his right hand at 0 degrees and at 90 degrees counterclockwise; a 5'5" man firing at a downward angle while holding the gun in his right hand at 0 degrees and 90 degrees counterclockwise; and a 5'5" man holding the gun at 0 degrees with both hands straight in front of him and at a downward angle.

10. If I had been called as a witness at Mr. Lawrence's trial in 2006, I would have testified to these results and to the contents of my report.

11. I have reviewed the February 24, 2006, testimony of Mark J. Hardy, a criminalist with the Columbus Police Department who testified at Mr. Lawrence's trial. Mr. Hardy testified that his educational background was an undergraduate degree in microbiology, and that he had no educational background in engineering, physics, or mathematics. (Trial Transcript Volume 8 at p. 69) I am aware that Mr. Hardy testified that he did not believe that one could obtain valid ejection pattern results if one did not use the same individual weapon that was used in the shooting incident, and instead used a weapon of the same brand and model. (Trial Transcript Volume 8 at p. 92) I disagree with Mr. Hardy's testimony. Based on my extensive experience performing ejection pattern analyses, as well as my background in engineering and weapon systems analysis, it is my professional opinion, to a reasonable degree of scientific certainty, that when conducted properly, identical brands and models of firearms will, in most instances, produce reliable representative data as to the manner in which spent cartridge cases will be ejected. If I had been called as a witness at Mr. Lawrence's trial in 2006, I would have been prepared to testify about this, too.

12. Mr. Hardy also testified that he did not conduct chemical testing of the officer's shirt because he did not have the weapon used during the shooting. (Trial Transcript Volume 8 at p. 79) It is my professional opinion, to a reasonable degree of scientific certainty, that this rationale for not conducting chemical testing makes little sense and that his decision to refrain from conducting chemical testing was not justified. These chemical tests can be performed independent of having the actual individual weapon, or any weapon at all, at least for the purpose of determining whether residue, such as soot or propellant particles, are present on the item of clothing. Information derived from such testing would have been useful in determining whether the gunshot that penetrated the clothing was fired within three feet (muzzle to target distance). A positive result on the chemical test would have indicated that the shot was fired at less than three feet, and a negative result would have indicated that the shot was fired at more than three feet. A weapon is only needed if there is a positive result, in order to determine a more precise range of the distance at which the gun was fired. The actual gun that was used in the shooting is not needed; one can use the same brand and model of gun, provided that the manufacturer has not changed the rifling and/or barrel characteristics.

13. Mr. Hardy testified that he conducted an analysis of the officer's shirt to determine whether the fatal shot was fired at close range or not. Mr. Hardy's testing consisted of a macroscopic and microscopic examination of the area on the shirt surrounding the bullet hole for evidence of soot and gunpowder particles. He testified that he found no such evidence of a close gunshot wound. Mr. Hardy defined a close gunshot as one fired with

the muzzle of the gun within two to three feet from the target. (Trial Transcript Volume 8 at p. 38 and p. 7).

14. Mr. Hardy testified that the absence of gunpowder particles on the shirt did not mean that this had not been a close gunshot wound. He testified that the absence of soot or gunpowder particles on the shirt could be attributable to an interfering substance (such as another layer of clothing - although in this case it was known that there was none), or the possibility that during the process of removing the officer's shirt and preserving it, the particle evidence may have fallen off. (Trial Transcript Volume 8 at p. 39).

15. On cross-examination, Mr. Hardy testified that gunpowder particles fired from close range can burn into the fabric of a garment. When he was asked whether those burns in the fabric could have shaken off, Mr. Hardy testified: "I do not know. There is, again, probably too many variables. It might depend on how hard the shirt was shaken or if it was hit or whatever." (Trial Transcript Volume 8 at p. 78).

16. Mr. Hardy also testified that he was asked to compare the 40 caliber spent cartridge cases that were recovered at the Fifth Third Bank in 2005 with a 40 caliber spent cartridge case that was recovered at a different crime scene in 2004. Mr. Hardy testified that the 2004 spent cartridge case "was fired by the same weapon that fired" the 2005 spent cartridge cases. (Trial Transcript Volume 8 at p. 63).

17. Mr. Hardy further testified that all the opinions he had given in his testimony that day were "within a reasonable degree of scientific certainty." (Trial Transcript Volume 8 at p. 63).

18. While I partially agree with Mr. Hardy's assessment in that "some" of the evidence of gunpowder particles may have fallen off the shirt in the process of removing and preserving the shirt, in my expert opinion, to a reasonable degree of scientific certainty, it is implausible that *all* of the evidence of gunpowder particles would have fallen off in that process. Gunpowder (propellant) particles are expelled from a gun when it is fired, following behind the bullet. These particles travel in an expanding cloud of gas, forward and outward from the muzzle of the gun, and with respect to handguns, typically may be deposited on surfaces out to a distance of approximately three feet from the muzzle. When these particles are expelled, they burn at a high temperature and move at high velocity, and when they hit a cloth surface, many of those particles will burn and embed themselves into the fabric of the garment and adhere to it, producing a "stippling" pattern in the area surrounding the bullet hole.

19. This process is essentially the same as the process that causes stippling on skin. (When a gun is fired within two to three feet and the propelled materials come in contact with skin, the cloud of propellant particles emitted embed themselves in the skin and produce a visible stippling). It is extremely unlikely that the ordinary process of removing and

preserving a shirt from a gunshot victim would have sufficient force to cause all the gunpowder particles that were embedded in the shirt to fall off. These propellant particles typically may have sharp edges and, consequently, become embedded and trapped in the weave of the fabric. Even if one shook the shirt with a substantial and sustained amount of force, in my professional opinion, to a reasonable degree of scientific certainty, it is implausible that all of the evidence of propellant particles would fall off. Even in those areas where particles did fall off, burn marks and damage to the fabric would remain and be visible.

20.     Based on the foregoing, it is my expert opinion, to a reasonable degree of scientific certainty, that Mr. Hardy's testimony – that the absence of visible microscopic gunpowder particles on the shirt did not rule out the possibility of a close range gunshot because the particles may have fallen off when the shirt was removed and preserved – is misleading and contradicted by experience and science. If I had been called as a witness at Mr. Lawrence's trial in 2006, I would have testified to my disagreement with Mr. Hardy's testimony in this regard.

21.     It is also my expert opinion, to a reasonable degree of scientific certainty, that Mr. Hardy's testimony that a 40 caliber spent cartridge case that was recovered from a 2004 crime scene "was fired from the same weapon" as the spent cartridge cases recovered from the 2005 crime scene, was not a statement that a competent and responsible forensic scientist could properly or appropriately render. Although it might be the case that the spent cartridge cases that were compared shared similar markings, it is not possible – and it was not possible in 2006 – to state within a reasonable degree of scientific certainty that the spent cartridge cases were fired from the "same" weapon. Mr. Hardy's conclusion of identification is further weakened by the fact that no firearm was recovered in this case and, consequently, no test fired ammunition components or "standards" could be obtained. This leaves open the possibility that any markings assumed to be unique may in fact have been sub-class characteristics.[2]

22.     An examiner cannot, within a reasonable degree of scientific certainty, state that two spent cartridge cases were fired by the *same* weapon. This is because the concept of firearm toolmark uniqueness/individuality – that is, the assumption that each firearm leaves a unique toolmark on ammunition components to the exclusion of any other firearm in the world – has not been demonstrated or proven to the scientific community. There is not, and there was not in 2006, a statistical empirical foundation for this assumption. This lack of such a foundation was remarked upon in a 2009 National

---

[2] "Sub-class characteristics" are those characteristics that typically result from an imperfection in the tool used to manufacture the firearm component under consideration. All of the components manufactured with that tool will exhibit the same imperfection, but once the tool is replaced subsequent batches of components will be somewhat different in appearance. This batch of components is said to have sub-class characteristics, and all ammunition components fired through firearms incorporating components from the same batch will exhibit similar markings.

Academy of Sciences report, "Strengthening Forensic Science in the United States: A Path Forward." (Although published after Mr. Lawrence's trial, the underlying scientific bases for the report's conclusions with respect to this issue were known to competent forensic scientists, such as myself, as of 2006).

23. The outer limit of what a competent and responsible forensic scientist could have testified to in 2006 was that the spent cartridge cases shared similar apparent individual characteristics or markings. Anything more definitive that implied that the cases were fired by the same weapon to the exclusion of all others, and that one could reach this opinion with a reasonable degree of scientific certainty, would not have been a valid scientific opinion. A competent and responsible forensic scientist could not validly reach such a conclusion because there was no firm statistical empirical foundation for the claim that a particular firearm possesses individual characteristics that produce unique markings on ammunition components to the exclusion of every other firearm in the world.

24. If I had been called to testify at Mr. Lawrence's 2006 trial, I would have testified to the same regarding Mr. Hardy's invalid and unreliable opinion concerning spent cartridge case comparisons. Additionally, if I had been called to testify at a pre-trial *Daubert* hearing regarding the invalidity and unreliability of Mr. Hardy's opinion concerning spent cartridge case comparisons, I would have testified to this, too.

I declare under penalty of perjury that the foregoing is true and correct.

_____
John Nixon

Executed on December 2, 2015.

# Exhibit 5:

# Charles Wetli Declaration

Declaration of Charles V. Wetli, M.D.

1. My name is Charles V. Wetli. I am a medical doctor with a specialty in forensic pathology. I received my medical degree in 1969 from the St. Louis University School of Medicine in St. Louis, Missouri. I served in the United States Army on active duty from 1973 through 1976, where I held the rank of Major, and served as the Chief of the Pathology Unit at the United States Medical Laboratory Pacific, in Japan. Among other positions which are detailed on my attached curriculum vitae, I served in various positions in the Dade County (Florida) Medical Examiner Department for 18 years until 1995. I then became Chief Medical Examiner in Suffolk County, New York, a position I held from 1995 through 2006. I was also a Clinical Professor of Pathology at the State University of New York at Stony Brook during that same time period. I have been a fellow of the American Academy of Forensic Sciences since 1979, and of the National Association of Medical Examiners since 1980. I was also a fellow of the American Society of Clinical Pathologists from 1972 through 2006. I have written and lectured extensively, as detailed on my CV.

2. I have been asked to render my opinion regarding certain matters surrounding the homicide death of Bryan Hurst, a special duty officer shot during the course of an attempted bank robbery.

3. To this end, I have been provided with a number of documents, photographs and other materials, which I have reviewed. I have appended a list of these materials to this declaration.

4. Very briefly, there was an exchange of gunfire during a bank robbery at the Third Fifth Bank on January 6, 2005, during which Officer Bryan Hurst, a special duty police officer was struck in the chest, and killed. The identity of the bank robber is not in question; Daryl Lawrence confessed to the crime. Mr. Lawrence was convicted and sentenced to death. Issues of concern are the distance from which Mr. Lawrence shot Officer Hurst, and whether Officer Hurst was shot before his weapon was drawn, while crouching behind the teller's desk, or rather while he was standing in the hallway adjacent to the teller area.

5. With regard to the distance from which Mr. Lawrence fired the fatal shot, according to the Coroner's Report, autopsy photographs, and the testimony at trial, Officer Hurst died as the result of a bullet that entered his body through the upper middle of his chest. After entering his body, the bullet pierced his ascending aorta, superior vena cava, right lung, and both his pulmonary vein and artery, before exiting through the back of his chest. There was no stippling around the entry wound, and no evidence of any stippling, soot, or gunpowder particles on his clothes near or around the wound. There is a patch of stippling on the left side of Officer Hurst's face, extending from the side of his nose to his

chin, over an area of approximately 5 x 3 inches. There is no evidence of stippling on the right side of his face.

6. The distance from which someone was shot can sometimes be determined by the characteristics of the gunshot wound or the residue found on the skin or clothing surrounding the entrance wound. Wounds are classified as contact or near contact; close or intermediate; or long or indeterminate range. None of the telltale signs appear in either the Coroner's Report or the autopsy photographs to suggest that Officer Hurst's wound was a contact or near contact wound, and Dr. Patrick Fardal, the forensic pathologist who conducted the autopsy, testified at trial that Officer Hurst's wound did not appear to be a contact wound. Based on the autopsy photographs, I concur.

7. An intermediate range wound is one inflicted when the muzzle of the gun is not pressed against the body when the gun is discharged, but is still sufficiently close that powder grains expelled from the muzzle cause "tattooing" of the skin or clothing around the entry wound. If no tattooing is present, the wound is considered a distant wound and there is no *way to determine how far away the muzzle may have been from the body,* except that the muzzle must have been at least two to three feet from the target.

8. Mark Hardy, identified at trial as a criminalist working for the Columbus Police Department, prepared a report in July 2005, seven months after this incident, in which he noted that he had examined Officer Hurst's shirt both macroscopically and microscopically and observed no evidence that the shot to the officer's chest was a close shot. Mr. Hardy then testified at trial that there was no observable gun powder residue on Officer Hurst's clothing, but added that this might be because the residue had shaken off while it was being handled.

9. As a forensic pathologist, I have often had occasion to examine the clothing of a gunshot victim to determine the presence of gunshot particles. While it is possible that some gun powder residue might be able to fall off a garment, most of it is in the form of hot embers, which would burn themselves into the material. Thus, I disagree with Mr. Hardy's casual assessment that the absence of microscopic particles might simply be the result of the particles having been shaken off

10. The presence of stippling on Officer Hurst's face suggests that an intermediate range shot passed near the left side of his face. In the absence of evidence of the presence of nitrites, lead or burned-in embers, or visible stippling around the entrance wound on Officer Hurst's chest or shirt, there is no basis to suggest that the shot that deposited the stippling on his face was the same shot that struck him in the chest, or that the shot that struck him in the chest was fired from intermediate range. Thus, it must be assumed that the fatal shot that struck Officer Hurst was fired, muzzle to entry wound, at a distance of greater than two to three feet.

11. With regard to Officer Hurst's position when he was shot, there is also no clear evidence to suggest that Officer Hurst was in a crouched position when he sustained the fatal gunshot wound. The bullet entered his chest at a point four inches higher than it exited through his back, which is consistent with a shot being fired downward. However, the track of the bullet through his body would also be consistent with the officer being upright (i.e., standing) and leaning forward when he was struck.

12. There is additional reason to believe that Officer Hurst was not shot while in a crouched position behind the teller desk. The fatal injury he sustained pierced central blood vessels. The ascending aorta extends out of the heart and carries oxygenated blood to every part of the body. The superior vena cava returns deoxygenated blood from the arms and the head to the right atrium of the heart. The pulmonary artery carries deoxygenated blood from the heart to the lungs and the pulmonary vein returns oxygenated blood from the lungs to the heart to be pumped throughout the body. Once these blood vessels were ruptured by the bullet wound, his blood pressure would have dropped immediately and precipitously. His right lung would also have collapsed when it was pierced.

13. According to the testimony at trial, Officer Hurst fired his gun seven times, and his body was found in the small hallway outside the teller area. Had he been struck by the fatal shot while he was still unholstering his weapon, while in a crouched position, he would still have had to stand up, fired all seven shots, absorbing the recoil from his gun seven times, and exited the teller area through an inward opening doorway (*i.e.*, one he could not have simply fallen against) into the hallway where his body was found face up by first responders.

14. When Dr. Fardal testified at trial, he suggested that, because Officer Hurst's spinal cord was not severed by the gunshot wound, he could have continued to engage in deliberate and conscious movement for some unspecified period of time before collapsing. I disagree. While it is true that almost anything is possible in the realm of the human body, I believe the wound Officer Hurst sustained would almost certainly have caused him to collapse on the spot. I do not believe he could have continued to exert the effort required to stand up from a crouch, fire seven shots, and move into the hallway.

15. I express the above opinions to a reasonable degree of scientific certainty.

I declare under penalty of perjury that the foregoing is true and correct.

Charles V. Wetli, M.D.                    Executed on 2 December , 2015.

# List of Materials Reviewed

- **Bank layout and evidence key** .

- **2005.01.09 Transcript of Audio Taped Interview of Daryl Lawrence**

- **Bank Witnesses:**

**Heather Clifton**

2005.01.13 Heather Clifton FBI statement.
Heather Clifton handwritten statement
Heather Clifton trial testimony

**Warren Cox**
2005.01.06 Warren Cox – Columbus P.D. summary
Warren Cox handwritten statement .
Warren Cox trial testimony .

**Andrea Ross**
2005.01.06 Andrea Ross – Columbus P.D. summary .
Andrea Ross handwritten statement
Andrea Ross trial testimony

**Amanda Goodman**
2005.01.06 Amanda B. Goodman - Columbus P.D. summary
Amanda Goodman trial testimony

**Marian Large**
2005.01.13 Marian Large FBI statement
Marian Large handwritten statement
Marian Large trial testimony

**Angela Karst**
2005.01.06 Angie Karst FBI statement
Angela Karst trial testimony

**Brian Dickerson**
2005.01.13 Brian Dickerson FBI statement
2005.01.06 Brian Dickerson handwritten statement

**Deborah Rader**
2005.01.06 Deborah Rader – Columbus P.D. summary
Debbie Rader handwritten statement

1

**Erica Arnold**
2005.01.06 Erica Arnold – Columbus P.D. summary
Erica Arnold handwritten statement

**Heather Kinney**
2005.01.06 Heather Kinney – Columbus P.D. summary
Heather Kinney handwritten statement

**Michelle Johnson**
Michelle Johnson handwritten statement

- **Government witnesses folder**
  David Love trial testimony
  Andrew Weber trial testimony
  Detective Snyder trial testimony .
  Detective Waugh trial testimony
  Mark Hardy trial testimony
  Dr. Patrick Fardal trial testimony

- **Coroner Report**

- **2005.01.24 Toxicology Report**

- **Guilt Phase Closing Arguments**
  Government's closing
  Defendant's closing
  Government's rebuttal

- **Grand Jury Transcripts (Vol. 1)**

- **Videos of the bank robbery**

- **The video of Mr. Lawrence's statement to law enforcement**

- **Color photos of the crime scene at Fifth Third Bank**

- **News interview of Michele Johnson, a bank witness**

- **Files received from John Nixon, a trial expert in crime scene investigation**

- **Files received from Scott Roder, a trial media consultant:**

- **A second audio taped interview with Mr. Lawrence.**

2

# <u>CURRICULUM VITAE</u>
(30 July 2015)


# <u>CHARLES V. WETLI, M.D.</u>


TEL. 201-750-8220


*charlesvwetli@gmail.com*


2 Berkery Place
Alpine, NJ 07620-0398

# CURRICULUM VITAE
# CHARLES V. WETLI, M.D.

**I.      GENERAL:**

Full name:              Wetli, Charles Victor
Place of birth:         Green Bay, Wisconsin
Date of birth:          27 August 1943

**II.     EDUCATION AND TRAINING:**

**University:**
University of Notre Dame, South Bend, Indiana
Pre-professional studies (concentration in chemistry)
Degree - Bachelor of Science, 6 June 1965

**Medical School:**
St. Louis University School of Medicine, St. Louis, Missouri
September 1965 - June 1969
Degree - M.D., 31 May 1969

**Internship:**
Jackson Memorial Hospital and University of Miami School of Medicine
Miami, Florida, June 1969 - June 1970
Anatomic and Clinical Pathology

