IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | Case Number 2:05-CR-00011 |
| | ) | |
| v. | ) | JUDGE MICHAEL H. WATSON |
| | ) | |
| | ) | Magistrate Judge Terence P. Kemp |
| DARYL LAWRENCE | ) | |
| Defendant | ) | ORAL ARGUMENT REQUESTED |

## MOVANT DARYL LAWRENCE'S INITIAL MOTION FOR LEAVE TO CONDUCT DISCOVERY AND INCORPORATED MEMORANDUM

Comes now Daryl Lawrence, respectfully and through undersigned counsel, and pursuant to Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), and the Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, moves this Honorable Court for leave to conduct discovery. The requested discovery is needed to guarantee Mr. Lawrence a full and fair opportunity to develop and present facts in support of his § 2255 motion and ensure a fully developed factual record for judicial review of his claims for relief. The grounds for this request are set forth in the following memorandum.

Respectfully submitted,

/s/ Miriam Gohara
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender,
District of Maryland
265 Church St., Suite 702
New Haven, CT 06510
(301) 344-2337 (phone)
(301) 344-0019 (fax)
E-mail:  Miriam_Gohara@fd.org

/s/Amy Gershenfeld Donnella
Amy Gershenfeld Donnella (PA85194)
Federal Capital Habeas Project
Federal Public Defender, District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103 (phone)
(301) 344-0019 (fax)
E-mail:  Amy_Donnella@fd.org

1

# TABLE OF CONTENTS

MEMORANDUM ..................................................................................................................1

I.  Summary Pursuant to Local Rule 7.2(a)(3) .................................................................1

II.  The "Good Cause" Standard Governing Discovery in § 2255 Cases .................................3

III.  The Liberal Standard for Fact Development in Capital § 2255 Cases ..............................7

    A.  Discovery is more favored under § 2255 than § 2254 cases...................................7

    B.  Discovery Is Especially Warranted In Capital Cases .............................................9

IV.  Mr. Lawrence Has Made Efforts to Obtain Discovery Directly from Relevant Parties ....10

    A.  Efforts to Informally Resolve Discovery Requests with the Government ...........10

    B.  Records Requests to Third Parties ........................................................................14

        1.  Columbus Division of Police ("CDP").......................................................14

        2.  Federal Bureau of Investigation ("FBI") ..................................................15

        3.  Other Third Party Agencies and Institutions .............................................16

V.  Mr. Lawrence has Shown Good Cause for the Following Discovery ...............................18

    A.  Discovery in Support of Mr. Lawrence's Punishment Phase Ineffective Assistance of Counsel Claim ...............................................................................20

        1.  Trial Counsel Failed to Collect Evidence Demonstrating that Mr. Lawrence Has a Major Blood Disorder and Brain Damage, Exacerbated by his Trauma and A Wealth of Records Documenting the Lawrence Family's Medical, Mental Health and Environmental Problems. (§ 2255 Motion, Claims I and VI) .........................................................21

    B.  The Jury's Decision Was Based on an Inaccurate Account of the Circumstances of the Offense Because of Trial Counsel's Ineffectiveness and the Government's Misleading Presentation. (§ 225 Motion, Claims II and V)..................................27

    C.  The Government Did Not Comply with Its Obligation to Disclose Exculpatory and Impeachment Material. (§ 2255 Motion, Claim IV) .......................................40

    D.  Trial Counsel Failed to Secure Reasonably Necessary Expert Assistance to Challenge Mr. Lawrence's Post-Arrest Statement (§ 2255 Motion, Claim VIII) ...................................................................................................................46

i

████████████████████████████████████████████

████████████████████████████████████████████████

G.    Trial Counsel was Ineffective for Failing to Object to Junk Science that the Shell Casings from Two Different Crime Scenes "Matched." (§ 2255 Motion, Claim XI) ...................................................................................................54

H.    Trial Counsel Failed to Challenge the Underrepresentation of African Americans, Hispanics, and Women in the Grand and Petit Jury Venires. (§ 2255 Motion, Claim XII)...................................................................................................60

I.    Trial Counsel was Ineffective for Failing to Investigate and Challenge Aggravating Evidence Introduced Against Mr. Lawrence. (§2255 Motion, Claim XVI) ...............................................................................................61

█    ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

K.    The Government's Decision to Charge and Seek the Death Penalty was Impermissibly Based on the Laxity of Federal Law Concerning "Victim Impact" Evidence. (§ 2255 Motion, Claim XXVI) ...............................................................65

L.    Mr. Lawrence's Death Sentence was Impermissibly Based on his Race. (§ 2255 Motion, Claims XXVII) ...........................................................66

M.    The Decision to Seek and Charge the Death Penalty Against Mr. Lawrence was Impermissibly Based on Race and Geography. (§ 2255 Motion, Claim XXVIII)................................................................................................69

CONCLUSION.................................................................................................70

**MEMORANDUM**

### I.     Summary Pursuant to Local Rule 7.2(a)(3)

Mr. Lawrence respectfully moves the Court for leave to conduct discovery in support of the claims raised in his § 2255 Motion.[1] This request is authorized by Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6")[2] and is consistent with the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same); *see also Rules Governing Section 2254 Cases in the United States District Courts*, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[3]

In his § 2255 Motion, Mr. Lawrence raised numerous claims for relief, including claims of ineffective assistance of counsel and prosecutorial misconduct among others. Due to the scope of Mr. Lawrence's claims and the nature of his requests for discovery arising from those claims,

---

[1] Mr. Lawrence initially moved for discovery under Habeas Rule 6 prior to filing his § 2255 motion. *See* Doc. No. 323 ("Motion for Leave to Conduct Discovery and Incorporated Memorandum") & Doc. 321 ("Motion for Subpoenas to Produce Documents, Information, or Objects and Incorporated Memorandum"). The motions were denied without prejudice on the ground that "federal courts do not have authority to order pre-petition discovery," and therefore any requests for discovery were not justiciable until after a "formal § 2255 motion" was filed. *See* Doc. No. 327 ("Opinion and Order") at 5.

[2] Habeas Rule 6(A) states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."

[3] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases in the United States District Courts* are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts*.

1

a brief explanation of how this memorandum in support of his initial discovery motion is organized bears mention.

Section II, which follows this brief introductory overview, sets forth the legal authority and "good cause" standard that govern discovery in § 2255 cases. Section III discusses distinctions between § 2255 and § 2254 proceedings and between capital and non-capital cases, as they highlight the liberal standard for fact development through discovery in capital § 2255 cases. Section IV summarizes counsel's efforts to date to obtain discovery directly from relevant parties, including from the United States and various third parties, without the involvement of this Court, and the outcome of those efforts. Finally, Section V contains Mr. Lawrence's specific requests for discovery. These requests are organized according to the claims raised in Mr. Lawrence's § 2255 Motion; the claims are incorporated by reference throughout Section V, and pertinent allegations raised in those claims are summarized in order to establish good cause for his requests.

Because this is Mr. Lawrence's first § 2255 motion and he sets forth well-supported claims delineating deprivations of his constitutional rights, which, if proved, would necessitate a new trial or sentencing, governing law requires that he be permitted to discover the evidence requested below.[4]

---

[4] Pursuant to this Court's orders (Doc. Nos. 341 & 350), this is Mr. Lawrence's initial request for discovery. Information that comes to light as the result of discovery obtained pursuant to this motion, and/or the nature of objections and responses given by parties from whom discovery is currently being requested, may require, and provide grounds for, Mr. Lawrence to seek leave to conduct further discovery pursuant to Habeas Rule 6, including but not limited to additional requests for production, subpoenaes *duces tecum*, and depositions of persons believed to have knowledge relevant to Mr. Lawrence's § 2255 claims and/or any information disclosed pursuant to his requests for discovery. Potential deponents, for example, could include such persons as trial counsel for Mr. Lawrence and the Government, members of the Columbus Division of Police, members of the Federal Bureau of Investigation, and testifying and non-testifying

## II.     The "Good Cause" Standard Governing Discovery in § 2255 Cases

Although a grant of the discovery requested herein is not a matter of right, this Court may order parties to provide discovery if Mr. Lawrence meets the liberal "good cause" standard. Mr. Lawrence's specific requests, enumerated below, do establish good cause for discovery. He seeks specific information pertinent to claims he has alleged in his motion for relief pursuant to 28 U.S.C. § 2255 and which if proven true will entitle him to relief. As discussed in more detail below, "good cause" is met when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).[5]

This Court has broad power in the type of discovery it can grant including those provided for "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Habeas Rule 6. Rule 6 has been interpreted across the country to authorize a court, for example, to issue subpoenas to produce documents, information or objects; to allow depositions of the prosecution team; or to order release of physical evidence.[6]

---

witnesses to the incidents described at Mr. Lawrence's trial. Particularly in light of the expense and other resources necessary for depositions, and the fact that the materials sought here might ultimately obviate the need for some or all of them, Mr. Lawrence is not making those requests at this time.

[5] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous—i.e., the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

[6] *See*, *e.g*., *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *O'Neal v. Lampert*, 199 F.Supp.2d 1064, 1065 (D. Or. 2002) (granting motion for subpoenas to produce records under Habeas Rule 6); *In re Braxton*, 258 F.3d 250,

The Supreme Court's *Bracy* decision both defines "good cause" for discovery in habeas and highlights the low threshold necessary to meet that standard.

William Bracy was convicted of capital murder and sentenced to death before Cook County Circuit Judge Thomas J. Maloney in 1981. *Bracy v. Gramley*, 81 F.3d 684, 687 (7th Cir. 1995), *rev'd*, 520 U.S. 899 (1997). Judge Maloney accepted bribes from criminal defendants in his court and, in return for the bribes, arranged for the defendants to be acquitted or convicted of lower-grade offenses. *Bracy*, 520 U.S. at 906-08; *see also United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996).

The judge fixed cases tried shortly before and after Mr. Bracy's case, in each case skewing his rulings in order to ensure the acquittal (or the conviction on reduced charges) of murder defendants. *Id*. Mr. Bracy did not bribe Judge Maloney. *Id*. In his habeas petition, Mr. Bracy alleged that Judge Maloney had ruled against him on several discretionary matters in order (1) to "compensate" for his pro-defendant rulings in cases that had been fixed; and (2) to encourage criminal defendants to bribe him in fear of what would happen to them if they did not. *Bracy*, 81 F.3d at 684. Mr. Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at [his] trial." *Id*. at 690. To that end, Mr. Bracy sought access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's conduct in the cases where he

255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall*, 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other physical items); *Ross v. Kemp*, 785 F.2d 1467, 1469, 1478-79 (11th Cir. 1986) (subpoenas issued to clerk of jury commission); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).

did not receive bribes, and for evidence from the federal prosecution of Judge Maloney that would establish the judge's behavior in non-bribe cases.

The Seventh Circuit upheld the district court's decision to deny all three forms of discovery. The circuit court conceded the "appearance of impropriety" but reasoned that Mr. Bracy's theory of "compensatory bias" provided only a weak basis on which to suggest the result of the trial was unreliable; though "plausible," was not "compelling" enough to presume prejudice; and otherwise lacked good cause because evidence that the judge had ruled leniently in other cases did not mean he had ruled more harshly in Mr. Bracy's case. *Id.* at 690. The Seventh Circuit freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners," but rationalized that the "defendants are speculating too." *Id*.

The Supreme Court reversed. It acknowledged as true the Seventh Circuit's characterization that Mr. Bracy's theory of compensatory judicial bias was "quite speculative," *id*. at 905 (quoting *Bracy*, 81 F.3d at 689-90), but stated that the proper focus of a Habeas Rule 6 discovery request is not the probability that the requested discovery will yield anything, but whether the sought-after facts, if true, would help establish a claim for relief. *Id*. at 905 ("[D]ifficulties of proof aside, there is no question that, *if it could be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment.").

The Court explained the proper application of Habeas Rule 6:

> In *Harris* [*v. Nelson*, 394 U.S. 286 (1969)], we stated that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." 394 U.S. at 300. Habeas Corpus Rule 6 is meant to be "consistent" with *Harris*. . . . It may well be, as

5

the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to . . . [prove his claim], but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good cause" for discovery.

*Bracy*, 520 U.S. at 908-09.

*Bracy* establishes that a movant who has (1) made specific allegations warranting relief, and (2) shown why the requested information would assist the adequate factual development of his claims, has established "good cause" under Habeas Rule 6. If the petitioner has properly alleged a cognizable claim and requested probative evidence, he has shown "good cause" for discovery.[7] *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added).