**Residency:**
Jackson Memorial Hospital, University of Miami School of Medicine and Veteran's
Administration Hospital, Miami, Florida, June 1970 - June 1973

Dade County Medical Examiner Department and University of Miami School of
Medicine, September 1977 - September 1978
Forensic Pathology

**Government and Administration/Management:**
Forensic Administration - St. Louis University School of Medicine, Department of
Pathology (Division of Forensic and Environmental Pathology)
July 28-31, 1986, St.  Louis, MO

Harvard Program for Senior Executives in State and Local Government, John F. Kennedy
School of Government, Harvard University, Cambridge, MA, June 12 - July 1,
1988; Alumni Refresher Course (Harvard): 1989, 1990, 1991, 1992, 1993

**2**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

### III.    CERTIFICATION AND LICENSURE:

**National Board of Medical Examiners No. 107806, 1 July 1970**
      American Board of Pathology May 1974, Anatomic and Clinical Pathology

**American Board of Pathology, May 1979, Forensic Pathology**

State Board of Medical Examiners of the State of Florida, No. 16616,
        4 September 1970
        (inactive status as of January 1995; allowed to expire January 2008)
Medical Licensure, State of Missouri (lapsed)
New York State (effective 25 January 1995,  No. 198336)
State Board of Medical Examiners of New Jersey (license # 25MA08212100, effective 1
      February 2007)

**FEMA Certification in IS-00100 and IS-00700, 26 June 2006**

### IV.    MILITARY EXPERIENCE:

Reserve Commission (Berry Plan) U.S. Army, November 21, 1969
      active duty September 1973 to August 1976

Rank:        Major
Station:     U.S. Army Medical Laboratory Pacific (Japan)
Function:    Chief of Pathology Unit; Emergency Room Coverage
Awards:     Certificate of Appreciation, Far East U.N. Command (April 1975)

Army Commendation Medal, August 1976

### V.    APPOINTMENTS:

Associate Instructor of Otolaryngology (part-time),
      University of Miami School of Medicine, 1 August 1970 - 30 June 1973

Associate Medical Examiner, Dade County Medical Examiner Department
      Miami, Florida, 1 July 1973 - 31 August 1973

Staff Pathologist, Daniel Seckinger, M.D. & Associates, P.A., Staff,
      Appointment to Cedars of Lebanon Health Care Center, Miami, Florida
      September 1976 - September 1977

Director, Physician's Reference Laboratory, Miami, Florida, September 1976, September 1977

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

Associate Medical Examiner, Dade County Medical Examiner Department
Miami, Florida, September 1977 - October 1980

Deputy Chief Medical Examiner, Dade County Medical Examiner Department
Miami, Florida, November 1980 - January 1995

Assistant Professor of Clinical Pathology, University of Miami School of Medicine
Department of Pathology, Miami, Florida, September 1977 - June 1982

Clinical Associate Professor of Pathology, Department of Pathology, University of Miami
School of Medicine, June 1982 - January 1995

Staff Instructor, Drug Enforcement Administration, 1980 – 1993

**Chief Medical Examiner, Suffolk County, New York**
**February 5, 1995 – 14 August 2006**
**Note**:  Accredited by National Association of Medical Examiners (NAME)
April 2000 and May, 2005; American Board Forensic Toxicology, April 1999;
National Society of Crime Laboratory Directors (ASCLD/LAB), March 1997.

**Note**:  National Association of Counties **(NACO)** Award for Mass Disaster Preparedness
Program, May 2000 (Best in Category); semifinalist in **Innovations in American**
**Government competition** (JFK School of Government, Harvard
University).

Lecturer in Forensic Pathology, State University of New York at Stony Brook, March 23, 1995 -
30 April 1996

Clinical Professor of Pathology, State University of New York at Stony Brook, 1 May 1996 – 14
August 2006

Regional Trauma Oversight Committee and Trauma Peer Death Review Committee, 1999 - 2006
**Note:  NYS Trauma Physician of Distinction, 1999**
Presented by NYS Trauma Committee, American Trauma Society, NY Division

**VI.    JOURNAL MANUSCRIPT REVIEWER:**

Journal of the American Medical Association, January 1983
American Journal Forensic Medicine & Pathology, January 1992 - Present
American Society Clinical Pathology Check Sample (1986-2005)
Annals Internal Medicine (Occasional, since approximately 1990)
American Journal of Clinical Pathology (Dec. 1996 - 2006)
Circulation (March 2004)

**4**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

**VII.    PROFESSIONAL AFFILIATIONS:**

1.    **American Society of Clinical Pathologists** (Fellow No. F094661)
        Elected October 1972 - December 2006
        **ASCP Activities:    SEE ADDENDUM**

2.    **American Academy of Forensic Sciences** (Fellow #84825)
        February 1979 - present

    Discipline/Assessment Task Force Committee Member for  Path/Bio Section
        November 1991 - Feb. 1995

3.    **National Association of Medical Examiners** (Fellow)
        August 1980 –present

    Ad Hoc Committee for **Guidelines for Use of Pathology Assistants in Medical Examiner Offices** (11/95 - 11/96).

    Ad-Hoc Committee on **Current Issues Response** (9/97 - 2/98)

    Ad-Hoc Committee on **NTSB-ME Linkage** (9/97)

    Ad-Hoc Committee on **Cocaine** (10/99 – 01/01)

    Ad-Hoc Committee for the **Utilization of Pathology Assistants**

    Ad-Hoc Committee for **Relationship Between Tissue Procurement Agencies and Medical Examiners/Coroners** (10/01 – 12/14)
        Appointed Chairman, February  02/05 - 06/12

    Ad Hoc Committee for **NAME Journal RFP**
         March 2010 – September 2010.

    **Accreditation Inspector** for:
        Bergen County, NJ, Medical Examiner Office (06-14-02)
        Los Angeles County Coroner/Medical Examiner Office, Los Angeles, CA
            (06-06, 07-06)
        San Diego, CA, Medical Examiner Office, October 20, 2008

    **Board of Directors**, October 2006 – December 31, 2012

    **Executive Committee**, 2009 - 2011

4.    **Medical Society of the State of New York**, 1995 – 2006

**5**

# CURRICULUM VITAE
# CHARLES V. WETLI, M.D.

Forensic Committee, April 1995, and
Vice-Chair, April 2005 – December 2006

5. **Suffolk County Medical Society**, 1995 - 2006

6. **NYS Association of County Coroners and Medical Examiners**, 1997 - 2006

7. **National Disaster Management System (D-Mort Team, Region II**, 3/11/98 - 2006

8. **College Of American Pathologists** (Fellow)
   May 2000 (Member No. 0073905) – December 2006

9. **American Red Cross**
   National Medical Examiner/Coroner Advisory Committee, 1998 – 2005

10. **New York Organ Donor Network**
    Medical Advisory Board
    Chairman Tissue Subcommittee, January 2002 – February 2009

11. **College of American Pathologists**, Fellow No. 073905
    Elected May 1973 - December 1978 (resigned)

12. **The American Board of Pathology**
    Forensic Pathology Test Committee, 1985-1989 (five year maximum tenure)

13. **Florida Medical Examiners Commission**
    1985 Committee on Standards & Training (ad hoc)
    1989 Committee on Operations & Procedures (ad hoc)

14. **South Miami Medical Forum**
    July 1984 - January 1995

15. **Dade County Association of Chiefs of Police**, May 1989 - January 1995

16. **American Society for Public Administration**, January 1989 - 1995

**6**

# CURRICULUM VITAE
# CHARLES V. WETLI, M.D.

## VIII.   FORMAL MEDICAL AND FORENSIC PRESENTATIONS:

1.    Dermatofibrosarcoma Protuberans - Case Report, Zola Cooper Dermatology Seminar, at Convention of Southern Medical Association, Miami, Florida, November 1971, (Co-author, A. Bernard Ackerman)

2.    Cocaine-Related Deaths, Amer. Acad. Forensic Sci., Atlanta, Georgia, February 1979

3.    Potassium Chloride Overdose Deaths, Amer. Acad. Forensic Sci., Atlanta, Georgia, February 1979

4.    Propoxyphene Related Deaths, A Ten Year Assessment, Amer. Acad. Forensic Sci., New Orleans, Louisiana, February 1980

5.    Death from Primary Pulmonary Hypertension, Amer. Acad. Forensic Sci., New Orleans, Louisiana, February 1980 (Co-author, presented by Donna L. Brown, M.D.)

6.    Fatal Hemorrhage from Peripheral Vascular Disease, Amer. Acad. Forensic Sci.; Los Angeles, California, February 1981 (Donna L. Brown, M.D., Co-author)

7.    The Body Packer Syndrome, Amer. Acad. Forensic Sci., February 1981 (Co-author, presented by R.E. Mittleman, M.D.)

8.    Forensic Aspects of Santeria, Amer. Acad. Forensic Sci., February 1981 (R.Martinez, Co-author)

9.    Symposium on Drug Abuse, Plenary Session (Moderator), at Seventh International Congress of Cuban Physicians in Exile; 30 June 1981, Bal Harbour, Florida

10.    Santeria:  A Magico-Religious System of Afro-Cuban Origin; Amer. Assoc. for Soc. Psychiatry, 29 October 1981 (Co-author, presented by Rafael Martinez, M.A.)

11.    Methaqualone-Related Death:  1971 - 1981 Amer. Acad. Forensic Sci., February 1982, Orlando, Florida (Poster Session)

12.    The Fatal Cafe Coronary:  A Two Decade Experience, Amer. Acad. Forensic Sci., February 1982, Orlando, Florida (Poster Session, Co-author, presented by R.E. Mittleman, M.D.)

13.    The Threaded Bolt Pattern Injury, Amer. Acad. Forensic Sci., Orlando, Florida, February 1982 (Co-author, presented by R.E. Mittleman, M.D.)

14.    Fungal Cerebritis in Intravenous Cocaine Abusers: Amer. Acad. Forensic Sci., February 1983 (Presented by Sigmund Menchel, M.D.)

7

# CURRICULUM VITAE
# CHARLES V. WETLI, M.D.

15. Cocaine Overdose Deaths:  Amer. Acad. Forensic Sci., February 1983 (Presented by Roger E. Mittleman, M.D.)

16. Cocaine Psychosis and Sudden Death in Recreational Cocaine Users:  Amer. Acad. Forensic Sci., February 1985 (D. Fishbain, M.D., Co-author)

17. Cocaine and Sudden "Natural" Death: Amer. Acad. Forensic Sci., February 1986 (Presented by R.E. Mittleman, M.D.)

18. Methods and Risk of Suicide:  Amer. Acad. Forensic Sci., February 1986 (Presented by David Neubauer, M.D.)

19. Forensic Significance of Petechiae:  Int. Acad. Forensic Sci:  August, 1986, Sri Lanka (Presented by Dr. Valerie Rao)

20. Deaths from Hurricane Andrew and its Aftermath.  Amer. Acad. Forensic Sci.: February 1994, San Antonio, TX (Dr. Emma Lew, Co-author)

21. Altered Dopaminergic Synaptic Markers in Cocaine Psychosis and Sudden Death.  J.K. Staley, C.V. Wetli, A.J. Ruttenber, W.L. Hearn, and D.C. Mash.  College on Problems of Drug Dependency, June 1994, Palm Beach, Florida (presented by Dr. Staley).

22. Resnik, B.I. and Wetli, C.V.: Lichtenberg's Flowers.  Poster Exhibit (P341), Amer Acad Dermatology Annual Meeting (New Orleans, LA.) Feb. 4-9, 1995.

23. Raval, M.P. and Wetli, C.V.: Sudden Death from Cocaine-Induced Excited Delirium: An Analysis of 45 Cases.  Poster Session at Fall 1995 National Meeting, (New Orleans, LA) Sept. 18-20, 1995

24. Wetli, C.V., Rao, A., Rao, V.J.: Fatal Heroin Body Packing.  National Assn. Medical Examiners (Traverse City, MI), 18 September 1996

25. Wetli, C.V.:  The Crash of TWA-800:  Lessons Learned.  National Assn. of Medical Examiners, (Baltimore, MD), 13 Sept. 1997.

26 Wetli, C.V.:  The History of Excited Delirium - 19th Century to the Present, National Assn. Medical Examiners interim      meeting, (San Francisco, CA), 11 February 1998.

27. Wetli, C.V. with Sathyavagaswaran, L.:  The Medical Examiner and the News Media: The Good, The Bad and The Ugly; American Society of Clinical Pathologists, Resident Physician Section, (Los Angeles, CA) April 1998

**8**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

28. Wetli, C.V., Kolovich, R., and Dinhofer, L.:  A Modified Cardiectomy Technique:  A Reasonable Solution to the Dilemma Regarding Determining Cause of Death vs. Heart Valve Procurement for Tissue Donation.  Amer. Assoc. Tissue Banks 24th Annual Meeting, 10 September 2000, Bal Harbour, FL (Platform and Poster Presentation).

29. Wetli, C.V., Kolovich, R., and Dinhofer, L.:  A Modified Cardiectomy Technique:  A Reasonable Solution to the Dilemma Regarding Determining Cause of Death vs. Heart Valve Procurement for Tissue Donation.  National Assoc. of Medical Examiner 34th Annual Conference, 17 September 2000, Indianapolis, IN.

30. Wetli, C.V., Golden, R.M., Genna, R:  Medical Examiner Conducted Disaster Exercise with Electronic Mapping.  September 2000 (Poster Presentation), National Association of Medical Examiners, Indianapolis, IN

31. Jentzen, J.M., Stephens, B., Wetli, C.V., Karch, S.:  The Certification of Cocaine-Related Deaths:  A Survey of Medical Examiner Offices.  18 September 2000 (Presented by Dr. Jentzen)

32. Shields, LBE, Hunsaker, D., Hunsaker, J., Holmes, R., Wetli, C.V.:  Atypical Autoerotic Deaths: An Ultra Extreme Sport.  Presented at the 37th Annual Meeting of the National Association of Medical Examiners, 20 Sept. 2003 in San Jose, CA, by Dr. Shields

33. Davis, NL; Wetli, CV; and Shakin, JL:  The Retina in Forensic Medicine: Applications of Ophthalmic Endoscopy – The first 100 Cases.  Presented at the 38th Annual Meeting of the National Association of Medical Examiners, 13 September 2004 in Nashville, TN by Dr. Neil Davis

34. Thomas, L and Wetli, CV:  The Medical Examiner in the 21st Century. Presented to the Jurisprudence Section of the American Academy of Forensic Sciences, February 25, 2010, Seattle, WA (presented by Dr. Lindsey Thomas)

35. Graham, M., Karch, S. B., Wetli, C.V., Kroll, M. W., and Brave, M.:  Medical Examiner Collection of Comprehensive, Objective Medical Evidence for Conducted Electrical Weapons and Their Temporal Relationship to Sudden Arrest. Presented at the annual meeting of the National Association of Medical Examiners, September 23, 2014, Portland, OR (presented by Dr. Mark Kroll).

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**


**IX.     GOVERNMENTAL TESTIMONY AND SYMPOSIA:**

1. Cocaine Related Deaths:  U.S. House of Representatives Select Committee on Narcotics Abuse and Control, 96th Congress, 26 July 1979  (U.S. Govt. Printing Office SCNAC-96-1-9, 1980)

2. Homicides and Drug-Related Deaths in Dade County, Florida, Dade County Grand Jury, 11th Judicial Circuit of Florida, Fall term, 1981, 23 March 1982

3. Cocaine-Related Deaths, New York State Division of Substance Abuse Services, Symposium on Cocaine, May 3 and 4, 1982, New York, N.Y. (Julio Martinez, Director)

4. Methaqualone-Related Deaths, U.S. Senate Committee on Labor and Human Resources, Subcommittee on Investigations and General Oversight Hearing: Drug Abuse - Quaaludes, 13 May 1982  (Senator Paula Hawkins, Chairperson); Ninety-Seventh Congress, second session, pp 57-60

5. Drug Abuse, Turks and Caicos Islands (British West Indies), "Hearts and Minds" Campaign (Invitation of Governor C.J. Turner and Minister of Health In Conjunction With U.S. Drug Enforcement Administration; 1-4 March 1983; 19-23 July 1983; 8-10 November 1984)

6. Death Related to Methaqualone and Cocaine in Current Topics in Drug and Alcohol Abuse Symposium, April 1983.  Sponsored by the Academy of Medicine of New Jersey, the Medical Society of New Jersey, and the New Jersey State Department of Health

7. Cocaine, Governor's Council on Drug and Alcohol Abuse, September 12, 1984 - Miami, Florida

8. Cocaine, President's Commission on Organized Crime, 27 November 1984, Washington, DC, (Hon. Irving R. Kaufman, Chairman; James D. Harmon, Jr., Exec. Dir): Hearing IV, Organized Crime and Cocaine Trafficking, pp. 108-128

9. Cocaine, Governor's Task Force on Cocaine, Tallahassee, 4 September 1986, (Hon. Janet Reno, Chairperson); Senate Judiciary Committee (Criminal), Tallahassee, 2 Dec. 1986 (Sen. Robert Johnson, Chairman)

10. Cocaine Toxicity:  Panel Evaluation of N.Y.P.D. Response to Emotionally Disturbed Persons & Victims of Cocaine Psychosis.  New York, N.Y., 5 Dec. 1989

11. National Institute on Drug Abuse, Bethesda, MD. July 9-10, 1991:  "Acute Cocaine Intoxication: Current Methods of Treatment" (see NIDA Research Monograph No 123, NIH Publication 93-3498, 1993)


**10**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

12.     National Transportation Safety Board - Investigative Hearings Concerning the Crash of TWA-800.  8 December 1997, Baltimore, MD

13.     NIH Teleconference:  Initiative on "Cardiovascular Complications Related to Cocaine Abuse in HIV Infection".  20 January 1998

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**


# BIBLIOGRAPHY

1.  Wetli, C.V.; Davis, J.H.; and Blackbourne, B.D.; **Narcotic Addiction in Dade County, Florida: An Analysis of 100 Consecutive Autopsies**, Arch Path 93:330-343, 1972

2.  Wetli, C.V.; Pardo, V.; Millard, M.; and Gersten, K; **Tumors of Ceruminous Glands**, Cancer 29:1169-1173, 1972

3.  Wetli, C.V.; Heal, A.V.; and Miale, J.B.: **A Previously Unrecognized Laboratory Hazard: Hepatitis-B Antigen-Positive Control and Diagnostic Sera**, Amer J Clin Path 59:684-687, 1973

4.  Wetli, C.V.; Noto, T.A.; and Fernandez-Carol, A.: **Immunologic Abnormalities in Heroin Addiction**, South Med J 67:193-197, 1974

5.  Tyler, T.C.; Chandler, J.R.; Wetli, C.V.; and Moffitt, B.M: **Olfactory Neuroblastoma**, South Med J 67:193-197, 1974

6.  Weissman, B.W. and Wetli, C.V.: **Ameloblastoma of the Maxilla**, South Med J 70:251-253, 1977

7.  Wetli, C.V. and Davis, J.H.: **Fatal Hyperkalemia Due to Oral Overdose of Potassium Chloride**, JAMA 240:1339, 1978 (Letter to Editor)

8.  Wetli, C.V. and Wright, R.K.: **Death Caused by Recreational Cocaine Use**, JAMA 241:2519-2522, 1979

9.  Wetli, C.V.: **Application of the Tri-ess Mini Metal Detector to Forensic Autopsies (or, How to Find the Elusive Projectile)**, J Forensic Sci 24:656-659, 1979

10. Wetli, C.V. and Bednarczyk, L.R.: **Deaths Related to Propoxyphene Overdose: - A Ten Year Assessment**, South Med J, 73:1205-1209, 1980

11. Wetli, C.V.: **Cocaine-Related Deaths in Local Drug Abuse: Trends, Patterns, and Issues - Proceedings of Community Correspondents Group**, NIDA, 1:106-123 (Dec.), 1980

12. Brown, D.L., Wetli, C.V., and Davis, J.H.: **Sudden Death from Primary Pulmonary Hypertension**, J Forensic Sci 26:381-386, 1981

13. Bednarczyk, L.R.; Wetli, C.V.; and Balkon, J: **Respirator Toxicology**, J Forensic Sci 26:373-380, 1981

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

14.    Wetli, C.V.; Wright, R.K., and Gressmann, E.:  **A Case of Naked Hyperthermia**, <u>Forensic Pathology:  Check Sample</u>, ASCP #FP 81-1 (FP-114), Vol. 23, No. 1, 1981 (May)

15.    Wetli, C.V. and Mittleman, R.E.:  **The Body Packer Syndrome - Toxicity Following Ingestion of Illicit Drugs Packaged for Transportation**, <u>J Forensic Sci.</u> 26:492-500, 1981

16.    Wetli, C.V., and Martinez, R.:  **The Forensic Science Aspects of Santeria - A Religious Cult of African Origin**, <u>J. Forensic Sci</u>, 26:506-514, 1981

17.    Fishbain, D. and Wetli, C.V.: **Cocaine Intoxication, Delirium and Death in a Body Packer**, <u>Ann of Emerg Med</u> 10:531-532, 1981

18.    Wright, R.K., and Wetli, C.V.:  **A Guide to the Forensic Autopsy-Conceptual Aspects**, Sommers, S.C. and Rosen, P.P. (eds) 16:273-288, 1981, <u>Path Ann: 1981</u>, Part 2

19.    Wetli, C.V.:  **Methaqualone Abuse - Resurgence of the Quiet Epidemic** - <u>Miami Medicine</u> 51:21-25, 1981

20.    Mittleman, R.E. and Wetli, C.V.:  **The Fatal Cafe Coronary - Foreign Body Airway Obstruction**, <u>JAMA</u> 247:1285-1288, 1982 (translated into Finnish edition) (Abstract and critique in:  <u>Emergency Medicine Survey</u> 1:114-116, 1982) (Abstract in: <u>Current Surgery</u> 39:445-446, 1982

21.    Wetli, C.V. and Mittleman, R.E.:  **Aspiration of Food by Psychiatric Patients**, <u>JAMA</u> 248:1712, 1982 (Reply to Editorial Letter by Wendkos, M.H.)