The Sixth Circuit Court of Appeals has affirmed that the *Bracy* "good cause" standard applies in the context of discovery requests in § 2255 cases. *See Cornell v. United States*, 472 Fed. Appx. 352, 354 (6th Cir. 2012) (holding that in § 2255 cases, "[g]ood cause is established 'where specific allegations … show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate entitlement to relief.'") (citing *Bracy*, 520 U.S. 899, 908-09). Moreover, the Sixth Circuit has embraced the central holding in *Bracy* that the proper focus of a

---

[7] In this respect, the scope of discovery under Habeas Rule 6 is similar to the scope of discovery in conventional civil actions. A plaintiff who makes specific allegations which, if proven, would entitle him to legal relief is entitled, *without more*, to access to the fact-development procedures necessary to flesh out his claims without undue interference. *Cf. Neitzke v. Williams*, 490 U.S. 319 (1989) ("What [Fed.R.Civ.P.] 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.").

6

Habeas Rule 6 discovery request is not the probability that the requested discovery will yield anything, but whether the sought-after facts, if true, would help establish a claim for relief.

In *Cornell*, the movant alleged that the prosecutor committed misconduct by presenting the perjured testimony of DEA Agent Lee Lucas, and that trial counsel was ineffective for failing to properly investigate Lucas's background and to impeach Lucas during trial. The movant sought leave to conduct discovery, seeking, among other things, documents concerning Lucas's actions in other cases. The district court denied the discovery request. On appeal, the Sixth Circuit found that the district court had abused its discretion. *Cornell*, 472 Fed. Appx. at 354. Notably, the Sixth Circuit held that the movant had demonstrated "good cause" despite the fact that his allegations of misconduct by Lucas in his case were speculative: "Our review of the record indicates that although [the movant] has not alleged specific facts tending to show that Lucas engaged in wrongdoing in this case, he has identified a notorious history of misconduct by Lucas that gives us pause. This history provides reason to believe that [the movant] *may* be able to demonstrate entitlement to relief if the facts are fully developed." *Id*. (emphasis in original) (internal citations omitted).

## III. The Liberal Standard for Fact Development in Capital § 2255 Cases

### A. Discovery is More Favored Under § 2255 Than § 2254 cases.

Although governed by the same Eighth Amendment jurisprudence, capital § 2255 and § 2254 proceedings vary in ways critical to federal practice, including discovery. The most important of these is that in a capital § 2254 case, the main post-conviction process, including factfinding and discovery, should occur in state court. By the time the petitioner has entered federal court, the primary opportunity to develop extra-record facts in support of the petition has already taken place. If the § 2254 petitioner does not succeed in state court, he has a chance to

pursue federal claims for relief in the federal system, but the opportunity for new factual development, the ability to obtain a hearing, and the possibilities of relief are limited by the extent to which he availed himself of, and was granted, process in state court. *See*, *e.g.* 28 U.S.C. § 2254(e)(2) (setting forth conditions for evidentiary hearing in § 2254 cases).

For a capital § 2255 litigant, the federal district court is both the first and last place where she can develop facts necessary to support her constitutional claims. Because there are no prior state court proceedings, the federal prisoner is not constrained by exhaustion requirements or state procedural rulings like her state counterpart, and the federal district court has much more latitude in § 2255 litigation as a forum for fact-development.[8]

The liberal standard for fact development in capital § 2255 cases is reflected, for instance, in the text of the statute governing evidentiary hearings which creates a presumption in favor of promoting fact development: "*Unless* the motion and the files and the records of the case *conclusively* show that the prisoner is entitled to no relief, the court *shall . . . grant a prompt hearing thereon . . .*" 28 U.S.C. § 2255(b) (emphasis added). Mr. Lawrence's capital § 2255 motion easily surpasses this threshold: he has raised numerous claims supported by detailed factual allegations, which if true, will entitle him to relief. In the same vein, Mr. Lawrence is

---

[8] Additionally, motions under § 2255 can be based on violations of federal statutory criminal law and criminal procedure codes as well as the federal Constitution, and accordingly are subject to a wider range of potentially available federal legal claims than are state prisoner actions under § 2254. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution *or laws of the United States* . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence") (emphasis added). Thus, a § 2255 investigation must be more far-ranging because the potential cognizable claims can be statutory in nature as well as constitutional.

8

entitled not only to a forum in which to demonstrate the strength of his proof, but also to discovery of materials not otherwise available to him to enable him to develop that proof.

Legislative history also underscores the difference Congress saw between the necessity for hearings and factual development in § 2254 and § 2255 proceedings. When Congress passed the AEDPA, it curtailed a federal district court's discretion to grant an evidentiary hearing on a § 2254 petition. *See* 28 U.S.C. 2254(e). Congress, however, placed no such limitations on the standard for granting an evidentiary hearing in § 2255 proceedings.[9]

### B. Discovery Is Especially Warranted In Capital Cases.

The policies favoring discovery are even stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnify the "need for reliability" and, the corresponding need for reliable fact-determination procedures. *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976). Because habeas corpus discovery is designed to aid courts in determining the validity of the movant's claims, it is indispensable to the reliability of habeas corpus proceedings in capital cases. For this reason, liberal use of discovery is appropriate in such cases. *See Bracy*, 520 U.S. at 904-09 (denial of capital habeas corpus petitioner's discovery request abused district court's discretion).[10]

---

[9] *See*, *e.g*., *Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D. S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.").

[10] *See also Wilson v. Butler,* 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be presented every opportunity possible, consistent with the interests of the state, to present facts relevant to his constitutional claims."); *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) ("more liberal discovery is appropriate in capital cases where the stakes

9

**IV.** **Mr. Lawrence Has Made Efforts to Obtain Discovery Directly from Relevant Parties.**

Prior to filing the instant motion, Mr. Lawrence attempted to obtain the requested discovery materials that are the subject of this motion directly from the relevant parties, through productive discussions with the Government[11] and Freedom of Information and Open Records requests from a number of third parties. As described in detail below, some of these attempts were fruitful; others were not. Mr. Lawrence has exhausted the available avenues for obtaining the requested discovery without court assistance, and thus Rule 6 discovery is the only process remaining by which Mr. Lawrence can obtain the discovery he enumerates herein.

**A.** **Efforts to Informally Resolve Discovery Requests with the Government**

Prior to filing the § 2255 motion, counsel for Mr. Lawrence sent a letter, dated September 23, 2015, to the Government requesting informal discovery of the following items:

1. A complete set of all reports, records, files, witness statements, documents and tangible objects that were produced by the Government to trial counsel in connection with the proceedings in *United States v. Daryl Lawrence*, No. CR-2-05-11 (S. D. Ohio).

2. Copies of any and all written, audio- or video-recorded statements (as well as transcriptions thereof) of witnesses (both testifying and non-testifying) to:

---

for prisoners are so high"); *United States ex rel. Brisbon v. Gilmore*, 1997 U.S. Dist. LEXIS 8314, at *8 (N.D. Ill. June 10, 1997) ("The Court agrees that, in light of the heavy burden Brisbon bears in petitioning for habeas relief from his death sentence, potentially corroborating evidence constitutes good cause for limited discovery").

[11] The Government mailed its most recent batch of informal discovery to the undersigned on September 26, 2016. In an email dated that same day, the Government confirmed that it had completed its review of its files and had provided all the materials in its possession relating to the agreed-upon categories of documents. That said, the parties remain in communication over technical issues that have arisen with respect to previously provided digital files; some of the files were in a format that the undersigned could not review or open using software available to the Federal Defender office, and the Government is working to provide those files in a different format. Should review of those materials lead to a need to revise or supplement these discovery requests, Mr. Lawrence will do so as quickly as possible.

        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

3. Copies of any and all FBI-302 reports pertaining to:
        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

4. Copies of all rough drafts of reports or rough notes made by FBI agents pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:
        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

5. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession prepared by other federal, state, or local law enforcement agencies (e.g., Columbus Police Department, F.D.I.C.) pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:
        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

6. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession that the banks prepared during internal investigations pertaining to:
        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

7. Copies of any and all written, oral, video or electronic forensic reports, tests and/or data in the Government's possession produced in connection with the investigation, arrest and prosecution of Mr. Lawrence pertaining to:
        a. The Sky Bank robbery on September 8, 2004.
        b. The Key Bank robbery on August 12, 2004.
        c. The Fifth Third Bank robbery on January 21, 2004.
        d. The Fifth Third Bank robbery on January 6, 2005.

11



10. Color copies of any and all photographs and/or video-recordings of the crime scenes pertaining to:
   a. The Sky Bank robbery on September 8, 2004.
   b. The Key Bank robbery on August 12, 2004.
   c. The Fifth Third Bank robbery on January 21, 2004.
   d. The Fifth Third Bank robbery on January 6, 2005.

11. Color copies of any and all photographs generated in connection with the autopsy and medical examination of Officer Bryan Hurst.

12. To the extent that the Government is in possession of trial exhibits or other physical evidence not maintained by the Clerk's Office, undersigned counsel requested access to inspect those items.

Prior to the filing of Mr. Lawrence's § 2255 Motion, the Government produced for inspection Item 1 of undersigned counsel's informal discovery request. The remaining items sought in the undersigned's letter were not produced.

After the § 2255 motion was filed, counsel for Mr. Lawrence again conferred with the Government, pursuant to Local Rule 37.1, regarding its September 23rd discovery letter, as well as the discovery motion that Mr. Lawrence filed prior to his § 2255 motion, which included two additional categories: materials concerning jury selection and materials concerning the Government's decision to prosecute Mr. Lawrence federally. The Government agreed to search its files and provide documents responsive to several categories described in Mr. Lawrence's

discovery letter;  the Government declined to voluntarily provide materials relevant to Items 4 (rough notes), ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

The Government further indicated that it would not affirmatively search for or provide any materials that might be in the possession of a third party (for example, documents originating from the Columbus Division of Police or the FBI), regardless of the category the request covered. The Government also declined to provide any materials concerning jury selection or its decision to prosecute Mr. Lawrence federally without a court order.

After reviewing the files and materials in the possession of the United States Attorney's Office for the Southern District of Ohio, the Government voluntarily provided Mr. Lawrence with eight sets of discovery materials between March 8 and September 26, 2016. On September 26, 2016, the Government represented that it had completed its voluntary review of its files and confirmed that it has provided all items in the possession of the U.S. Attorney's Office for the Southern District of Ohio that fall within categories 1, 2, 3, 5, 6, 7, 10, 11 and 12 of the September 23, 2015 letter. These materials included five VHS tapes, nine CDs of audio and video files, 387 color photographs, and over 500 pages of PDF versions of paper files. The Government further noted that throughout this informal discovery process, it has reserved the right to withhold or redact otherwise responsive materials for reasons of privilege or confidentiality, but would maintain a record of any such materials. Consistent with its prior position that it would not affirmatively make requests to third parties to provide responsive documents, the Government has made no representations regarding whether any other entities,

13

such as the FBI, the Columbus Division of Police, or Fifth Third Bank, may be in the possession of materials that are responsive to Mr. Lawrence's requests.

### B.        Records Requests to Third Parties

Mr. Lawrence has also attempted to obtain relevant records in support of his claims utilizing the Freedom of Information Act ("FOIA"), the Ohio Open Records Law, and records requests to various state agencies, institutions, and hospitals. Although a number of documents were obtained through these efforts, permitting Mr. Lawrence to allege in good faith claims raised in the § 2255 Motion, some of his records requests to third parties have been denied. Thus, absent a court order, Mr. Lawrence has been unable to obtain the following records:

### 1.        Columbus Division of Police ("CDP")

The CDP was the lead investigative agency of the January 6, 2005, attempted robbery and fatal shooting at the Fifth Third Bank. It processed the crime scene, collected evidence, interviewed eyewitnesses and other witnesses, conducted searches and seizures, conducted forensic examinations, and ultimately arrested and interrogated Mr. Lawrence. The CDP worked closely with both the FBI and the Government in this case, and several CDP officers testified at Mr. Lawrence's trial.

The CDP also investigated and opened case files on the 2004 robbery of Fifth Third Bank and the 2004 robbery of Sky Bank, and processed and examined the physical evidence from these other bank robberies that it used in linking Mr. Lawrence to the 2005 Fifth Third Bank offense.

On October 8, 2015, the undersigned sent a request to the CDP pursuant to the Ohio Open Records Law (Ohio Revised Code § 149.43 et seq.), requesting a copy of the records maintained by the CDP pertaining to Mr. Lawrence and its investigation into the incidents at Sky

14

Bank, Key Bank, and Fifth Third Bank. On October 23, 2015, the undersigned received a letter response from the CDP (dated October 14, 2015) indicating that the request was denied. The CDP letter asserted that the requested records were exempt from disclosure, citing a provision of the Ohio Open Records Law that permits public offices to withhold "Confidential Law Enforcement Investigatory Records" ("CLEIR exemptions") under Ohio Revised Code § 149.43(1)(h).