22.    Mittleman, R.E. and Wetli, C.V.:  **The Threaded Bolt Injury** <u>J Forensic Sci</u>. 27:567-571, 1982

23.    Martinez, R., and Wetli, C.V.:  **Santeria: A Religious System of Afro-Cuban Origin**, <u>Amer J Soc Psych</u> 2:32-38, 1982

24.    Lowery, S., and Wetli, C.V.:  **Sexual Asphyxia - A Neglected Area of Study**, <u>Deviant Behavior</u>, 4:19-39, 1982

25.    Wetli, C.V.:  **Changing Patterns of Methaqualone Abuse - A Survey of 246 Fatalities**, <u>JAMA</u> 249:621-626, 1982 (translated into Japanese edition - August 1982)

26.    Deming, J.E., Mittleman, R.E., and Wetli, C.V.: **Forensic Science Aspects of Fatal Sexual Assaults on Females**, <u>J Forensic Sci</u> 28:527-576, 1983

27.    Wetli, C.V., and Martinez, R.:  **Brujeria - Manifestations of Palo Mayombe in South Florida**, <u>J Fla Med Assoc</u> 70:629-634, 1983

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

28.  Wetli, C.V., Roldan, E., and Fojaco, R.:  **Listeriosis as a Cause of Maternal Death - An Obstetrical Complication of the Acquired Immunodeficiency Syndrome**, Amer J Obstet Gyn 147:7-9, 1983

29.  Wetli, C.V., Weiss, S.D. Cleary, T.J., and Gyori, E.: **Fungal Cerebritis from Intravenous Drug Abuse**, J Forensic Sci 29:260-268, 1984

30.  Wetli, C.V.:  **Investigation of Drug-Related Deaths - An Overview**, Amer J Forensic Med and Path, 5:111-120, 1984

31.  Wetli, C.V., Roldan, E., and Fojaco, R.:  **Listeriosis and AIDS - An Unfounded Assumption (Reply letter)**, Am J Obst Gyn 149:805-806, 1984

32.  Mittleman, R.E., and Wetli, C.V.:  **Death from Recreational Cocaine Use - An Update**, JAMA 252: 1889-1893, 1984; JAMA Edition Français 10:244-247, 1985; 1986 Yearbook of Pathology and Clinical Pathology, pp 95-97

33.  Wetli, C.V.:  **Drug Abuse Prevention:  The Physician's Responsibility**, N.Y.S. Journal of Medicine 84:587, 1984 (commentary)

34.  Wetli, C.V. and Hensley, G.T.:  **A Case of Haitian AIDS** - ASCP Check Sample: FP 84-5, Vol. 26. No. 5 (FP-136), 1984

35.  Suarez, R.V. and Wetli, C.V.:  **Sudden Death Due to Coronary Artery Dissection** - ASCP Check Sample: FP-84:6, Vol. 26, No. 6 (FP-137), 1984

36.  Mittleman, R.E. and Wetli, C.V.:  **Death Caused by Cocaine**, Human Sexuality 19:9, 1985

37.  Micozzi, M.S. and Wetli, C.V.:  **Intravenous Amphetamine Abuse, Primary Cerebral Mucormycosis and Acquired Immunodeficiency**, J Forensic Sci 30:504-510, 1985

38.  Wetli, C.V., and Fishbain, D.A.:  **Cocaine-Induced Psychosis and Sudden Death in Recreational Cocaine Users**, J Forensic Sci 30:873-880, 1985

39.  Eber, M. and Wetli, C.V.:  **A Case of Autoerotic Sexual Asphyxia**, Psychotherapy 22:662-668, 1985

40.  Wetli, C.V.:  **Let's Legalize Cocaine...and See What Happens**.  The Miami News, pg 9A, 29 Sept., 1986 (editorial)

41.  Beerman, R., Nunez, D., and Wetli, C.V.:  **Radiographic Evaluation of the Cocaine Smuggler**, Gastrointestinal Radiol 11:352-354, 1986

**14**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

42.    Mittleman, R.E. & Wetli, C.V.:  **Cocaine and Apparent "Natural Death"**, J Forensic Sci. 32:11-19, 1987

43.    Wetli, C.V.:  **Fatal Cocaine Intoxication - A Review**, Amer. J. Forensic Med. and Pathol 8:1-2, 1987

44.    Wetli, C.V.:  **Fatal Reactions to Cocaine**, in Cocaine - A Clinician's Handbook, Chapt. 4, pp 33-54; The Guilford Press, New York, 1987 (Washton, A. & Gold, M., eds)

45.    Mittleman, R.E.; Mittleman, H.S and Wetli, C.V: **Pattern Injuries in Child Abuse**, Amer J Nursing 87:1185-1188, 1987

46.    Wetli, C.V.:  **The Medical Examiner as an Expert Witness**.  The Practical Prosecutor, 1987:3-6, 1988 (Jan)

47.    Grey, T.C., Mittleman, R.E., Wetli, C.V., and Horowitz, S.: **Aortoesophageal Fistula and Sudden Death - A Report of Two Cases and a Review of the Literature**, Amer J Forensic Med and Pathol 91:19-23, 1988

48.    Rao, V.J. and Wetli, C.V.:  **The Forensic Significance of Conjunctival Petechiae**.  Amer J Forensic Med and Pathol 91:32-34, 1988

49.    Wetli, C.V.:  **The Medical Risks of Cocaine (editorial)** The West J of Med 148:456-457, 1988

50.    Wetli, C.V., Mittleman, R.E. and Rao, V.J.:  **Practical Forensic Pathology**. Igaku Shoin Publishers, Inc., April 1988, 1140 Avenue of the Americas, New York, New York 10036, ISBN 0-89640-144-8 (New York), ISBN 4-260-14144-9 (Tokyo)

51.    Wetli, C.V.:  **CAP Handbook on Unidentified Human Remains**, J Forensic Sci 33:852-853, 1988 (book review)

52.    Wetli, C.V. and Mittleman, R.E.:  **Forensic Pathology for The Hospital Pathologist - Part I**, Laboratory Medicine 20 (4):233-240, 1989 (Reprinted in J Amer Assoc Med Transcription 8(2):11-20, 1989)

53.    Wetli, C.V. and Mittleman, R.E.:  **Forensic Pathology for The Hospital Pathologist - Part II**, Laboratory Medicine 20 (5):299-304, 1989 (Reprinted in J Amer Assoc Med Transcription 8(4):27-36, 1989)

54.    Wetli, C.V.:  **Foreword to:  Santeria - The Religion**, by M. Gonzalez-Wippler, Harmony Books, New York, 1989, pp VII-X

55.    Wetli, C.V.:  **On Being An Expert Witness**, Laboratory Medicine 20:545-550, 1989

**15**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

56.    Wetli, C.V.: **Afro-Caribbean Religious Cults - Santeria and Palo Mayombe**, Training Key #395, International Academy of Chiefs of Police, August, 1989

57.    Martinez, R. and Wetli, C.V.: **Tattoos of the Marielitos**, Amer J Forensic Med and Path 10:315-325, 1989

58.    Rodriguez, M. and Wetli, C.V.: **Sudden Death from Falciparum Malaria**, ASCP Check Sample FP 89-6 (FPK7) Vol. 31, No. 6, 1989

59.    Vila, R.I., Martin, J.V., Wetli, C.V. and Freeman, R.: **Accidental Death from a Black-Powder Rifle Breech Plug**, Amer J Forensic Med and Path 11(3):241-243, 1990

60.    Hearn, W.L., Flynn, D.D., Hime, G.W., Rose, S., Cofino, J.C., Mantero-Atienza, E. Wetli, C.V. and Mash, D.C.: **Cocaethylene: A Unique Cocaine Metabolite Displays High Affinity for the Dopamine Transporter**, J Neurochemistry 56(2):698-701, 1991

61.    Escobedo, L.G., Ruttenber, A.J., Agocs, M.M., Anda, R.F., and Wetli, C.V.: **Emerging Patterns of Cocaine Use and the Epidemic of Cocaine Overdose Deaths in Dade County, Florida**. Arch Pathol and Lab Med 115:900-905, 1991

62.    Mittleman, R.E. and Wetli, C.V.: **The Pathology of Cocaine Abuse**, Adv Pathol and Lab Med 4:37-73, 1991

63.    Ruttenber, A.F., Sweeney, P.A. Mendlein, J.M., and Wetli, C.V.: **Preliminary Findings of an Epidemiologic Study of Cocaine-Related Deaths in Dade County, Florida**. NIDA Research Monograph 110, 1991 (Schober, S. and Schade, C., eds) pp 95-112 ISBN 0-16-035854-X, DHHS Publication No (ADM) 91-1787

64.    Bell, M.D., Rao, V.J., Wetli, C.V., and Rodriguez, R.N.: **Positional Asphyxiation in Adults - A Series of 30 Cases from the Dade and Broward County Florida Medical Examiner Offices from 1982 to 1990**. Amer J Forensic Med & Pathol 13(2):101-107, 1992

65.    Escobedo, L.G., Ruttenber, A.J., Anda, R.F., Sweeny, P.A. and Wetli, C.V.: **Coronary Artery Disease, Left Ventricular Hypertrophy, and the Risk of Cocaine Overdose Death**. Coronary Artery Disease 3:853-857, 1992

66.    Wetli, C.V.: **The Pathology of Cocaine: Perspectives from the Autopsy Table in Acute Cocaine Intoxication: Current Methods of Treatment**. NIDA Research Monograph 123, 1993, pp 172-182 (NIH Publication No 93-3498) - Reprinted in Practical Reviews in Pathology, Vol 18, No 3, July 1993 (Guest Transcript)

67.    Wetli, C.V.: **Investigation of Child Abuse Deaths**; CME Audiotape in Practical Reviews in Pathology, Vol 18, No 4, August 1993 (Guest Presentation)

**16**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

68. Pardo, V., Wetli, C.V., Strauss, J. and Bourgoignis, E.: **Renal Complications of Drug Abuse and Human Immunodeficiency Virus**, in Renal Pathology, 2nd edition, Tischer, C.C. and Brenner, B.M. (eds), J.B. Lippincott, Phila. 1994, pp 390-418 (ISBN 0-397-51240-6)

69. Wetli, C.V. and Davis, J.H.: **Participation of Physicians in Capital Punishment (Letter to the Editor)**, New Eng J Med 330:936, 1994

70. Wetli, C.V.: **Review of "Pathology of Drug Abuse"** by Karch, S.B., Arch Pathol and Lab Med 118:553, 1994

71. Staley, J., Basile, M., Wetli, C.V., Hearn, W.L., Flynn, D.D., Ruttenber, A.J. and Mash, D.C.: **Differential Regulation of the Dopamine Transporter in Cocaine Overdose Deaths**. In NIDA Research Monograph "Problems of Drug Dependence, 1993: Proceedings of the 55th Annual Scientific Meeting", Editor: Louis S. Harris, Ph.D., 141, pp 32-38, 1994

72. Staley, J.K, Hearn, W.L., Ruttenber, A.J., Wetli, C.V., and Mash, D.C.: **High Affinity Cocaine Recognition Sites on the Dopamine Transporter are Elevated in Fatal Cocaine Overdose Victims**. J. Pharm. and Exptl. Therapeutics 271:1678-1685. 1994

73. Wetli, C.V.: **Illicit Drug Abuse in Pathology of Environmental and Occupational Disease**, Craighead, J.D. (ed), Mosby-Year Book, Inc., St. Louis, Chapt. 15. pp 259-268, 1995 (ISBN 0-8016-C7776-9)

74. Wetli, C.V.: **Answering the Call to Court**, Advance for Laboratory Administrators 4:53-55, 1995. Advance for Physicians Assistants 4:27-32, 1996

75. Raval, M.P., and Wetli, C.V.: **Sudden Death from Cocaine Induced Excited Delirium: An Analysis of 45 cases (abstract)** Amer J Clinical Path 104(3):329, 1995

76. Wetli, C.V.: **Forensic Issues**, in The Textbook of Penetrating Trauma, Part X, Special Considerations, Ivatury, R.R. and Cayten, C.G. (eds) Williams & Wilkins, Philadelphia, 1995 (1996), Chapt. 85, pp 1084-1099 (ISBN 0-683-04338-2)

77. Karch, S.B. and Wetli, C.V.: **Agitated Delirium Versus Positional Asphyxia (letter to editor)** Ann. Emerg. Med. 26(6): 760-761, 1995.

78. Wetli, C.V.: **Fatal Lightning Strike** Amer Soc. Clinical Pathologists Check Sample FP96-1, 38 (1), 1996

79. Lew, E.O. and Wetli, C.V.: **Mortality from Hurricane Andrew**. J Forensic Sci 41(3): 449-452, 1996.

80. Wetli, C.V.: **Keraunopathology - An Analysis of 45 Cases** Amer J Forensic Med & Pathol. 17(2): 89-98, 1996.

**17**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

81.     Resnik, B.I. and Wetli, C.V.: **Lichtenberg Figures** Amer J Forensic Med & Pathol. 17(2): 99-102, 1996.

82.     Wetli, C.V.: **Death Certificate Completion by Physicians** JAMA 276:279-280, 1996 (letter to editor).

83.     Wetli, C.V., Mash, D., and Karch, S.B.: **Cocaine-Associated Agitated Delirium and the Neuroleptic Malignant Syndrome** Am J Emerg. Med. 14:425-428, 1996.14:425-428, 1996.

84.     Ruttenber, A.J., Lawler-Heavener, Yin, M., Wetli, C.V., Hearn, W.L. & Mash, D.C.: **Fatal Excited Delirium Following Cocaine use: Epidemiologic Findings Provide New Evidence for Mechanisms of Cocaine Toxicity** J. Forensic Sci 42:25-31, 1997.

85.     Wetli, C.V.: **When Lawyers Call: Pathologists and Laboratorians as Expert Witnesses**. ASCP Check Sample, Laboratory Practice Management (LPM 96-3) 2:35-48, 1997.

86.     DiPaolo, N., Fineschi, V., Dipaolo, M., Wetly (sic), C.V., Garosi, G., DelVecchio, M.T., and Bianciardi, G.: **Kidney Vascular Damage and Cocaine** Clinical Nephrology, 47:298-303, 1997.

87.     Fineschi, V., Wetli, C.V., DiPaolo, M. and Baroldi, G.: **Myocardial Necrosis and Cocaine**. Int J Legal Med 110:193-198, 1997.

88.     Wetli, C.V., Rao, A. and Rao, V.J.: **Fatal Heroin Body Packing**. Amer J Forensic Med & Pathol 18:312-318, 1997.

89.     Wetli, C.V. (ed): **Pathology of Drug Abuse** in Drug Abuse Handbook, Karch, S.B. (ed.-in-chief), CRC Press, Boca Raton, Chap. 1, pp 77-150, 1998, ISBN 0-8493-2637-0. Second Edition: Taylor and Francis Group, Boca Raton, FL, Chapter 2, pp 71-146, 2007 (ISBN 10-08493-1690-1; 13-978-0-8493-1690-6)

90.     Hollander, J.E., Levitt, M.A., Young, G.P., Briglia, E., Wetli, C.V., and Gawad, Y.: **Effect of Recent Cocaine Use on the Specificity of Cardiac Markers for Diagnosis of Acute Myocardial Infarction**. Am. Heart J 135:245-252, 1998

91.     Wetli, C.V.: **Commentary on Genius vs State (986 F.Supp. 668 D. Mass 1997) Hex Appeal: Did Voodoo Terror Bring Insanity?** Forensic Echo 2:3-4, 1998

92.     Wetli, C.V., Mittleman, R.E., and Rao, V.J.: **An Atlas of Forensic Pathology (subtitle Forensic Pathology - A Descriptive Atlas of the Latter Twentieth Century)**. American Society of Clinical Pathologists (ASCP Press), Chicago, 1999 ISBN 0-89189-430-6

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

93.     Wetli, C.V.:  **Disaster's Trauma to Rescuers (commentary)**  Forensic Echo 3(6): 13-14, 1999 (May)

94.     Wetli, C.V.:  **Perspectives in Pathology:  The Two Worlds of Autopsy**.  Advance for Administrators of the Laboratory,  8(4):  14-16, 1999

95.     Okia, Z. and Wetli, C.V.:  **Arrythmogenic Right Ventricular Dysplasia and Sudden Death**.  Amer. Soc. Clin. Path. Check Sample FP 99-6  41(6): 75-92, 1999

96.     Wetli, C.V.:  **Body Traces Bullet**.  The Forensic Panel Letter 3(11): 16, 1999

97.     Ruttenber, AJ, McAnally, HB and Wetli, CV:  **Cocaine-Associated Rhabomyolysis and Excited Delirium: Different Stages of the same Syndrome**.  Am J Forensic Med & Pathol 20(2): 120-127, 1999

98.     Wetli, C.V.:  **Dead Baby Diagnosis Valid?  Commentary on People vs.Lind (Illinois, 718 N.E. 2d 316):  When Do Injuries Establish Intent?**  The Forensic Panel Letter (online http://www.forensicpanel.com), April 26, 2000.