### 2. Federal Bureau of Investigation ("FBI")

The FBI was one of the main agencies that assisted the Government in its investigation and prosecution of Mr. Lawrence.[12] FBI case agents were at the scene of Fifth Third Bank on January 6, 2005, and assisted the CDP with the investigation of the attempted robbery and fatal shooting.[13] The FBI collected evidence, which was subsequently analyzed by FBI examiners, and case agents interviewed eyewitnesses on that same day.[14] An FBI case agent also participated in the interrogation of Mr. Lawrence after his arrest at CDP headquarters, and case agents interviewed other witnesses connected to the investigation and prosecution of Mr. Lawrence.[15] The FBI also investigated the robberies at Sky Bank (9/8/04), Key Bank (8/12/04) and Fifth Third Bank (1/21/04).

On January 30, 2015, the undersigned sent a FOIA request to the FBI requesting a copy of all records maintained by the FBI pertaining to Mr. Lawrence and its investigation into the four incidents at Sky Bank, Key Bank, and Fifth Third Bank. On April 23, 2015, the FBI sent a

---

[12] *See, e.g.,* Trial Tr. Vol. 9 at 72.

[13] *Id.*

[14] *Id.* at 18, 100, 154.

[15] *Id.* at 72.

15

response noting that it had located approximately 1,619 pages of records that were potentially responsive to the FOIA request. On April 30, 2015, the FBI sent an additional response denying the undersigned's request for expedited processing and release of those materials. On May 15, 2015, the undersigned appealed the denial of the request for expedited processing. On June 16, 2015, the undersigned received a response that the appeal had been granted, and that the matter was being remanded to the FBI for expedited processing of the original FOIA request.  On September 16, 2016, the undersigned inquired of the FBI regarding the status of the records request; the FBI stated that the request was still awaiting assignment to a "disclosure analyst" who would review the records to determine if any redaction was necessary; that upon completion the records would be forwarded to a supervisor for review; that if the supervisor approved, the records would be released, but if the supervisor did not approve, then the records would be sent back for further review, which may delay the release. The FBI further stated that it could not provide an estimated date of completion for its review. To date, the FBI has produced no records.

### 3.      Other Third Party Agencies and Institutions

Since appointment in December 2014, post-conviction counsel also have submitted numerous document requests to social service agencies, local courts and law enforcement agencies, health care facilities, and private organizations across the country, pursuing documents containing social history information about Mr. Lawrence and his family members relevant to Mr. Lawrence's § 2255 claims.[16] They have also collected documents from many of these

---

[16] Prevailing professional standards that guide post-conviction counsel's mitigation investigation and that of trial counsel provide:

> Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses'

entities that contain critical facts supporting claims that Mr. Lawrence's trial counsel failed to investigate and present evidence of brain damage and trauma, as well as other powerful mitigating evidence, at the penalty phase of his trial. *See* Claim I, Doc. 328 at 8-10; Claim VI, *id.* at 162-88. Mr. Lawrence's requests from these entities for other information supportive of Mr. Lawrence's claims, however, have been frustrated in the absence of compulsory process.

From the outset of their appointment to the present, counsel have diligently pursued this information from:  Franklin County Children Services; Franklin County Clerk of Courts Juvenile Division; Social Security Administration; OhioHealth Physician Group; Ohio State University Hospital System; Franklin County Adult Probation Division; Ohio Department of Rehabilitation and Corrections; Ohio Reformatory for Women; Drug Enforcement Administration; the U.S.

---

recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. A multi-generational investigation…may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to: a. school records; b. social service and welfare records; c. juvenile dependency or family court records; d. medical records; e. military records; f. employment records; g. criminal and correctional records; h. family birth, marriage, and death records; i. alcohol and drug abuse assessment or treatment records; j. INS records.

American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003), 31 Hofstra L. Rev. 913, 1024-25 (Feb. 2003); *see also id. at* 1080 (post-conviction counsel has duty to continue aggressive investigation of all aspects of the case).

17

Department of Justice Executive Office for the Organized Crime Drug Enforcement Task Forces; and National Personnel Records Center.

Counsel have complied with each entity's requirements for access to the documents, including for instance obtaining agency-specific signed release forms or continually resubmitting, where possible, narrowed and more specific requests for the documents. The Franklin County Children Services, Franklin County Clerk of Courts Juvenile Division, Franklin County Adult Probation Division, Ohio Department of Rehabilitation and Corrections, Ohio Reformatory for Women, and Ohio State University Hospital System have explicitly taken the position that the information Mr. Lawrence seeks will not be disclosed absent a court order or subpoena. The DEA produced a set of heavily redacted documents. The DOJ Executive Office for the Organized Crime Drug Enforcement Task Forces provided a written response to Mr. Lawrence's request for records indicating it was withholding documents pursuant to various FOIA exemptions. The Social Security Administration, OhioHealth Physician Group, and National Personnel Records Center have, despite repeated requests, produced no records to date and have provided no indication that the records have been destroyed.

## V.     Mr. Lawrence has Shown Good Cause for the Following Discovery.

In the following sections, Mr. Lawrence identifies his specific discovery requests and the claims to which they relate. Mr. Lawrence also summarizes the specific facts he has alleged that, once fully developed, will demonstrate that he is entitled to relief for each such claim. In this motion, Mr. Lawrence also refers to the specific claims and subparts of his § 2255 Motion, which provide more detailed information regarding each claim which he incorporates here by reference. In some instances, a request is related to more than one claim. Accordingly, Mr. Lawrence incorporates into each section all of the arguments presented in the other sections.

18

As used in Mr. Lawrence's discovery requests, the term "communication" means any oral, written, or electronic utterance, notation, or statement of any nature whatsoever, draft or final, by and to whomever, made or attempted to be made, including but not limited to correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, and other understanding, whether in a personal notation or between two or more persons.

The term "document" means any medium upon which intelligence or information can be recorded or retrieved and can be handwritten, typewritten, or electronically stored. The term "document" includes but is not limited to any record, note, email, memorandum, contract, draft, chart, report, drawing, sketch, graph, index, list, tape recording, or photograph.

To the extent the U.S. Attorney's office denies that the requested documents are in its files, Mr. Lawrence requests the Court order the Government to certify that no such responsive materials are in its possession, and, if applicable, the dates on which any responsive materials were destroyed.[17] To the extent that the Government has already provided all responsive documents for particular requests, Mr. Lawrence requests the Court order the Government to submit a verification to that effect. To the extent privilege is claimed, Mr. Lawrence asks that the Government be required to identify specific documents for which privilege is invoked. If the U.S. Attorney's Office does not possess or have control over files of the agencies cooperating in the investigation, the defense requests that the Court issue subpoenas *duces tecum* to compel their production from these agencies.

---

[17] The absence of requested documents in the U.S. Attorney's files does not necessarily mean such documents do not exist, and Mr. Lawrence has accordingly moved for discovery, in the form of subpoenas *duces tecum,* of the files of other agencies and third parties who investigated this case and may be in possession of the requested documents.

19

The relationship between the requested discovery to the claims alleged, as well as the "good cause" for requests, is discussed below.

### A. Discovery in Support of Mr. Lawrence's Punishment Phase Ineffective Assistance of Counsel Claim

Although the punishment phase ineffective assistance of counsel ("*Strickland*") claim in Mr. Lawrence's § 2255 Motion contained subsections with numbered "claims" (e.g. Claim I), legally the claim is a single ineffective assistance of counsel claim consisting of multiple errors or omissions that result in prejudice. *See, e.g., Strickland*, 466 U.S. 668, 693 ("Even if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must show that they actually had an adverse effect on the defense."); *id.* at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). This holds true in capital § 2255 cases as well: "*Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim." *Johnson v. United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012). *Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient. Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id*. at 695.

Mr. Lawrence has pled specific allegations about the ineffectiveness of his trial counsel at the punishment phase of his capital case. He now seeks this Court's assistance to provide the

necessary discovery so he may establish the prejudice caused by the deficiencies he has alleged.[18]

Mr. Lawrence requests discovery relating to two aspects of his *Strickland* punishment phase claim, described below:

1. **Trial Counsel Failed to Collect Evidence Demonstrating that Mr. Lawrence Has a Major Blood Disorder and Brain Damage, Exacerbated by his Repeated Exposure to Trauma and A Wealth of Records Documenting the Lawrence Family's Medical, Mental Health and Environmental Problems. (§ 2255 Motion, Claims I and VI)**

In Claim I, Mr. Lawrence alleged that trial counsel failed to investigate and present, among other significant facts, evidence that he has brain damage, attributable to a combination of factors, debilitating in its effects, and exacerbated by his repeated exposure to trauma. Doc. 328 at 8-10. He specifically alleged that trial counsel performed below established professional standards in their mitigation investigation, unreasonably failing to consult with a medical doctor and mental health professional with a background in childhood trauma, ignoring indications of possible brain damage in records they had in their possession, and failing to collect data from other readily available records and lay witnesses that were consistent with brain damage and

---

[18] The *Bracy* analysis of the *Strickland* claim before this Court, therefore, is not an item-by-item consideration of each request but rather a determination of whether, based on the allegations presented, Mr. Lawrence may be entitled to relief if the facts are fully developed. Such an analysis is consistent with *Strickland* and the law of this and other circuits. *See United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [IAC] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)); *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation, . . . the pattern of counsel's deficiencies must be considered in their totality."); *Henderson v. Frank*, 155 F.3d 159, 165 (3d Cir. 1998) ("The Supreme Court has warned that judges should not misread habeas petitions in order to split single claims and conduct separate exhaustion analyses for each.") (citing *Engle v. Isaac*, 456 U.S. 107, 124 n.25 (1982)); cf. *Mak v. Blodgett*, 970 F.2d 614, 622, 624–25 (9th Cir. 1992) (finding, with respect to "cumulative errors . . . in the sentencing phase," that "[w]e do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance").

exposure to trauma. *Id.* at 10-42. He also alleged that trial counsel's deficient performance prejudiced him in the following respects: with evidence of Mr. Lawrence's brain damage and exposure to trauma, jurors would have been able to consider Mr. Lawrence's actions inside the Fifth Third Bank and assess his level of intent in the context of his compromised executive functioning; new information about Mr. Lawrence's limitations would have strengthened the testimony of the defense experts, Dr. Elijah Anderson and Dr. Mark Cunningham; the evidence itself is clearly mitigating in nature; and the Government's case for a death sentence, which was based on showing jurors that Mr. Lawrence made deliberate choices that established his extreme culpability, would have been significantly undermined. *Id.* at 42-53.

The combination of factors contributing to Mr. Lawrence's brain injury, as identified by a medical expert and discussed in the § 2255 motion, include: Mr. Lawrence's serious lifelong blood disorder—polycythemia vera—known to deprive brain tissue of needed oxygen and affect the central nervous system, and the symptoms (heavy nosebleeds, headaches, lethargy) of which have been well-documented in medical records and in the observations of family members; Mr. Lawrence's biological mother Leondra Lawrence's ingestion of drugs and alcohol in the course of her pregnancy, associated untreated mental illness and maternal stress, and potential for Mr. Lawrence's *in utero* exposure to toxins; and a series of blows to his head causing traumatic brain injuries. *Id.* at 12-22.

Other aspects of Mr. Lawrence's social history noted in the § 2255 motion compromised his brain development as well. The prevalence of mental illness in many generations of Mr. Lawrence's family genetically predisposed him to psychiatric and neurological disorders from birth: Mr. Lawrence's biological mother, maternal cousin Aleta Lopez, maternal aunt Florencia

Walker, and maternal grandmother, Florence Perkins, are among those reported to suffer from serious mental illness. *Id.* at 19-20.

In addition, Mr. Lawrence's already damaged brain was, as the § 2255 motion describes, also subjected to the effects of severe trauma throughout his childhood. *Id.* at 20-35. After spending the first several tumultuous weeks of his life passed around among his biological mother's relatives, primarily in the care of Ms. Walker, Mr. Lawrence was finally taken into Eileen Lopez's home. Mrs. Lopez, herself intellectually impaired and the victim of alcohol-fueled assaults at the hands of her late husband, Manuel Lopez, raised young Daryl with the best of intentions but could never have provided the support he needed to overcome his disabilities. *Id.* Rather, a dominant feature of his experience in Mrs. Lopez's house became the terror of being left in the care of her adult daughter Aleta, who subjected anyone around her, but especially Mr. Lawrence and Mrs. Lopez, to unpredictable, violent outbursts and psychological assaults, a symptom of her mental illness reported by family members and corroborated in institutional records. *Id.* The neighborhoods where Mr. Lawrence grew up offered no shelter from the turmoil of his home: on street corners and pizza shops and playgrounds, Mr. Lawrence encountered countless episodes of violence, which a medical expert has explained influenced his developmental course and behavior adaptability and resulted in lifelong symptoms, including dissociative states. *Id.*

Mr. Lawrence alleged in Claim VI that trial counsel failed to develop and present mitigating evidence at the punishment phase of his trial. Doc. 328 at 162-188. He specifically alleged that trial counsel's unreasonably narrow focus on Mr. Lawrence's family's criminality; failure to ensure adequate time to conduct a thorough mitigation investigation or seek a continuance; and failure to adequately prepare their experts, Dr. Cunningham and Dr. Anderson,

fell below established constitutional norms and prejudiced Mr. Lawrence. *Id.* A central aspect of their deficiency discussed in the § 2255 motion is trial counsel's failure to request and obtain readily available records that contained basic social and medical history about Mr. Lawrence and his family, which were relevant to Mr. Lawrence's genetic predisposition to mental illness and to his caregivers' mental illness and impairments; documentation corroborating witness recollections about the dire financial straits Mr. Lawrence's caregivers faced; and independent support for family members' reports about multigenerational patterns of substance addiction, instability, and exposure to trauma. *Id.* at 163-167. All of these records were necessary for any reliable assessment of Mr. Lawrence's mental health, functioning, and mitigating circumstances, and were necessary for thorough preparation of defense experts and accurate expert reports and testimony. *Id.* at 164.