99.     Wetli, C.V.:  **Book Review: Criminal Poisoning**: Investigation Guide for Law Enforcement, Toxicologists, Forensic Scientists and Attorneys by Trestrial III, John Harris Lab. Med 32:49, 2001

100.    Torres-Matundan, E., and Wetli, C.V.: **Salicylate Poisoning**.  ASCP Check Sample FP00-09, 42(9): 113-124, 2001

101.    Wetli, C.V.:  **Autopsy Safety**.  Laboratory Medicine 32:451-453, 200

102.    Wetli, C.V. and Golden, R.M.:  **Mass Disaster Management**, ASCP Check Sample FP01-10, 43: 119-138, 2001

103.    Wetli, C.V., Kolovich, R.M. and Dinhofer, L.:  **Modified Cardiectomy: Documenting Sudden Cardiac Death in Hearts Selected for Valve Allograft Procurement**. Amer J Forensic Med & Pathol.  23(2): 137-141, 2002

104.    Wang, J., Biedrzycki, L., Wetli, C.V.: **Delayed Cardiac Death from Vehicular Trauma: Heart Attack by Motorcycle**.  ASCP Check Sample FP02-6, 44:69-81, 2002 (ISSN 1056-5922)

105.    Wetli, C.V., Krivosta, G. and Sturiano, J.V.: **Open Revolver Cylinder at the Suicide Death Scene**.  Amer J. Forensic Med & Pathol.  23(3): 229-233, 2002

106.    Wetli, C.V.: **The Medical Examiner's Role in Organ & Tissue Recovery**.  On the Beat (NY Organ Donor Network).  6:12, 2003.  Update (publication of UNOS – United Network for Organ Sharing), May-June, 2003, p. 29.

**19**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

107. Xiong, Z., Avella, J., and Wetli, C.V.: **Sudden Death Caused by 1,1-difluorethane Inhalation**. J Forensic Sci 49: 627-629, 2004

108. Stephens, B.G., Jentzen, J.M., Karch, S., Mash, D.C. and Wetli, C.V.: **Criteria for the Interpretation of Cocaine Levels in Human Biological Samples and Their Relation to the Cause of Death**. Amer J Forensic Med and Pathol 25:1-10, 2004

109. Stephens, B.G., Jentzen, J.M., Karch, S., Wetli, C.V., and Mash, D.C.: **National Association of Medical Examiners Position Paper on the Certification of Cocaine-Related Deaths**. Amer J Forensic Med and Pathol 25:11-13, 2004

110. Avella, Joseph; Wetli, Charles V.; Wilson, James C.; Katz, Michael and Hahn, Timothy: **Fatal Olanzapine-Induced Hyperglycemic Ketoacidosis**. Amer J Forensic Med Pathol 25:172-175, 2004; reproduced in Psychiatry Review, 2:21-23, 2005

111. Shields, L.B.E., Hunsaker, D.M., Hunsaker, J.C., Wetli, C.V. and Holmes, R.M.: **Atypical Autoerotic Death: Part II**. Amer J Forensic Med Pathol 26:53-62, 2005

112. Wetli, C.V.: **Foreword to Forensic Pathology: Principles and Practice** by Dolinak, Matshes and Lew, 2005 , xxi-xxii, Elsevier, MA  (ISBN 0-12-219951-0)

113. Wetli, CV and Natarajan, GA: **Death in Custody, United States of America**. In Encyclopedia of Forensic and Legal Medicine, Vol. 2. pp 65-73, Payne-James, Byard, Corey and Henderson (eds.), Elsevier, Glasgow, 2005 (ISBN: 0-12-547970-0 {set})

114 Wetli, Charles V: **Excited Delirium**. Ibid, pp 276-288

115. Wetli, Charles V.: **Excited Delirium** in Deaths in Custody, pp 99-112, Chapter 7, (Ross, DL and Chan, TC, eds.), Humana Press, Totowa, NJ, 2006

116. Davis, NL, Wetli, CV and Shakin, JL: **The Retina in Forensic Medicine Applications of Ophthalmic Endoscopy:  The first 100 Cases**. Amer J Forensic Med and Pathol 27:

117. Davis, NL, Wetli, CV, and Shakin, JL: **Ophthalmic Endoscopy – The Retina in Forensic Medicine** Check Sample, American Society for Forensic Pathology, FP 06-5 (FP 316), 48 (5):61-73, 2006

118. Pinckard, JK, Wetli, CV & Graham, MA: **National Association of Medical Examiner Position Paper on the Medical Examiner Release of Organs and Tissues for Transplantation**. Amer J Forensic Med & Pathol 28 (3): 202-207, 2007

119. Wetli, C.V.: **Overview of Pathology of Drug Abuse:  Scene of Death and the Autopsy** in Pathology, Toxicogenetics, and Criminalistics of Drug Abuse, Karch, S.B. (ed). CRC

**20**

# CURRICULUM VITAE
# CHARLES V. WETLI, M.D.

Press/Taylor and Francis Group, Boca Raton, FL,  Chapter 2, pp 71-78, 2008  ISBN 13:978-1-42005455-2

120.    Wetli, C.V.:  **Sudden Unexpected Death in Custody (SUDIC)** in TASER Conducted Electrical Weapons:   Physiology, Pathology, and Law; Kroll, M.W. and Ho, J.D. (eds.), Chapter 30, pp 379-388, Springer Science + Business Media, New York, 2009;  ISBN978-0-387-85474-8

121.    Wetli, CV; Ponzin, D; Womack, C; and McCann, G:  **Facilitating Donation – The Role of Key Stakeholders:  The Medical Examiner, the Coroner, the Hospital Pathologist, and the Funeral Director, in Tissue and Cell Donation - An Essential Guide**. Warwick, RM; Fehilym, D; Brubaker, S; and Eastlund, T (eds.); Chapter 9, pp 160-178,Wiley-Blackwell, Oxford, UK, 2009 ISBN 978-1-4051-6322-4

122.    Scheinin, L and Wetli, CV:  **Sudden Death and Sickle Cell Trait – Medicolegal Considerations and Implications**.  Amer J Forensic Med & Pathol 30:201-208, 2009

123.    Mash, DC; Duque, L; Pablo, J; Qin, Y; Adi, N; Hyma, B; Karch, S; Druid, H; and Wetli, CV:  **Brain Biomarkers for Identifying Excited Delirium as a Cause of Sudden Death**.  Forensic Science International, 190: e13-e19, 2009

124.    Wetli, CV and Davis, JA:  **Pediatric Organ and Tissue Donation** in Forensic Pathology of Infancy and Childhood, Springer, 2014, (Collins, KA and Bayard, RA -- eds.) -- pages 1157-1171
(print ISBN 978-1-61779-402-5; online ISBN 978-1-61779-403-2)

**21**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

# ADDENDUM I

## AMERICAN SOCIETY OF CLINICAL PATHOLOGISTS ACTIVITIES

**Forensic Council of Commission on Continuing Education** 1982-1988 (Chairman, 1986-1988); ex officio 1989-2001; Forensic Resource Council, January 2002 - 2005

**Check Sample: Editor for Forensic Council**, 1985 - 2005
Associate Editor for Check Sample Program &
Editor-in-Chief of Anatomic Pathology, 1990-1993

**Executive Committee**, (Editorial Board), April 1993 - 2005

**Abstract Review Subcommittee for Anatomic Pathology**, May 1988 - present

**American Journal of Clinical Pathology Editorial Board**, Dec. 1996 - 2006

**Resident In-Service Examination ("RISE") National Contributing Editor for Forensic Pathology** (test committee), June 1998 - 2006

**George F. Stevenson Society**, Nov. 2000 - 2006

**ASCP Awards:**

Commission of Continuing Education Medal, November 1988
Distinguished Service Award, May 1989

**Check Samples Published**:

**FP 81 - Naked Hyperthermia** (ref. 14)
**FP 84-5 - Haitian AIDS** (ref. 34)
**FP 84-6 - Coronary Artery Dissection** (ref. 35)
**FP 89-6 - Sudden Death from Falciparum Malaria** (ref. 58)
**FP 96-1 - Fatal Lightning Strike** (ref. 78)
**LPM-96-3 - When Lawyers Call: Pathologists and Laboratorians as Expert Witnesses** (ref. 85)
**FP 00-09 - Aspirin Toxicity** (ref. 99)
**FP01-10 - Mass Disaster Management** (ref. 101)
**FP02-06 - Delayed Cardiac Death from Vehicular Trauma** (ref. 103)
**FP 06-5 (FP 316) - Ophthalmic Endoscopy – The Retina in Forensic Medicine** (ref. 116)

**Teleconferences:**

**22**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

Drug Overdose Deaths June and October, 1985; September 1988

Forensic Pathology for the Hospital Pathologist - Part I, May 1989

Anatomy of Firearms Injuries (Dr. Geetha Ann Natarajan, Co-director), October 1995

**ASCP Workshops:**

#4430:    **Man & Machine: Evaluating the Auto Accident Victim** (Co-director with Dr. James Benz), October 1982, October 1983; Revised, with Dr. Don Reay as Co-director: November 1985, April 1987, March 1993

#4436:    **Forensic Pathology for the Hospital Pathologist** (with Dr. Roger Mittleman as Co-director), October 1984, April 1985, November 1985, April 1986, March 1987, October 1987, April 1988, March 1989 October 1989, March 1991, April 1992, September 1995

#4443:    **Pathology of Drug Abuse** (with Dr. Allen Jones, Co-director) October 1988, October 1989, October 1990; (with Dr. Geetha Natarajan, Co-director), September 1995

#A-135:   **The Art of Courtroom Testimony**, October 1989 (Mini-workshop)

#4447:    **The Art of Courtroom Testimony**, October 1990, March 1991, October 1992, October 1993, October 1994, October 1996

#A-152:   **Euthanasia and Physician-Assisted Suicide** (Mini-workshop) October 1994

#4454:    **Anatomy of Firearms Injuries** (with Dr. Geetha Natarajan, Co-director) April 1995, April 1996, April 1997

#A-166:   **Death Certification**, October 1996, September 1997, October 2000 (Mini-Workshop)

#A-190:   **Forensic Pathology Chat Room**, October 2000

#R-233:   **Forensic Pathology Round Table** (Lawyers, Courts & Judges), October 2000 (Workshop #4410)

**ASCP Dinner Seminars Presented:**

**23**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**

1982:    Spontaneous Human Combustion;
         Fungal Cerebritis in IV Cocaine Abuse

1983:    The Body Packer Syndrome;
         Graves, Skulls, and Blue Tattoos
         (Afro-Caribbean Religions).

1984:    Two Point Contact; (cylinder flare in GSW homicide)
         Psychotic Heat (excited delirium and cocaine).

1985:    Double Impact; (in automobile crash)
         Silence Please: Murder in Progress (firearms silencers)
         Lust Murder

1986:    Potential Significance of the Hexagram;
         Sudden Death in Crisis Intervention;
         Delayed Symptoms (Amoxapine Overdose);
         Blood, Alcohol and Trauma

1987:    Trial by Press;
         Hyperacute Cerebral Edema in an Adult

1988:    Blackpowder Backfire; (breech plug fatality)
         Sudden Death in Mental Illness (Neuroleptic Malignant Syndrome)

1989:    The Explosion  (deflagration vs bomb)
         A Fatal Breeze (CO poisoning).

1990:    An Epitaph of Adolfo De Jesus Constanzos;
         From Natural Causes (not so apparent manner of death).

1991:    A Maturational Arrest (in the grief reaction),
         The Hemlock Debate, (assisted suicide, euthanasia)
         If At First You Don't Succeed...; (multiple SGW suicide).
         Tales Bullets Tell (bullet cytology).

1992:    Time of Death;
         Candomble
         A Not-So-Spontaneous Subarachnoid Hemorrhage (vertebral artery laceration).

1993:    Colombian Entrepreneur  (heroin body packer)
         Death of a Healthy Child  (child abuse)
         Deaths From Hurricane Andrew

**24**

## CURRICULUM VITAE
## CHARLES V. WETLI, M.D.

1994:     A Matter of Position (gunshot wound problem solving);
          The Naked Truth (autoerotic sexual asphyxia)
          Chango's Revenge (Fatal Lightning Strike)

1995:     "The Chameleon" (approach to the Police Shooting);
          Fatal Firearm Facsimile (Black Powder Firearms)
          Gasping Baby Syndrome (Benzyl Alcohol Toxicity)

1996:     Degenerate Dissection (Heroin Body Packer)
          Degenerative Deglutination (Food Aspiration in Elderly)
          Acute Exhaustive Mania, Excited Delirium and the Neuroleptic Malignant Syndrome

1997:     Press, Politics and Mass Disaster (TWA 800 Disaster).
          Of Broken Bones and Dry Gas (Homicidal Methanol Poisoning)
          Forensic Stridor (Sudden Death from Laryngeal Tuberculosis)

2000:     Modified Cardiectomy
          Suicide with Open Revolver Cylinder

**25**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**


# ADDENDUM II

## ACTIVITIES ASSOCIATED WITH ORGAN AND TISSUE PROCUREMENT FOR TRANSPLANTATION

Medical Examiner and Coroner Advisory Committee for the **American Red Cross**, 1998-2005

Ad Hoc Committee of the **National Association of Medical Examiners** for Developing Guidelines for the Relationship between Tissue Procurement Agencies and Medical Examiners/Coroners, 01/01 – 12/14; appointed chairman 02/05-06/12

Medical Advisory Board and Chairman of the Tissue Subcommittee for the **New York Organ Donor Network**, 10/01 – 02/09

Medical Examiner and Coroner Advisory Board for the **Musculoskeletal Tissue Foundation** (Co-Chair), February 2006-2011


**Publications:**

106. Wetli, C.V.: **The Medical Examiner's Role in Organ & Tissue Recovery**.  On the Beat (NY Organ Donor Network).  6:12, 2003.  Update (publication of UNOS – United Network for Organ Sharing), May-June, 2003, p. 29 (ref. 105)

103. Wetli,C.V., Kolovich, R.M. and Dinhofer, L.:  **Modified Cardiectomy: Documenting Sudden Cardiac Death in Hearts Selected for Valve Allograft Procurement**. Amer J Forensic Med & Pathol.  23(2): 137-141, 2002 (ref. 102)

121. . Wetli, CV; Ponzin, D; Womack, C; and McCann, G:  **Facilitating Donation – The Role of Key Stakeholders:  The Medical Examiner, the Coroner, the Hospital Pathologist, and the Funeral Director,** in *Tissue and Cell Donation - An Essential Guide*. Warwick, RM; Fehilym, D; Brubaker, S; and Eastlund, T (eds.); Chapter 9, pp 160-178,Wiley-Blackwell, Oxford, UK, 2009 ISBN 978-1-4051-6322-4 (ref 119)

118. Pinckard, JK, Wetli, CV, and Graham, MA:  **National Association of Medical Examiner Position Paper on the Medical Examiner Release of Organs and Tissues for Transplantation.**  Amer J Forensic Med and Pathol 28 (3): 202-207, 2007

124. Wetli, CV and Davis, JA:  **Pediatric Organ and Tissue Donation** in *Forensic Pathology of Infancy and Childhood*, Springer, NY, 2014 (Collins, KA and Byard, RA - eds.); pages 1157-1171  (Print ISBN 978-1-61779-402-5; Online ISBN 978-1-61779-403-2)

**Presentations at the American Association of Tissue Banks:**

**CURRICULUM VITAE**
**CHARLES V. WETLI, M.D.**


2001:      Modified Cardiectomy
2005:      Medical Examiners and Tissue Procurement (panel)


# ADDENDUM III

## <u>AWARDS</u>


Far East United Nations Command:  Certificate of Appreciation, April, 1975

United States Army Commendation Medal, August, 1976

American Society of Clinical Pathologists Commission on Continuing Education Medal, 11/88

American Society of Clinical Pathologists Distinguished Service Award, May 1989

National College of District Attorneys Lecturer of Merit Award, June 1990

NYS Trauma Physician of Distinction, 1999
(Presented by NYS Trauma Committee, American Trauma Society, NY Division)
(Note:  The only pathologist to ever receive this award)

National Association of Counties Award (Best in Category):  Mass Disaster Preparedness
Program, May 2000

St. Louis University School of Medicine:  The George E. Gantner Memorial Lecture Award, July
23, 2007

Professional Leadership Award presented by The Association of Organ Procurement
Organizations (AOPO), October 14, 2013 (presented at the annual meeting of the National
Association of Medical Examiners, Milwaukee, WI)


**27**

# Exhibit 6:
# Patrick Fardal Declaration

## Declaration of Patrick M. Fardal, M.D.

1. My names is Patrick M. Fardal. I was employed as a forensic pathologist for the Franklin County Coroner's office beginning in 1978. I retired in 2005 and testified in the case which is the subject of this declaration in 2006. While working at the Coroner's Office, I performed autopsies primarily in homicide cases and cases in which the cause, time or manner of death was unknown or deemed suspicious. I received my medical degree from the University of Wisconsin and have had many years of specialized training and experience in conducting autopsies.

2. The Franklin County Coroner's Office was housed in the same building as the Columbus Police Department's Forensic Crime Lab. As a result, it was not unusual for police officers to attend autopsies, especially in cases of interest to them. When they attended, they would sometimes take their own sets of photographs and might ask questions during the course of the autopsy. Other members of the public were also permitted to attend, but did so with less frequency.

3. I conducted the autopsy of Officer Brian Hurst, who was shot and killed on January 6, 2005. After reviewing the Coroner's Report that I prepared, I see that I conducted the autopsy just a few hours after he was pronounced dead, at approximately 3:30 p.m. on January 6. As part of the autopsy, I took photographs, which I have also recently reviewed. I undertook this review at the request of George Kouros and Amy Donnella, who identified themselves as postconviction counsel for Daryl Lawrence.

4. Although I do not remember whether I took notes during the autopsy of Officer Hurst, it was my typical practice to either take notes myself or dictate notes to an assistant while conducting an autopsy.

5. During my discussion with Mr. Kouros and Ms. Donnella, I also reviewed a scale diagram of the bank at which the shooting had taken place, as well as crime scene photographs showing the layout of the bank and of the ballistics evidence found at the scene of the shooting. Some of these photographs also included dowel rods, apparently indicating the trajectories of some of the bullets that had been fired in the bank that day.

6. After reviewing my Coroner's Report, I recalled this case, and recalled that the bullet that struck Officer Hurst went through his sternum, and then lacerated his ascending aorta, his vena cava, his left pulmonary artery and vein, and it punctured his left lung in a couple of places before exiting through the back of his body. The bullet traveled from right to left, and entered his body approximately four inches higher than the point that it exited his body.