In support of his *Strickland* punishment phase claim (as specifically alleged in Claims I and VI), Mr. Lawrence requests power to issue subpoenas *duces tecum* for the following discovery (Exhibit 4):

1) **Franklin County Children Services**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Eileen Lopez (aka Eileen Bynum) (adoptive mother of Mr. Lawrence)
   - Florencia Walker (aka Florencia Lopez) (maternal aunt and early childhood caregiver of Mr. Lawrence)
   - Rodriccos Williams (maternal first cousin of Mr. Lawrence)

2) **Franklin County Clerk of Courts Juvenile Division**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Leondra Lawrence (aka Leondra Lawrence-Tye) (biological mother of Mr. Lawrence)
   - Eileen Lopez (aka Eileen Bynum)
   - Florencia Walker (aka Florencia Lopez)
   - Aleta Lopez (Eileen Lopez's daughter and caregiver of Mr. Lawrence)
   - Rodriccos Williams
   - Sarah Ethlyn Walker (maternal great grandmother)
   - Manuel Lopez, Sr. (maternal great grandfather)

24

3) **Social Security Administration**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Leondra Lawrence (aka Leondra Lawrence-Tye)
   - Florence Perkins (aka Florence Lopez) (maternal grandmother)
   - Jerry Hall (putative biological father)
   - William Tye (putative biological maternal grandfather)
   - Sarah Ethlyn Walker
   - Manuel Lopez, Sr.

4) **OhioHealth Physician Group**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Eileen Lopez (aka Eileen Bynum)
   - Florencia Walker (aka Florencia Lopez)
   - Aleta Lopez
   - Ricco Lawrence (biological half-sibling)

5) **Ohio State University Hospital System**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Florence Perkins (aka Florence Lopez)
   - Manuel R. Lopez (aka Manuel R. (Pee Wee) Lopez) (maternal great uncle, adoptive father, and husband of adoptive mother, Eileen Lopez)
   - Jerry Hall
   - Rodriccos Williams

6) **Franklin County Adult Probation Division**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Florence Perkins (aka Florence Lopez)
   - Rodriccos Williams
   - Jerry Hall
   - William Tye
   - Ricco Lawrence
   - Manuel R. Lopez
   - Manuel Lopez, Sr.
   - Sarah Walker

7) **Ohio Department of Rehabilitation and Corrections**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Leondra Lawrence (aka Leondra Lawrence-Tye)
   - William Tye
   - Ricco Lawrence

8) **Ohio Reformatory for Women**: Any files, including communications, documents, or information pertaining to the following individuals:
   - Leondra Lawrence (aka Leondra Lawrence-Tye)
   - Daryl Lawrence (aka Daryl Martez Lawrence)

25

9) **Drug Enforcement Administration**: Unredacted files, including communications, documents, or information pertaining to the following individuals:
   - Rodriccos Williams

10) **U.S. Department of Justice Executive Office for the Organized Crime Drug Enforcement Task Forces**: Any files, including communications, documents, or information pertaining to the following individuals:
    - Rodriccos Williams

11) **National Personnel Records Center**: Any military personnel files, including communications, documents, or information pertaining to following individuals:
    - Manuel R. Lopez

Additionally, Mr. Lawrence requests, in the form of an Order from the Court for requests of the Government (Exhibit 1), any communications, documents, or information concerning Mr. Lawrence's family members.

Mr. Lawrence has alleged that powerful mitigating evidence exists that jurors never heard due to trial counsel's constitutionally deficient investigation and presentation. The requested discovery contains important social history pertaining to Mr. Lawrence and his family members that may provide evidence supporting his ineffective assistance of trial counsel claim. Specifically, it is expected that the documents sought will help establish that Mr. Lawrence's family history made him susceptible to cognitive and neurological disorders at birth; that his traumatic childhood experience exacerbated the medical vulnerabilities he brought with him into the world; that he lacked the supports he needed to overcome his brain injuries; and provide independent support for family members' reports about multigenerational patterns of substance addiction, poverty, instability, and exposure to traumatic stress.

There is reason to believe that, if these facts are developed, Mr. Lawrence will be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**B.**     **The Jury's Decision Was Based on an Inaccurate Account of the Circumstances of the Offense Because of Trial Counsel's Ineffectiveness and the Government's Misleading Presentation. (§ 2255 Motion, Claims II and V)**

In Claim II of his § 2255 Motion, Mr. Lawrence alleged that trial counsel were ineffective for failing to: investigate the circumstances of the offense; adequately challenge the Government's account of the shooting; develop and present readily available evidence of a lowered culpability and lack of intent on Count 8. Doc. No. 328 at 54-124. In Count V, Mr. Lawrence alleged that the Government presented false and misleading evidence about the circumstances of the offense. *Id*. at 153-62.

Mr. Lawrence alleged that physical and forensic evidence, corroborated by an eyewitness account the jury never heard, establish that Officer Hurst was not shot at point-blank range while crouched behind the teller counter, as the Government claimed at trial. Rather, the fatal shot was fired from a distance while Officer Hurst was standing in a hallway outside of the teller line during a chaotic exchange of gunfire as Mr. Lawrence attempted to flee the bank. *Id*. at 57-84. Mr. Lawrence alleged that trial counsel unreasonably failed to investigate and present readily available evidence that would have successfully undermined the Government's account of the shooting and at the very least raised reasonable doubts in the minds of the jurors about the circumstances of the offense. *Id*. at 84-112. Mr. Lawrence further alleged that had trial counsel presented this readily available evidence, there is a reasonable probability that Mr. Lawrence would not have received a death sentence on Count 8 because the manner in which the shooting occurred was a critical factor in the jury's sentencing determination; this alternate account of the shooting would have undermined the statutory gateway intent factors under 18 U.S.C. § 3591(a) and rebutted the pecuniary gain statutory aggravating factor, and at least one juror would have made the same determination on Count 8 as was made on Count 7 – that Mr. Lawrence's conduct

27

did not rise to the level of "moral culpability" necessary to warrant a death sentence because the

shooting was not a cold-blooded killing at point-blank range, but rather was the tragic result of

Mr. Lawrence's panicked response during a chaotic exchange of gunfire. *Id*. at 112-24.

Mr. Lawrence made specific allegations and proffered facts in support of his claim that

the Government's account of the shooting was incorrect, including the following:

• The Government argued that after Officer Hurst was mortally wounded while in a crouched position, he managed to stand up and fire seven shots from his .45 caliber Smith and Wesson handgun before stumbling out of the teller area and collapsing in the hallway outside the teller area. Mr. Lawrence proffered a declaration from a forensic pathologist stating that given the type of gunshot injury that Officer Hurst sustained (which severed every major blood vessel surrounding his heart), the Government's explanation is extremely implausible. Officer Hurst's blood pressure would have dropped immediately and precipitously and he would have almost certainly collapsed immediately after being shot. In other words, from a medical standpoint, Officer Hurst was likely standing in the hallway when he was fatally shot, not crouched behind the teller counter. *Id*. at 71-72. Moreover the series of actions that the Government described Officer Hurst as undertaking after being fatally shot would have required him to exert an enormous amount of effort that, given the nature and severity of his gunshot wound, was extremely unlikely from a medical standpoint. *Id*. at 72.

• The medical evidence that Mr. Lawrence proffered was also corroborated by an eyewitness account of the shooting. The eyewitness was Michelle Johnson, a bank manager who was in her office during the shooting and had an unobstructed view of the lobby, teller area, and hallway during the incident. According to Ms. Johnson, after the first shots were fired she saw Officer Hurst come out from behind the teller line, emerge from the hallway, and assume a shooting stance in front of the teller line. According to her account, Officer Hurst was ready, alert, and responding to the threat in the bank. Her description gave no indication that Officer Hurst was wounded or that he stumbled out into the hallway and collapsed. *Id*. at 72-76. (Ms. Johnson, however was not called as a witness at trial, and the jury never heard her account of the shooting.)

• Ms. Johnson's account of the shooting is also consistent with the autopsy results of the trajectory of the bullet's path through Officer Hurst's body. That is, the trajectory is consistent with being shot while standing and leaning forward in a shooting stance. Mr. Lawrence proffered declarations from the coroner who conducted the autopsy of Officer Hurst, as well as that of a forensic pathologist, that corroborated this claim. *Id*. at 78-79.

• If the fatal shot had been fired at close range, as the Government claimed, there would be soot and gunpowder particles surrounding the bullet hole in the uniform, but a forensic analysis determined that there was no such stippling present on Officer Hurst's uniform

28

at the site of the fatal wound. Moreover, the gunpowder particles emitted from close range would burn at a high enough temperature to produce burn marks on the fabric, but a forensic analysis determined that there were no such burn marks. *Id*. at 62-64. Mr. Lawrence proffered the declaration of a firearms and ballistics expert stating that given the lack of gunpowder particles and burn marks on the uniform, the forensic evidence overwhelmingly supports the fact that Officer Hurst was shot at a distance of greater than three feet, and certainly not at point-blank range. *Id*. at 63-64.

• Mr. Lawrence proffered the declaration of a crime scene reconstruction expert who stated that based on the location where ballistics evidence was found inside the bank – i.e., the locations of shell casings, bullets, and bullet strikes correlated with Mr. Lawrence's and Officer Hurst's respective weapons – that evidence was consistent with Officer Hurst having been shot from a distance while standing near the hallway area. *Id*. at 76-78; 79-78; 121-24.

• The Government argued that the only explanation for the presence of spent shell casings originating from Mr. Lawrence's gun being found behind the teller line was that those shell casings were deposited while Mr. Lawrence leaned over the teller line and fired his gun. However, an ejection pattern analysis performed on the type of firearm which Mr. Lawrence used – a .40 caliber Mini Firestorm semiautomatic handgun – undermined the Government's claim. The ejection pattern analysis demonstrates that if Mr. Lawrence had been firing his gun in the manner that the Government claimed, the gun would have ejected the shell casings up, backwards, and to the right. That is, the shell casings most likely would have been ejected behind Mr. Lawrence, into the lobby area, and not forward into the teller area, where they were found. *Id*. at 64-66. Mr. Lawrence proffered the declaration of a firearms and ballistics expert who conducted the relevant ejection pattern analysis and determined that if Mr. Lawrence had fired his gun toward the hallway area while holding the gun at 90 degrees, or what is referred to as "side grip," the shell casings would have ejected into the teller area, even though that was not the direction in which he was shooting. *Id.* at 79-81.

• The Government argued that the video surveillance footage corroborated its theory that Mr. Lawrence fired the fatal shot while leaning over the teller counter and while Officer Hurst was crouched with his gun still in his holster. However, a side-by-side comparison of still images from the surveillance footage shows that as Mr. Lawrence entered the bank, the glass door behind him had already been shot by Officer Hurst. In other words, Officer Hurst could not have been crouched and still attempting to unholster his gun when Mr. Lawrence got to the teller counter because Officer Hurst had clearly already fired his gun and shot the glass door behind Mr. Lawrence at that point. *Id*. at 66-70.

• The surveillance footage and the location of bullet strikes from Mr. Lawrence's gun are also consistent with Mr. Lawrence firing towards the hallway area while simultaneously attempting to flee the bank; in other words, Mr. Lawrence's intent in firing his weapon was to give himself cover in order to escape, not a deliberate and intentional attempt to

29

murder Officer Hurst. Mr. Lawrence proffered a declaration from a crime scene reconstruction expert to that effect. *Id*. at 81-84; 121-23.

• The Government argued that the presence of stippling on Officer Hurst's face proved that he was fatally shot at close range. However, that stippling pattern was not necessarily related to the fatal shot, which was in Officer's Hurst chest; the fatal shot and the shot which produced the stippling on the face were likely two different shots. *Id*. at 61-62.