7. I also recalled after reading the report and reviewing the photographs that Officer Hurst had stippling on his face. This is indicative of a bullet having been fired at a range, measured muzzle to target, generally of two to three feet or less.

8. In response to questions put by Mr. Kouros and Ms. Donnella, I expressed my belief that it was possible for someone who was struck by a bullet in this fashion to continue to be capable of conscious and purposeful movement after being so struck, but made clear that this was a gunshot wound from which Officer Hurst could not have survived, striking as it did so many of his major blood vessels. I also indicated that, while I could not rule out Officer Hurst being able to engage in conscious and purposeful movement, given the severe nature of his wound, he might also have collapsed as soon as he was shot.

9. Mr. Kouros and Ms. Donnella asked me questions about the trajectory of the bullet through the officer's body, and whether the trajectory was consistent with the officer standing and leaning forward when he was shot. I said that it was and stood up and demonstrated for them that the trajectory of the bullet was consistent with Officer Hurst standing up and leaning forward.

10. I also noted that the rim of abrasion on the entry wound, which I described in the Coroner's Report as "unusual," was consistent with Officer Hurst being shot while standing and leaning forward.

11. They then showed me photographs of the bank, and read me an account of the shooting from a witness who said that she saw Officer Hurst come out from behind the teller line with his gun pointed. I was asked if the trajectory of the bullet path through the officer's body would be consistent with the witness's statement. I said that it was and again demonstrated for them that the wound could have resulted from the officer leaning forward, as the witness indicated, to fire his gun.

12. I was asked whether the officer's wound was consistent with the officer being positioned at the south end of the teller line, by the corner that leads into the hallway, and the shooter being positioned to the north of the officer when the fatal shot was fired. Based on the path of the bullet through the officer's body, this appears to be a plausible account of the relative positions of the shooter and Officer Hurst to produce the wound he sustained.

13. Counsel also asked me whether the stippling on the officer's face necessarily came from the same gunshot wound that struck and killed him. I said that it did not necessarily come from the same shot and that, if it had, you would expect to see stippling or some evidence of gun powder residue on the officer's shirt at the point of entry. In the absence of such residue, it is likely the fatal wound was produced by a different shot from a further distance than the shot that produced the stippling on the face.

14.     After reviewing the autopsy photographs, I do not believe that you can determine whether the gun shot that produced the stippling on Officer Hurst's face was fired from in front of him or from behind him.

I declare under penalty of perjury that the foregoing is true and correct.

_Patrick M. Fardal MD_

Patrick M. Fardal, M.D.

Executed on _December 2_, 2015.

# Exhibit 7:

# Dan Clark Declaration

## Declaration of Daniel P. Clark

1. My name is Daniel P. Clark. I am a licensed private investigator with over 20 years of experience, and a former Captain in the Clay County Sherriff's Department in Liberty, Missouri.

2. I was retained by the Federal Capital Habeas Project of the Federal Public Defender Office for the District of Maryland to assist in the postconviction investigation in USA v. Daryl Lawrence.

3. On November 16, 2015, I accompanied Attorney George Kouros to the home of Michelle Johnson in Antioch, Illinois.

4. We arrived at Ms. Johnson's home at approximately 3:15 PM. As we walked towards the driveway of her home, a young man pulled into the driveway in a white pick-up truck. I asked him if this was Michelle Johnson's home, and he answered, "Yes." I asked him if she was home, and he said he would go inside the home and check.

5. Mr. Kouros and I walked to the front door and waited. A few minutes later, a woman came outside and identified herself as Michelle Johnson.

6. Mr. Kouros identified himself as an attorney with the Federal Public Defender Office, appointed to represent Mr. Daryl Lawrence in his postconviction proceedings. I identified myself as a private investigator who was retained to assist Mr. Kouros on behalf of Mr. Lawrence.

7. Ms. Johnson confirmed that she was present at Fifth Third Bank the day that Officer Bryan Hurst was shot and that she witnessed the incident. She stated that she had a clear view of the incident from her vantage point inside the bank.

8. Ms. Johnson confirmed that shortly after the incident, she gave a handwritten statement about what she witnessed to the bank as part of its internal investigation.

9. Ms. Johnson stated that within a few days of the incident, she also had a sit-down meeting with a law enforcement investigator who interviewed her about what she witnessed. Ms. Johnson could not remember if this investigator was a Columbus Police Department employee or an FBI agent.

10. Ms. Johnson stated that within the last two years, she and two other witnesses (Heather Clifton and Warren Cox) gave a group interview to a local TV news station in Columbus about the incident. This interview was videotaped. Ms. Johnson stated that the account that she gave during that interview about what she witnessed was the same account that she gave to the law enforcement investigator she spoke to within days of the incident.

11. Ms. Johnson stated that after the incident, she was contacted by a victim liaison with the prosecution. The victim liaison had Ms. Johnson's contact information and periodically reached out to Ms. Johnson to inform her about the status of the legal proceedings against Mr. Lawrence.

1

12. Ms. Johnson stated that she was living in Columbus at the time of Daryl Lawrence's trial. She stated that she did not know why she was not called as a witness at the trial. She had a recollection that someone connected with the prosecution had told her that only the Fifth Third Bank employees who were present at both the 2004 robbery and the 2005 robbery would be called as witnesses, and she thought that might have been why she was not called as a witness.

13. Ms. Johnson stated that prior to this conversation with Mr. Kouros and me, she had never been contacted by any member of the defense trial team about Mr. Lawrence's case.

14. Ms. Johnson stated that the incident was a very difficult experience for her and that she did not want to revisit it. She stated that the account of the incident that she described in her television interview was the same account that she had previously provided to law enforcement officials in 2005, and that nothing about her account had changed since then.

15. I declare under penalty of perjury that the foregoing is true and correct.

_____

Daniel P. Clark

Executed on ___11-19-2015___

2

Summary Brief

Daniel Patrick Clark
118 North Conistor, Ste. 301
Liberty, Missouri 64068
Phone:  (816) 781-1188 Fax: (816) 781-1978
Email: pidanclark@gmail.com

**Education:**   B.S. Administration of Justice, University of Missouri-Kansas City, MO.
San Bernardino County Sheriffs Academy, Basic Training Course, San Bernardino, CA.
Missouri Highway Patrol Basic Academy, Jefferson City, MO.
Drug Enforcement Administration Undercover Narcotics Investigations, Kansas City, MO.
Numerous seminars and courses in law enforcement subjects.

**Experience:**   More than 20 years of progressive law enforcement and private investigative experience: including undercover, line staff and administrative responsibilities. Highlights include: Federal criminal defense work in first capital murder in Western District, settled with a plea; winning federal criminal defense cases in arson and civil rights charges. Recovery of more than $250,000 stolen property resulting from a nine-day surveillance; finding missing persons, and hidden witnesses. Managed a staff of 21 officers in county jail with a daily average population of over 85 prisoners.

* Western District of Missouri, U.S. Federal Court: appointed to represent youngest brother in first capital crime charged in this district. Investigation led defense team to a plea agreement to save client's life. US Organized Crime Strike Force case with 35 defendants.

* Eastern District of Kansas, U.S. Federal Court: Represented two defendants with five counts each of arson, mail fraud, conspiracy and aiding and abetting others in a criminal action. ATF and Organized Crime Strike Force. Both found not guilty on all counts.

* Eastern District of Kansas, U.S. Federal Court: Represented a police officer for a civil rights charge of excessive force and perjury. Charges initiated by FBI and Civil Rights Task Force, U.S. Attorneys. Officer found not guilty on all counts.

Above investigations included skills and procedures in:

* Crime scene investigations and analysis.
* Witness interviews and analysis.
* Witness background investigations.
* Extensive report writing.
* Preparation of court exhibits, including crime scene photography.
* Worked closely with legal counsel, creating a team approach.
* Assisted in courtroom strategy sessions and in courtroom.
* Surveillance and covert information gathering techniques.

More than 15 years experience in business consulting in marketing, management and sales, working with senior executives. Placed senior financial executives in chief executive positions. Negotiated IRS 941 tax liens. Strong research and interviewing skills used to develop plans matched to clients' goals and ability.

Assisted in development of drug prevention programs for local law enforcement groups to use in schools, worked closely with chiefs of police, sheriffs and state legislatures.

**Work History:**

| | |
|---|---|
| 6/98 to Present | Clark Investigative Group, Kansas City, MO. Owner. |
| 4/96 to 6/98 | Federal Public Defender's Office, Kansas City, MO. Investigator. |
| 2/95 to 6/96 | Private Investigator, Kansas City, MO. |
| 8/87 to 2/95 | K.C. Productions, Kansas City, MO.   Owner. |
| 4/85 to 8/89 | Executive Search Group, Inc., Kansas City, MO. President. |
| 2/84 to 3/85 | Professional Career Development, Kansas City, MO. Executive Recruiter. |
| 1/81 to 2/84 | Life Styles Group, Inc., Kansas City, MO. President. |
| 11/76 to 1/81 | Hallmark Cards, Lafayette, EM. Account Manager. |
| 3/76 to 11/76 | Farmers Insurance Group, Kansas City, MO. Agent. |
| 3/72 to 3/76 | Clay County Sheriffs Department, Liberty, MO. Captain. |

**Other:**

Commissioned Private Detective, State of Missouri
Commissioned Private Detective, State of Kansas Attorney General's Office.
Member of National Defense Investigator's Association.
Member of Evidence Photographer's Council.
Certified Personnel Consultant.
Honorable Discharges, U.S. Air Force and U.S. Army Reserves. Viet Nam service.

**Other Recent Cases:**

US v. Dwayne Hooks, US Kansas District, Criminal Civil Rights, Perjury. Jury found not guilty. July, 1999.
          Also reversed a civil settlement based on perjury of complaining witness. Missouri v. Ellen
Reasonover, US Eastern Missouri District Court, St. Louis, MO, Judge Hamilton found for
          Defendant Reasonover and released from life without parole sentence. Actual innocence. June, 1999.
Missouri v. Eric Clemmons, Greene County Circuit Court, Springfield, MO, jury found not guilty of first
          degree murder. Originally convicted of capital murder and given death penalty. Actual innocence.
          February, 2000.
US v. Stewart Venable, et al., Eastern District of Kansas, Kansas City, KS. Jury found three federal corrections
          officers not guilty of criminal civil rights, excessive use of force. November, 2000.
US v. Sahakian, et al, Southern District of Illinois.  Four month jury trial for capital murder and conspiracy in a
          prison murder.  Hung jury, 11-1 for acquittal.  October 2004.
Dennis Fritz, Ron Williamson v. Pontotoc County, OK.  Innocence case, Fritz and Williamson incarcerated
          over 12 years for a brutal rape-murder, later cleared by DNA.  Civil investigation found many police
          and prosecutorial mistakes and gross misconduct.  Fritz and Williamson awarded large settlement for
          their civil rights award.  2007.
Darryll Burton released on innocence gateway, sponsored by Centurion Ministries.  Burton spent 24 years in
          prison, case took eight years to resolve.  August 2008.
Bowling v. USA; government agent beat up a man over a traffic accident, while on a drug investigation.
          Government found liable by judge, Bowling awarded over $833,000.  September, 2010.

# Exhibit 8:

# Tressel Report



## Forensic Investigative Services

### R. Robert Tressel

381 Cotton Mill Drive
Hiram, Georgia  30141
(404)735-3687

Amy Donnella
George Kouros
Federal Capital Habeas Project
Federal Public Defender Office
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770

December 3, 2015

Re: USA v. Daryl Lawrence

Ms. Donnella and Mr. Kouros,

I have been asked to review the provided case file materials in the above captioned case to provide my professional opinion(s) in regards to my analysis of the forensic evidence, crime scene investigation and crime scene reconstruction.

Credentials and the Field of Crime Scene Investigation

My curriculum vitae is attached to this report and details my training and employment history.  Briefly, however, I began my training in 1972 when I went through basic police training at the Cobb County, Georgia, Regional Police Academy, followed by basic training conducted by the Georgia Police Academy.  I worked in different capacities for the Cobb County Police Department for twelve years, including detective and sergeant in the Crimes Against the Person Division.  I spent the subsequent thirteen years as Operations Manager for the Cobb County Medical Examiner's Office.  From 1985 to the present, I have worked in a private capacity as a forensic investigator and consultant in the field of forensic evidence and investigation. Since

1

April, 2011, I have been the chief criminal investigator for the Cobb County (Georgia) District Attorney's Office.

My specialized training is in the fields of criminal investigatory practices and crime and accident scene reconstruction. I first spent some twenty years doing this in various capacities exclusively on behalf of various law enforcement agencies. While I continue to work as a consultant to law enforcement agencies, I have also worked for almost thirty years as a consultant for insurance agencies to help reconstruct accidents of various kinds, and for prosecuting authorities and criminal defendants, helping to analyze and reconstruct crime scenes.

I have more than forty years of training and experience working for the police and other law enforcement agencies, and for private clients, collecting and examining evidence, directing investigators in the proper methods of collecting evidence (including interviewing witnesses) to obtain a full picture of what transpired during a crime or accident, and reconstructing crime and accident scenes from evidence such events typically generate. This includes witness accounts, ballistics, blood spatter, vehicle placement, crime scene photographs, police and autopsy reports, and numerous other factors. Once an accident or a crime has occurred, it is often necessary to examine and reconcile multiple sources of information to determine how the events unfolded. The available evidence may lead to a single narrative of events or may narrow the field of possibilities without leading to a conclusive picture of what happened. By the same token, without careful examination, the available or known evidence may seem to lead to a particular narrative but, while plausible, is one of only many possibilities as to what happened.

My goal in reviewing all available sources of evidence is to determine from this evidence what plausibly may have occurred. In some cases, this may result in ruling out a suggested sequence of events; in other cases, my review and analysis may confirm a suggested sequence. In yet other cases, this review may demonstrate that several or many scenarios could explain the forensic evidence, not just the scenario offered by law enforcement.

Summary of the Offense

Someone attempted to rob the Fifth Third Bank in Columbus, Ohio, on January 6, 2005. A man, approximately 5'6" wearing a full face mask, hoodie, and gloves, is seen, entering the bank through doors on the west side of the bank, which lead into a foyer. There, he encounters three employees from other branches of the bank who had been in the basement and were standing at the top of the steps in the foyer. He directs them in through doors that lead into the bank lobby and orders them to lie down on the floor, which they do. He proceeds east across the lobby towards the teller desk with a gun in his right hand. When he reaches the teller desk, a surveillance camera shows the glass in a door across the lobby behind him shatter. At the same moment, another surveillance camera shows this person with his arms extended over the teller counter, apparently holding a gun with two hands (although his hands cannot be seen in this still frame) and with his head down, facing into the teller counter. In a subsequent still frame, he is

2

seen crouched, parallel to the teller desk, but his head turned to the left, cradled in the crook of his left arm. His right arm is not visible in this still frame. He is then seen retreating from the bank, with his right arm extended out behind him. As he is running out of the bank, he is seen tripping over a stanchion and falling through the same glass door that had splintered earlier, now shattering the glass in it. He then leaves the premises. During the incident, he has been shot twice. One shot takes off part of a finger on his left hand and lodges in his forearm. A second shot enters and exits through his left shoulder.

Officer Bryan Hurst, on special duty to provide bank security that morning, is behind the teller desk at the south end of the teller line when this incident begins. When the incident is over, Officer Hurst is lying on his back in a small hallway, outside the teller area, with a gunshot wound through his chest, and stippling on the left side of his face. He is in cardiac arrest by the time medics arrive on the scene minutes later, and dies of his chest wound shortly thereafter.

Subsequent evidence retrieval indicates that the perpetrator fired seven 40 caliber gunshots. Officer Hurst fired seven 45 caliber gunshots.

Daryl Lawrence gave a statement to police on January 9, 2005, and confessed to the attempted robbery, including firing his weapon, a Mini Firestorm, during the incident. Throughout his statement, Mr. Lawrence states that he did not expect that an officer would be inside the bank, that he panicked, and that he did not mean to kill anyone.

Materials I have reviewed

I have attached to this Report an index of all the materials I have reviewed to reach the conclusions I express herein.

I have also reviewed the expert declaration prepared by firearms and ballistics expert, John Nixon, and by forensic pathologists, Dr. Patrick Fardal and Dr. Charles Wetli.

Matters that Constrain Crime Scene Reconstruction in This Case

In order to perform a thorough crime reconstruction at the scene of a shooting, one needs certain baseline information. Ideally, this would mean: viewing the crime scene immediately after the offense has occurred, when the analyst can take all measurements and photographs necessary to memorialize the placement of the evidence and can interview eyewitnesses while their memories are still fresh and unaltered by suggestions or discussions with anyone else about the event. A defense crime scene analyst rarely has access to the evidence in this initial condition, which makes it critical that law enforcement take careful measurements and photographs before evidence is moved, note carefully the exact location of bullet strikes and, if possible and relevant, the angle of incidence of those bullet strikes. Likewise, it is important that law enforcement get statements from witnesses and, to the extent they ask the witnesses questions, those questions be open-ended and not suggest details to the witnesses of what might

3

have happened.  Recording oral statements and interviews is important not only to get the witnesses' exact statements but to enable anyone later considering the statement to see how the questions to the witnesses were framed.

There are a number of problems that present themselves in reconstructing the crime scene at issue in Mr. Lawrence's case.

First, there is a problem that plagues many crime scenes and to a large extent is unavoidable.  That is, because of the chaos in the immediate aftermath of a crime, numerous people pass through the crime scene, including all those people present at the scene of the offense, emergency medical personnel, and other first responders.  According to the testimony given in this case, numerous employees moved throughout the scene after the shooting was over, as well as teams of emergency medical personnel, with medical equipment, and several police officers, before the scene was secured.

Second, members of the Columbus Police Department collected evidence and, while they took some steps to memorialize the scene, because they failed to follow best practices, they destroyed important evidence that could have been used to reconstruct the movement and shooting trajectories of both Mr. Lawrence and Officer Hurst.  Police photographed the scene from a number of different angles throughout the bank.  They also placed red cones next to suspected pieces of evidence and photographed both the evidence and the cones along with the evidence.  While law enforcement made a list of the items they collected, noting in general terms where the items had been found, such as "lobby floor," they did not take measurements to identify the location of these items by reference to fixed points so the scene could later be reconstructed with any kind of precision.

Similarly, although law enforcement photographed bullet strikes throughout the bank, law enforcement did not measure the height of these strikes, or the distances to them from fixed reference points. It appears that the surfaces that sustained the bullet strikes were subsequently repaired, making it impossible to reconstruct the scene.  Law enforcement also took steps to determine the trajectory of various bullets using dowel rods placed in bullet holes around the bank, and photographing the bullet strikes with the dowel rods in them.  At trial, in fact, Columbus Police Detective William Snyder, and Mark J. Hardy, a criminalist with the Columbus Police Department, testified that by placing these dowels in bullet holes found in the bank, police could determine the trajectory of shots.  Done properly, determining the trajectory of shots can be an invaluable tool when reconstructing a crime scene because an accurate trajectory can then help determine where the person who fired a shot could have been standing, and rule out other locations.  However, in addition to not measuring the exact location of the bullet strikes, law enforcement did not measure the angles of incidence of the dowel rods, thereby eliminating the possibility of anyone actually being able to use the bullet trajectories to determine the location from where bullets had been fired.