Mr. Lawrence alleged that trial counsel unreasonably failed to present medical evidence that would have undermined the Government's account of the shooting. *Id*. at 85-86. Mr. Lawrence also alleged that the Government knew, or reasonably should have known, that its account of the shooting was incorrect. *Id*. at 153-62. In support of these claims, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 5):

1.      Any communications, documents, or information concerning the nature of Officer Hurst's gunshot injury and the effect that injury would have had on Officer Hurst's ability to move and respond during the shooting incident at Fifth Third Bank.

The requested discovery goes to whether Officer Hurst would have been able to move after he was shot in the manner that the Government maintained at trial, whether he was in fact standing in the hallway when he was fatally shot and collapsed immediately in that same location, and whether the Government or its agents were aware of these facts at the time of Mr. Lawrence's trial, as raised in Claims II and V in the § 2255 motion. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged that trial counsel unreasonably failed to challenge the Government's evidence of a close-range gunshot based on the forensic analysis of Officer Hurst's uniform shirt. Doc. No. 328 at 87-88. Mr. Lawrence further alleged that the Government

30

presented false evidence on this matter. Specifically, the criminalist for the CDP, Mark J. Hardy, testified that despite the absence of soot, gunpowder particles, and burn marks on the uniform, he could not rule out the possibility that the shot had been fired at close-range because the relevant particles might have been shaken off the garment. *Id.* at 158-59. Mr. Hardy also testified that although he could have conducted chemical testing for the presence of nitrites or lead on the shirt in order to determine whether it was a close-range shot, there was no value in conducting such chemical tests because Mr. Lawrence's gun had not been recovered. *Id.* at 159. Mr. Lawrence proffered the declaration of a firearms and ballistics expert explaining that Mr. Hardy's testimony was false. Gunpowder particles travel at a high enough velocity and at a high enough temperature that they burn into fabric and embed themselves in the weave; while some particles from a close-range shot might fall off, it is false to opine that they all could have, or that burn marks in the fabric could have fallen off. *Id.* at 159. Additionally, despite not having recovered the weapon that fired the shot, chemical testing could have been performed on the shirt; if the tests were negative for nitrites or lead, they could have ruled out a close-range shot. *Id.*

In support of this claim, Mr. Lawrence requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 5):

2. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of Officer Hurst's uniform shirt.

3. Any communications, documents, or information containing internal written policies and standards for examinations concerning firearms distance determinations testing and guidelines for rendering an opinion.

4. Any communications, documents, and information concerning the decision as to what type of testing to utilize on Officer Hurst's uniform shirt to determine the presence of nitrites or lead.

31

5.      Any color photographs of Officer Hurst's uniform shirt, at all stages of collection and testing.

6.      Any communications, documents, or information concerning written procedures (including those called Standard Operating Procedures (SOPs)) for firearms distance determinations testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices.

7.      Any communications, documents, or information concerning cases where the Government (or any law enforcement organization or forensic laboratory under its auspices or at its direction) or the CDP has conducted chemical testing to determine the presence of lead or nitrites in the absence of recovering the firing weapon.

8.      A copy of Mark J. Hardy's personnel file and all internal and external proficiency testing results for firearms distance determinations testing administered to him (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate).

The requested discovery is directly relevant to whether Mr. Hardy testified falsely or misleadingly about whether all the gunpowder particles and/or burn marks had shaken off the garment; that Mr. Hardy's failure to utilize chemical testing in this instance was contrary to standard forensic procedures; that chemical testing could have been performed even in the absence of the firing weapon, and that the testing could have yielded relevant information about whether there was a close range shot; or that Mr. Hardy has been cited for failing to follow standard forensic procedures with respect to firearms distance determinations. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged that trial counsel unreasonably failed to rebut the ballistics evidence regarding the location of Mr. Lawrence's spent .40 caliber shell casings. Doc. No. 328 at 88-90. At trial, the Government argued that the location of three spent .40 caliber shell casings

behind the teller line proved that Mr. Lawrence fired the fatal shot while leaning over the teller line. The Government also argued that the location of spent .40 caliber shell casings in the lobby proved that Mr. Lawrence fired at Officer Hurst as soon as he entered the bank. *Id*. at 88-89. Trial counsel unreasonably failed to present readily available evidence from a firearms and ballistics expert that rebutted the Government's arguments. Specifically, trial counsel could have presented evidence of an ejection pattern analysis that was performed on the same type of weapon that Mr. Lawrence used. That analysis would have established that: (1) if Mr. Lawrence had fired his gun while leaning over the teller line as the Government claimed, the spent shell casings would have ejected into the lobby, not into the teller area; (2) if Mr. Lawrence had been shooting towards the hallway area while holding the gun at 90 degrees counterclockwise, the spent shell casings would have ejected into the teller area, even though that is not the direction in which he was firing; and (3) that the spent shell casings recovered in the lobby were consistent with Mr. Lawrence firing his weapon as he exited the bank, not as he entered. *Id*. at 88-90. Mr. Lawrence also alleged that Mr. Hardy falsely testified that a proper ejection pattern analysis could not be performed without having the actual weapon that was used. *Id*. at 159-60. Mr. Lawrence has proffered a declaration from a firearms and ballistics expert stating that using a replica of the weapon – that is, another .40 caliber Mini Firestorm – would have yielded reliable and representative results, and would at least have enabled Mr. Hardy to determine that, like most semi-automatic pistols, this particular weapon ejects spent shell casings up, backward and to the right when fired at a 0 degree angle. *Id*.

In support of these claims, Mr. Lawrence requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 5):

9.      Any communications, documents, or information containing internal written policies and standards for examinations concerning ejection pattern analysis and guidelines for rendering an opinion.

10.      Any communications, documents, and information concerning the decision not to conduct an ejection pattern analysis in this case.

11.      Any communications, documents, or information concerning cases where the Government (or any law enforcement organization or forensic laboratory under its auspices or at its direction) or the CDP has conducted ejection pattern analysis in the absence of recovering the firing weapon.

12.      Any communications, documents, or information concerning any forensic or crime scene reconstruction analysis about Mr. Lawrence's movements and actions inside Fifth Third Bank based on the locations of the spent .40 caliber shell casings.

The requested discovery is sought to establish that the Government knew, or reasonably should have known, that: (1) the presence of .40 caliber shell casings behind the teller line was not consistent with its claim that they were deposited there because Mr. Lawrence fired the fatal shot while leaning over the teller counter; (2) the location of the .40 caliber shell casings in the lobby was not consistent with its claim that Mr. Lawrence fired his weapon when he entered the bank; and (3) a reliable ejection pattern analysis can be conducted even in the absence of recovering the weapon used in the incident. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged that trial counsel unreasonably failed to present ballistics evidence demonstrating that Officer Hurst moved out from behind the teller area and into the hallway before he was fatally shot, and that Mr. Lawrence was shooting toward the hallway during the exchange of gunfire. Doc. No. 328 at 90-91. In support of this claim, Mr. Lawrence proffered the declarations of a crime scene reconstruction expert, a firearms and ballistics expert, and a forensic pathologist that the physical and forensic evidence was consistent with this

34

alternate account of the shooting. *Id*. Mr. Lawrence also alleged that the Government knew, or reasonably should have known, based on the same physical and forensic evidence discussed in the proffered expert declarations, that its account of the shooting was false. *Id*. at 154-62.

In support of these claims, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 5):

13. Any communications, documents, or information concerning physical and forensic evidence that is consistent with the defense theory that Officer Hurst was shot from a distance.

14. Any communications, documents, or information concerning physical and forensic evidence that is consistent with the defense theory that Officer Hurst was standing in the hallway area adjacent to the teller line of the Fifth Third Bank when he was shot.

15. Any communications, documents, or information concerning physical and forensic evidence that is consistent with the defense theory that Mr. Lawrence was shooting toward the hallway area adjacent to the teller line of the Fifth Third Bank.

16. Any communications, documents, or information concerning a crime reconstruction analysis of how the shooting incident occurred.

The requested discovery may establish that the account of the shooting that the Government presented at trial was false, and that based on the available physical and forensic evidence, the Government knew or reasonably should have known that Officer Hurst was not fatally shot at point-blank range while crouched behind the teller area, with his gun still holstered. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged that trial counsel unreasonably failed to adequately challenge the relevance of the bank surveillance footage, and that counsel unreasonably failed to use still

35

images from the surveillance footage to demonstrate that the Government's account of the shooting was false. Doc. No. 328 at 94-101. Mr. Lawrence also alleged that based on the surveillance footage, the Government knew, or reasonably should have known, that its account of the shooting was false. *Id*. at 154-56.  In support of these claims, Mr. Lawrence alleged that the video-cameras in the bank recorded only two frames per second, producing results that, while appearing to show continuous movement, have significant gaps during which the action is not being recorded, and therefore create a false understanding that viewers are seeing a continuous image of what transpired. *Id*. at 94-95. In contrast to the illusion created by the running video, trial counsel could have presented still images from the videos that supported the defense theory that Mr. Lawrence fired toward the hallway with his head turned away, and that he was employing gunfire to cover his retreat from the bank, not to deliberately and intentionally kill Officer Hurst. *Id*. at 96-101. Additionally, a side-by-side comparison of the video footage from two different angles contradicted the Government's claim that Mr. Lawrence fatally shot Officer Hurst while he was crouched behind the teller counter struggling to unholster his gun; the still images from these two cameras reveal that Officer Hurst had already fired his weapon and shot the glass door behind Mr. Lawrence before Mr. Lawrence even reached the teller counter. *Id*. at 96.

In support of these claims, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI and the Fifth Third Bank (Exhibit 5):

> 17.  Any communications, documents, or information concerning the number of frames per second that the video-cameras inside Fifth Third Bank recorded.
>
> 18.  Any communications, documents, or information regarding concerns about the quality of the surveillance footage and/or the accuracy of what it depicted, including

information concerning the Fifth Third Bank's video-cameras' frames-per-second recording capacity.

19.    Any communications, documents, or information concerning enhancements to the Fifth Third Bank's surveillance footage or to still images taken from the surveillance footage.

The requested discovery may establish that the Government knew or reasonably should have known that Officer Hurst fired his weapon before Mr. Lawrence reached the teller counter. It may also establish that the Government knew or reasonably should have known that the quality of the surveillance footage was insufficient to draw reliable conclusions about how the shooting occurred. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged that the Government knew, or reasonably should have known, that its account of the shooting was false based on information provided to it by eyewitnesses. Doc. No. 328 at 156-58. In addition to Michelle Johnson's statement, the Government was also in possession of two statements provided by Brian Dickerson, a bank customer who was outside of the bank during the incident. Mr. Dickerson stated that he was able to see someone running away from the teller desk, firing his gun behind himself, as he ran to exit the bank. *Id*. at 156-57. This contradicted the Government's account that the spent shell casings on the lobby floor must have meant that Mr. Lawrence fired his weapon immediately upon entering the bank. *Id*. at 157. As with Ms. Johnson, the Government did not call Mr. Dickerson as a witness at trial. *Id*. Additionally, many of the eyewitnesses who were called at trial testified to facts that were materially different from, and completely contradicted by, what they had self-reported immediately after the event, and what they had reported in police and FBI interviews. *Id*. at 106-110; 157-158. Some of these witnesses met with the prosecution before trial and were shown

37

evidence, including the bank surveillance footage; Mr. Lawrence has alleged that this process

tainted the witnesses' memories. *Id*. at 110-11; 157-58.

In support of these claims, Mr. Lawrence requests the following discovery, in the form of

an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum*

addressed to the CDP, FBI and the Fifth Third Bank (Exhibit 5):

20.     Any communications, documents, or information identifying all witnesses to the shooting at Fifth Third Bank on January 6, 2005.

21.     Any communications, documents, or information concerning any interviews conducted with Michelle Johnson and/or Brian Dickerson regarding the shooting at Fifth Third Bank, including the dates and locations of those interviews.

22.     Any communications, documents, or information concerning any statements that Michelle Johnson and/or Brian Dickerson made about the shooting at Fifth Third Bank.

23.     Any communications, documents, or information concerning the decision not to call Michelle Johnson or Brian Dickerson as witnesses at Mr. Lawrence's trial.

24.     Any communications, documents, or information concerning meetings with the testifying eyewitnesses (Marian Large, Heather Clifton, Andrea Ross, Amanda Goodman, Warren Cox, and Angela Karst), including the dates of such meetings, notes or memoranda regarding statements made by the witnesses, and evidence that was shown to the witnesses.