4

Nor did law enforcement use centering cones when placing the dowel rods in the bullet holes.  Dowel rods frequently have a smaller circumference than the holes into which they are placed, so they can be moved to different angles within the hole.  Even the smallest difference at the originating point of the bullet strike can make a significant difference over the distance of several feet, creating a different bullet path than the one a bullet actually took.[1]

It is not clear what method law enforcement used to secure interviews with witnesses.  I have seen hand-written statements from many of them, and summary interviews from law enforcement of most of them.  The summary statements prepared by the Columbus Police Department indicate that the interviews were audiotaped.  I have not had access to these audiotapes. Mention is also made in the transcripts that some witnesses were brought in to view photographs of possible suspects the day after the incident.  Mention is also made that some witnesses were shown the surveillance videos by members of the U.S. Attorney's Office.  I have seen no transcripts or recordings of these sessions.

One other source of information about the events is helpful but also has serious limitations which must be recognized in order not to give it undue weight or significance.  The bank had several surveillance cameras mounted on the east side of the bank, trained on the lobby and entrances to the bank.  While two of these cameras captured images of Mr. Lawrence entering the bank, approaching the teller counter, and leaving the bank, the video cameras did not capture anything that happened behind the teller desk (that is, east of the teller line) or on the south side of the bank – in other words, there is no footage showing what Officer Hurst was doing during the offense.  In addition, the video cameras only captured images at a rate of two frames per second.  This produces a false sensation of seeing continuous motion when what viewers are really seeing is stop-image footage.

How Expert Testimony Presented At Trial Could Have Rebutted Government Inferences

The Government's account of this offense, presented through lay and law enforcements witnesses, is that Mr. Lawrence killed Officer Hurst deliberately and intentionally, and specifically in order to get to the bank's vault to make off with bank funds. The Government's account was that Mr. Lawrence ran to the teller line, fired three shots at Officer Hurst from point blank range while his arms were over the teller line, that one of those shots fatally struck Officer Hurst while he was crouched in a defensive position behind the teller line, and that after being shot, Officer Hurst unholstered his gun and fired seven shots of his own before stumbling out into the hallway south of the teller line and collapsing.

---

[1] "Bullet trajectories must be established at the scene and properly documented … . Not doing this at the scene virtually eliminates the possibility of later determining trajectory."  Theory and Practice of Shooting Reconstruction, at 7.

The defense presented at trial consisted of cross-examining Government lay and law enforcement witnesses.  Although the defense appears to have hired a crime scene expert and firearms examiner, no defense witnesses were called to rebut the Government's case.  Instead, the defense argued in closing that the Government's own evidence failed to prove Mr. Lawrence's intent beyond a reasonable doubt, and failed to prove that Officer Hurst was shot from point blank range while crouched behind the teller line. The defense argued that Mr. Lawrence was not expecting to see an officer in the bank and panicked, that Officer Hurst opened fire first, that Mr. Lawrence returned fire in an attempt to give himself cover while fleeing the bank, and that the incident was best understood as a chaotic exchange of gunfire that lasted less than 7 seconds during which Mr. Lawrence did not have time to form the intent to kill, nor deliberately tried to kill Officer Hurst.

There were several areas of testimony and evidence introduced by the prosecution, and inferences drawn therefrom, that could have been effectively challenged and rebutted by the defense with appropriate expert testimony and that would have supported the defense description of the events.  Some areas a defense expert could have testified to are as follows:

### *Location of Spent Shell Casings*

The Government made two arguments based on the location of spent shell casings at the scene.  These arguments were based on the untested supposition that shell casings typically eject from a gun up, backwards, and to the right, when the shooter is holding the gun in a conventional position at shoulder height with his hand straight.  Even when this general proposition is true, there is great variation in various gun brands so that the average distance a spent shell ejects can vary widely.  When a gun is held in a different position from the conventional position, such as 90 degrees with the ejection point facing skyward, the spent shell casings can eject in a different direction.

In this case, the defense team hired firearms expert, John Nixon, who performed spent shell ejection tests on a replica of the gun used by Mr. Lawrence, a 40 caliber Mini Firestorm. Mr. Nixon performed the tests with the gun in six different positions: 0 degrees, point of aim 59" above ground, holding the gun with two hands; 0 degrees, point of aim 59" above ground, holding the gun with one hand; 0 degrees, point of aim 48' above ground, holding the gun with 2 hands; 0 degrees, point of aim 48" above ground, holding the gun with one hand; 90 degrees, point of aim 48" above ground, holding the gun with one hand; and 90 degrees, point of aim 59" above ground, holding the gun with one hand.

Of greatest relevance, according to Mr. Nixon's report, when the gun was held at 0 degrees with a point of aim at 59" above ground, as Mr. Lawrence is seen holding the gun when he enters the bank, the ejection pattern showed that the spent shell casings would eject in a general right and rearward direction.  The average distance the spent shell casings would travel is 156 inches to the right of the shooter, more than 12 and a half feet.  The range of shots landed

between 117 inches and 226 inches to the right of the shooter.  When held at 90 degrees to the normal shooting position, the gun ejected spent shell casings in a left and rearward direction. The average distance the spent shell casings would travel to the left is 97 inches, almost 9 feet. The range of shots landed between 65 inches and 131 inches to the left of the shooter.  When held with two hands, hands at 0 degrees, shooting downward, as Mr. Lawrence is purported to have done when leaning on the teller desk, the ejection pattern shows the spent shell casings traveling right an average of 158 inches, with a minimum of 116 inches and maximum of 204 inches.  The spent shell casings would have travelled backward an average of 30 inches, with a maximum range of 65 inches to the rear and 4 inches forward.

These results are significant from the perspective of crime scene reconstruction and would have rebutted two claims made by the Government at trial.  First, the Government claimed that, looking at the location of spent shell casings, common sense tells you that Mr. Lawrence must have entered the bank and fired his gun on the way to the teller desk because there are three spent shell casings in a formation to the left of the door through which he entered.

The ejection pattern of the spent shell casings, however, shows that the casings would have been ejected twelve feet to Mr. Lawrence's *right*, if he had been firing on his way into the bank – that is, south of the doors where he entered. Even if the casings had been stopped by a wall or other obstacle, the casings would not have naturally wound up to the *north* of that doorway.

It should be noted, too, that a customer of the bank, Brian Dickerson, who was about to enter the bank as Mr. Lawrence was retreating from the teller desk, gave a statement in which he reported seeing Mr. Lawrence running out of the bank, firing behind him as he ran. This is consistent with surveillance footage from the Front Door camera, which shows Mr. Lawrence with his right arm outstretched behind him in a shooting position as he runs toward the exit. This suggests that the three 40 caliber shells casings that were found north of the entranceway are from shots that were fired by Mr. Lawrence as he exited the bank, not as he entered.

Also, of importance in this regard is the statement given by bank employee Amanda Goodman pretrial that, upon his entering the bank, she heard Mr. Lawrence say, "Put it down. Put it away."  This suggests he was trying to get Officer Hurst to lower his gun and may himself not have been firing at this point.

Second, three spent shell casings were found behind the teller counter, inside the teller area.  One was found on the workstation counter top for the teller line, but below the upper top of the counter; one was found on the floor just west of a desk; and the third was found the floor just west of the door that opens into the hallway.  The Government asserted in closing arguments that common sense dictated that the most likely way the three spent shell casings could have wound up in these locations was if Mr. Lawrence fired those three shots while leaning over the teller desk.

This assertion is belied by the ejection pattern.  The ejection pattern for firing the Mini Firestorm, holding it with two hands, pointing downward at a target three feet away, would most likely result in the spent casings landing approximately 13 feet to the right of him, and roughly two and a half feet behind him – which would put them on the outside of the teller line, in the lobby area, not the inside the teller area.

On the other hand, if Mr. Lawrence fired his gun with his hand turned 90 degrees, while his arm was pointed towards the south, those spent shell casings would have travelled to his left over the teller counter and would likely have landed inside the teller area and, in fact, they were.

As a crime scene reconstruction expert, I rely upon this type of ejection pattern testing as the basis for my professional opinions, rather than reaching conclusions that have no grounding in science or testing, as the Government urged the jurors to do when it asked them to use their common sense to reconstruct the crime scene based on the location of spent shell casings.

Several additional pieces of evidence support the inference that Mr. Lawrence fired his weapon in a southerly direction.  One of the bullet strikes identified by law enforcement after the shooting is in the upper wall south of the teller line.  The bullet from that shot was recovered in the attic and was a 40 caliber shot.  Another 40 caliber bullet went through the south wall of the hallway and landed in one of the south offices.  Both of these appear to have been fired by Mr. Lawrence in a southerly direction, and would account for two spent shell casings that had been ejected to the left and into the teller area.

In addition, the still image at 10:35:27 (frame two) is consistent with Mr. Lawrence shooting in a southward direction even though his head is turned away from his shooting arm, and is in the crook of his left arm:

Image from Teller 5 Camera at 10:35:27 Frame Two



Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

8

He is still crouched down below the level of the teller counter top. Even though his right arm is not visible in this frame, it would be a mistake to conclude that Mr. Lawrence is not firing in this moment.  Over the next four frames, one can see that he is running toward the door with his right hand stretched out behind him, which is consistent with his continuing to shoot as he retreated.

Image from Teller 5 Camera at 10:35:28 Frame One



Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

Image from Teller 5 Camera at 10:35:28 – Frame Two



Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

9

Image from Front Door Camera at 10:35:29 – Frame One



Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

Image from Front Door Camera at 10:35:29 Frame Two



Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

As noted earlier, there is additional evidence that suggests that Mr. Lawrence was firing his gun as he exited the bank: the witness statement of Brian Dickerson and the location of the spent shell casings to north of the west entranceway.

10

When the shooting was over, Officer Hurst was found in the small hallway, south of the teller area.  As I will discuss below, there is significant evidence that the fatal shot to Officer Hurst's chest was delivered while he was in this hallway, firing at Mr. Lawrence, not while he was crouched behind the teller desk, as the Government has asserted.  If this is true, this would also account for Mr. Lawrence firing a shot in a southerly direction, likely resulting in a shell casing inside the teller line if Mr. Lawrence had been holding his gun at 90 degrees when he fired.

***Witness Reports During Shooting Incidents Are Often Distorted. Even If Distorted, Early Open-Ended Witness Reports Are More Accurate Than Later Reports Which May Be Affected By Subsequent Events.***

Two issues arise from the trial testimony of the eyewitnesses to the offense.  One is a concern over whether law enforcement used proper protocols when interviewing witnesses, because the failure to use best practices can taint witness accounts. The second is the well-documented phenomenon of the distortion in perception that witnesses to shooting incidents frequently experience.

It is a well-documented phenomenon, and well-known among trained crime scene experts and those trained in best police investigative practices, that witness memories can become contaminated over time.  As a witness discusses the event with law enforcement, friends and family, and as he or she is provided with additional information about an incident, the witness often confabulates details; in other words, other accounts or discussions about the event get incorporated into his or her own memories. Early reports generally reflect the most accurate memories a witness has, even when details of the account are vague or contain perceptual distortions.  For this reason, police protocols have been developed and suggested for use by law enforcement to help ensure that memories are not altered by suggestive interviews.  I have personally helped implement such protocols and have consulted with law enforcement about them.

A crime scene expert must remain alert to issues of memory contamination and generally rely on early interviews with eyewitnesses to provide the most accurate details of an event, and be cautious relying on the testimony of eyewitnesses at trial that differs, sometimes dramatically, sometimes subtly, from the statements witnesses had initially provided to police.

For example, the prosecutor confirms when questioning Andrea Ross, an eyewitness, that she has seen the bank videos from the morning of the crime, prior to testifying.  TT V 6 at 198.  Ms. Ross had been down on the floor through most of the shooting incident.  Being shown these videos may have contaminated her memory as it would have caused her to combine her actual memory with images the video recorded that occurred outside her line of sight or from a different vantage point.  Given that a number of eyewitnesses were asked to describe aspects of the surveillance video at trial, it is likely Ms. Ross was not the only witness shown it prior to trial.

11

Moreover, it was disclosed at trial that some witnesses were brought in by police the day after the incident for photo identification sessions.  These are all potential sources of memory contamination which police interview protocols are designed to prevent.

It was, therefore, important that jurors be given sufficient information about the effects of law enforcement interviews and other influences on witness memories so the jurors could better understand that these memories might be altered even though these changes did not reflect the witness engaging in deception.

Experience and research have also demonstrated that the perceptions of people who are involved in shooting incidents are often distorted. When shots are fired indoors, even people who are accustomed to hearing gunfire often mistake the direction from which shots have been fired. Under such circumstances, a witness will often misattribute the directionality of the sound of gunshots to the location from which he or she was expecting gunfire to come.

Research conducted with police officers involved in shooting incidents bears out the fact that the perceptions of even trained professional law enforcement officers frequently become distorted during these incidents.  The distortions involve sound, sight and memory. This phenomenon has been documented and studied for many years.[2]

As to both points, there are a number of instances of eyewitnesses whose accounts of the incident are different or more detailed in significant ways from their initial hand-written reports and police interviews. There are also instances in which the eyewitnesses indicate their belief as to the directionality of gun shots based on sound, even though such beliefs are notoriously shaped by witness expectations.

For example, Andrea Ross notes in her hand-written statement that she heard a variety of noises as she was trying to get down on the floor, including gun shots and glass shattering, but "had no idea where the sound was coming from."  In her trial testimony, she testified that she heard the first shots "from behind me.  Over my right shoulder."  TT V 6 at 196, 199.

When interviewed within a week of the shooting, Heather Clifton and Warren Cox both stated that they did not hear gunfire until they were already lying on the ground. Heather Clifton reported in her initial post-incident report and interview that she heard between *4 and 6* shots *after* she had laid down.  Nevertheless, she testified at trial that she counted the shots and heard *15* of them, the first shot coming *before* they were through the doorway.  She testified further that she had heard 3 gunshots *before* she was on the floor.  When cross-examined on this point, she explained this by saying she was in shock and that her early reports were wrong (even though her police interview was a week after the incident.)  TT V 6 143, 145, 160.

---

[2] See, for example, "Perceptual and Memory Distortion During Officer-Involved Shootings," by Alexis Artwohl, Ph.D., October 2002, FBI Law Enforement Bulletin, documenting the phenomenon and surveying previous studies.

Ms. Clifton's explanation could have been rebutted by pointing to the variety of influences that likely affected her memory (and those of other witnesses, as well).

Additionally, the three witnesses, Warren Cox, Andrea Ross, and Heather Clifton, who entered the bank at Mr. Lawrence's direction were not employed at that branch and had no reason to know anyone else at the bank was armed. Warren Cox, for example, testified at trial that he did not know at the time that there was an officer working at the bank so did not know at the time of the shooting that this was an "exchange" of gunfire. TT V 6 at 176, 180. Similarly, Andrea Ross testified at trial that she had not known there was a police officer in the bank at the time of the shooting and had not seen him when she entered the bank. TT V 6 at 202. Thus, it is not surprising that these witnesses identified the source of gunfire they heard as coming from behind them, since they had no expectation that there was anyone else in the bank that was armed who could have been shooting.

An explanation of this, too, could have helped jurors better evaluate the testimony of these witnesses.

### *Evidence To Rebut the Government's Contention That The Fatal Shot Was Delivered At Close Range, Before Officer Hurst Had Unholstered His Gun or Fired a Single Shot.*

The Government contended at trial that Mr. Lawrence delivered the fatal shot to Officer Hurst at close range. Several pieces of evidence were cited in support of this contention.

First, Officer Hurst had stippling on the left side of his face. The Government argued that the stippling could only have been deposited by a shot fired at between six inches and 3 feet.

Second, the Government suggested that, while it was possible the shot that caused the stippling on Officer Hurst's face could have been separate from the shot to his chest, it was likely that this was all one shot, and that, in any event, it was clear from the location of the spent shell casings that Mr. Lawrence had fired his gun three times while leaning over the teller desk. I have addressed the fallacy behind that claim in a previous section.

Third, the Government presented the testimony of Marian Large, a teller who testified that she had seen Officer Hurst crouched down beneath the teller desk, had heard the sound of gun shots and had then heard the sound of Velcro ripping. (Ms. Large did not mention hearing the sound of Velcro in interviews she gave shortly after the shooting, and prior to her trial testimony.) The Government argued that the sound of the Velcro must have been the result of Officer Hurst touching a Velcro strap on his gun belt as he was in the process of unholstering his gun. Thus, according to the Government, if Ms. Large heard gun fire before hearing the Velcro, this proved that Mr. Lawrence had fired his gun several times before Officer Hurst's gun was even out of the holster.

13

I have reviewed the video stills side by side of two bank surveillance cameras, Teller 5 and Front Door. Matching these stills frame for frame by the time counter on them, one can clearly see that by the time Mr. Lawrence is leaning on the teller desk (the only frame in which he is doing so), the glass door behind him, leading to the west foyer and bank entrance, has been hit; although the glass is still in the door, it is clearly shattered:

<u>10:35:26 Frame One: Teller 5 Camera and Front Door Camera</u>

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

<u>10:35:26 Frame Two: Teller 5 Camera and Front Door Camera</u>

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

14

<u>10:35:27 Frame One: Teller 5 Camera and Front Door Camera</u>

 

Video Capture Size: 352 x 240 pixels     Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time) Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

The only reasonable explanation for this is that Officer Hurst had already fired his weapon at Mr. Lawrence *prior* to the image captured on the Teller 5 camera at 10:35:26 (frame two), as Mr. Lawrence was on his way to the teller desk.

It is my opinion to a reasonable degree of professional certainty, based on this evidence alone, that Officer Hurst was not delivered the fatal shot at close range before he had unholstered or fired his weapon.

Fourth, the Government put on the testimony of Dr. Patrick Fardal, the forensic pathologist who conducted the autopsy on Officer Hurst. Dr. Fardal testified that the trajectory of the bullet wound through Officer Hurst's chest was consistent with Mr. Lawrence firing downward at a crouching Officer Hurst, and at close range, meaning at a distance less than two to three feet.

Dr. Fardal did not, however, insist that this was the only combination of relative positions Mr. Lawrence and Officer Hurst could have been in, consistent with the trajectory of the fatal shot through the chest. Michelle Johnson, a bank manager who was at her desk in a south office at the bank the morning of the attempted robbery, provided a statement to bank officials in which she said that, during the incident, she saw Officer Hurst come out from behind the teller line and begin firing.[3] When this statement was read to Dr. Fardal by post-conviction counsel, Dr. Fardal noted that, if Officer Hurst was standing up and leaning forward in a shooting stance and Mr.

---

[3] In addition to reading Ms. Johnson's handwritten statement, I have also reviewed a television interview she gave in 2014, in which she describes Officer Hurst's actions in more detail. She says she witnessed him come out from behind the teller line, go in front of the teller line where the customers would be, and assume a firing stance. I have not seen reports of any interviews with Ms. Johnson conducted by law enforcement. She appears to be the only eyewitness to the offense for whom there is no police or FBI interview.

15

Lawrence was standing near the teller desk, facing south, those relative positions would also be consistent with the path of the bullet through Officer Hurst's body.

Dr. Charles Wetli, a forensic pathologist has submitted a declaration, opining on this issue, and concurs with Dr. Fardal's opinion on this point. Based on my own experience with crime scene evidence and working in the Cobb County Medical Examiners Office, I also agree with this assessment.