This discovery is requested in order to establish that the Government knew, or reasonably

should have known, that Ms. Johnson and Mr. Dickerson had provided credible eyewitness

accounts of the shooting that undermined the prosecution theory of how the shooting occurred,

and that this was the reason that these witnesses were not called to testify at Mr. Lawrence's

trial. This discovery also may establish that the other testifying eyewitnesses made material

assertions for the first time at trial, after having been interviewed on more than one occasion

prior to trial, that prosecutors had reason to believe were suspect based on the fact that these

assertions were not previously made. This discovery might also establish that these testifying

38

witnesses were exposed to evidence during their pre-trial interviews that contaminated their memories of the shooting incident. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

With respect to all of the allegations raised in Claims II and V, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI, and the Fifth Third Bank (Exhibit 5):

25. A complete copy of the CDP's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

26. A complete copy of the FBI's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

27. A complete copy of Fifth Third Bank's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

28. Copies of any and all written, audio- or video-recorded statements (as well as transcriptions thereof) of witnesses (both testifying and non-testifying) concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

29. Copies of all rough drafts of reports or rough notes made by the CDP or FBI pertaining to the investigation, arrest and prosecution of Mr. Lawrence concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

30. Copies of any and all written, oral, video or electronic forensic reports, tests and/or data produced in connection with the investigation, arrest and prosecution of Mr. Lawrence concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

31. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects prepared by any other federal, state, or local law enforcement agencies pertaining to the investigation, arrest and prosecution of Mr. Lawrence concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

These discovery requests may establish that there was readily available evidence that trial counsel could have investigated, obtained, and presented that rebutted the Government's account of the shooting. These requests may also establish that the Government knew, or reasonably should have known, of physical, forensic, or testimonial evidence that contradicted its account of the shooting that it presented at trial. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

### C. The Government Did Not Comply with Its Obligation to Disclose Exculpatory and Impeachment Material. (§ 2255 Motion, Claim IV)

In Claim IV, Mr. Lawrence has alleged that the Government failed to disclose material exculpatory and impeachment evidence. Doc. No. 328 at 140-153. Mr. Lawrence has alleged, *inter alia*, that the Government failed to disclose information provided by Michelle Johnson, a Fifth Third Bank manager and eyewitness to the 2005 Fifth Third Bank shooting, whose account of the incident contradicted the Government's presentation at trial that Mr. Lawrence shot Officer Hurst at point-blank range in order to get to the bank's vault; instead, counsel learned during the post-conviction investigation, Ms. Johnson's account of the shooting corroborated the defense theory that Officer Hurst was fatally shot from a distance during a chaotic exchange of gunfire as Mr. Lawrence attempted to the flee the bank. *Id*. at 145-49. Mr. Lawrence has a good faith basis for pleading that the Government was aware of Ms. Johnson's account of the shooting at the time of Mr. Lawrence's trial. First, Ms. Johnson was interviewed by the defense prior to the filing of the § 2255 motion, and she confirmed that she was interviewed by law enforcement after the shooting and gave her account of what she witnessed. *Id*. at 147-48. Additionally, AUSA Michael Burns stated prior to trial that he had personally interviewed the Fifth Third

Bank employees in March 2005, so it is reasonable that Ms. Johnson, who was still employed at Fifth Third Bank at the time, would have been one of the employees that AUSA Burns interviewed. *Id*. at 147 & n.62. Moreover, every other witness who was present at the Fifth Third Bank shooting that day was interviewed by the CDP or FBI, yet Ms. Johnson is the only witness for whom no CDP report or FBI 302 report exists. Indeed, as Ms. Johnson was in her office during the shooting and was the sole eyewitness to have an unobstructed view of the lobby and teller area during the incident, it would have been out of keeping with the standard practice of the CDP and FBI not to interview her.[19]

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI, and the Fifth Third Bank (Exhibit 6):

1.	Any communications, documents, or information concerning any interviews conducted with Michelle Johnson regarding the shooting at Fifth Third Bank, including the dates and locations of those interviews.

2.	Any communications, documents, or information concerning any statements that Michelle Johnson made about the shooting at Fifth Third Bank.

The discovery is sought to establish that Ms. Johnson did, in fact, make statements to law enforcement regarding the shooting at Fifth Third Bank, and that her account of the shooting contained material exculpatory or impeachment information. There is reason to believe that, if

---

[19] *See* Exhibits 15 and 16: Declarations of Donald Sowards, retired homicide detective with the Columbus Division of Police; and Sandra Ladley, retired homicide detective with the Columbus Division of Police. Both of these declarants took part in witness interviews following the shooting incident on January 6, 2005, at the Fifth Third Bank, and describe department protocols for interviewing eyewitnesses and record-keeping. The declarants note that all eyewitnesses would have been interviewed following an incident such as this; that a record would have been generated of each interview, even if the witness provided no information; and that it was typical for witnesses to be re-interviewed after the initial interviews.

these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence further alleged that the Government also failed to disclose additional interviews and witness statements made by other witnesses to the Fifth Third Bank shooting, and that these interviews and statements contained material exculpatory and/or impeachment information. Mr. Lawrence has a good faith basis for asserting this claim. As noted in Mr. Lawrence's § 2255 Motion, the trial record reveals that many of the eyewitnesses who testified at trial had been interviewed on more than one occasion between the time of the shooting and their testifying at Mr. Lawrence's trial. *Id*. at 150-52. However, the defense was not provided with any statements or witness interview summaries beyond those that memorialized the witnesses' initial statements on or in the days following the day of the shooting. Notably, many of these witnesses testified in a manner that conflicted with their initial accounts of the shooting, and the changes in their stories were uniformly helpful to the Government's theory of the case. *Id*.

In support of this claim, Mr. Lawrence seeks the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI and the Fifth Third Bank (Exhibit 6):

3.      Any communications, documents, or information concerning any interviews conducted with Erica Arnold, Heather Clifton, Warren Cox, Brian Dickerson, Amanda Goodman, Angela Karst, Heather Kinney, Marian Large, Deborah Rader, and Andrea Ross, or any other witnesses inside or immediately outside the bank, regarding the shooting at Fifth Third Bank, including the dates and locations of those interviews. This request includes any interviews conducted by the Government, the FBI, the CDP or employees of Fifth Third Bank.

4.      Any communications, documents, or information concerning any statements made by Erica Arnold, Heather Clifton, Warren Cox, Brian Dickerson, Amanda Goodman, Angela Karst, Heather Kinney, Marian Large, Deborah Rader, and Andrea Ross, or any other witnesses inside or immediately outside the bank, about the shooting at Fifth Third

42

Bank. This request includes any statements these witnesses made to the Government, the FBI, the CDP or employees of Fifth Third Bank.

The discovery is requested to help establish that some or all of the eyewitnesses gave multiple statements regarding their account of the shooting between the time of the shooting and the time of the trial, and that some or all of the statements contained material exculpatory or impeachment information about the manner in which the shooting occurred and/or material inconsistencies that undermined the Government's account of the shooting or the witnesses' credibility. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence further alleged that the Government knew, or reasonably should have known, that Officer Hurst was not fatally shot while crouched behind the teller line, and more likely was shot while standing in the area of the hallway outside the teller line. Doc. No. 328 at 132-33. In support of this claim, Mr. Lawrence noted in his § 2255 Motion that sometime in the fall of 2005, the FBI's Investigative and Prosecutorial Graphics Unit ("IPGU") prepared an animated re-creation video of the shooting incident inside Fifth Third Bank, which the Government anticipated introducing into evidence at trial. *Id*. at 132. The video purports to show Mr. Lawrence's movement in the bank during the incident from his first-person perspective.[20] Notably, the video has Mr. Lawrence running east toward the teller line, peering over the teller counter, and then running south to the hallway where Officer Hurst's body was found before exiting the bank. The last part of the animation, however, is flatly contradicted by the surveillance footage taken inside the bank, which shows that Mr. Lawrence never ran to the

---

[20] A copy of the video file was attached as Exhibit 109 to the § 2255 Motion.

43

hallway before exiting the bank. The fact that the FBI video attempted to place Mr. Lawrence near that hallway raises the strong inference that the Government and/or FBI were in possession of information that, at the very least, suggested to them that Officer Hurst was shot while standing in the hallway rather than while crouched behind the teller counter. This is significant because if, in fact, Officer Hurst was fatally shot while standing in the hallway, then the surveillance footage conclusively establishes that the shot was fired from a distance. In other words, Mr. Lawrence did not shoot Officer Hurst execution style at point-blank range, but rather, as was alleged by the defense, the fatal shot was fired during a chaotic exchange of gunfire in a panicked attempt to flee the bank. These facts are critically relevant to establishing the statutory intent factors and "pecuniary gain" statutory aggravating factor found during the eligibility phase, and would additionally have sufficiently lessened Mr. Lawrence's moral culpability during the selection phase of the trial so as to result in a life sentence on Count 8. *Id*. at 112-24.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI, and the Fifth Third Bank (Exhibit 6):

5. Any communications, documents, or information concerning the events at the Fifth Third Bank at 6265 East Broad Street, Columbus, Ohio on January 6, 2005, reviewed by the FBI's Investigative and Prosecutorial Graphics Unit ("IPGU") and/or relied upon by the IPGU to produce its animated re-creation video.

6. Any communications, documents, or information about any meetings between members of the IPGU and the prosecution team, including the dates of those meetings and any documents memorializing the substance of those meetings.

7. Any communications, documents, or information concerning or referencing the possibility that Officer Hurst was fatally wounded somewhere other than behind the teller counter and/or that Officer Hurst was not fatally shot at point-blank range.

8.      Any communications, documents, or information concerning or referencing any expert opinions provided to the Government about the manner in which the shooting occurred, including but not limited to crime scene reconstruction analysis.

The requested discovery is sought to establish that the Government knew, or reasonably should have known, that Officer Hurst was not fatally shot at point-blank range while crouched behind the teller counter. The requested discovery may also establish that the Government knew, or reasonably should have known, that Officer Hurst was standing in the hallway outside the teller line when he was fatally shot. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

With respect to all of the allegations raised in this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI, and the Fifth Third Bank (Exhibit 6):

9.      A complete copy of the CDP's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

10.      A complete copy of the FBI's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

11.      A complete copy of Fifth Third Bank's case file concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

12.      Copies of any and all written, audio- or video-recorded statements (as well as transcriptions thereof) of witnesses (both testifying and non-testifying) concerning Officer's Hurst homicide and the related attempted robbery at Fifth Third Bank.

13.      Copies of all rough drafts of reports or rough notes made by the CDP or FBI pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

14.      Copies of any and all written, oral, video or electronic forensic reports, tests and/or data produced in connection with the investigation, arrest and prosecution of Mr.

Lawrence concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

15.     Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects prepared by any other federal, state, or local law enforcement agencies pertaining to the investigation, arrest and prosecution of Mr. Lawrence concerning Officer Hurst's homicide and the related attempted robbery at Fifth Third Bank.

These requests are sought to establish that the Government had physical, forensic, or testimonial evidence that constituted material exculpatory or impeachment information that it was under an obligation to disclose, but which it suppressed. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

> **D.     Trial Counsel Failed to Secure Reasonably Necessary Expert Assistance to Challenge Mr. Lawrence's Post-Arrest Statement. (§ 2255 Motion, Claim VIII)**

In Claim VIII, Mr. Lawrence has alleged that trial counsel were ineffective for failing to secure reasonably necessary expert assistance to challenge Mr. Lawrence's post-arrest statement admitting guilt for the charged offenses. Doc. No. 328 at 198-202. Trial counsel moved to suppress the statement on the ground that Mr. Lawrence, who was suffering from gunshot wounds sustained three days earlier, was in severe pain during the interrogation, and that the pain interfered with his ability to validly waive his right against self-incrimination and to give a voluntary statement. The court denied the suppression motion because trial counsel failed to proffer sufficient evidence that Mr. Lawrence asked for immediate medical attention during the interrogation; that Mr. Lawrence had indicated he was in such pain that it affected the voluntariness of his statement; or that the police prohibited him from receiving medical attention. Doc. No. 328 at 200-01. Mr. Lawrence alleged that such information was in fact available, and

46

that trial counsel's litigation of this issue at the suppression hearing was inadequate, and that but for trial counsel's deficiencies, there is a reasonable probability that Mr. Lawrence's post-arrest statement would have been suppressed.

Specifically, Mr. Lawrence alleged that, given trial counsel's strategy to suppress the statement based on Mr. Lawrence's medical condition at the time of the interrogation, it was objectively unreasonable for trial counsel to fail to consult with a medical doctor to fully understand the medical issues in play and determine which factors supported the argument to suppress the statement. If trial counsel had done so, they would have discovered that Mr. Lawrence suffered from a condition that substantially impaired his mental state and decision-making ability at the time of his interrogation, and that this change in his mental status would have been further compounded by the pain he was suffering from his physical injury. (Mr. Lawrence had lost part of a finger, had been shot through his shoulder, and also had a bullet lodged in his forearm.) Specifically, a medical doctor would have informed trial counsel that Mr. Lawrence had suffered since very early childhood from polycythemia vera ("PV"), a blood disease that results in the production of an abnormal increase of red blood cells, which can be detected by increased hematocrit levels in a blood panel.