Dr. Wetli and I both have one point of disagreement with Dr. Fardal. That is, Dr. Fardal has indicated that, despite the fact that all of Officer Hurst's major arteries were lacerated by the bullet that hit him, he would still have been capable of conscious and deliberate movement for some time after being struck. To Dr. Fardal's credit, he has acknowledged that he could not say whether, in any individual case, a person struck in this way actually would have been able to continue moving, and that it is also possible that a person would have immediately collapsed after being struck this way

However, in Dr. Wetli's declaration, he indicates that the severing of these arteries would have produced such a sudden and immediate drop in the officer's blood pressure, while deliberate movement was theoretically feasible, it was highly improbable. This comports with my experience, seeing people collapse from catastrophic gunshot wounds, even when those wounds have not damaged their spinal cord or nervous system.

In fact, the spent shell casings from Officer Hurst's gun show that he fired seven rounds, leaving shell casings mostly behind the teller counter, with at least another two in positions consistent with his firing his weapon while in or near the hallway next to the teller counter. Dr. Wetli has indicated, and I concur, that it would have been unlikely that Officer Hurst could have been shot while crouching down, hit with the force of a gun shot at close range that severed all the major arteries that deliver blood throughout the body, then stood up, fired seven shots, and walked out to the hallway adjacent to the teller line before collapsing. It is far more likely, given the nature of his injuries, that he fired his weapon several times from behind the teller line, then moved into the small hallway where, as the eyewitness Michelle Johnson reported, he assumed a firing stance, fired his gun once or twice more and then was struck by the fatal shot.

It is my opinion to a reasonable degree of professional certainty that this is a plausible account of what happened and is consistent with all of the evidence I have seen. As I noted at the outset, the failure of the initial law enforcement investigative team to record precise locations of ballistics evidence and angles at which bullets struck surfaces inside the bank, or even the precise location and position Officer Hurst was in when he collapsed, has eliminated additional sources of evidence that might support this alternative theory, which I believe to be more plausible than the account suggested by the Government at trial.

Finally, I note a point of misleading testimony offered at trial by Mark J. Hardy, identified as a criminalist with the Columbus Police Department. Mr. Hardy provided firearms

16

and ballistics expertise on behalf of the Government at this trial. Additionally, pretrial, Mr. Hardy prepared a Crime Laboratory Report which noted, among other things, the results of the examination he had conducted of Officer Hurst's uniform shirt on July 10, 2005.  Under "Results of Examination," Mr. Hardy states, "The bullet hole and surrounding area in the white uniform shirt, PR# 05-370, was macroscopically and microscopically examined.  No evidence of a 'close' gunshot wound was observed."

At trial, however, Mr. Hardy testified that, just because he had not seen gun powder particles on Officer Hurst's shirt, it did not rule out this having been a close gunshot wound.  He repeated both on direct and cross-examination that the fact that he did not see gun powder particles on the shirt might simply have meant that these particles had been shaken off or that the shirt had been "hit." This likely left the jury with the idea that gun powder particles are like dust or soot, and can easily be brushed, shaken or otherwise dislodged from a piece of fabric.  Such an answer would make it seem as likely as not that the fatal wound had been inflicted at close range despite Mr. Hardy's failure to observe the presence of gun powder particles.

Such testimony was misleading.  When a shot is fired at a range of between 6 inches and 3 feet from a piece of fabric, there is a cone of gun powder particles that is expelled that consists of burning hot particles that will burn into the fabric.  It is extremely unlikely that all traces of these burned-in particles could have been dislodged as a result of the handling of this critical piece of evidence by medical and police personnel.

A trained crime scene expert could have corrected this misimpression for the jury, as well.

*The Bank Surveillance Video*

I have already noted some of the limitations of the bank surveillance videos, which only recorded two images per second and captured images only of a limited area of the bank, and which did not include anything happening behind the teller area, in the hallway next to the teller area, or in the offices around the perimeter of the bank lobby. Because of these limitations, one can easily be misled by watching the videos into thinking they are seeing continuous action and can tell what Mr. Lawrence was doing as he entered and left the bank.  In fact, these videos leave significant time gaps in between frames during which many things cannot be seen.  One glaring example is that we know that Mr. Lawrence is shot twice during the attempted robbery.  One of the shots enters and exits through Mr. Lawrence's left shoulder from front to back.  Another shot enters through a finger on his left hand and the bullet travels through his hand, wrist and into his forearm in a collinear fashion. There is no moment on the surveillance video, however, where one can see either of these shots happen or even see Mr. Lawrence react to them.  Thus, although there is reason to believe Mr. Lawrence was shot at least once as he was approaching the teller desk, because this is the only point at which his left arm is extended in front of him consistent

17

with a collinear path from fingertip to forearm, the moment at which he is struck is not captured on the video.

Moreover, other than the ability to see the top of Officer Hurst's cap at the beginning of the video from the Teller 5 camera, the officer's movements are otherwise not captured on the videos.[4]

What we can tell from the videos is limited to the following:  Mr. Lawrence enters the bank through the west foyer.  Three people, two women and a man, enter in front of him.  These three people move to the north of the door after entering and lie down on the floor.  One woman with a cane takes longer to get onto the floor than the others.  It appears from the images of Officer Hurst's white hat visible in the bottom of the frame on the Teller 5 footage that, over the course of frames 10:35:19 (frame two) to 10:35:24 (frame one), he turns towards the west door as they enter:

10:35:19 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:19 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:19 AM (Eastern Standard Time)

---

[4]  From the movement one *can* see of Officer Hurst's cap in the bottom of the frame of the Teller 5 camera footage, he appears to be turning towards the entrance way as Mr. Lawrence is entering from the outside into the west foyer, and appears to be alert and oriented to the threat. His cap then disappears from the frame, indicating he has begun to react.  The further indication we have on the surveillance video regarding Officer Hurst's immediate reaction is the still image from the Front Door camera footage showing that the glass door behind Mr. Lawrence has been shot by the time Mr. Lawrence reaches the teller desk.

Other inferences can be made about Officer Hurst's movements during the shooting based on the placement of bullet strikes, bullets and metal fragments from his gun, including a shot through the teller desk and shots that struck the west and north walls of the bank; Michelle Johnson's statement that she saw him outside the teller line; the location of spent shell casings from his gun; and the fact that he collapses face up, outside the teller line.  Together, these pieces of evidence are consistent with Officer Hurst moving south towards the hallway and out in front of the teller line during the course of the shooting.

18

### 10:35:20 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:20 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:20 AM (Eastern Standard Time)

### 10:35:20 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:20 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:20 AM (Eastern Standard Time)

### 10:35:21 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:21 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:21 AM (Eastern Standard Time)

### 10:35:21 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels    Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:21 AM (Eastern Standard Time) Video Frame Time: 01/06/2005 10:35:21 AM (Eastern Standard Time)

### 10:35:22 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels    Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:22 AM (Eastern Standard Time) Video Frame Time: 01/06/2005 10:35:22 AM (Eastern Standard Time)

### 10:35:22 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels    Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:22 AM (Eastern Standard Time) Video Frame Time: 01/06/2005 10:35:22 AM (Eastern Standard Time)

20

### 10:35:23 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:23 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:23 AM (Eastern Standard Time)

### 10:35:23 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:23 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:23 AM (Eastern Standard Time)

### 10:35:24 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:24 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:24 AM (Eastern Standard Time)

21

Mr. Lawrence proceeds east towards the teller counter, with his right arm extended at shoulder level, holding a gun in one hand, his left arm down by his side:

## 10:35:24 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:24 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:24 AM (Eastern Standard Time)

## 10:35:25 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:25 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:25 AM (Eastern Standard Time)

22

## 10:35:25 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:25 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:25 AM (Eastern Standard Time)

As he gets closer to the teller desk, however, he brings his left arm up level with his right arm:

## 10:35:26 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

In the next frame, he has reached the teller desk and can be seen with his arms resting on the desk.  His face is not visible.  His head appears to be pointed down or forward but is hidden by his hood. His hands are not visible but it appears he may be holding the gun with both hands. In the same frame in which Mr. Lawrence's head is facing down on the teller desk, the Front Door camera captures the glass in the door through which Mr. Lawrence entered now shattered, though still in place:

10:35:26 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:26 AM (Eastern Standard Time)

In the next frame, one can see Mr. Lawrence crouched below the teller desk with just his right hand resting on top of the desk with the gun at a 90 degree angle.  His head is below the countertop level:

10:35:27 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels                                    Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time) Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

Next, he can be seen still crouched down with his left arm resting against the teller desk but not on top of it and his face appears to be buried in the crook of his left elbow:

10:35:27 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels                                    Video Capture Size:  352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)  Video Frame Time: 01/06/2005 10:35:27 AM (Eastern Standard Time)

25

In the next frame, he has his right arm extended at an angle in a south-easterly direction, but his head is turned away, and facing north – in other words, he is not facing the same direction his gun is pointing:

10:35:28 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels  
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels  
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

Over the course of the next three frames, Mr. Lawrence can be seen running in a north westerly direction, with his back to the teller desk, bent from the waist.  His right arm appears to be extended behind him:

10:35:28 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size:  352 x 240 pixels  
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

Video Capture Size:  352 x 240 pixels  
Video Frame Time: 01/06/2005 10:35:28 AM (Eastern Standard Time)

### 10:35:29 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

### 10:35:29 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:29 AM (Eastern Standard Time)

In that third frame above (10:35:29 frame two), it appears that Mr. Lawrence trips over the stanchion in the lobby and falls forwards towards the door with the broken glass.

27

In the next two frames, he can be seen actually having fallen through the door:

## 10:35:30 Frame One: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

## 10:35:30 Frame Two: Teller 5 Camera and Front Door Camera

 

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

Video Capture Size: 352 x 240 pixels
Video Frame Time: 01/06/2005 10:35:30 AM (Eastern Standard Time)

From the time Mr. Lawrence appears in a frame in the foyer until the time he lands back on the floor of the foyer, the elapsed time is 10 seconds. From the time he enters into the bank lobby until he falls through the glass door, the elapsed time is just 6 seconds.

*Crime Reconstruction of this Event*

Based on all of the documents and other evidence I have reviewed, as listed above; my review of Dr. Wetli's declaration; and my own 40 years of training and experience, I can offer to a reasonable degree of professional certainty, an alternate explanation for the events at the bank on the morning of January 6, 2005, from the one the Government claimed it had proven beyond a reasonable doubt.

Daryl Lawrence entered the bank that morning with the intention of robbing it, unaware an armed officer was in the bank. After getting inside the bank, he saw Officer Hurst with his weapon raised and told him to put it down. Officer Hurst began firing at him, as Mr. Lawrence moved towards the teller desk, shooting out the window in the west foyer and hitting Mr. Lawrence with a bullet that penetrates from his left hand into his left forearm, and another that went through his left shoulder.[5] At this point, Mr. Lawrence begins firing back to create cover so he can get out of the bank, including firing one shot at close enough range that, although it misses Officer Hurst, it leaves stippling on his face.[6] Mr. Lawrence then continues firing almost blindly, keeping his head down and in the opposite direction from his shooting arm. He continues to return fire, as he runs out of the bank.

For his part, Officer Hurst has spotted Mr. Lawrence as he enters the bank and understands Mr. Lawrence intends to rob the bank. Officer Hurst also sees that Mr. Lawrence has a gun, so begins to fire at him once the three people from the foyer are out of harm's way. Officer Hurst retreats toward the hallway as he is firing in order to get out from behind the teller line. The pattern of shell casings from his gun seems to be consistent with Officer Hurst shooting as he is moving south towards the hallway. (While I have not seen any ejection pattern testing on his gun, he was using a Smith and Wesson 45 caliber semi-automatic. This is a relatively common gun, often used by law enforcement, and ejects up, back and to the right.) By this point, Mr. Lawrence has ducked down on the other side of the teller desk and is firing his gun only with the aim of being able to get out of the bank without getting shot. With his head turned away from his own line of sight on his gun, Mr. Lawrence fires his gun in the direction he thinks shots are coming from. He then begins to charge out the bank, firing behind himself. Officer Hurst is now in the hallway, shooting at him from the end of the teller desk. The location of at least two of Officer Hurst's spent shell casings is consistent with Officer Hurst firing from the corner of the hallway, by the front of the teller line, where Michelle Johnson saw him in a

---

[5] It appears from diagrams this distance is roughly 30 feet. Unfortunately, law enforcement officers do not seem to have taken precise measurements of the bank floor plan or of Mr. Lawrence's path across it.

[6] In her FBI statement, dated 1/13/2005, Marian Large said that she saw "both the suspect and Hurst firing at each other from a short distance and over the top of the teller counter. They were 'face to face, gun to gun.'" This could have been the moment when a shot fired by Mr. Lawrence passed by Officer Hurst, creating stippling on his face. Because of the angle at which they were firing, this could not have been when the fatal shot was delivered.

29

shooting stance. One of the shots Mr. Lawrence fires while he is retreating, strikes Officer Hurst in the chest.  Mr. Lawrence then falls through the door and continues running away.

This explanation is consistent with:

- the initial statements and police interviews given by bank eyewitnesses, including Amanda Goodman and Michelle Johnson;
- the police statement given by bank customer Brian Dickerson;
- the stippling on Officer Hurst's face;
- the lack of gun residue on Officer Hurst's shirt;
- the bullet strikes in places like the upper window behind the teller desk and the upper wall towards the south of the bank;
- the bullet strikes (presumably from Officer Hurst's gun) in the west wall and north wall of the bank;
- the video surveillance footage, when lined up for frame by frame comparison;
- the ejection pattern of the Mini Firestorm;
- the location of spent shell casings from both Mr. Lawrence's and Officer Hurst's guns;
- the trajectory of the fatal bullet through Officer Hurst's body;
- the location and position of Officer Hurst's body (on his back) in the hallway when he collapsed.

It is my opinion to a reasonable degree of professional certainty that this explanation is not only plausible and consistent with the physical evidence and witness statements, but that it is more plausible than the narrative the Government offered at trial, the support for which could have been seriously undermined and rebutted by a qualified forensic pathologist, supplied with adequate materials to understand the crime scene; a qualified firearms expert; and a crime scene expert.

This alternate explanation provides reason to believe that Officer Hurst was not fatally shot at point blank range while crouched behind the teller line, and that he could have been shot from a distance after he came out from behind the teller line. This alternate explanation also provides reason to believe that Mr. Lawrence did not fire his weapon with the intent to kill Officer Hurst, but rather that Mr. Lawrence panicked in the moment and that the exchange of gunfire was chaotic rather than deliberate.  This alternate explanation also provides reason to doubt that Mr. Lawrence killed Officer Hurst in order to get to the bank vault and instead provides reason to believe he engaged in suppressive fire.  In other words, it appears that Mr. Lawrence shot Officer Hurst in the course of his attempt to cover his retreat from the bank, not to continue a forward drive towards the bank vault.

30

I offer all of the opinions herein to a reasonable degree of professional certainty.

I reserve the right to amend this report and my opinions should additional materials become available for review and analysis.

R. Robert Tressel

# List of Materials Reviewed

- **Bank layout and evidence key** .

- **2005.01.09 Transcript of Audio Taped Interview of Daryl Lawrence**

- **Bank Witnesses:**

**Heather Clifton**

2005.01.13 Heather Clifton FBI statement.
Heather Clifton handwritten statement
Heather Clifton trial testimony

**Warren Cox**
2005.01.06 Warren Cox – Columbus P.D. summary
Warren Cox handwritten statement .
Warren Cox trial testimony .

**Andrea Ross**
2005.01.06 Andrea Ross – Columbus P.D. summary .
Andrea Ross handwritten statement
Andrea Ross trial testimony

**Amanda Goodman**
2005.01.06 Amanda B. Goodman - Columbus P.D. summary
Amanda Goodman trial testimony

**Marian Large**
2005.01.13 Marian Large FBI statement
Marian Large handwritten statement
Marian Large trial testimony

**Angela Karst**
2005.01.06 Angie Karst FBI statement
Angela Karst trial testimony

**Brian Dickerson**
2005.01.13 Brian Dickerson FBI statement
2005.01.06 Brian Dickerson handwritten statement

**Deborah Rader**
2005.01.06 Deborah Rader – Columbus P.D. summary
Debbie Rader handwritten statement

1

**Erica Arnold**
2005.01.06 Erica Arnold – Columbus P.D. summary
Erica Arnold handwritten statement

**Heather Kinney**
2005.01.06 Heather Kinney – Columbus P.D. summary
Heather Kinney handwritten statement

**Michelle Johnson**
Michelle Johnson handwritten statement

- **Government witnesses folder**
  David Love trial testimony
  Andrew Weber trial testimony
  Detective Snyder trial testimony .
  Detective Waugh trial testimony
  Mark Hardy trial testimony
  Dr. Patrick Fardal trial testimony

- **Coroner Report**

- **2005.01.24 Toxicology Report**

- **Guilt Phase Closing Arguments**
  Government's closing
  Defendant's closing
  Government's rebuttal

- **Grand Jury Transcripts (Vol. 1)**

- **Videos of the bank robbery**

- **The video of Mr. Lawrence's statement to law enforcement**

- **Color photos of the crime scene at Fifth Third Bank**

- **News interview of Michele Johnson, a bank witness**

- **Files received from John Nixon, a trial expert in crime scene investigation**

- **Files received from Scott Roder, a trial media consultant:**

- **A second audio taped interview with Mr. Lawrence.**

2

# CURRICULUM VITAE
## *RALPH ROBERT TRESSEL*

**DATE OF BIRTH: JULY 18, 1953**

**NATIONALITY: U.S. CITIZEN**

**MARITAL STATUS: MARRIED**

**WIFE: CYNTHIA L. GEYER**

**TWO CHILDREN – AGES 17 AND 19**
**TWO STEP CHILDREN – AGES 22 AND 20**

**HOME ADDRESS:   381 COTTON MILL DRIVE**
**HIRAM, GEORGIA 30141**

**PROFESSION:  CHIEF CRIMINAL INVESTIGATOR**
**COBB COUNTY DISTRICT ATTORNEY'S OFFICE**
**70 HAYNES STREET**
**3RD FLOOR**
**MARIETTA, GA. 30090**

**FORENSIC INVESTIGATOR/CONSULTANT FORENSIC EVIDENCE AND INVESTIGATION (since 1999)**

**TITLE: OWNER – *FORENSIC INVESTIGATIVE SERVICES***

**EDUCATION:**

**GRADUATED: SPRAYBERRY HIGH SCHOOL 1971**

**KENNESAW JR. COLLEGE – 1971-1972**

**SPECIALIZED TRAINING:**

**BASIC RECRUIT TRAINING**
**COBB REGIONAL POLICE ACADEMY**
**1973 80 HOURS**

**BASIC MANDATE TRAINING**
**GEORGIA POLICE ACADEMY**
**1973 120 HOURS**

Page 2
CV – Robert Tressel

**ROBBERY & BURGLARY SEMINAR**
**COBB REGIONAL POLICE ACADEMY**
**1974 16 HOURS**

**RAPE INVESTIGATION COURSE**
**COBB REGIONAL POLICE ACADEMY**
**1975 16 HOURS**
**GOVERNOR'S CRIME AWARENESS PROGRAM**
**COBB REGIONAL POLICE ACADEMY**
**1976 16 HOURS**