In support of this claim, Mr. Lawrence proffered the declaration of Dr. Siddhartha Nadkarni, who reviewed the relevant hospital records after Mr. Lawrence was admitted to the hospital after his interrogation. Those records revealed that Mr. Lawrence's hematocrit levels had dropped precipitously, and that a person who suffered from PV:

> would have been markedly encephalopathic or "delirious." Although such symptoms may not have been obvious to a person not medically trained, such a large drop of hematocrit would result in symptoms such as hypotension and an acute change of mental status. A patient in such a condition would be far from his or her normal state of mind, very confused, and in no position to make complex

47

decisions. This change in mental status would be further compounded by pain
from physical injury.

Doc. No. 328 at 202.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an

Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum*

addressed to the CDP and FBI (Exhibit 7):

> 1.      Any communications, documents, or information regarding law enforcement
> officers' impressions of, or comments about, Mr. Lawrence's mental or physical health
> from the time of his arrest until he was admitted to Grant Hospital after his interrogation,
> including but not limited to informal notes, electronic communications, other
> correspondence, memoranda, records, and audio- or video recordings.
>
> 2.      Any communications, documents, or information between law enforcement
> and/or the Government with Grant Hospital staff regarding Mr. Lawrence's mental or
> physical health at the time of his admission.
>
> 3.      Any communications, documents, or information between Mr. Lawrence and law
> enforcement officers regarding requests for medical assistance or treatment, and/or
> statements by Mr. Lawrence regarding his mental or physical health, from the time of his
> arrest until he was admitted to Grant Hospital after his interrogation.

This discovery is requested to obtain information regarding symptoms that Mr. Lawrence

exhibited that would support the allegations asserted in Claim VIII. As he noted in his § 2255

motion: (1) contrary to the district court's fact-finding at the suppression hearing, Mr. Lawrence

had, in fact, requested medical attention during the interrogation, and this request was captured

on the videotape of the interrogation; (2) several law enforcement witnesses at the suppression

hearing, including the arresting officers, testified that they observed Mr. Lawrence in pain on the

day of his arrest and subsequent interrogation; (3) the CDP detective who interrogated Mr.

Lawrence testified that Mr. Lawrence told him he needed to get to a hospital; and (4) the nurse

who treated Mr. Lawrence at the hospital after his interrogation testified that Mr. Lawrence had

reported that his pain level was a nine out of ten, that the pain was constant and burning, and that he appeared to have problems with cognition/perception. Doc. No. 328 at 199-200.

There is reason to believe that, if these facts are developed, Mr. Lawrence will be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

49

50





███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

**G.** **Trial Counsel was Ineffective for Failing to Object to Junk Science that the Shell Casings from Two Different Crimes Scenes "Matched." (§ 2255 Motion, Claim XI)**

In Claim XI, Mr. Lawrence alleged that trial counsel unreasonably failed to object to the Government's evidence that the gun used in the Sky Bank Robbery and the Fifth Third Bank homicide were one and the same.

Mr. Lawrence was charged with the 2004 robbery of Sky Bank in counts 5 and 6 of the Indictment. None of the eyewitnesses in that incident identified Mr. Lawrence as the perpetrator, so the Government relied on the expert testimony of Mr. Hardy to establish Mr. Lawrence's guilt. Mr. Hardy testified that he examined a spent .40 caliber shell casing that was accidentally discharged during that robbery and compared it with the spent .40 caliber shell casings that were recovered from Fifth Third Bank, and that in his expert opinion, the Sky Bank casing "was fired by the same weapon that fired the previously discharged .40 caliber casings" found at the Fifth Third Bank crime scene. Doc. No. 328 at 207. He further testified that his opinion was "within a reasonable degree of scientific certainty." *Id*.

Mr. Lawrence alleged in Claim XI of his § 2255 Motion that trial counsel should have filed a pretrial motion to exclude such evidence because even at the time of Mr. Lawrence's trial, the premise underlying Mr. Hardy's testimony – that firearms leave unique marks on ammunition components such as shell casings that allow for matches – had never been proven; the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under Rule 702 of the Federal Rules of

54

Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Indeed, use of such evidence was being successfully challenged in this manner around the country at the time of Mr. Lawrence's trial. *Id.* at 208. But for trial counsel's failure to object on these grounds, Mr. Hardy's testimony about the match between shell casings would have been precluded.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 10):

> 1. Any communications, documents, studies, or information at the time of Mr. Lawrence's trial or sentencing establishing a statistical empirical foundation, or the lack thereof, for the claim that firearms leave unique toolmarks on ammunition components such that a positive "match" can be made based on such toolmarks.
>
> 2. Any communications, documents, studies or information regarding objective national standards, or the lack thereof, governing the subjective determination of firearms and toolmarks examiners.

This discovery request is reasonably likely to yield information supporting Mr. Lawrence's claims. As explained in the § 2255 Motion, there is a good faith basis for this belief given a 2009 National Academy of Sciences Report that recognized that the field of firearms and toolmarks examination historically suffers from: (1) the fact that the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has never been fully demonstrated, and (2) a lack of a precisely defined process or protocol concerning the specific features to be examined and compared between toolmarks, and concerning the level of agreement that must exist in the pattern of two sets of marks before an examiner can determine with a degree of confidence that there is a correlation between the items being examined. Doc. No. 328 at 209 n.99. These deficiencies in the field of firearms and toolmarks examination existed at the time of Mr. Lawrence's trial. Thus, there is reason to believe that, if these facts are

55

developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Moreover, Mr. Lawrence alleged that trial counsel unreasonably failed to object to Mr. Hardy's qualifications as an expert. Doc. No. 328 at 209. At trial, Mr. Hardy testified that his qualifications as a firearms examiner were based on his years spent working under the direction of Richard Fisher, who was the prior firearms examiner for the CDP. *Id*. However, Mr. Fisher's qualifications were never described. Nor was any other foundation for Mr. Hardy's alleged expertise established, including whether he had any other specific training in firearms examination; whether his training was consistent with any national standards or practices of certifying organizations, such as the Association of Firearm and Toolmark Examiners (AFTE); whether he had ever attempted certification by the AFTE; the accuracy rate of his prior examinations; whether his laboratory was certified by any organization; or any other indicia of expertise. *Id*. Had trial counsel objected on these grounds, there is a reasonably probability that Mr. Hardy would not have been found qualified to offer an opinion about the purported match in shell casings. *Id*.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 10):

> 3. Any communications, documents, or information regarding Mark J. Hardy's training in firearms and toolmarks examination at the time of Mr. Lawrence's trial or sentencing.
>
> 4. Any communications, documents, or information establishing that Mark J. Hardy's training in firearms and toolmarks examination at the time of Mr. Lawrence's trial or sentencing was consistent with any national standards or practices of certifying organizations, such as the AFTE.

5. Any communications, documents, or information regarding whether Mark J. Hardy had ever attempted certification by the AFTE prior to the time of Mr. Lawrence's trial or sentencing, and the results of any such attempts at certification.

6. Any communications, documents, or information regarding Mark J. Hardy's accuracy rate in conducting firearms and toolmarks examination at the time of Mr. Lawrence's trial or sentencing, including but not limited to any communications, documents, or information about specific cases in which Mr. Hardy's examination had been found to be inaccurate and/or unreliable.

7. Any communications, documents, or information about whether the CDP crime lab in which Mark J. Hardy worked was certified by any organization at the time of Mr. Lawrence's trial or sentencing.

8. Any communications, documents, or information Standard Operating Procedures (SOPs) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices.

9. Any communications, documents, or information concerning laboratory quality manuals (however named) in effect at the time Mark J. Hardy's work in this case was performed or when he testified.

10. Any communications, documents, or information concerning laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time Mark J. Hardy's work related to Mr. Lawrence's case was performed or when he testified.

11. Any communications, documents, or information concerning internal and external audit reports generated or received by the CDP crime lab.

12. Any communications, documents or information concerning Mark J. Hardy's personnel file and all internal and external proficiency testing results for toolmark identification (including sponsoring agency, date(s) performed, responsible analysts, true values, reported results, raw data, scores, related correspondence, and corrective action records).

The requested discovery may establish that Mr. Hardy was unqualified or subject to impeachment as an expert in the field of firearms and toolmarks examination. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Additionally, Mr. Lawrence alleged trial counsel unreasonably failed to cross-examine Mr. Hardy about the basis for his expert opinion. His testimony omitted such crucial information as: (1) which toolmarks he observed on the .40 caliber casings that he considered to be unique characteristics; (2) how many points of agreement he found between the shell casings in concluding that they matched; and (3) whether the type of firearm in question leaves unique markings on ammunition. Given the significant gaps in Mr. Hardy's testimony, there is a reasonable probability that if trial counsel had subjected his opinion to such scrutiny, the jury would have rejected his expert conclusion. Doc. No. 328 at 210.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP and the FBI (Exhibit 10):

13.  Any communications, documents, or information concerning the examination of the shell casings collected from the September 8, 2004 Sky Bank crime scene and the January 6, 2005 Fifth Third Bank crime scene for the robberies of those banks for which Mr. Lawrence was prosecuted.

14.  Any communications, documents, or information relating to the manufacturer and model of the microscopes used for comparison purposes of the relevant shell casings, and any manuals describing proper uses and maintenance of the instrument.

15.  Any communications, documents, or information containing the CDP's internal written policies and standards for toolmark comparisons and guidelines for rendering an opinion.

16.  Any photomicrographs of the comparison shell casings related to Mr. Lawrence's case.

17.  Any diagrams or photographs of the relevant shell casings related to Mr. Lawrence's case, at all stages of collection and testing.

18.  Any communications, documents, or information establishing that the firearm used by Mr. Lawrence during the 2005 Fifth Third Bank shooting leaves, or fails to leave, unique markings on ammunition.

The requested discovery may establish that Mr. Hardy's expert conclusion lacked sufficient basis or indicia or reliability to conclude that the shell casings from the Sky Bank robbery matched the shell casings recovered from the Fifth Third Bank crime scene. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

Mr. Lawrence also alleged in his § 2255 Motion that trial counsel unreasonably failed to present expert evidence of their own to rebut Mr. Hardy's testimony. In support of that claim, Mr. Lawrence proffered the declaration of John Nixon, a trained firearms expert who had been retained by trial counsel, but not called as a witness at Mr. Lawrence's trial. Mr. Nixon could have provided testimony both at a *Daubert* hearing and, if necessary, at trial that there was no scientific basis for Mr. Hardy's conclusion that the relevant shell casings were "fired by the same weapon" or that such a conclusion could be rendered "within a reasonable degree of scientific certainty." Doc. No. 328 at 210. All the previously requested discovery in this section is requested with respect to this claim. There is good cause for this request because the aforementioned discovery may establish that Mr. Hardy's expert opinion may not have survived a *Daubert* challenge; that Mr. Hardy may not have been qualified to testify about firearms and toolmarks examinations; and that the results of Mr. Hardy's examination lack sufficient basis to conclude that the relevant shell casings matched and were therefore fired by the same weapon. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**H.     Trial Counsel Failed to Challenge the Underrepresentation of African Americans, Hispanics, and Women in the Grand and Petit Jury Venires. (§ 2255 Motion, Claim XII)**

In Claim XII, Mr. Lawrence alleged that trial counsel unreasonably failed to challenge the composition and selection of the grand and petit jury venires. Doc. No. 328 at 212-18. Mr. Lawrence further alleged that African Americans, Hispanics and women were underrepresented in the grand and petite jury venires presiding over Mr. Lawrence's case, and that this underrepresentation was due to a systemic exclusion of these groups in the jury selection process utilized. *Id*.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and of the Clerk's Office for the Eastern Division of the Southern District of Ohio (Exhibit 2):

1.      All JS-12 and/or AO-12 forms for the Eastern Division of the Southern District of Ohio for a period dating from 1995 to 2006.

2.      All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO12s/JS12s requested in item 1.

3.      Any communications, documents, or information explaining the process by which grand and petit juries were selected in the Eastern Division of the Southern District of Ohio at the time of Mr. Lawrence's trial.

4.      Any communications, documents, or information explaining any changes in the process by which grand and petit juries were selected in the Eastern Division of the Southern District of Ohio since the time of Mr. Lawrence's trial.

5.      Any communications, documents, or information concerning statistical information on the make-up of the grand and petit jury venires, according to race, ethnicity, and gender for a period dating from 1995 to 2006 for the Eastern Division of the Southern District of Ohio, and/or the actual numbers of African Americans, Hispanics, and women in those venires.

The discovery is requested in order to establish that African Americans, Hispanics, and women were underrepresented in the venire from which the grand and petit jurors in Mr.