**SEX CRIMES WORKSHOP**
**GEORGIA STATE UNIVERSITY**
**1977 40 HOURS**

**ARSON & BOMB WORKSHOP**
**COBB REGIONAL POLICE ACADEMY**
**1978 40 HOURS**

**BASIC HOSTAGE NEGOTATIONS**
**F.B.I. – ATLANTA, GEORGIA**
**IN ASSOCATION WITH F.B.I., QUANITICO, VIRGINIA**
**1977 40 HOURS**

**ADVANCED CRIMINOLOGY**
**GEORGIA POLICE ACADEMY**
**IN ASSOCATION WITH F.B.I., QUANTICO, VIRGINA**
**1978 50 HOURS**

**HOMICIDE INVESTIGATION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**TERRORISM SEMINAR**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**POLICE SUPERVISION**
**UNIVERSITY OF GEORGIA**
**1979 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**GEORGIA POLICE ACADEMY**
**1979 40 HOURS**

Page 3
CV – Robert Tressel

**POLICE DISCIPLINE**
**COBB COUNTY POLICE DEPARTMENT**
**1980 4 HOURS**

**FIREARMS INVESTIGATION TECHNIQUES**
**DEPARTMENT OF THE TREASURY**
**1981 40 HOURS**
**STRESS MANAGEMENT**
**COBB COUNTY POLICE DEPARTMENT**
**1981 4 HOURS**

**BLOOD STAINS/SPATTER WORKSHOP**
**FLORIDA INSTITUTE OF LAW ENFORCEMENT**
**ST. PETERSBURG, FLORIDA**
**1981 40 HOURS**

**SEX CRIMES**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**INTERVIEWS AND INTERROGATIONS**
**LEVEL II**
**GEORGIA POLICE ACADEMY**
**1981 40 HOURS**

**HOSTAGE NEGOTIATIONS**
**COBB REGIONAL POLICE ACADEMY**
**1982 40 HOURS**

**SEARCH AND SEIZURE**
**COBB REGIONAL POLICE ACADEMY**
**1982 16 HOURS**

**COMPUTER APPLICATIONS IN LAW ENFORCEMENT**
**GEORGIA POLICE ACADEMY**
**1984 40 HOURS**

**SEARCH WARRANTS & AFFIDAVITS**
**GEORGIA POLICE ACADEMY**
**1984 16 HOURS**

**LAW ENFORCEMENT SUPERVISION**
**GEORGIA POLICE ACADEMY**
**1984 120 HOURS**

Page 4
CV – Robert Tressel

**MEDICO-LEGAL DEATH INVESTIGATION**
**ST. LOUIS UNIVERSITY SCHOOL OF MEDICINE**
**ST. LOUIS, MISSOURI**
**1985 40 HOURS**

**ARSON INVESTIGATION SEMINAR**
**ATLANTA, GEORGIA**
**1986 16 HOURS**
**HOMICIDE INVESTIGATION**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**ATLANTA, GEORGIA**
**1986 16 HOURS**

**POLICE MEDICO-LEGAL INVESTIGATION OF DEATH**
**UNIVERSITY OF MIAMI SCHOOL OF MEDICINE**
**MIAMI, FLORIDA**
**1986 40 HOURS**

**BLOODSTAIN EVIDENCE SEMINAR**
**NATIONAL LAW ENFORCEMENT INSTITUTE**
**SANTA ROSA, CALIFORNIA**
**1988 40 HOURS**

**SATANIC & CULT INFLUENCES IN HOMICIDE**
**VALENCIA COMMUNITY COLLEGE**
**1989 28 HOURS**

**SECOND NATIONAL CONFERENCE ON CHILD FATALITIES AND**
**PHYSICAL ABUSE**
**NATIONAL CENTER FOR PROSECUTION OF CHILD ABUSE**
**AMERICAN PROSECUTOR'S RESEARCH INSTITUTE**
**SAN DIEGO, CALIFORNIA**
**1991 32 HOURS**

**FORENSIC SYMPOSIUM 2011**
**FORENSIC EXAMINATION & CRIME SCENE PROCESSING**
**NORTH GEORGIA COLLEGE & STATE UNIVERSITY**
**DAHLONEGA, GEORGIA**
**MARCH 2011, 16 HOURS**

**AT-RISK ADULT CRIME TACTICS**
**GEORGIA DEPARTMENT OF HUMAN RESOURCES**
**DIVISION OF AGING SERVICES**
**SEPTEMBER 2011, 16 HOURS**

Page 5
CV – Robert Tressel

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**DULUTH, GEORGIA**
**OCTOBER 2011, 60 HOURS**


**LEADERS WITHOUT TITLES SEMINAR**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**DULUTH, GEORGIA**
**DECEMBER 2011, 6 HOURS**

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**ATLANTA, GEORGIA**
**FEBRUARY, 2012, 14 HOURS**

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**SAVANNAH, GEORGIA**
**JULY, 2012, 14 HOURS**

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**ATHENS, GEORGIA**
**FEBRUARY 2013 14 HOURS**

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**SAVANNAH, GEORGIA**
**JULY, 2013, 14 HOURS**

**CHIEF EXECUTIVE TRAINING**
**GEORGIA ASSOCIATION OF CHIEFS OF POLICE**
**ATLANTA, GEORGIA**
**FEBRUARY 2014 8 HOURS**

**CRIME SCENE RECONSTRUCTION**
**PATTERN INJURY INTERPRETATION**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1985 - 2010**

**BIOMECHANICS AND OCCUPANT KINEMATICS**
**DR. JOSEPH L. BURTON**
**MARIETTA, GEORGIA**
**1990 – 2010**

Page 6
CV – Robert Tressel

**PREVIOUS EMPLOYMENT:**

**SENIOR FORENSIC INVESTIGATOR**
**BURTON & ASSOCIATES**
**ALPHARETTA, GEORGIA**
**1999 – 2010**

**OPERATIONS MANAGER**
**COBB COUNTY MEDICAL EXAMINER'S OFFICE**
**MARIETTA, GEORGIA**
**1985 – 1998 (RETIRED)**

**SERGEANT, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1978 – 1985**

**DETECTIVE, CRIMES AGAINST PERSONS UNIT**
**COBB COUNTY POLICE DEPARTMENT**
**MARIETTA, GEORGIA**
**1975 – 1978**

**POLICE OFFICER – PATROL DIVISION**
**COBB COUNTY POLICE DEPARTMENT**
**MARETTA, GEORGIA**
**1973 – 1975**

**ADDITIONAL INFORMATION:**

**MEMBER:**

**FRATERNAL ORDER OF POLICE (inactive)**
**POLICE OFFICER'S ASSOCATION OF GEORGIA (inactive)**
**GEORGIA CHIEFS OF POLICE ASSOCIATION**
**INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE**

**INSTRUCTOR:**

**DEATH INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**

**HOMICIDE INVESTIGATION**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1983 – 1998**

Page 7
CV – Robert Tressel

**CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**INMATE AND JAIL DEATHS**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1990 – 1998**

**DRUG DEATHS**
**COBB COUNTY DISTRICT ATTORNEY'S DRUG AWARENESS PROGRAM**
**1985 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH CENTRAL GEORGIA LAW ENFORCEMENT ACADEMY**
**1993 – 1998**

**ADVANCED CRIME SCENE PROCESSING**
**NORTH WEST GEORGIA LAW ENFORCEMENT ACADEMY**
**1995 – 1996**

**APPOINTMENTS:**

**JANUARY 1990**
**ELECTED BOARD OF DIRECTORS**
**NATIONAL SUDDEN INFANT DEATH SYNDROME**
**GEORGIA CHAPTER**

**MAY 1990**
**APPOINTED**
**COBB COUNTY CHILD ABUSE PROTOCOL COMMITTEE PURSUANT TO**
**GEORGIA H.B. 1318**

**JULY 1990**
**RECIPIENT**
**INSTRUCTOR'S CERTIFICATE TO TEACH DEATH INVESTIGATION TO**
**LAW ENFORCEMENT OFFICERS OF THE STATE OF GEORGIA (RENEWED**
**1995)**

**JANUARY 1991**
**ELECTED**
**BOARD OF DIRECTOR'S OF SUDDEN INFANT DEATH RESEARCH**
**FOUNDATION**
**ASSISTED WITH INCORPORATION OF SAME**

# Exhibit 9:

# Walker Declaration

<u>Declaration of Florencia Walker</u>

1.  My name is Florencia Walker. I live in Columbus, Ohio.

2.  I have known Daryl Lawrence since 1975 and was asked to provide the following information by Daryl's current lawyers.

3.  I am Daryl's biological mother Leondra's half-sister. I am the daughter of Florence Lopez, Daryl's maternal grandmother, and Clarence Walker.

4.  When Leondra was in prison and about to give birth to Daryl, Leondra, and my sister Tanya, and I decided that Tanya and I would jointly care for Daryl until Leondra's release. Later, however, when Tanya and I went to the hospital to pick up Daryl, my mother Florence had already been there and taken him. Florence always treated Leondra horribly, and I think she took Daryl so that she could control the situation.

5.  My mother brought Daryl to me when he was barely a week old and I had him until my Uncle Pee Wee and Aunt Eileen took him in. At the time, I was in my early 20s and I was living in an apartment in the Windsor Park projects. I had three children of my own—Leslita (age 4), Rodriccos (age 3), and Quan (age 1)—and I was six months pregnant with my fourth, Mahlon. There were times when I also took care of Ricco and Djuana, two of Leondra's children older than Daryl. I was not working and lived off the help of family and public assistance.

6.  I had Daryl for about two months. It was really hard to take care of him. He cried non-stop and seemed to be in constant pain and discomfort. He acted like he was hungry all the time, but would spit up because he ate too much. He barely slept, was never able to calm down and needed to be constantly held. Nothing I did soothed him. He was so miserable.

7.  Leondra used drugs while she was pregnant with Daryl. She stayed with me a lot during the beginning of her pregnancy and saw her use drugs. I assumed whatever was wrong with Daryl was caused by her drug use. My other three children did not act like this and I did not know what to do. I took Daryl to multiple doctors who said they could not explain why he was so colicky. One pediatrician at the Windsor Park Clinic told me to lay Daryl across my bare stomach because the natural heat would soothe him. That would work for a few minutes, but he would eventually start screaming again. Another pediatrician, Dr. Marks, whose office was located on Broad Street, put Daryl on Nutramigen, a very expensive and nasty formula. It did not work great, but it worked the best out of all the other formulas they told me to try. Daryl was hardly able to digest anything.

8.  I nearly lost my mind trying to care for Daryl. I was so exhausted. I remember begging God to please give me ten minutes of sleep. I cried a lot because I felt overwhelmed by having to take care of Daryl - in addition to my three other

1

children - without any help. It was difficult to take care of all the kids and do chores around the house. The fathers of the children were not around. I called my mother and sister and begged them to help me but I did get not the help I needed. I was alone with the children a lot of the time and could not go out much. It was hard for me to get around pregnant with four kids under the age of five. My neighbors used to check on me to make sure I was okay. They knew I was struggling and often asked, "How are you doing all this?"

9. After two months, I could no longer handle being around Daryl and his constant crying. I desperately needed a break from caring for him. I asked my cousin, Becki Green, and her mother, Pat Green, to take care of Daryl for a while. Pat was once married to my uncle, Algenon Lopez. When I returned to pick up Daryl, I found out my mother, Florence, had already come and took him to live with Uncle Pee Wee and Aunt Eileen.

10. I was so upset with my mother for taking Daryl away from me. My mother was telling everyone that Daryl was malnourished and underweight because I was not taking care of him. I got into an argument with her and told her I took care of Daryl the best I could, but he was sick and I did not have help.

11. As an infant, Daryl reminded me a lot of his cousin, Lorenzo Lopez, Jr., because Lorenzo Jr. was born addicted to drugs. Lorenzo's mother, Velva, and his father, Lorenzo Lopez Sr., who is also my maternal uncle, were heroin addicts. Lorenzo Sr. died before his son was born and Velva was too strung out to keep the baby. My maternal grandmother, Sarah Etheyln Lopez and maternal aunt Conchita raised him. When he was an infant, Lorenzo Jr. suffered from what Aunt Conchita and the other adults in my family called seizures. I remember my aunt Conchita would start yelling and panic when Lorenzo Jr. began to seize. She would rush him into the bathtub to calm him down. Lorenzo Jr. also had mental health problems beginning at a very young age.

12. There were times when I was taking care of Daryl when I noticed he would get this funny look in his eyes. It was like he wasn't there. His body got real still, his head would slightly tilt to the side and his eyes would glaze over. He was spacey, like he wasn't there, like he went somewhere else. Sometimes it would last close to a minute; other times it would last only seconds. I noticed this because my children did not gaze like that. As infants, my children looked at you in the eye.

13. After Daryl went to live with Uncle Pee Wee, I asked Pee Wee's daughter Yolanda how he was doing. She told me they were giving him paregoric syrup to help with his heroin withdrawal. I remember my sister Tanya gave her oldest son paregoric syrup for seizures when he was around six months old. My little brother Paul had seizures when he was little too.

2

14. My mother had four husbands: Charles Luster, Clarence Walker, who was father to me, Tanya, and Daryl Walker; Richard Johnson, who was Juana's father; and Paul Perkins, who was father to Luis and Paul, Jr.

15. Leondra grew up believing Charles Luster was her father until Aunt Conchita told her, sometime in the early 1970s, that her real father was Billy "Broadway" Tye. Aunt Conchita told her about this because Leondra mentioned she was hanging out with Billy Tye's three sons. Conchita did not want her sleeping with one of her half-brothers by mistake.

16. I remember meeting Billy Tye once or twice when I was child. I do not know how long Billy Tye was with my mother. As a child, I did not have a close relationship with my mother because she placed me and my siblings, Tanya and Daryl Walker, in a boarding home. The conditions of the boarding home were horrible. When my Aunt Margaret came to visit us at the home she immediately called my father to come pick us up after seeing a large cut on my forehead that I got from falling down the cellar steps. I was molested at the boarding house and have always blamed my mother for putting us there and doing nothing to protect us.

17. After my father picked us up from the boarding home, I lived with him for about ten years until I was about thirteen years old. Throughout that time, I hated my mother and wished she died. When I was thirteen, I left my father's house and moved in with my paternal grandmother in Kentucky until I got into a fight at school and was kicked out of the school district. It is hard for me to remember all the places I lived throughout my childhood because I bounced around a lot between Columbus, Cleveland and Kentucky.

18. My siblings and I lived with my mother off and on over the years and I have horrible memories from those times. I remember coming home from school one day and seeing my mother beating Tanya across her back with an extension cord. When I tried to get in the middle of it my mother and Aunt Margaret, who happened to be there that day, began beating me up badly. I ran out of the house with a bloody lip and sections of my hair pulled out.

19. At one point when I was a teenager, my mother had me sent to a detention facility for "incorrigible youth." I was living with my mother when she caught me smoking cigarettes inside of Lance's Record Shop downtown. When my mother saw me smoking, she walked in and smacked me in front of everyone. When I got home my mother called the paddy wagon to pick me up. I served three weeks detention in a juvenile facility located on Mound Street.

20. When I got out of the detention facility I was released into Aunt Conchita's custody. I lived with Aunt Conchita for about a year until she kicked me out of the house when I disobeyed her and attended the funeral of a friend who was killed. It was unfair for Aunt Conchita to kick me out of the house, but that is how she was. She played favorites. My brother Daryl Walker, who also lived with

3

Aunt Conchita at different times was not kicked out even though he was arrested and expelled from East High School.

21. I remember my mother never allowed me or my sisters to be alone with her last husband, Paul. When Tanya and I lived with them, my mother forced us to wait in the car on the nights she worked the Neopolitan Club, an after-hours spot on the corner of Oak Street and Miller Avenue. She would leave a can in the car in case we had to go to the bathroom.

22. I wanted my mother's love but she never showed it. I remember I used to daydream in school that my mother would show up wearing a fairy tale dress, and walk into my classroom and point at me saying, "that's my daughter right there." In my dreams, my mother finally realized how much she loved me.

23. Leondra had it the worst out of all my siblings. Leondra never had a father or paternal relatives to shelter her from my mother's terrible treatment of her. My mother would make Leondra date men in order get my mother things. She became power-of-attorney over Leondra and her children and used that to collect welfare in their names. Once, when Leondra received money from a lawsuit after a car accident she was in, my mother went to the lawyer's office, took the check and never gave Leondra any of the money. My mother was always scheming.

24. Leondra was addicted to drugs nearly all her life. I remember Leondra using heavily around the time I was pregnant with Leslita in 1968 or 1969. Her drug of choice was heroin and she started by snorting it. In 1970, I remember times when my brother Daryl Walker and Leondra used heroin together. She tried going to methadone clinics for help because she could not stop using on her own. Leondra was on a combination of heroin and methadone up until her death in 2003.

25. Donald Branch, who we considered an uncle because he was with my Aunt Conchita for many years, is the father of Leondra's first child, Felicia. Felicia was taken from Leondra at birth and given to my Aunt Margaret. I remember going to Aunt Margaret's place after Felicia went to live with her. Margaret's apartment was incredibly small and Felicia slept on a pallet on the floor because there wasn't an available bedroom.

26. Leondra gave birth to Ricco at St. Ann's Hospital. She was married to Edward "Bigs" Lawrence at the time, but when Ricco came out everyone knew he wasn't Edward's child. Ricco had a very dark complexion and Edward was very light skinned. Edward might have had suspicions about Leondra having an affair, but he stayed with her until after Djuana's birth. They separated soon after that when Edward confirmed that Leondra had been with other men.  After they broke up, Leondra moved to Cleveland and began staying with Aunt Margaret and Uncle Sonny.

27.     After Leondra was released from prison when Daryl was a baby, she wanted to see Daryl but I do not think Aunt Eileen and Uncle Pee Wee would allow it. I think Leondra tried many times to see him.

28.     Even though I love my children and Daryl, I admit I have not always been emotionally stable. I have been in mental health treatment on and off for many years. I first went to see a psychologist, Dr. Greer, in the 1980s because I had a breakdown. I could not stop crying; I was crying every day. I was abused by my mother and my brother, Daryl Walker, and I think a lot of my problems are because of that.  My brother tortured me when were kids. He would pull my hair over and over again. He smacked me in the face, kicked me in the temple (I had headaches afterwards for years), and he spit in my food. When we lived together as adults he stole from me.

29.     When I was in federal prison for three years after being convicted of drug trafficking, I saw a psychologist who worked at the prison who said I was manic-depressive. I was diagnosed with Bipolar Disorder in 1998 and was prescribed Zoloft and Paxil. The Zoloft worked for a little bit but I stopped taking it. Paxil had too many side effects. I think I was on Lithium as well. Buspar gave me the feeling of having electric shocks so I could not take it. I have also been on Prozac and Seroquel over the years.

30.     I remember testifying in this case. The lawyers asked me questions and I answered them. I answered all of the questions the lawyers asked of me. Everything that I've said in this declaration is something that I knew at the time and would have been willing to describe to the lawyers or to the jury if I had been asked to do so.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Florencia Walker

Executed on ___ November, 2015.

5