60

Lawrence's case were selected. The requested discovery may also establish that this underrepresentation was due to a systemic exclusion of these groups in the jury selection process utilized. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**I.      Trial Counsel was Ineffective for Failing to Investigate and Challenge Aggravating Evidence Introduced Against Mr. Lawrence. (§2255 Motion, Claim XVI)**

In Claim XVI, Mr. Lawrence alleged that trial counsel failed to investigate and properly challenge aggravating evidence introduced at his trial, including evidence relating to Mr. Lawrence's prior bank robberies; an unadjudicated robbery of the Kentucky Check Cashing establishment; and allegations made by a former girlfriend, Renee Anderson, including that Mr. Lawrence had allegedly threatened her with a gun. Doc. No. 328 at 223-224.

In support of these claims, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the CDP, FBI, the Sky Bank, the Key Bank, and the Fifth Third Bank (Exhibit 11):

1.      Any communications, documents, or information concerning the Sky Bank robbery on September 8, 2004.

2.      Any communications, documents, or information concerning the Key Bank robbery on August 12, 2004.

3.      Any communications, documents, or information concerning the Fifth Third Bank robbery on January 21, 2004.

4.      Any communications, documents, or information concerning the Kentucky Check Exchange robbery on August 17, 2002.

5.      Any communications, documents, or information regarding the allegations made that Mr. Lawrence committed crimes against Renee Anderson, including but not limited to threatening her with a gun.

These discovery requests are intended to establish that these records contained exculpatory or impeachment information that trial counsel could have utilized to challenge the aggravating evidence at trial, such as witness statements or other evidence that undermined or was otherwise inconsistent with the Government's portrayal of each of these incidents at Mr. Lawrence's trial. Alternately, these records may establish that there were "red flags" regarding investigative leads that may have led trial counsel to uncover evidence that rebutted the Government's account of these other incidents at trial. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.







**K. The Government's Decision to Charge and Seek the Death Penalty was Impermissibly Based on the Laxity of Federal Law Concerning "Victim Impact" Evidence. (§ 2255 Motion, Claim XXVI)**

In Claim XXVI, Mr. Lawrence alleged that the Government's decision to charge and seek the death penalty against Mr. Lawrence was fundamentally arbitrary and was driven by a local rather than a federal interest. Doc. No. 328 at 258-65. Mr. Lawrence alleged that the primary reason the prosecution pursued Mr. Lawrence's capital case in federal court was to take advantage of federal law concerning victim impact evidence that would allow the prosecution to present the jury with substantially more such aggravating evidence than would be admissible under state law if the case had been prosecuted in state court. *Id*. at 261-63. Mr. Lawrence has a good faith basis for asserting this claim based on statements made by Ron O'Brien, a Franklin County Prosecutor who was given special authority to appear as counsel in federal court and co-tried the federal case alongside the U.S Attorney's Office. In remarks made to the press after Mr. Lawrence's trial, Mr. O'Brien explained his rationale for supporting federal jurisdiction in this case:

> O'Brien opted to allow the federal government to charge Lawrence because of a difference in how the second phase of a death penalty case is handled by the federal courts. There, in contrast to Ohio law, jurors are allowed to hear victim impact statements from relatives of a slain individual as they weigh their decision. Such testimony is prohibited in state courts for fear it will unnecessarily inflame juror's emotions. O'Brien's gamble worked: Lawrence was sentenced to death.

*Id*. at 263-64.

Mr. Lawrence further alleged that the decision to prosecute the case federally in order to take advantage of the laxity of evidentiary rules did not further a federal interest, but rather

65

injected an inappropriate arbitrariness into the process that violated the Fifth and Eighth Amendments. *Id*. at 264.

In support of this claim, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and a subpoena *duces tecum* addressed to the Franklin County Prosecutor's Office (Exhibit 13):

> 1.      Any communications, documents, or information concerning or regarding the decision to prosecute Mr. Lawrence in federal court rather than in state court.

The requested discovery may establish that the federal interest in prosecuting Mr. Lawrence was weak, and that the decision to proceed in federal court rather than state court was based all or in part on the difference between state and federal law concerning the admissibility of victim impact evidence in capital sentencing proceedings or another improper federal v. state basis. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**L.      Mr. Lawrence's Death Sentence was Impermissibly Based on his Race. (§ 2255 Motion, Claims XXVII)**

In Claim XXVII, Mr. Lawrence alleged that Mr. Lawrence's death sentence was impermissibly sought and obtained based on his race. Doc. No. 328 at 265-67. Mr. Lawrence alleged he was prosecuted pursuant to a pattern of seeking the death penalty where the defendant is a person of color, particularly African American, and the victim white.  He alleged that the decision to prosecute him in federal court rather than in state court had further racial implications because Franklin County juries are more racially diverse than the federal jury pool. That is, prosecuting the case in federal court with a venire drawn from the entire Eastern Division of the Southern District of Ohio, rather than from only Franklin County, would result in drastically

66

reducing the proportion of African-Americans in the jury pool.[22] Indeed, Mr. Lawrence was tried by an all-white jury. Moreover the Government's heavy focus on the non-statutory aggravating factor concerning victim impact evidence, as well as its arguments drawing direct comparisons between the worth of the lives of Officer Hurst and Mr. Lawrence, had racial implications. . *Id.* at 266-67.

In order to determine whether or not racial bias impermissibly affected the charging decisions, Mr. Lawrence requires access to the relevant information before the U.S. Attorney and the Attorney General at the time those decisions were made. It is Mr. Lawrence's understanding that decisions to seek the federal death penalty are meant to be based on factors such as whether the crime was aggravated in nature, the strength of the evidence, the background and criminal history of the defendant, and other such circumstances.[23] Those who commit capitally-eligible homicides therefore should be treated similarly where such factors are similarly present, regardless of the race of the accused or the victim. To determine if race played a role, one must first assess whether or not similarly situated individuals were treated similarly and, if not, examine what factors might explain the difference.

---

[22] Mr. Lawrence previously provided census data demonstrating that by bringing the charges federally, the Government effectively reduced the number of African-Americans in the jury pool by roughly 50%. *See* Appellant's Brief (*USA v. Daryl Lawrence*), No. 06-4105, Doc. No. 006110535420 (filed April 27, 2010) at 203 (noting that African-Americans constituted 17.6% of Franklin County's population, as compared to 9.0% of the population of the thirty counties that make up the Eastern Division of the Southern District of Ohio). Mr. Lawrence also cited additional evidence that federal capital charging decisions appeared often to have been motivated by race, including a study released by the Department of Justice in 2000 that presented data strongly suggesting that the federal death penalty had been disproportionately sought against minority-group defendants, *id.* at 199-200, and that all six capital cases involving bank robberies, prosecuted by the federal government at the time of Mr. Lawrence's trial, that resulted in death sentences, involved African-American defendants and white victims. *Id.* at 202 n.26.

[23] The Department of Justice's U.S. Attorneys Manual is one source for determining when a death sentence should be sought. *See*, *e.g.*, Title 9-10.140 ("Standards of Determination").

Therefore, in support of this claim, Mr. Lawrence requests the following discovery,[24] in the form of an Order from the Court for requests of the Government (Exhibit 1) and a subpoena *duces tecum* addressed to the Franklin County Prosecutor's Office (Exhibit 14):

1.  Information as to all capitally eligible homicides in the Southern District of Ohio for the 15 years preceding and including March 2005, including but not limited to:
    a.  Number, race and gender of victims, including surviving victims
    b.  Attendant felonies (e.g., kidnapping, robbery, sexual assault)
    c.  Other aggravating factors.

2.  Information about the individuals accused in those homicides, including but not limited to:
    a.  Prior convictions of the accused, whether or not charged with a capital or federal offense.
    b.  Other unlawful or violent conduct of the accused, adjudicated or unadjudicated.

3.  Regarding the same individuals, any other information claimed to be relevant by federal prosecutors to the decision to seek death or try the case federally (e.g., victim's family wishes).

4.  Any communications, documents, or information concerning or regarding the decision to prosecute Mr. Lawrence in federal court rather than in state court, to proceed with a capitally eligible offense rather than other crime, and to seek the death penalty.

5.  The same information listed under items 1, 2 and 3 for all such cases in any federal jurisdiction.

6.  Any communications, documents, or information relating to the United States Attorneys' and Attorney General's consideration over whether to resolve Mr. Lawrence's case with a plea to a sentence of life without possibility of release, or any lesser sentence, and the criteria used to make that determination.

7.  Any communications, documents, or information concerning or regarding jury selection related to the race of prospective jurors.

8.  Any communications, documents, or information concerning or regarding trial or sentencing theories of the case related to race.

---

[24] The information requested here will also be relevant to establishing the facts of Claim XXVI and Claim XXVIII.

68

The requested discovery may establish that impermissible factors related to the race of the defendant, the victim, the witnesses or the jurors influenced the decision to seek the death penalty against Mr. Lawrence or to prosecute him federally for the killing of a state law enforcement officer, and or not to plead the case to a lesser sentence.  . There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**M.      The Decision to Seek and Charge the Death Penalty Against Mr. Lawrence was Impermissibly Based on Race and Geography. (§ 2255 Motion, Claim XXVIII)**

Mr. Lawrence has alleged that the Government's decision to seek the death penalty against him was impermissibly based on race. Doc. No. 328 at 268-69. In Claim XXVIII, Mr. Lawrence further alleged that the Government's decision to seek the death penalty against him was impermissibly based on a consideration of geography. *Id.* at 269-70. Had certain basic demographic facts been different in Mr. Lawrence's case – were Mr. Lawrence not a black defendant in the state of Ohio, charged in the death of a white man – he may not have received a sentence of death. In support of this claim, Mr. Lawrence cited a 2000 DOJ study that documented evidence of both racial bias and lack of geographical uniformity in the application of the federal death penalty. *Id.* at 268-69. For example, the DOJ found that: (1) U.S. Attorneys were more than twice as likely to seek death against a black defendant than they were for a white defendant; (2) white defendants were almost twice as likely as non-white defendants to receive plea agreements that removed the death penalty from consideration; (3) the death penalty was sought in a disproportionately larger proportion of cases in which the victim was white, and disproportionately smaller proportion of cases in which the victim was black; and, significantly,

69

(4) there was a significant lack of geographical uniformity in the imposition of the death penalty.

*Id.*

In support of these claims, Mr. Lawrence requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1):

1.      Any communications, documents, or information relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of which defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case.

2.      Any communications, documents, or information relating to the United States Attorneys' and Attorney General's decision to prosecute Mr. Lawrence capitally and the criteria used to make that determination.

The requested discovery may establish that the pattern of racial and geographic disparities in the application of the federal death penalty identified in 2000 by DOJ persisted at the time of Mr. Lawrence's trial. There is reason to believe that, if these facts are developed, Mr. Lawrence may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.[25]

**CONCLUSION**

WHEREFORE, Daryl Lawrence respectfully requests that this Honorable Court grant the foregoing Motion, permit Mr. Lawrence to conduct discovery of the materials requested herein pursuant to Habeas Rule 6, order the Government to provide the discovery delineated herein and

---

[25] *See also McCleskey v. Kemp*, 481 U.S. 279 (1987) (rejecting claim based on state-wide statistics but allowing defendants to seek relief if they can show racial bias may have influenced their own cases.

70

identified on the attached Proposed Order (Exhibit 1), and grant Mr. Lawrence authorization to issue the subpoenas *duces tecum* identified herein and attached hereto.

Mr. Lawrence also respectfully requests oral argument on this motion after the Government has submitted its Response and Mr. Lawrence has submitted his Reply. Mr. Lawrence submits that oral argument is necessary because of the complexity of the factual and legal issues presented in his motion.

Respectfully submitted,

/s/ Miriam Gohara_____
Miriam Gohara (NY2903243)
Federal Capital Habeas Project
Federal Public Defender,
District of Maryland
265 Church St., Suite 702
New Haven, CT 06510
(301) 344-2337 (phone)
(301) 344-0019 (fax)
E-mail:  Miriam_Gohara@fd.org

/s/Amy Gershenfeld Donnella
Amy Gershenfeld Donnella (PA85194)
Federal Capital Habeas Project
Federal Public Defender, District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103 (phone)
(301) 344-0019 (fax)
E-mail:  Amy_Donnella@fd.org

71

**CERTIFICATE OF SERVICE**

I hereby certify that an exact copy of the foregoing was sent on October 6, 2016 through the Court's ECF system to:

Mary Beth Young, Esq.
United States Attorney's Office
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
Email: mary.beth.young@usdoj.gov

/s/Amy Gershenfeld Donnella
Amy Gershenfeld Donnella (PA85194)
Federal Capital Habeas Project
Federal Public Defender, District of Maryland
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103 (phone)
(301) 344-0019 (fax)
E-mail:  Amy_Donnella@fd.org

72