## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Daryl Lawrence, | : | Criminal No. 2:05-cr-011 |
| *Petitioner*, | : | Civil No. 2:15-cv-3060 |
| | : | |
| v. | : | |
| | : | Judge Watson |
| | : | Magistrate Judge Kemp |
| United States of America, | : | |
| *Respondent.* | : | |

---

### United States' Response to Movant Daryl Lawrence's
### Initial Motion to Conduct Discovery

---

Petitioner's Initial Motion for Discovery (Doc. 354) requests leave to conduct discovery

pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States

District Courts.  The United States opposes the requested discovery.  The grounds for the United

States' opposition are set forth in the attached memorandum.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/Mary Beth Young
MARY BETH YOUNG (0073451)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
Mary.Beth.Young@usdoj.gov

1

## Table of Contents

I.     Introduction and Summary Pursuant to Local Rule 7.2(a)(3)..................................................4

II.    The Good Cause Standard for Discovery ...............................................................................5

III.   Summary of Informal Post-Conviction Discovery Provided and Objections
to Lawrence's Request for a Court Order for Production of Documents from
the United States ....................................................................................................................7

IV.   Responses to Lawrence's Specific Discovery Requests .......................................................12

     A.    Discovery identified as relevant to § 2255 Motion, Claims I and VI. .........................12

     B.    Discovery identified as relevant to § 2255 Motion, Claims II and V .........................22

           1.   Discovery regarding Officer Hurst's injury.............................................................25

           2.   Discovery regarding forensic analysis of Officer Hurst's shirt .............................27

           3.   Discovery regarding ballistics evidence of spent shell casings .............................32

           4.   Discovery regarding crime reconstruction evidence.............................................. 35

           5.   Discovery regarding surveillance footage ............................................................36

           6.   Discovery regarding eyewitness testimony ...........................................................37

           7.   Lawrence's catchall discovery requests.................................................................41

     C.    Discovery identified as relevant to § 2255 Motion, Claim IV....................................42

     D.    Discovery identified as relevant to § 2255 Motion, Claim VII ..................................47

     E.    Discovery identified as relevant to § 2255 Motion, Claims IX, XX, and XXII ..........52

     F.    Discovery identified as relevant to § 2255 Motion, Claims X, XXI and XXII ...........55

     G.    Discovery identified as relevant to § 2255 Motion, Claim XI....................................57

     H.    Discovery identified as relevant to § 2255 Motion, Claim XII ..................................63

     I.     Discovery identified as relevant to § 2255 Motion, Claim XVI.................................68

     J.     Discovery identified as relevant to § 2255 Motion, Claim XXII ...............................69

1. ██████████████████████████████████ .............69

2. ██████████████████████████████████ ...............72

    K.     Discovery identified as relevant to § 2255 Motion, Claim XXVI ...............................73

    L.     Discovery identified as relevant to § 2255 Motion, Claim XXVII
      and Claim XXVIII ...................................................................................................75

Conclusion ................................................................................................................79

Certificate of Service ................................................................................................79

**Memorandum**

I.      **Introduction and Summary Pursuant to Local Rule 7.2(a)(3)**

Daryl Lawrence was sentenced to death in 2006 for an attempted bank robbery during which he shot and killed Columbus police officer Brian Hurst.  (Doc. 235; Doc. 9.)  Officer Hurst had returned fire during the attempted robbery, and Lawrence was injured.  (*See* Doc. 296 at 4.)  He aborted the robbery and fled. (*Id.*) He was arrested days later, at which time he confessed to having committed the attempted robbery, as well as three other bank robberies in central Ohio. (*Id.*)  Lawrence was indicted on three counts of armed bank robbery (Counts 1, 3, and 5), one count of attempted bank robbery resulting in the killing of Officer Hurst (Count 7), two counts of brandishing a firearm during a crime of violence (Counts 2 and 4), one count of brandishing and discharging a firearm during a crime of violence (Count 6), and one count of using a firearm during and in relation to a crime of violence to commit murder (Count 8).  (Doc. 9.) He was convicted of all counts and sentenced to death on Count 8.  (Doc. 235.)  His conviction and sentence became final following direct appeal when his petition for certiorari was denied on December 8, 2014.  (Doc. 299.)

Pursuant to 28 U.S.C. § 2255, Lawrence has filed a Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial.  (Doc. 328.) This Court established a preliminary discovery schedule indicating that "the parties shall make a good faith effort to reach any informal agreement(s) they can concerning . . . the conduct of discovery."  (Doc. 341.) Consistent with that, the parties engaged in informal discovery efforts resulting in the United States' sharing a significant amount of information with Lawrence, as he acknowledges. (*See* Doc. 354 at 10-14.)

After informal discovery was completed, Lawrence's Initial Motion for Discovery was filed on October 7, 2016. (Doc. 354.)  The Motion requests discovery pertaining to 17 of the 30

claims raised in Lawrence's § 2255 motion. The requested discovery includes materials from the United States Attorney's Office in 88 categories (Doc. 356 (Exh. 1)); materials from the Clerk's Office of this Court in 5 categories (Doc. 356 (Exh. 2)); materials from court personnel in 6 categories (Doc. 356 (Exh. 3)); and a total of 36 subpoenas to 19 other entities requesting materials in 253 categories (Doc. 356 (Exhs. 4–15)).

The United States opposes the requested discovery as failing to satisfy the "good cause" standard applicable to discovery in § 2255 actions. *See* Rule 6 of the Rules Governing Section 2255 Proceedings; *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997).

Section II, which follows this introduction, discusses the requirements of the good cause standard. Section III summarizes the informal discovery already provided by the United States and addresses overarching objections to Lawrence's request for a court order for production of documents from the United States in light of informal discovery already provided. The section proposes an alternate procedure for any additional discovery from the Government this Court should conclude is warranted. Section IV responds to Lawrence's specific requests for discovery, following the organization of Lawrence's motion.

## II.     The Good Cause Standard for Discovery

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy,* 520 U.S. at 904; *see also Harris v. Nelson*, 394 U.S. 286, 298–300 (1969). Instead, leave of court is required. Rule 6 of the Rules Governing Section 2255 Proceedings states that "[a] judge may, for good cause, authorize a party to conduct discovery." Under this "good cause" standard, courts grant leave to conduct discovery "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Bracy*, 520 U.S. at

5

908–909. Generalized statements regarding the possible existence of discoverable material fail to meet the good cause standard. *Pizzuti v. United States*, 809 F. Supp. 2d 164, 175 (S.D.N.Y. 2011). Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations"; rather, "the petitioner must set forth specific allegations of fact" in order to justify a grant of discovery. *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004); *see also, e.g., Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994). "Even in a death penalty case, bald assertions and conclusory allegations" do not provide sufficient ground to warrant discovery. *Bowling v. Parker,* 344 F.3d 487, 512 (6th Cir. 2003) (internal quotation marks omitted).

A party requesting particular discovery must "provide reasons for the request." Rule 6(b) of the Rules Governing Section 2255 Proceedings. "A court may deny a petitioner's request for discovery 'where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition.'" *Ruine v. Walsh*, No. 00 Civ. 3798(RWS), 2005 WL 1668855, at *6 (S.D.N.Y. July 14, 2005) (quoting *Hirschfeld v. Comm'r of the Div. of Parole*, 215 F.R.D. 464, 465 (S.D.N.Y. 2003)). It is petitioner's burden to demonstrate the materiality of the information requested. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). The requested discovery must be essential to an adequate factual development of the record. *See Williams,* 380 F.3d at 975 (denying discovery which petitioner had not demonstrated would "resolve any factual disputes that could entitle him to relief") (quoting *Stanford*, 266 F.3d at 460); *see also, e.g., United States v. Thompson*, No. 09C 7685, 2010 WL 1976880, at *3 (N.D. Ill. May 13, 2010).

Even where some discovery is warranted, the "scope and extent of such discovery is a matter confided to the discretion of the District Court." *Bracy*, 520 U.S. at 909. As in other proceedings, courts maintain the discretion to limit discovery where the evidence sought is

6

unreasonably cumulative or unduly burdensome. *United States v. Johnson*, No. 02 C 6998, 2009 WL 1405856, at *3 (N.D. Ill. May 15, 2009); *Dickerson v. Johnson*, No. 3:14-cv-1717, 2016 WL 1028117, *3 (M.D. Tenn. March 15, 2016); *see* Fed. R. Civ. Proc. 26(b)(2).

**III.** **Summary of Informal Post-Conviction Discovery Provided and Objections to Lawrence's Request for a Court Order for Production of Documents from the United States**

Consistent with this Court's order that "the parties shall make a good faith effort to reach any informal agreement(s) they can concerning . . . the conduct of discovery" (Doc. 341), Lawrence requested informal discovery from the United States in several categories:

1. A complete set of all reports, records, files, witness statements, documents and tangible objects that were produced by the Government to trial counsel in connection with the proceedings in *United States v. Daryl Lawrence*, No. CR-2-05-11 (S. D. Ohio).

2. Copies of any and all written, audio- or video-recorded statements (as well as transcriptions thereof) of witnesses (both testifying and non-testifying) to:
   a. The Sky Bank robbery on September 8, 2004.
   b. The Key Bank robbery on August 12, 2004.
   c. The Fifth Third Bank robbery on January 21, 2004.
   d. The Fifth Third Bank robbery on January 6, 2005.

3. Copies of any and all FBI-302 reports pertaining to:
   a. The Sky Bank robbery on September 8, 2004.
   b. The Key Bank robbery on August 12, 2004.
   c. The Fifth Third Bank robbery on January 21, 2004.
   d. The Fifth Third Bank robbery on January 6, 2005.

4. Copies of all rough drafts of reports or rough notes made by FBI agents pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:
   a. The Sky Bank robbery on September 8, 2004.
   b. The Key Bank robbery on August 12, 2004.
   c. The Fifth Third Bank robbery on January 21, 2004.
   d. The Fifth Third Bank robbery on January 6, 2005.

5. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession prepared by other federal, state, or local law enforcement agencies (e.g., Columbus Police Department, F.D.I.C.) pertaining to the investigation, arrest and prosecution of Mr. Lawrence in connection with:

7

       a. The Sky Bank robbery on September 8, 2004.
       b. The Key Bank robbery on August 12, 2004.
       c. The Fifth Third Bank robbery on January 21, 2004.
       d. The Fifth Third Bank robbery on January 6, 2005.

6. Copies of any and all written, oral, video or electronic reports, records, files, witness statements, documents and tangible objects in the Government's possession that the banks prepared during internal investigations pertaining to:
       a. The Sky Bank robbery on September 8, 2004.
       b. The Key Bank robbery on August 12, 2004.
       c. The Fifth Third Bank robbery on January 21, 2004.
       d. The Fifth Third Bank robbery on January 6, 2005.

7. Copies of any and all written, oral, video or electronic forensic reports, tests and/or data in the Government's possession produced in connection with the investigation, arrest and prosecution of Mr. Lawrence pertaining to:
       a. The Sky Bank robbery on September 8, 2004.
       b. The Key Bank robbery on August 12, 2004.
       c. The Fifth Third Bank robbery on January 21, 2004.
       d. The Fifth Third Bank robbery on January 6, 2005.



10. Color copies of any and all photographs and/or video-recordings of the crime scenes pertaining to:
       a. The Sky Bank robbery on September 8, 2004.
       b. The Key Bank robbery on August 12, 2004.
       c. The Fifth Third Bank robbery on January 21, 2004.
       d. The Fifth Third Bank robbery on January 6, 2005.

11. Color copies of any and all photographs generated in connection with the autopsy and medical examination of Officer Bryan Hurst.

12.     To the extent that the Government is in possession of trial exhibits or other physical evidence not maintained by the Clerk's Office, undersigned counsel requested access to inspect those items.

13.     Materials concerning jury selection and

14.     Materials concerning the Government's decision to prosecute Mr. Lawrence federally.

(*Accord* Doc. 354 at 10–12.)

Without conceding that there was good cause for any such discovery, the United States agreed to voluntarily review the files and materials in the possession of the United States Attorney's Office for the Southern District of Ohio and to provide materials determined to be responsive to categories 1, 2, 3, 5, 6, 7, 10, 11, and 12.  Although the United States initially did not commit to provide materials in categories 4, 8, 9, after the review of its files were complete, the undersigned informed Lawrence's counsel by email of September 29, 2016 that "the U.S. Attorney's Office has no drafts or notes not previously provided that would be responsive to item number 4; and ████████████████████████████████████████

████████████████████████████████████████████████

During informal discovery in connection with the § 2255 motion, the United States provided opportunity for Lawrence's postconviction counsel to review at the U.S. Attorney's Office all materials previously produced by the Government to Lawrence's trial counsel.  The Government also reviewed all other files related to this case in the U.S. Attorney's Office's possession for documents responsive to Lawrence's informal discovery requests, resulting in producing to Lawrence 500 additional pages of paper files; five VHS tapes; nine CDs of audio and video files (including numerous audio witness interview files copied by the U.S. Attorney's Office from original individual microcassettes); and 387 color photographs.  The United States

enlisted the technical assistance of its own IT staff and an FBI Special Agent to provide technical advice to Lawrence's counsel regarding accessing certain provided audio and video files.

Lawrence now further requests a Court Order for any communications, documents, or information in the Government's possession in 88 specified categories.  (*See* Doc. 356, Exh. 1 (Proposed Order regarding production of documents by the United States).)   As is illustrated by a comparison of the proposed order (Doc. 356, Exh. 1) with the categories Lawrence requested from the United States during informal discovery (*see supra* at 6–8*; accord* Doc. 354 at 10–12 (describing informal discovery requests)), the requested categories in Lawrence's proposed order do not parallel those as to which informal discovery was requested.  The United States has already expended considerable resources manually reviewing files in the possession of the United States Attorney's Office from the 2005-2006 investigation and trial in this case and identifying and providing documents responsive to Lawrence's informal discovery requests.  It should not now be ordered to again review these files in response to additional requests, and to assess whether those same files contain information responsive to the new category descriptions. This Court's discovery order required that "the parties shall make a good faith effort to reach any informal agreement(s) they can concerning . . . the conduct of discovery" (Doc. 341). Requesting informal discovery based on one set of categories and then moving this Court to order additional discovery based on a new and different set of categories is not consistent with this instruction and is unduly burdensome.

Nonetheless, the United States realizes that this Court may hesitate to preclude Lawrence access to materials for which this Court determines good cause for discovery otherwise exists. As such, the United States proposes the following alternate procedure as to any further discovery from the United States Attorney's Office that this Court may conclude is warranted:  The United

States has now made available to Lawrence the bulk of all materials in the possession of the U.S. Attorney's Office pertaining to this case. The remaining sections of this response explain why, with limited exceptions, the Government does not believe Lawrence establishes a basis for the categories of discovery he now requests. Should the Court conclude that discovery is warranted from the Government in any of the categories requested by Lawrence's present motion, however, the United States requests that it not be required to again review the materials it previously produced to postconviction counsel or made available for inspection during informal postconviction discovery to determine whether they meet the newly specified categories. These materials have been made available to Lawrence already; his counsel can review their content for relevance to the newly enumerated categories. Instead, the United States requests that any order of production to the Government (i.e., pertaining to materials in the possession of the United States Attorney's Office) that the Court deems warranted be limited to materials that have not been previously produced or made available to Lawrence's post-conviction counsel.

Finally, the United States objects to Lawrence's proposed order's requirement that, for each of the 88 categories, if there are no responsive materials, the United States "[c]ertify, . . ., if applicable, the dates on which any responsive materials were destroyed" (Doc. 356, Exh. 1, proposed order, final page.) Under the procedure proposed by the United States above, the United States would not be required to determine whether or not there are *any* responsive documents in a given category, but would only determine whether there are responsive documents in that category *that have not been previously produced.* Moreover, to require the United States Attorney's Office to determine and "certify" whether files may have existed *in the past* in Lawrence's 88 requested categories, and if so when they were destroyed, is unduly burdensome (if not impossible).

IV.     **Responses to Lawrence's Specific Discovery Requests**

Lawrence's Initial Motion for Discovery (Doc. 354) includes numerous specific discovery requests, which he identifies as relating to claims raised in the § 2255 motion. The United States responds to these requests below, following the organization of Lawrence's motion.  In addition to the category-specific responses below, the United States notes that, as Lawrence describes (Doc. 354 at 15–16), he has made FOIA requests to the FBI for documents related to Lawrence's case.  Based on communications from Lawrence's counsel, it is the United States' understanding that Lawrence has now received a significant number of documents from the FBI in response, and has a pending appeal with the Bureau seeking additional materials. The fact that Lawrence has received a significant number of documents via this FOIA request, and is seeking more, is likely to diminish the necessity and appropriateness of some or all of the discovery Lawrence now requests. The United States anticipates that Lawrence will update the Court on his FOIA proceedings and their impact on his requested discovery.  (*Cf.*  Doc. 354 at 14–18) (describing status of record requests at time of discovery motion).

A.     **Discovery identified as relevant to § 2255 Motion, Claims I and VI.**

This requested category of discovery includes subpoenas duces tecum to several agencies for information regarding various members of Lawrence's family, including his adoptive and biological mother, adoptive father, putative biological father, adoptive and biological siblings, aunts, uncles, cousins, grandparents and putative grandparents.  (*See* Doc. 354 at 24–26; Doc. 356 (Exh. 4).)  Discovery of information concerning Lawrence's family members is also requested from the United States.  (Doc. 354 at 26; Doc. 356 (Exh. 1).) Lawrence requests power to issue subpoenas for information relating to one or more family members from the following agencies:

- Franklin County Children Services

12

- Franklin County Clerk of Courts Juvenile Division
- Social Security Administration[1]
- OhioHealth Physician Group
- Ohio State University Hospital System
- Franklin County Adult Probation Division
- Ohio Department of Rehabilitation and Corrections
- Ohio Reformatory for Women
- Drug Enforcement Administration
- U.S. Department of Justice Executive Office for the Organized Crime Drug Enforcement Task Forces
- National Personnel Records Center

(*See* Doc. 354 at 25–26; *see also* Doc. 356 (Exh. 4).)

The United States opposes this requested discovery as not meeting the good cause requirement.  The requested discovery relates most directly to Claim VI of Lawrence's § 2255 motion, in particular its allegation that trial counsel provided ineffective assistance for the punishment phase by not obtaining certain records containing social and medical history of Lawrence's family members. (*See* Doc. 328 at 163.)  However, Lawrence does not present specific allegations that show reason to believe that he will be able to demonstrate that counsel's performance in this regard was constitutionally ineffective. *See Bracy*, 520 U.S. at 908–09.

A claim that counsel's assistance was so defective as to require reversal of a death sentence has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence

---

[1] The United States has been informed by Lawrence's counsel that since the filing of their motion for discovery, they have received responses to document requests from the Social Security Administration ("SSA") regarding several of Lawrence's family members.  As such, it is unclear whether Lawrence continues to assert that the requested subpoena to the SSA is warranted.  (*Cf.* Doc. 354 at 18 (noting that no response had been received to request for documents from the SSA at the time of Lawrence's motion); *id.* at 25 (requesting discovery from SSA).)

13

resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Judicial scrutiny of counsel's performance must be "highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Petitioner "must overcome the presumption that under the circumstances the challenged action must be considered sound strategy." *Id.* (internal quotation marks omitted). To prevail, petitioner must establish "a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." *Ross v. United States*, 339 F.3d 483, 492 (6th Cir. 2003).

While making reasonable investigations is part of counsel's duties, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Providing competent representation does not and cannot require counsel to obtain any and all information that might be obtained with infinite time and resources, particularly where that information may require significant effort to identify and obtain.  *Cf. Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (rejecting argument that counsel should have spoken to other family members about defendant's traumatic childhood, and noting that "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive of more important duties"); *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("[W]e emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.")  Moreover, where a habeas petitioner contends that his trial counsel failed to investigate other avenues that could have resulted in mitigation, "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a

14

substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 318–19 (6th Cir. 2005) (collecting cases).

Lawrence's trial counsel prepared and presented an extensive mitigation case, presenting testimony of 30 witnesses, including 16 family members. As part of the mitigation case, counsel developed a variety of evidence regarding both Lawrence and his family members. Clinical and forensic psychologist Dr. Mark Cunningham testified that in preparation for his expert testimony he reviewed "school records, medical records, medical records and criminal records about his family, his employment records, past criminal records regarding him, some offense records regarding this offense." (Tr. V. 16 at 97.) Dr. Cunningham interviewed Lawrence himself for over six hours, personally interviewed at least ten family members, and further reviewed nineteen interviews and summaries prepared by defense counsel and investigators. (Tr. V. 16 at 98–99.) During the selection phase, counsel employed extensive fact and expert testimony to present a picture of numerous interrelated mitigating factors regarding Daryl Lawrence. (*See generally* Tr. V. 13 at 125–41 (defense counsel's opening statement for selection phase); Tr. V. 17 at 34–54 (defense closing).) ███████████████████████████████████ ████████████████████████████████████

Lawrence complains in his § 2255 motion that "record gathering on family members appears to have focused almost exclusively on documenting their 'criminality.'" (Doc. 328 at 163.) But evidence regarding the criminal histories of Lawrence's family members—and Lawrence's early awareness of that—was used effectively by trial counsel to present a picture to the jury of Lawrence's difficult upbringing and self-concept. (*See, e.g.,* Tr. V. 13 at 130–131; Tr. V. 15 at 144; Tr. V. 17 at 42–44.) Dr. Cunningham explained that a family history of criminal behavior, as well as "parental attitudes that were favorable toward criminal

involvement," had been identified by the Department of Justice as risk factors for criminal conduct. (Tr. V. 16 at 108.) Similarly, Cunningham explained that delinquency of siblings and peers was an important risk factor for later violence. (Tr. V. 16 at 115.) ███████████

███████████████████████████████████████████████████

██████████

Moreover, contrary to Lawrence's characterization, the evidence regarding his family that was presented by trial counsel went well beyond evidence of their "criminality." As to Lawrence's biological mother, for example, the jury heard evidence of her sexual abuse and introduction to drugs by her own uncle and testimony by numerous witnesses that she was addicted to drugs during her pregnancy with Lawrence. (*See, e.g.,* Tr. V. 14 at 11–15; Tr. V. 15 at 117–120; Tr. V. 16 at 29.) The jury heard evidence that Lawrence and his cousins regularly participated in organized fist fights as children. (Tr. V. 14 at 38–39.) They heard evidence of difficult circumstances in Lawrence's adoptive home due to poverty and to his adoptive father's addiction to alcohol and his physical violence. (*Id.* at 112; Tr. V. 15 at 59–60; Tr. V. 16 at 175.) They also heard evidence that Alita Lopez, the much older stepsister who lived with Lawrence growing up, was mentally ill, heard voices, was verbally abusive of Lawrence and was physically and verbally abusive of Eileen Lopez, her own mother and Lawrence's primary caregiver. (Tr. V. 15 at 139–40; Tr. V. 16 at 182.) Dr. Cunningham, using Department of Justice research regarding risk factors for future criminality, presented detailed testimony regarding the numerous risk factors present in Daryl Lawrence's background and how those factors impacted his ability to make good choices. (Tr. V. 16 at 106–213.) This testimony included detailed discussion of the substance abuse issues of numerous family members as well as psychological and personality disorders apparent from their histories. (Tr. V. 16 at 154–173.) Given the

significant evidence that trial counsel *did* obtain and use regarding Lawrence's family, Lawrence is left to speculate that obtaining the records he now claims were necessary could have allowed for "richer detail." (Doc. 328 at 163).

In light of the extensive mitigation evidence presented by Lawrence's trial counsel— including extensive evidence regarding his family members—Lawrence fails to present specific allegations that provide reason to believe that discovery regarding those family members would enable him to demonstrate either deficient performance or prejudice in connection with counsel's investigation of family members. *See generally, e.g., Van Hook*, 558 U.S. at 9–13 (in light of extensive mitigating evidence presented, it was neither deficient nor prejudicial for defense counsel not to pursue more); *Goodwin v. Johnson*, 632 F.3d 301, 328 (6th Cir. 2011) (suggesting prejudice is not established where new mitigation evidence "would barely have altered the sentencing profile presented to the sentencing judge and jury" (brackets omitted)). Indeed, even if the requested records were obtained and asserted to have mitigating content, that hindsight view would not establish that counsel was ineffective in failing to obtain them. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (recognizing inappropriateness of hindsight view in evaluating counsel's performance).

Far from presenting "specific allegations" justifying discovery of the requested records, the content (and in many cases, even existence) of the requested records is at this point largely unknown. Lawrence's speculation that the eleven listed agencies may possess records regarding the twelve identified individuals that could have some mitigating tendencies is inadequate to satisfy the "specific allegation" requirement of the good cause standard. *See, e.g., Pizzuti*, 809 F. Supp.2d at 175; *cf. Brown v. Lengerich*, No. 16-1110, 2017 WL 836018, at *3 (10th Cir. March 3, 2017) (affirming denial of habeas discovery because "speculation about the contents of the

17

[requested] files" does not constitute "specific allegation indicating entitlement to habeas relief"). In fact, six of the twelve listed individuals (Jerry Hall, Rodriccos Williams, Sarah Ethlyn Walker, William Tye, Manual R. Lopez, and Manuel Lopez, Sr.) are not so much as mentioned in either of the two claims of his § 2255 motion that he identifies as warranting this discovery.

Although the requested discovery in this group is for records regarding Lawrence's family members rather than himself,[2] Lawrence attempts to link this discovery not only to Claim VI of his § 2255 motion, but also to Claim I, which alleges that his trial counsel was ineffective in failing to investigate and present evidence regarding Lawrence's own "brain damage and trauma" during the penalty phase. That claim's primary focus, however, ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Lawrence cannot make his case for broadly subpoenaing records of 12 family members by characterizing his Claim VI argument regarding counsel's not obtaining additional family records and his Claim I argument regarding counsel's alleged failure to develop evidence regarding his own brain injury as "a single ineffective assistance of counsel claim." (*See* Doc. 354 at 20.) While it is true that the *effect* of any constitutional deficiencies in counsel's performance during the punishment phase should be considered cumulatively in assessing prejudice, that does not entitle petitioner to obtain discovery as to an area of counsel's performance he provides no basis for believing was deficient. *See United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an

---

[2] ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel *found to be constitutionally deficient*, in light of the totality of the evidence in the case.") (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)) (emphasis added).[3]

Moreover, contrary to Lawrence's suggestion (*see* Doc. 354 at 21 n.18), determining whether discovery is warranted in a § 2255 proceeding does in fact require an "item-by-item consideration of each request." *See* Rule 6(b) of the Rules Governing Section 2255 Proceedings (party requesting particular discovery must "provide reasons for the request"); *Williams v. Bagley,* 380 F.3d 932, 975 (6th Cir. 2004) (denying discovery which petitioner had not demonstrated would "resolve any factual disputes that could entitle him to relief").  Lawrence cannot obtain discovery through reliance on a mismatched claim.

Lawrence only attempts specifically to connect his Claim I argument that counsel was ineffective in failing to develop evidence regarding his own alleged brain injury to the biological or environmental influence of a few specified family members.  In particular, he claims that prenatal drug abuse by his biological mother (Leondra Lawrence) may have contributed to his alleged brain damage, that three specified biological family members (mother Leondra Lawrence, maternal aunt Florencia Walker and maternal grandmother Florence Perkins) had a history of mental illness that may indicate genetic predisposition, and that records regarding his adoptive mother and sister (Eileen Lopez and Aleta Lopez) could demonstrate that he was exposed to trauma and lack of support that may have worsened his alleged brain injury.  (*See* Doc. 328 at 17–20, 22–24.)

---

[3] *See also, e.g., Johnson v. United States*, 860 F. Supp. 2d 663, 761 (N.D. Iowa 2012) (while treating claim of ineffective assistance during mitigation phase as a single multifaceted claim, holding that "[o]f course, only facets of the claim that are actually found to involve unreasonable, and therefore deficient, performance must be considered to determine whether the 'prejudice' prong of the ineffective assistance of counsel claim has been met").

But even as to the records of these family members identified as allegedly relevant to Claim I, good cause is not established. Given the extensive mitigation evidence developed and presented by trial counsel, Lawrence has demonstrated no reason to believe that he may be able to demonstrate ineffective assistance with regard to Claim I, much less that the requested discovery regarding records of these family members is necessary to appropriate development of that Claim. The mitigation case presented by Lawrence's trial counsel—while not using the precise experts Lawrence now claims were required—carefully detailed numerous factors that contributed to Lawrence's risk of violence and delinquency, including his own "wiring" as influenced by both genetic and environmental influences of family members. (*See generally* Tr. V. 16, 105–215.) This included undisputed evidence that Lawrence's biological mother (Leondra Lawrence) was heavily abusing alcohol, heroin, and cocaine during the first several months of her pregnancy with Lawrence. (*See, e.g.,* Tr. V. 16 at 134; Tr. V. 14 at 15.) Not only that, psychologist Mark Cunningham testified that, while it had not been confirmed by childhood tests, there was a reasonable inference that Lawrence suffered from brain damage due to his mother's drug and alcohol abuse during pregnancy. (Tr. V. 16 at 108, 133.) Cunningham explained to the jury that fetal alcohol exposure impacts the child's nervous system development in several ways, including neurobehavioral disinhibition and impairment of executive functions arising out of the frontal lobes. (*Id.* at 136–37.) The jury heard from Dr. Cunningham and from family members that Lawrence suffered from numerous symptoms consistent with fetal exposure to alcohol during childhood, including crying, digestive problems, and sleep disturbance. (Tr. V. 16 at 135–36; Tr. V. 14 at 16–18, 112.) ███████████████████████████████ ██████████████████████████████████████████████ As such, there is no reason to believe that factual development will allow Lawrence to demonstrate that

20

counsel was constitutionally ineffective in not obtaining the now-sought records regarding his biological mother Leondra Lawrence.

In addition, Cunningham further testified that based on family history as described and corroborated through numerous interviews, Lawrence had a genetic predisposition for both alcohol and drug dependency as well as psychological and personality disorder. (Tr. V. 16 at 154–158.) While acknowledging that he had not done diagnostic evaluations of Lawrence's family members, based on described life patterns, Dr. Cunningham identified numerous family members as suffering from schizophrenia, affective disorder, and personality disorders, all of which have a strong genetic component. (Tr. V. 16 at 157–59.) This included evidence regarding disorders of Florence Perkins, Florencia Walker, and Aleta Lopez. (*Id.* at 158; *see* Doc. 354 at 22–23.)

Further, Dr. Cunningham gave significant emphasis to how Lawrence's "wiring" issues, including exposure to drugs and alcohol as a fetus and genetic predisposition to psychological disorders (as well as his ADHD and multiple head injuries during youth) worked in tandem with environmental factors. In particular, Dr. Cunningham pointed to Lawrence's "emotional and supervisory neglect" during childhood and adolescence in light of his adoptive father's alcoholism and domestic violence, and his adoptive parents' "tremendously conflicted marriage," all of which was confirmed by lay testimony. (Tr. V. 16 at 114, 182–83, 194–95; Tr. V. 15 at 60, 137, 141; Tr. V. 14 at 112.) Dr. Cunningham further highlighted the abuse by his schizophrenic adult stepsister Alita as contributing to his risk for future violence. (Tr. V. 16 at 114, 182–83, 195.) In sum, given trial counsel's development and effective presentation of evidence regarding the genetic and environmental influences of the very family members whose records Lawrence

now identifies as relevant to Claim I, Lawrence fails to demonstrate good cause for discovery of the requested records.

**B.    Discovery identified as relevant to § 2255 Motion, Claims II and V**

This requested category of discovery pertains to Lawrence's claims that his trial counsel were ineffective for failing adequately to investigate and develop evidence regarding the circumstances of the offense (Claim II) and that the Government presented false and misleading evidence about the circumstances of the offense (Claim V).  (*See* Doc. 354 at 27.)  In support of these claims, Lawrence seeks information from the Government, the FBI, and the Columbus Division of Police ("CDP").  (*Id.* at 30–40.)  That information includes 31 enumerated categories.  (*Id.* at 30–39) (Requests 1–31.)

The United States opposes each of the 31 categories of requested discovery in this group, as Lawrence has failed to raise specific allegations that show reason to believe that he may be able to demonstrate entitlement to relief on either Claim II or Claim V. As discussed more fully above, to succeed on his ineffective assistance of counsel claim, Lawrence would be required to demonstrate both constitutionally deficient performance and prejudice.  *See supra* at 12–14.  To obtain relief on his Claim V "false evidence" argument, Lawrence would need to demonstrate that the Government presented evidence that was actually false, that it was material, and that the prosecution knew it was false.  *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009); *see generally Napue v. Illinois*, 360 U.S. 264 (1959).  Moreover, the defendant must show that the evidence "was 'indisputably false,' rather than merely misleading."  *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (quoting *United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir. 1989)).

In considering whether Lawrence establishes good cause for discovery regarding these claims, it is useful to isolate what "circumstances of the offense" are at issue.  Lawrence's

22

challenge to trial counsel's handling of, and the Government's evidence regarding, the "circumstances of the offense" in no way calls into question that he shot and killed Officer Hurst, a point that was never at issue. *See, e.g.,* Tr. V. 6 at 32–33. Nor does it challenge that upon entering Fifth Third Bank, Lawrence charged toward Officer Hurst with gun drawn, firing seven shots before eventually fleeing the bank—points incontrovertibly established by surveillance footage and forensic evidence. Lawrence's argument is instead that counsel failed adequately to develop (and the Government presented false evidence obscuring) the theory that the *fatal* shot came *after* Officer Hurst moved from behind the counter and while Lawrence was fleeing the bank. Lawrence argues that more thorough development of this theory (and the lack of contrary false evidence by the Government) would have "undermined the statutory gateway intent factors under 18 U.S.C. § 3591(a)," "rebutted the pecuniary gain statutory aggravating factor," and affected the jury's ultimate sentencing decision. (*See* Doc. 354 at 27.) He has not, however, demonstrated good cause for discovery relating to Claims II and V on these grounds.

To begin, it is clear that Lawrence's ineffective assistance and false evidence arguments regarding the "circumstances of the offense" can have no effect on his eligibility for the death penalty. First, even under Lawrence's proposed account of the circumstances of the offense, one or more of the statutory gateway intent factors would have been satisfied. The eligibility phase instructions required the jury to find

> whether the defendant intentionally killed Bryan Hurst, or

> whether the defendant intentionally inflicted serious bodily injury that resulted in the death of Bryan Hurst, or

> whether the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than . . . one of the participants in the offense, and Bryan Hurst died as a direct result of the act, or

23

> whether the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Bryan Hurst died as a direct result of the act.

(Tr. V. 12 at 52–53); *accord* 18 U.S.C. § 3591(a)(2). The jury answered yes to all four. (*See* Doc. 204 (verdict form).) Lawrence's proposed account—which has the fatal shot being fired in the direction of Officer Hurst as Lawrence fled—would still plainly satisfy at least the last two of these intent factors, and Lawrence, even under his own version of the "circumstances of the offense," can demonstrate no reasonable probability that the jury would have found otherwise.

Second, pecuniary gain was only one of the statutory aggravating factors proved; the jury also found that the defendant knowingly created a grave risk to other persons, *see* 18 U.S.C. § 3592(c)(5). (*See* Doc. 204.) Lawrence's § 2255 motion raises no challenge affecting that statutory aggravator. *Cf. United States v. Lawrence*, 735 F.3d 385, 417 (6th Cir. 2013) (rejecting challenge to this factor). As such, Lawrence's alternate account of the circumstances, even if it were found to cast any doubt on the pecuniary gain factor, would cast no doubt on his eligibility. *See, e.g., Bolden v. United States*, 171 F. Supp. 3d 891, 924 (E.D. Mo. 2016) (even if attorney's failure to challenge pecuniary gain aggravator was deficient, it was not prejudicial as there was another statutory aggravator).

What remains, then, is Lawrence's assertion that counsel's development of additional information regarding the circumstances of the offense (and the absence of allegedly false evidence) would have supported his account of the fatal shot and thus would have altered the sentence ultimately selected. In connection with his claims related to the "circumstances of the offense," Lawrence presents several groups of discovery requests. (*See* Doc. 354 at 30–40.) Each group will be addressed in the order of Lawrence's motion.

### 1. *Discovery regarding Officer Hurst's injury*

Lawrence first seeks discovery regarding "the nature of Officer Hurst's gunshot injury and the effect that injury would have had on Officer Hurst's ability to move and respond. . ." (Doc. 354 at 30 (Request 1).)  He asserts that this discovery is warranted to support his argument that counsel unreasonably failed to retain a defense forensic pathologist on this issue (Doc. 328 at 85–86), as well as his claim that "the Government had affirmative reason to know its account was false." (*Id.* at 156).  There is no good cause for discovery, as Lawrence does not show a reasonable basis to believe that factual development would allow him to succeed on either of these arguments.

As an initial matter, Lawrence's claim of ineffective assistance lacks the necessary nexus to the discovery he seeks.  While he seeks discovery related to Officer Hurst's injury from the Government, FBI, and CDP, his ineffective assistance claim does not challenge the actions of the Government and law enforcement, but his own counsel's decision whether to use the testimony of a defense expert.  Lawrence does not explain how the constitutional effectiveness of his counsel in that regard turns on the contents of the requested law enforcement files, which he does not claim that counsel could or should have accessed. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (noting petitioner's burden to demonstrate materiality of requested discovery to claim raised).

In any event, Lawrence provides no reason to believe that factual development would allow him to demonstrate either deficient performance or prejudice.  As Lawrence acknowledges, trial counsel met prior to trial with Dr. Fardal, the forensic pathologist for the Franklin County Coroner's Office who conducted the autopsy.  (*See* Doc. 328 at 86.)  According to Dr. Fardal's post-conviction affidavit, counsel asked him a variety of questions related to the autopsy, including questions about the possibility of voluntary movement after the injury was

25

sustained. (*See* Doc. 328 at Exh. 6 ¶ 8.) Dr. Fardal – who is board certified in anatomical, clinical and forensic pathology and has performed more than 5,000 autopsies (Tr. V. 8 at 98)— indicated that conscious movement would have been possible, although it is also possible the victim would have collapsed on the spot. (Doc. 328 at Exh. 6 ¶ 8.) Consistent with that, Dr. Fardal testified at trial that Officer Hurst "could" have engaged in purposeful and voluntary motion after his gunshot wound, because there was no injury to the central nervous system, although noting that "[d]oesn't necessarily mean he did." (Tr. V. 8 at 122.) Although Lawrence now claims that counsel should have perceived a "red flag" on this issue, there is no basis for his argument that counsel was constitutionally deficient for not questioning the opinion of this experienced forensic pathologist. (Doc. 328 at 86.) Moreover, particularly given the noncommittal nature of Dr. Fardal's testimony on the point (and the fact that Lawrence's own post-conviction expert, while deeming such movement unlikely, himself acknowledges that "almost anything is possible in the realm of the human body" (Doc. 328 at Exh. 5 ¶ 14)), there is no reasonable probability that retaining a defense pathologist would have affected the selection phase outcome, particularly in light of Lawrence's prior bank robberies, the surveillance footage of Lawrence charging toward Officer Hurst and pointing a firearm at him over the counter, and forensic evidence of facial stippling demonstrating a shot at close range (*see* Tr. V. 8 at 32–36).

Nor is the requested discovery related to Hurst's injuries justified in connection with Lawrence's claim that the Government presented false or misleading evidence on this point. As an initial matter, this false evidence issue (and, indeed, all of his false evidence arguments in Claim V) is procedurally defaulted. Lawrence was aware of the Government's evidence with regard to Officer Hurst's injury and movement at trial, yet did not raise any claim in his motion for new trial (Doc. 234) or on direct appeal, *see* 735 F.3d 385 (6th Cir. 2013) that the evidence

26

was false. *See, e.g., United States v. Watson*, 3:11cr079, 2016 WL 3058014 (report and recommendation finding *Napue* claim procedurally defaulted), *adopted* 2016 WL 4182364 (S.D. Oh. August 8, 2016); *United States v. Donald*, No. cr 2:12-026, 2015 WL7722021 (E.D. Ky. Nov. 30, 2015) (same).

Moreover, Lawrence even now nowhere specifies any particular testimony or other evidence regarding Officer Hurst's injury or movements that he believes to have been false. (*See* Doc. 328 at 154, 157.) In particular, while challenging Dr. Fardal's conclusion, he does not claim that Fardal testified falsely (or that the prosecution knew that). Instead, Lawrence's argument on this point focuses not on particular evidence claimed to be false, but on the Government's account of events in its opening statement. (*Id.*) Yet Lawrence does not contest (nor did he contest at trial or on appeal) that the Government's argument had support in the evidence. As such, he fails to provide any reasonable basis for believing that he could succeed in establishing that any evidence presented regarding Officer Hurst's injury or movement was "actually false," *see Rosencrantz*, 568 F.3d at 583, much less that the Government knew that. His "vehement disagreement" with the Government's theory does not establish a basis for a false evidence claim. *See Lambert v. Blackwell*, 387 F.3d 210, 245 (3rd Cir. 2004).

2.      *Discovery regarding forensic analysis of Officer Hurst's shirt*

The next category of requested discovery (*see* Doc. 354 at 31–32 (Requests 2–8)) pertains to Lawrence's claims that trial counsel were ineffective in failing to present a defense expert to challenge the possibility of a close-range gunshot based on forensic analysis of Officer Hurst's shirt by Government witness Mark Hardy (*see* Doc. 328 at 87–88), and that Hardy's testimony on this topic was false (*id.* at 158–59). There is no good cause for this discovery, as Lawrence does not show any reason to believe that factual development would allow him to succeed on either of these arguments.

27

As an initial matter, Lawrence's claim of ineffective assistance again lacks the necessary nexus to the discovery he seeks.  He does not explain how the constitutional effectiveness of his trial counsel in choosing not to present expert testimony regarding Officer Hurst's shirt turns on the contents of the requested law enforcement files. *See supra* at 24.

In any event, Lawrence provides no reason to believe that factual development would allow him to demonstrate either deficient performance or prejudice.  Mr. Hardy's overall conclusion—that forensic analysis of Officer Hurst's shirt provided no evidence of a close-range shot—was *helpful* to Lawrence.  *See* Tr. V. 8 at 38 ("I examined the bullet hole and the area surrounding that bullet hole on the shirt, and I found no evidence of a close gunshot wound.") Lawrence argues that his counsel was ineffective in not refuting Hardy's testimony that evidence of a close gunshot wound could have been lost by removal of the shirt.  In particular, when asked on direct examination whether removal of clothing by medical personnel could affect whether evidence of a close gunshot would will be found, Hardy indicated that "it may," as "when the clothing is taken off or cut off or torn off, there may be gunpowder particles lost during that process." (Tr. Vol. 8 at 37.) But Hardy also acknowledged, in describing the "variables that would affect the presence or absence of powder particles or gunshot residue on clothing," that "obviously, the main one is the distance that the weapon was away from the clothing." (*Id.* at 36.)

Moreover, Lawrence's counsel cross-examined Hardy regarding his analysis of the shirt, obtaining Hardy's acknowledgment that after both a "microscopic" and "macroscopic" analysis, "there [was] no evidence of close gunshot wound" on the shirt (*id.* at 77–78).  Trial counsel specifically cross-examined Hardy regarding what Hardy characterized as the "possibility" that gunpowder particles "could be shaken off a shirt or removed when emergency personnel took his

shirt off" and obtained his concession that "everything in science is a possibility." (*Id.* at 77–78.) Hardy further acknowledged on cross-examination that gunpowder particles sometimes "burn into the garment." (*Id.*) When asked to acknowledge that "a burning of the fabric . . . can't be shaken off," Hardy responded only that he didn't know, as there are "too many variables," including "how hard the shirt was shaken or if it was hit." (*Id.*) Lawrence's counsel immediately obtained Hardy's acknowledgement, however, that he had no evidence that in this case the uniform shirt was shaken or hit. (*Id.*) Lawrence's trial counsel also elicited Hardy's testimony that he did not conduct any chemical testing of the shirt. (*Id.* at 79–82.)

Lawrence's ineffective assistance claim urges that in addition to this effective cross-examination, trial counsel was constitutionally obliged to present evidence from a defense expert on the likelihood of gunpowder particles being shaken from the shirt. There is no reasonable basis to believe, however, that he would be able to establish either constitutional deficiency or prejudice on this score. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ [4] That is all the more clear given that Hardy's testimony regarding the uniform shirt was in large part *favorable* to the defense in that he unequivocally testified that he found no evidence of a close gunshot on the shirt. *See* Tr. Vol. 10 at 49 (defense closing emphasizing that ""Mr. Hardy told you that the shirt macroscopically, microscopically, there is no evidence of a close gunshot wound.") And while Hardy declined to eliminate any chance that gunshot residue could be removed through removal or shaking of a garment (Tr. V. 8 at 78), he never suggested this was likely, instead only characterizing it as a "possibility" and

---

[4] Lawrence does not allege that counsel was ineffective in handling the "chemical testing" issue. (*See* Doc. 328 at 87–88.)

acknowledging that he had no evidence that the shirt here was shaken or hit.   Counsel could reasonably conclude that the issue was adequately dealt with via cross-examination—particularly given that while Hardy's examination of the shirt did not evidence a close gunshot, the stippling on Officer Hurst's face did.  (*Id.* at 34–36.) Given this, there is no reasonable basis to anticipate that factual development would allow Lawrence to establish either deficient performance or prejudice on this claim.

Nor is discovery warranted based on Lawrence's claim that Hardy's testimony regarding the "possibility" of gunpowder falling of the uniform shirt was "false." As an initial matter, this argument too is procedurally defaulted, as it was not raised in Lawrence's motion for new trial or on direct appeal.  *See supra* at 25–26. Further, there is no reasonable basis to believe that factual development would allow Lawrence to demonstrate that Hardy's testimony in this regard was false or that the Government knew that.  Lawrence does not disagree with the general notion that "some particles from a close gunshot might fall off," arguing only that "it is false to suggest they all could have."  (Doc. 328 at 159.) ███████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████        This narrow difference between experts as to a "possibility" versus "extremely unlikely" falls far short of providing a reasonable basis for a false evidence claim. *See, e.g., Gimenez v. Ochoa*, 821 F.3d 1136, 1142–43 (9th Cir. 2016) (holding that to the extent that petitioner's expert affidavits contradicted the prosecution's expert, "it's simply a difference in opinion – not false testimony" and observing that "[i]ntroducing expert testimony that is contradicted by other experts, whether at trial or at a later date, doesn't amount to suborning

perjury or falsifying documents; it's standard litigation."); *Sutton v. Bell*, No. 3:06-cv-388, 2011 WL 1225891, \*9 (E.D. Tenn. March 30, 2011) ("disagreement between experts does not transform an expert's opinion into a falsehood"); *Devoe v. Davis*, No. A-14-CA-151-SS, 2016 WL 5408169, \*15 (W.D. Tex. Sept. 27, 2016) ("Mere differences of opinion between expert witnesses do not, standing alone, establish that either expert furnished false, misleading, or perjured testimony.").

Lawrence also includes in his false evidence claim an assertion that Hardy falsely "testified that there was no value in conducting chemical testing for the presence of nitrites or lead on the shirt …because Mr. Lawrence's weapon had not been recovered." (Doc. 328 at 159; *accord* Doc. 354 at 31.) This argument too is procedurally defaulted. *See supra* at 25–26. Lawrence also fails to show reason to believe that factual development will allow him to succeed on the merits. Lawrence cites an affidavit stating that such chemical testing can be performed even without the original weapon, and urges that Hardy's testimony in this regard was "misleading at best." (Doc. 328 at 159.) In fact, Lawrence's account of Hardy's testimony on this point is itself misleading. Hardy was not asked, and did not testify, as to whether there was "no value" (*see id.*) in chemical testing absent the weapon. The question posed to him was whether it was true that after macroscopic and microscopic examination, the "next step" is chemical testing of the garment, as to which he responded "[i]f we have a weapon, yes." (Tr. V. 8 at 79.) Testimony that chemical testing is the "next step" when there is a weapon at most suggests that such testing is not routine or is of lessened value absent a weapon, not, as Lawrence now suggests, that such testing is of "no value" in that circumstance. Lawrence does not allege that what Hardy *actually* said on this point is erroneous, much less "false." On the contrary, Lawrence's own expert agrees that chemical testing without a weapon has a more limited role,

31

and that a weapon is needed "to determine a more precise range of the distance at which the gun was fired."  (Doc. 328, Exh. 4 ¶ 12.)  In any event, Lawrence's counsel vigorously pursued the chemical testing question with Hardy on cross-examination, highlighting in detail the available chemical tests and the fact that although Hardy knew the type of weapon and ammunition used, he did not pursue chemical testing. (Tr. V. 8 at 79–81.)  Counsel returned to the same point in closing.  (Tr. V. 10 at 49–50). There is no basis for believing that Hardy's limited testimony that chemical testing was "the next step" "if we have a weapon"—even if it could in any way be construed as false and known to the prosecution to be so—had any reasonable likelihood of affecting the verdict.

Finally, Requests 3, 6, 7, and 8 (see Doc. 354 at 31–32) each seek broad information that pertains not to the forensic analysis performed in *this* case, but general information "concerning" internal policies, standards, and procedures of the FBI and CDP regarding firearms distance determinations (Requests 3 and 6); Mark Hardy's personnel file (Request 8); and "communications, documents, or information" about chemical testing in *other* cases (Request 7). Even if the court concluded that any discovery was warranted in this category, these particular requests are speculative, insufficiently connected to any specific allegation, overbroad, unduly burdensome, and not essential to factual development of Lawrence's claims.

> 3.  *Discovery regarding ballistics evidence of spent shell casings*

The next category of requested discovery relates to Lawrence's claim that his counsel "unreasonably failed to rebut the ballistics evidence regarding the location of Mr. Lawrence's spent .40 caliber shell casings" by presenting testimony of a defense expert and that Hardy "falsely testified that a proper ejection pattern analysis could not be performed without having the actual weapon that was used."  (Doc. 354 at 32–34 (Requests 9–12).)  There is no good cause for this discovery.

First, Lawrence's claim of ineffective assistance again lacks the necessary nexus to the discovery he seeks.  He does not explain how the constitutional effectiveness of his trial counsel in choosing not to present expert testimony regarding the location of the shell casings turns on the contents of the requested law enforcement files. *See supra* at 24.

Moreover, Lawrence fails to establish reason to believe that factual development would allow him to demonstrate either deficient performance or prejudice. ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ was explored by Lawrence's trial counsel during Hardy's cross-examination, with Hardy readily agreeing that "most guns" eject backward and to the rear, but noting that as to this particular firearm, while he knew it ejected to the right, he did not know whether it would go backward or forward.  (Tr. V. 8 at 87.)  Lawrence's trial counsel also elicited testimony from another government witness, Detective Snyder, that casings would generally fly backward and right when a firearm is held upright, but backward and left if the firearm is held sideways. (Tr. V. 7 at 92.)  Hardy himself said that it "would not surprise" him if another detective testified that in his experience casings fly backward and right.  (Tr. V. 5 at 88.)  Given that Hardy made no representations as to whether the casing would go forward or backward, and in fact freely acknowledged the likelihood that it would go backward, Lawrence demonstrates no reasonable basis to believe that factual development would allow him to demonstrate either deficient performance or prejudice regarding counsel's handling of this issue.

Lawrence also cannot demonstrate good cause based on his argument that Hardy "falsely testified that a proper ejection pattern analysis could not be performed without having the actual weapon that was used." (Doc. 354 at 33.) As an initial matter, this claim, like his other false evidence arguments, is procedurally defaulted, as Lawrence did not raise it in his motion for new trial or on direct appeal. *See supra* at 25–26.

Further, Lawrence establishes no reason to believe that factual development of this claim may allow him to succeed in demonstrating that Lawrence's opinion testimony regarding the value of test firing a similar firearm was "false" or that the Government knew that. Hardy explained that "to me" test-firing a firearm of the same type lacked value because "[t]here may be variables with that weapon, such as the amount of tension on the recoil slide, whether the weapon is working properly or not, whether there is any dirt or anything inhibiting the ejection process." (Tr. V. 8 at 44.) On redirect, Hardy was asked why, "unless you actually had the exact gun used, you wouldn't test fire a weapon to see how far shell casings would land?" (*Id.* at 92.) Hardy answered that "There are too many variables to do that. You could perform that analysis, but I don't know that you would get any beneficial information from that because of all the variables that are involved." (*Id.*) Lawrence now cites a post-conviction affidavit indicating that "when conducted properly, identical brands and models of firearms will, in most instances, produce reliable representative data as to the manner in which spent cartridge cases will be ejected." (Doc. 328, Exh. 4 ¶ 11.) While Lawrence is free to disagree with Hardy's opinion regarding the relative value of such a test, he provides no reason to believe that Hardy's opinion regarding the limited usefulness of such a test was "false," much less that the prosecution knew that or that the statements had any reasonable likelihood of affecting the verdict.

34

Finally, Requests 9 and 11 (see Doc. 354 at 34) each seek discovery that pertains not to the crime scene analysis performed in this case, but only to general information "concerning" internal policies or standards for ejection pattern analysis (Request 9) and *other* cases in which ejection pattern analysis was used although the weapon was not recovered (Request 11). Even if the Court concluded that any discovery was warranted in this category, these particular requests are speculative, insufficiently connected to any specific allegation, overbroad, unduly burdensome, and not essential to factual development of Lawrence's claims.

### 4. *Discovery regarding crime reconstruction evidence*

The next group of requested discovery (*see* Doc. 354 at 34–35 (Requests 13–16)) relates to Lawrence's claim that trial counsel was ineffective in not developing ballistics evidence to support the defense theory regarding the circumstances of the offense.  In particular, Lawrence urges that counsel was ineffective in not using testimony of a crime scene reconstruction expert to present "an opinion that the evidence at the scene was consistent with Officer Hurst moving out from behind the teller line before he was fatally shot." (*See* Doc. 328 at 90.)  In support of this claim, Lawrence requests a variety of discovery from the Government, CDP and FBI.  (*See* Doc. 354 at 35.)

Here again, while Lawrence seeks discovery from the Government, FBI, and CDP, this claim does not challenge the actions of Government and law enforcement, but his own counsel's decision whether to use a crime scene reconstruction expert.  He does not explain why the requested law enforcement files are necessary to the factual development of this claim. *See supra* at 24.

Moreover, Lawrence does not show reason to believe that factual development may allow him to succeed on his argument that counsel was ineffective in this regard. ███████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Counsel effectively cross-examined the Government's witnesses regarding the ballistics and crime scene evidence. (*See, e.g.,* Tr. Vol. 7 at 84–95; Tr. Vol. 8 at 69–91.)  Lawrence's trial counsel argued vigorously in closing that the physical evidence did not support the Government's sequence of events.  (Tr. Vol. 10 at 37–51.)████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████provides no reason to believe that he will be able to establish either constitutionally deficient representation or any prejudice to Lawrence's ultimate sentence.

### 5.       *Discovery regarding surveillance footage*

The next category of discovery relates to Lawrence's ineffective assistance and false evidence claims regarding the use of the surveillance footage.  (*See* Doc. 354 at 35–57 (Requests 17, 18, and 19).) These requests each seek communications, documents, or information from the Government, CDP, FBI, and Fifth Third related to the quality of Fifth Third's surveillance footage.  Lawrence has not established good cause for this discovery.

Lawrence claims his counsel was ineffective in failing adequately to challenge the probity of the surveillance footage in light of the limited number of frames per second (Doc. 328 at 94–95).  But the jury was well aware of the limited number of frames per second, as the parties stipulated that "[t]he video captures are done at two frames per second."  (Tr. V. 9 at 102.)  In fact the Government pointed this out in its opening statement.  (Tr. V. 6 at 23) ("Now, the video isn't the kind at Blockbuster.  It only shows two frames per second . . .").  As such, Lawrence has shown no reason to believe that the discovery identified in items 17, 18, and 19 would allow him to demonstrate an entitlement to relief on his claim that counsel was deficient

36

in this regard or that presenting additional information regarding the low frames-per-second issue would have affected the outcome in any way.

Lawrence relatedly argues that his trial counsel was ineffective for not using certain still images from the surveillance video that he believes call into question the Government's account of the offense, and that these same images support an argument that the Government knew that its account of the shooting was false.  (Doc. 354 at 36–37; Doc. 328 at 95–101, 155.)   Lawrence does not, however, provide good cause for the discovery requested in items 17, 18, and 19 (Doc. 354 at 36-37).  As an initial matter, this false evidence argument, like his others, is procedurally defaulted.  *See supra* at 25–26.  In addition, Lawrence fails to show any reason to believe that factual development would allow him to succeed on his claims that trial counsel were constitutionally ineffective, or that the Government presented false evidence, simply because they did not focus on and draw the same conclusions from the still images he now does in hindsight.  Moreover, the identified discovery lacks an appropriate nexus to the claims. Lawrence's arguments are based on specific still images Lawrence claims undermine the Government's account of the circumstances of the offense.  (*See* Doc. 328 at 95–101, 155.) Lawrence already has these images.  He fails to explain how the requested information from the Government, FBI, CPD or Fifth Third files concerning the general quality of the surveillance footage, number of frames per second, or enhancements to that footage is necessary (or even connected) to these claims.

### 6.    *Discovery regarding eyewitness testimony*

The next category of discovery seeks information from the Government, CDP, FBI, and Fifth Third in connection with Lawrence's claim that the Government knew or should have known its account of the shooting was false based on information provided by eyewitnesses. (Doc. 354 at 37–38 (Requests 20 – 24).) There is no good cause for this discovery.

As an initial matter, the claim is procedurally defaulted, as it was not raised in Lawrence's motion for new trial or on direct appeal.  *See supra* at 25–26.

Moreover, Lawrence's argument on this point does not identify any evidence claimed to be "actually false," *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009), but instead takes issue with the Government's general theory.  (*See* Doc. 328 at 154–55.)  Lawrence really alleges nothing more than that the Government interpreted the evidence presented in a way that he believes is unpersuasive.  He was free to so argue, and did. (Tr. Vol. 10 at 37–42.) His "vehement disagreement" with the Government's theory does not establish a basis for a false evidence claim.  *See Lambert v. Blackwell*, 387 F.3d 210, 245 (3rd Cir. 2004); *Sanchez v. Chappell*, No. 1:97-CV-6134, 2015 WL 4496379, at *82 (E.D. Cal. July 23, 2015) (rejecting *Napue* claim of false testimony as "simply a disagreement as to the interpretation of the evidence").

Moreover, Lawrence fails to establish any reason to believe that the discovery requested would allow him to succeed on a false evidence claim of any sort. Lawrence's § 2255 motion asserts that the Government must have known its theory of the shooting was false based on the accounts of Michelle Johnson and Brian Dickerson and requests discovery related to these eyewitnesses.  (Doc. 328 at 156–57; Doc. 354 at 38.)   Lawrence points to Michelle Johnson's handwritten statement after the robbery (*see* Doc. 328, Exh. 77), as evidencing the falsity of the Government's account of the offense, and requests further discovery regarding Johnson (*see* Doc. 354 at 38 (Requests 21–23).)  But nothing in that handwritten statement (which was provided to the defense pretrial) comes close to establishing that any evidence presented by the Government was false.  Johnson's statement that the officer "came out from behind the line with his gun pointed" (*see* Exh. 77) is perfectly consistent with the Government's account, and with

38

other testimony (including that of Dr. Fardal that conscious and purposeful movement would have been possible after Officer Hurst's injury (Tr. V. 8 at 122)). Further, Michelle Johnson's account of the shooting is already available to Lawrence, not only from this handwritten statement but from other sources. First, while Lawrence's § 2255 motion asserted that "the Government has never produced any statements Ms. Johnson made to law enforcement after the incident, although she remembers having given such a statement," (*see* Doc. 328 at 156 n.76), the United States has subsequently produced to Lawrence during informal post-petition discovery the handwritten notes of AUSA Mike Burns regarding his interviews with Michelle Johnson and other witnesses.[5] Lawrence identifies nothing in those notes that supports his request for additional discovery. Lawrence also has access to a videotaped interview given by Johnson in 2014 (*see* Doc. 328, Exh. 110). According to an affidavit from Lawrence's investigator, Johnson has indicated that the videotaped account is consistent with her initial understanding (*see* Doc. 328, Exh. 7, ¶ 10). As such, even to the extent that Michelle Johnson's account could provide any support for a false evidence claim, Lawrence already has access to that account.

Lawrence also claims that the Government should have known its theory of the shooting was false based on statements by eyewitness Brian Dickerson. (Doc. 328 at 156–57.) Lawrence points in particular to an interview report (provided by the Government during pretrial discovery) indicating that Dickerson stated that he observed the subject firing back toward the teller line while running toward the exit. (*Id.* at 157.) It is unclear how Lawrence believes this is inconsistent with the Government's theory, much less that it suggests knowing use of any false evidence. (*See* Tr. Vol. 10 at 66 (Govt. closing for guilt phase) ("Even after the defendant is shot

---

[5] These notes were produced to Lawrence by letter on September 26, 2016 as item number 45.

and he is running out of that bank, what's he doing? He's still shooting at Officer Hurst. Even though he's wounded, even though Officer Hurst did his job and stopped him from robbing that bank, he's wounded. He's getting out of there. Now, he's still shooting. He's shooting backwards."); Tr. Vol. 12 at 16 (Govt. closing for eligibility phase) ("as he's running out of the bank, he's trailing behind, shooting, before he fell through that left inside door. The video shows the defendant running out, gun pointed behind him to the right . . ."); Tr. Vol 12 at 40 (Govt. rebuttal for eligibility phase) ("there is evidence that suggests he may have shot as he's running towards the officer. There is evidence that he may have shot as he's running away from the officer or both.").) Moreover, Lawrence provides no specific allegation suggesting any reason to believe that there are additional statements or interviews by Dickerson that have not been disclosed. The United States provided pretrial the written reports Lawrence now cites regarding Dickerson. (Doc. 328 at 156–57; Exhs. 75, 76.) In addition, during informal postconviction discovery, the Government provided Lawrence with a CD containing the audio file of Dickerson's interview with law enforcement. There is no good cause for the requested discovery regarding Dickerson.

Lawrence also asserts that discovery is warranted on his false evidence claim because "many of the eyewitnesses" testified to facts that differed from earlier statements and interviews. (Doc. 354 at 37.) But even if some witnesses' testimony differed from earlier statements in some respects, that would not demonstrate that their trial testimony was false, or that the Government knew that. *See, e.g., Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *United States v. Ogle*, 425 F.3d 471, 477 (7th Cir. 2005). Nor would such alleged differences support the requested discovery. For one, while Lawrence's § 2255 motion points to claimed inconsistencies only as to Large, Clifton and Ross (*see* Doc. 328 at 157), he seeks discovery as to all six testifying

40

eyewitnesses (*see* Doc. 354 at 38 (Request 24)).  Moreover, Lawrence provides no specific allegation suggesting any reason to believe that there are additional statements or interviews by these witnesses that have not been disclosed.  Lawrence already has access to reports of all six witnesses' interviews with law enforcement, which he received pretrial. (*See* Doc. 328, Exhs. 85–90.)  And in response to Lawrence's requests during informal post-conviction discovery, the United States has now provided Lawrence with handwritten witness interview notes of AUSA Burns, which include notes of interviews of not only all six testifying eyewitnesses to the shooting, but numerous additional witnesses (testifying and non-testifying) as well.  As such, Lawrence's assertion regarding claimed variations in witness testimony does not demonstrate good cause for further discovery.

7.  *Lawrence's catchall discovery requests*

The remainder of Lawrence's requests in this subsection (Doc. 354 at 39 (Requests 25 – 31)) are attempted "catchall" requests that are significantly overbroad and unsupported by good cause.  Lawrence makes no effort to link these requests to any specific allegations, noting only that they "may establish that there was readily available evidence that trial counsel could have investigated, obtained, or presented that rebutted the Government's account of the shooting" or "may also establish" that the Government knew or should have known of "physical, forensic, or testimonial evidence" that contradicted its account.  (Doc. 354 at 40.)

Requests 25, 26, and 27 are for "a complete copy" of the "case file" of CDP, FBI, and Fifth Third Bank respectively.  These general requests for a "case file" are overbroad.  *See, e.g., Smith v. Wetzel,* No. CIV. A. 13-2410, 2015 WL 4886421, at *5 (E.D. Pa. Aug. 14, 2015 ) ("Courts have generally held that a request for a complete record of a police investigation file in the course of seeking discovery in connection with a habeas petition is too broad to be allowed."); *Carter v. Martel*, No. 06-cv-1343, 2011 WL 3047672, at *4 (S.D. Cal. July 25, 2011)

(denying, as overbroad and speculative, requests for production of "entire police and prosecution case files"). Requests 28–31 are similarly overbroad, each requesting broad general ranges of documents inadequately linked to specific allegations. *See* Doc. 354 at 39 (Request 28 seeking "any and all" statements of testifying and non-testifying witnesses); *id* (Request 29 seeking "all rough drafts or rough notes made by the CDP or FBI"); *id.* (Request 30 seeking "any and all" forensic reports, tests, or data); *id.* (Request 31 seeking "any and all written, oral, video, or electronic reports, records, files, witness statements, documents, and tangible objects prepared by any other federal, state, or local law enforcement agencies"). Lawrence's earlier discovery requests in this section seek more targeted information within these same categories. The Court should evaluate those specific requests, not allow Lawrence to leapfrog them via these sweeping catchall requests.

### C. Discovery identified as relevant to § 2255 Motion, Claim IV

This requested category of discovery pertains to Lawrence's allegation in Claim IV of his § 2255 motion that the Government did not comply with its obligation to disclose exculpatory and impeachment material. The Due Process Clause requires the Government to disclose any known exculpatory or impeachment information that is material to the defense. *See Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A violation of this duty requires Lawrence to prove that (1) the information was favorable to the defense; (2) that it was suppressed (whether intentionally or not) by the Government; and (3) that prejudice resulted. *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002). The prejudice element is established only if the suppressed information was material, leading to a reasonable probability of a different outcome if the information had been available. *Id.*

42

As an initial matter, the requested discovery is unwarranted because Lawrence's *Brady /*
*Giglio* arguments in Claim IV of his § 2255 motion are procedurally defaulted, as they were not
raised in his new trial motion or on direct appeal. *See Johnson v. United States*, 759 F. Supp. 2d
534, 539–43 (D. Del. 2011) (§ 2255 *Brady* claim not raised on direct appeal defaulted and cause
not shown); *United States v. Peirce*, No. 06 Cr. 1032, 2011 WL 4001071, *6 (S.D.N.Y. Aug. 30,
2011) (same); *cf. Harbison v. Bell*, 408 F.3d 823, 831–32 (6th Cir. 2005) (*Brady* claim
procedurally defaulted where could have been raised in state post-conviction proceedings).
Moreover, the requested discovery is otherwise unsupported by good cause for the reasons
below.

Lawrence first requests discovery in connection with his allegation that the Government
failed to disclose exculpatory information provided by Michelle Johnson, a Fifth Third employee
who was present during the 2005 shooting. In support, he notes that Johnson is the only
eyewitness for whom no CDP report or FBI 302 report was created. He also points to statements
by AUSA Burns prior to trial indicating that he had personally interviewed Fifth Third
employees in March 2005. (*See* Doc. 354 at 40–41.) As such, Lawrence requests document
production from the Government, and subpoenas to CDP, FBI, and Fifth Third, for
communications, documents, or information concerning interviews with or statements by
Michelle Johnson. (Doc. 354 at 41 (Requests 1 and 2).)

Lawrence fails to show good cause for this discovery. First, the United States has already
produced to Lawrence during informal discovery the handwritten notes of AUSA Mike Burns
regarding his interviews with Michelle Johnson and other witnesses. These notes were produced
to Lawrence by letter on September 26, 2016 as item number 45. Lawrence identifies nothing in
those notes that supports his request for additional discovery.

43

Second, even if the lack of an FBI 302 or CDP report provided any reason to believe that discovery could turn up additional "communications, documents, or information" concerning Michelle Johnson, Lawrence nonetheless does not demonstrate any reason to believe that such information would establish a *Brady* violation.  Michelle Johnson's account of the shooting is already available to Lawrence from other sources.  In addition to the above-mentioned interview notes of AUSA Burns, Lawrence has a videotaped interview given by Johnson in 2014.  This interview was included as an exhibit to Lawrence's § 2255 motion, (*see* Doc. 328,  Exh. 110; *see also* Doc. 328 at 75 (discussing and quoting interview)), along with an affidavit from a defense investigator indicating that Johnson indicated that the videotaped account was consistent with her initial understanding (*see* Doc. 328, Exh. 7).  Lawrence's § 2255 motion asserts that Johnson's account is material to the eligibility and penalty phases because her interview indicates that she saw Officer Hurst out from behind the teller line aimed and ready, which Lawrence argues is suggestive that he had not already been shot. (Doc. 328 at 148–49.)  But there was never any question that Officer Hurst came out from behind the teller line, as that was where his body was found. And Johnson's interview itself makes clear that she did not see what happened throughout much of the encounter, as she was hiding under her desk during most of the incident. (*See* Doc. 328, Exh. 110.)

Further, Johnson's videotaped account is consistent with information the United States *did* provide information regarding Johnson pretrial.  While there was no report of an interview with Johnson, Johnson was specifically mentioned in CDP reports of the interviews of fellow Fifth Third employees Erica Arnold and Deborah Rader that were provided to Lawrence's trial counsel, so her presence at the scene was certainly known to Lawrence. (Doc. 328, Exhs. 76, 92.) In addition, prior to trial, the United States provided to defense counsel Michelle Johnson's

44

handwritten statement given after the offense, in which she stated that "[t]he police officer came out from behind the line with his gun pointed." (*See* Doc. 328, Exh. 77.)[6] As such, Lawrence knew the essential facts related to Michelle Johnson's presence and her account of the shooting pretrial, and cannot establish a *Brady* violation on this ground. *See, e.g., Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994); *Maharaj v. Sec'y of the Dep't of Corr.*, 432 F.3d 1292, 1315 n. 4 (11th Cir. 2005). Accordingly Requests 1 and 2 (*see* Doc. 354 at 41) should be denied.

Lawrence next seeks information from the Government, CDP, FBI, and Fifth Third regarding any interviews or statements of other witnesses to the Fifth Third Bank shooting. (Doc. 354 at 42–43.) As support for this discovery, he points to the assertion in his § 2255 motion that the trial record indicated that many witnesses had been interviewed by prosecutors on more than one occasion, while the defense was only provided with the witnesses' initial handwritten statements and investigative interview reports. (*See* Doc. 328 at 150–152.) Lawrence has not shown good cause for this discovery. The only "specific allegations" in his § 2255 motion pertain to claims that prosecutors had met with these witnesses, and, in particular, that AUSA Mike Burns had indicated at a February 10, 2006 hearing that he had personally interviewed all bank witnesses. (*See* Doc. 328 at 150, 147 n. 62.) As noted above, the Government has now turned over all of AUSA Burns' witness interview notes during informal discovery. As such, Lawrence does not demonstrate good cause for further discovery on this front.[7]

_____

[6] Lawrence in fact alleges that in light of this handwritten statement, his trial counsel were ineffective for not following up and presenting Johnson's account. (Doc. 328 at 92.)

[7] Moreover, even if Lawrence could establish any basis for additional discovery of witness interviews and statements, the request is overbroad. While Lawrence requests interviews and statements of ten named eyewitnesses "or any other witnesses inside or immediately outside the bank" and asserts that "many" of the eyewitnesses testified in a manner conflicting with their initial accounts (Doc. 354 at 42), his § 2255

45

Lawrence next seeks discovery related to an animated video of the shooting prepared by the FBI's Investigative and Prosecutorial Graphics Unit that appeared to show Mr. Lawrence leaving the teller line and running to the hallway where Officer Hurst's body was ultimately found before exiting the bank.  (*See* Doc. 354 at 43–45 (Requests 5–8); Doc. 328 at 152.)  This video was provided by the United States to the defense pretrial, but was not used at trial. From this unused video, Lawrence attempts to infer that the Government and FBI were in possession of undisclosed information that would have supported the defense theory that Officer Hurst was shot while in the hallway while Lawrence was fleeing at a distance.  (*Id.*)   There is no basis for this inference, and it does not provide good cause for the requested discovery.  The video itself provides ample explanation for the United States' not using the video: As Lawrence himself acknowledges, the "[t]he last part of the animation . . . is flatly contradicted by the surveillance footage taken inside the bank, which shows that Mr. Lawrence never ran to the hallway before exiting the bank." (Doc. 354 at 43–44.)  Lawrence's inference that the Government's choice not to use this admittedly inaccurate but fully disclosed video somehow reflects underlying data that would be helpful to his account that Officer Hurst was shot from a distance while Lawrence was fleeing is sheer speculation.

In addition, the request is overbroad.  While the stated basis for this group of requests is the FBI video, and Requests 5 and 6 on page 44 focus on information connected to that video, Requests 7 and 8 broadly seek "[a]ny communications, documents, or information concerning or referencing the possibility that Officer Hurst was fatally wounded somewhere other than behind the teller counter and/or that Officer Hurst was not fatally shot at point-blank range" (Request 7) and "any communications, documents, or information concerning or referencing any expert

---

motion includes specific allegations regarding only three witnesses:  Marian Large, Heather Clifton, and Andrea Ross. (*See* Doc. 328 at 150–51.)

opinions provided to the Government about the manner in which the shooting occurred, including but not limited to crime scene reconstruction analysis" (Request 8).  Even if Lawrence's speculation about the creation of the video could support targeted discovery regarding the video itself, it cannot support this broad fishing expedition.

The remainder of Lawrence's requests in this subsection (*see* Doc. 328 at 45–46 (Requests 9–15)) are attempted "catchall" requests that are significantly overbroad and unsupported by good cause.  Lawrence makes no effort to link these requests to any specific allegations, noting only that they "are sought to establish that the Government had physical, forensic, or testimonial evidence that constituted material exculpatory or impeachment information."  (Doc. 354, motion at 46.)  Requests number 9, 10, and 11 are for "a complete copy" of the "case file" of CDP, FBI, and Fifth Third Bank respectively.  These general requests for a "case file" are overbroad and insufficiently linked to Lawrence's allegations.  *See supra* at 40-41.  The same is true for Requests 12–15 (*see* Doc. 354 at 45–46), each of which seeks broad categories of information inadequately tailored to any specific allegations.  *See generally Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.")

### D.      Discovery identified as relevant to § 2255 Motion, Claim VIII

Lawrence requests discovery from the Government, CDP, and FBI in support of his claim that his trial counsel were ineffective for failing to secure expert assistance to support their motion to suppress Lawrence's post-arrest statements on the basis that his medical condition made him incapable of providing a valid *Miranda* waiver or a voluntary statement.  (Doc. 354 at 46–48.)  There is no good cause for this discovery.

As an initial matter, Lawrence's claim of ineffective assistance lacks the necessary nexus to the discovery he seeks. While Lawrence seeks discovery from the Government and law enforcement, this claim does not challenge the actions of Government and law enforcement, but of his own counsel. He does not explain why the requested discovery from the Government, CDP, and FBI is necessary to illuminate whether trial counsel was constitutionally ineffective in handling the suppression issue.

In any event, even beyond the mismatch between the claim and the requested discovery, Lawrence fails to establish good cause for any discovery related to this ineffective assistance claim, as he provides no basis to believe that factual development may lead to facts allowing him to succeed.

First, Lawrence does not establish any basis to believe he could establish prejudice from counsel's choice not to hire an expert for purposes of the suppression motion. Even if hiring an expert would have resulted in conclusions comparable to those of Lawrence's post-conviction expert, (speculating that Lawrence "most likely" lost about 20 points to his hematocrit and opining that a loss of that sort would result in a change in mental status and confusion, *see* Doc. 328 at 202) there is no reasonable probability that would have resulted in suppression of his statements.

Lawrence sought suppression of pre-*Miranda* statements made at the time of his arrest and during transport, as well as post-*Miranda* statements made during his videotaped interview. (Doc. 55 at 390–91.) As to the former, this Court found that

> without prompting or questioning, Defendant made several
> statements. Specifically, he advised the officers at the scene and
> the transportation officer about the journal he had been keeping.
> He said that he was sorry and that he did not mean to kill Officer
> Hurst. Once Defendant arrived at the police station, he apologized
> for his actions to several officers. All of these statements were not

48

> the result of interrogation. Where a defendant makes a voluntary statement while in custody without being questioned or pressured by the police, the statements are admissible despite the absence of Miranda warnings.

Doc. 120, order at 843. Hiring an expert would not have affected that outcome. Because these statements were admittedly pre-*Miranda*, there was no issue as to whether there was a valid *Miranda* waiver, and thus expert evidence regarding Lawrence's medical condition would not have been relevant on that score. Similarly, given the court's conclusion that these statements were made "without prompting or questioning" and "without being questioned or pressured by the police," expert evidence regarding Lawrence's medical condition could not have established that the statements were subject to suppression under the due process involuntariness standard, which requires police coercion. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to a finding that a confession is not 'voluntary.'").

Lawrence also does not establish any basis to believe he could establish prejudice as to the post-*Miranda* statements made at Columbus Police Headquarters. Regarding those statements, this Court concluded that "after closely reviewing the videotape of the interrogation, this Court is convinced that Defendant knowingly, voluntarily, and intelligently waived his Miranda rights and agreed to talk with the officers." (Doc. 120, order at 846.) The court further concluded that "[a]fter initially showing some symptoms of pain or discomfort when the Officers were not present in the interrogation room, Defendant at no other time indicated to the officers or showed any signs of pain during the interview. To the contrary, Defendant was alert and answered all of the officers' questions." (*Id.* at 847.) This Court's conclusion that there was a valid *Miranda* waiver was affirmed by the Sixth Circuit. *See* 735 F.3d at 437–38. Given this Court's conclusions after careful review of the videotaped confession, there is no reasonable

49

likelihood that discovery would allow Lawrence to establish that trial counsel's hiring a medical doctor would have resulted in suppression of any of these statements.

Moreover, Lawrence's focus on whether hiring an expert might have affected the *suppression proceeding* is legally off the mark. Even if he could establish (which, as explained above, he cannot) a reasonable probability of succeeding in suppressing any of his statements if his trial counsel had hired a medical expert, that would not establish a reasonable probability that the outcome of Lawrence's trial or sentencing would have been different, and thus would not entitle him to relief. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *see also, e.g., Woodard v. Chappius*, 631 F. App'x 65, 66 (2d Cir. 2016) ("even if Woodard is correct that the statement should have been suppressed, there is no reasonable probability of a different verdict and, therefore, no prejudice"); *Rodriguez v. Warden*, 940 F. Supp.2d 704, 716–17 (S.D. Oh. 2013) (finding lack of prejudice where "no reasonable probability that the jury verdict would have been different even had his statement to the officer been suppressed.") In the circumstances of this case, even without the defendant's challenged statements, the evidence of his guilt— including DNA from his own gunshot wound at the scene—was overwhelming. (He also confessed to the crime in a handwritten journal that was not used in the guilt phase. *Cf.* Tr. V. 12 at 29 (defense closing in eligibility phase) (in arguing Lawrence's acceptance of responsibility, noting that "He just told the officers what happened, and he'd already written it down in the journal, and you'll see, if you look through the journal, it's consistent with what he told the officers").) Nor does Lawrence suggest that suppression of Lawrence's statements would have had any effect on the eligibility or selection phases. Indeed, at the eligibility phase, Lawrence himself put into evidence the entire videotaped interview, as well as testimony of an officer regarding Lawrence's statements at the scene, and pointed to Lawrence's statements as

50

suggesting a lack of intent.  (Tr. V. 11 at 43, 187, 188, 197; Tr. V. 12 at 30–31.)  And at the selection phase, Lawrence pointed to those statements as mitigating evidence indicating contrition. (Tr. V. 17 at 48; ███████████████  As such, there is no reasonable basis for believing that factual development would allow Lawrence to succeed on this claim.

For related reasons, Lawrence also cannot demonstrate deficient performance. Lawrence's trial counsel filed both a motion to suppress and supplemental memorandum seeking to suppress Lawrence's statements based on his medical condition at the time they were given. (Doc. 55; Doc. 84.)  At the suppression hearing, counsel vigorously cross-examined the officers who were present when the statements were made and obtained acknowledgments that Lawrence appeared to be in some degree of pain.  (Tr. 9-26-05 at 26, 39, 43, 61.)  Not only that, counsel also obtained the testimony and documentation of a nurse who had attended Lawrence during his admission to the hospital following the interviews in which he made the statements and documented his pain.  (*Id.* at 67-71.) Choosing not to also retain a medical doctor for the purpose of the suppression proceeding did not result in deficient representation, particularly given that there was every reason to conclude that doing so was unlikely to change the outcome.   Given the Court's ability to observe Lawrence's condition on the videotape, the fact that Lawrence had voluntarily admitted his involvement in voluntary statements (and handwritten notes) even before interrogation began, and the fact that in the circumstances of this case, suppression of the statements would still have left overwhelming evidence of Lawrence's guilt, Lawrence does not establish reason to believe that factual development would allow him to establish constitutional ineffectiveness.

52







55



55





### G.     Discovery identified as relevant to § 2255 Motion, Claim XI

Claim XI of Lawrence's § 2255 motion alleges that trial counsel was ineffective in failing to object to testimony of Government witness Mark Hardy comparing spent shell casings from the Sky Bank robbery and the 2005 Fifth Third robbery as failing to meet the requirements of Rule of Evidence 702.  The claim also faults trial counsel for failing adequately to cross-examine Hardy's testimony on this point and failing to present expert testimony of their own in an effort



to exclude Hardy's testimony or to counter it at trial. In connection with this claim, Lawrence seeks a wide variety of discovery from the Government, the CDP and the FBI. (*See* Doc. 354 at 54–59 (Requests 1–18).) There is no good cause for this discovery.

First, Lawrence does not establish a reasonable basis for believing that if the facts were fully developed he could establish either deficient performance or prejudice regarding counsel's choice not to pursue exclusion of this testimony under Rule 702. Lawrence argues that use of toolmark analysis was being "successfully challenged around the country at the time of Lawrence's trial." (Doc. 354 at 55.) Yet his § 2255 motion cites no federal case holding that toolmark analysis in general is insufficiently reliable to satisfy *Daubert*'s requirements. *See United States v. Ashburn*, 88 F. Supp. 3d 239 (E.D. N.Y. 2015) (noting lack of authority for proposition that toolmark identification is an inappropriate topic of expert testimony). On the contrary, both at the time of Lawrence's trial and to date, "there has been widespread acceptance of firearms and toolmark analysis in the courts" despite *Daubert* challenges. *United States v. Wrensford*, No. 2013-0003, 2014 WL 3715036, at * 17 (D. V.I. July 28, 2014); *see, e.g., United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004); *United States v. Foster*, 300 F. Supp. 2d 375, 377 n.1 (D. Md. 2004); *United States v. Natson*, 469 F. Supp. 2d 1253, 1261 (M.D. Ga. 2007); *United States v. Diaz,* No. 05-cr-167, 2007 WL 485967, at *14 (N.D. Cal. Feb. 12, 2007); *United States v. Otero*, 849 F. Supp.2d 425 , 438 (D. N.J. 2012). Acceptance of toolmark techniques extends to situations where, as here, no firearm has been recovered. *Foster*, 300 F. Supp. 2d at 376 (finding ballistics evidence reliable "even where there is no 'known' weapon recovered"); *United States v. Willock*, 696 F. Supp. 2d 536, 547 n.25 (D. Md. 2010) (adopting magistrate recommendation that toolmark evidence be admitted notwithstanding defense's objection that the "fact that no firearm was recovered in this case . . . makes the comparison of cartridge casings

less reliable"). Given this body of caselaw, there is no reasonable probability that a motion to exclude Mark Hardy's toolmark evidence on the ground that it was not based on sufficiently reliable methods to satisfy the requirements of Rule of Evidence 702 would have succeeded.[11]

In addition, the discovery Lawrence seeks on this score (see Doc. 354 at 55 (Requests 1 and 2)) is ill tailored to his claim.  Whether or not Lawrence's counsel was ineffective in declining to challenge the use of toolmark analysis at the time of Lawrence's trial bears no particular relation to what "communications, documents, studies, or information" the Government, CDP, or FBI might itself possess regarding toolmark analysis techniques. Lawrence's claim is that his counsel was ineffective, not that the Government violated any right by using toolmark analysis.  His ineffective assistance of counsel claim does not support his overbroad requests to require the Government, CDP, and FBI to search for and produce "any communications, documents, studies, or information" regarding toolmark analysis or standards for toolmark examiners—requests which seek potentially wide-ranging information not limited to files identified with Lawrence's case.

Lawrence next requests discovery in connection with his claim that counsel should have objected to Hardy's qualifications as an expert.  (*See* Doc. 354 at 56–57 (Requests 3–12).) Lawrence presents no specific allegations in support of his claim of constitutional ineffectiveness on this score.  In particular, he identifies no basis for believing Hardy was not qualified, instead

---

[11] The one federal case Lawrence cites *rejected* the defense's effort to exclude the toolmark evidence, noting that "the problem for the defense is that *every single court* post-*Daubert* has admitted this testimony." *United States v. Green*, 405 F. Supp. 2d 104, 109 (D. Mass. Dec. 20, 2005).  That court did prevent the examiner from testifying regarding a match to "the exclusion of all other guns in the world." *Id.*, 405 F. Supp. 2d at 117, 124.  Hardy did not use similar wording here.  Instead, he stated that in his "opinion" the casings were "fired by the same weapon," and that his opinion was to a "reasonable degree of scientific certainty." (See Tr. V. 8 at 63.)  Defense counsel highlighted on cross-examination that Hardy did not claim 100% or absolute certainty, to which he readily agreed. (See *id*. at 90–91.)

merely asserting that his expertise was inadequately established at trial and that "there is a reasonable probability that Mr. Hardy would not have been found qualified."  (Doc. 354 at 56.) This speculation does not provide good cause for the requested discovery, particularly where the available evidence provides no reason to question Hardy's qualifications.  Hardy testified at trial that after receiving a bachelor's degree, he received training under the previous firearms examiner for CDP and worked for 12 years under his direction with an additional 12 years' experience after his departure.  (Tr. V. 8 at 29–30.) He also testified that he had attended numerous training seminars in the area of firearms examination and identification hosted by the FBI, ATF, and also the Association of Firearms and Tool Mark Examiners.  (*Id.*)  He stated that he had provided expert testimony in at least 200 prior cases.  (*Id.*) Given this, Lawrence establishes no reasonable basis to believe that discovery would allow him to succeed on either the ineffectiveness or prejudice prong of this claim.[12]

Lawrence's claim that counsel was ineffective in cross-examining Hardy also does not entitle him to the requested discovery.  (See Doc. 354 at 58 (Requests 13 – 18).)  While trial counsel's cross examination did not focus on examining the bases for Hardy's conclusion that the shell casings from the two robberies matched, counsel could reasonably have concluded that doing so would only emphasize Hardy's conclusion to that effect (which had not been a

---

[12] Moreover, even if Lawrence could establish good cause for any discovery regarding Hardy's qualifications, several of his discovery requests are overbroad and inadequately specified.  Requests  8–11 seek a broad range of "communications, documents, or information" relating to categories including "Standard Operating Procedures for evidence testing," "all required quality control practices," "laboratory quality manuals," "laboratory quality procedures," "internal and external audit reports generated or received the CDP crime lab."  These requests seek ill-specified categories of information and/or are not limited to information regarding toolmark analysis much less to Hardy's qualifications.  (See Doc. 354 at 57.)  Similarly, Request 12 seeks "any communications, documents, or information concerning Mark J. Hardy's personnel file"—a request that could include a variety of information not remotely linked to Lawrence's claim. (*Id.*)

particularly prominent part of his direct testimony, *see* Tr. V. 8 at 63) and, by inviting him to share a technical explanation with the jury, emphasize his expertise. Instead, counsel chose to emphasize that Hardy did not suggest that his conclusions were absolutely certain (*see* Tr. V. 8 at 90–91), and to cross-examine Hardy extensively regarding other areas of his testimony, including his analysis of ejection trajectories, the asymmetry of the stippling on Officer Hurst's face, the lack of evidence of soot or hot propellant residue on Officer Hurst's shirt, and the fact that Hardy did not perform chemical analysis of the shirt. (*See id.* at 69–89); *see also United States v. Bruce*, No. 97-1198, 1998 WL 538146, \*5 (2d Cir. March 13, 1998) ("The scope of cross-examination 'falls squarely within the ambit of trial strategy and, if reasonably made,' cannot support an ineffective assistance claim.") (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)).

There is no reasonable basis for believing that discovery would allow Lawrence to demonstrate that counsel's choices in this regard were constitutionally ineffective. Hardy's direct examination had described his methodology of conducting a microscopic examination with a forensic comparison microscope to determine whether there were a sufficient number of matching characteristics that were in Hardy's opinion unique to a particular weapon. (*See* Tr. V. 8 at 47.) Hardy's written report regarding the analysis of the shell casings was available to counsel. (*See* Tr. V. 8 at 61.) Moreover, while Hardy testified to his opinion that the Sky Bank casings were fired from the same weapon as certain casings at Fifth Third (Tr. V. 8 at 63), Hardy's direct testimony had revealed several instances in which he had been asked to compare certain bullets or casings found at Fifth Third to other bullets or casings found at Fifth Third, but after examination concluded that "there was not enough information or not enough individual characteristics" to form an opinion. (*See* Tr. V. 8 at 55; *see also id.* at 49, 50, 52, 53.) He

61

reached the same conclusion regarding his comparison of bullets found at Sky Bank to bullets found at Fifth Third.  (*See* Tr. V. 8 at 62.)

Lawrence makes no specific allegation regarding anything that more extensive cross-examination would have revealed, instead merely speculating that "there is a reasonable probability that if trial counsel had subjected his opinion to such scrutiny, the jury would have rejected his expert conclusion."  (Doc. 354 at 58.)  This speculation about what additional cross-examination might have accomplished provides no good cause for the requested discovery.  (See Doc. 354 at 58 (Requests 13–18).)  Moreover, even if any discovery were otherwise appropriate on this claim, Requests 14 and 15 are overbroad, speculative, and unduly burdensome, requesting general information not tailored to Lawrence's claim.  *See* Doc. 354 at 58 (Request 14 (seeking broad information and communications "relating to the manufacturer and model of the microscopes used" including "manuals describing proper uses and maintenance"); Request 15 (seeking broad information and communications regarding "internal written policies and standards for toolmark comparisons")).

Finally, all requested discovery in this section (Doc. 354 at 55–58 (Requests 1–18)) is also unwarranted because even if Lawrence's trial counsel *could* have successfully challenged the toolmark analysis—either by excluding it entirely, restricting the conclusions permitted, or using cross-examination or a defense expert[13] to highlight limitations in the technique—Lawrence can show no reason to believe that he was ultimately prejudiced by counsel's failure to do so.  That is, Lawrence demonstrates no reason to believe that discovery would allow him to

[13] ██████████████████████████████████████████████████████████

demonstrate a reasonable probability that the outcome of any phase of the proceeding would have been different even if the toolmark analysis were completely excluded (much less simply limited or countered in some way). As Lawrence acknowledges (Doc. 328 at 207 n.97), Lawrence's own statement admitted his involvement in the Sky Bank robbery (as well as the other prior robberies). (*See* Tr. V. 9 at 89–90.) In addition, witness testimony and surveillance video from Sky Bank evidenced a robber with similar general appearance and methodology to that used in the 2006 Fifth Third robbery. (*See generally* Tr. V. 9 at 102; Tr. V. 6 at 120–29.)

In sum, Lawrence establishes no good cause for discovery on Claim XI, as there is no reasonable basis to believe that further development of the facts would demonstrate that trial counsel's choice not to further challenge Hardy's toolmark analysis was either constitutionally deficient or prejudicial.

### H.  Discovery identified as relevant to § 2255 Motion, Claim XII

The Court should deny Lawrence's request for discovery as to his claim alleging ineffective assistance on the grounds of trial counsel's failure to challenge the composition of the grand and petit jury venires.[14] In connection with this claim, Lawrence seeks discovery from both the Government and the district court clerk's office in five categories of documents potentially spanning over 22 years. (Doc. 354 at 60 (Requests 1–5).) The requested discovery should be denied for lack of good cause, as it is supported only by "conclusory allegations [that] are not enough to warrant discovery under Rule 6." *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004).

---

[14] Lawrence's § 2255 motion asserts underrepresentation of African Americans, Hispanics, and women, and alleges that counsel should have raised two constitutional violations related to jury composition: the Sixth Amendment's fair-cross-section requirement, *see Duren v. Missouri*, 439 U.S. 357, 364 (1979), and the Fifth Amendment's guarantee of equal protection, *see Castaneda v. Partida*, 430 U.S. 482 (1977). (*See* Doc. 328 at 212–16.)

Lawrence provides no basis to believe that discovery will allow Lawrence to demonstrate either constitutionally deficient performance or prejudice regarding counsel's failure to challenge the grand and petit jury venires.

First, Lawrence provides no basis whatsoever to believe that Lawrence will be able to establish that the absence of an objection to the grand or petit jury venires constituted deficient performance under the first prong of the *Strickland* analysis. "There must be some evidence of irregularity in jury selection practices before failure to object to the panel rises to the level of ineffective assistance of counsel." *Gustave v. United States*, 627 F.2d 901, 905–06 (9th Cir. 1980); *see United States v. Cooke*, 110 F.3d 1288, 1301–02 (7th Cir. 1997) (finding similar ineffective-assistance claim "meritless," as "presence of only one African-American on the venire might warrant some inquiry into the methods for selecting jurors . . . [but] that fact alone would not be a sufficient basis for raising a Sixth Amendment objection and the record does not suggest that any other bases for raising such an objection are present"). Instead, Lawrence's § 2255 motion and discovery request contain only bald assertions that trial counsel's decision not to object was unreasonable. (Doc. 328 at 213.) Contrary to Lawrence's suggestion, there is no evidence to suggest that "at the time of Mr. Lawrence's indictment and trial, the composition of Southern District of Ohio grand juries raised serious concern." (*Id.*)

Lawrence cites (and the Government is aware of) no prior cases or even news articles calling into doubt the constitutionality of the district court's jury selection plan. Instead, Lawrence makes a vague reference to "statistical evidence" submitted in his direct appeal.[15]

---

[15] Lawrence unsuccessfully argued on direct appeal that the Sixth Amendment prohibited federal prosecution, alleging that "[t]he Government's decision to secure a jury pool by relying on the entire Eastern Division of the Southern District of Ohio, rather than the county in which the offense occurred, Franklin County, had the result of drastically diluting the jury pool of African Americans." (Appeal Br. at 176–77 (6th Cir. No. 06-4105, ECF #169).)

64

(Doc. 328 at 213).  Far from impugning the constitutionality of the district's jury selection procedures, those statistics only compare the percentage of African Americans in the Franklin County population against the percentage in the entire Eastern Division of the Southern District of Ohio.

In analyzing deficient performance, the central inquiry is whether the facts as known at the time of trial "should have alerted counsel to the need to pursue" an objection.  *United States v. Plaza-Uzeta*, No. CV-09-1231, 2010 WL 6826540, at *14 (D. Ariz. Nov. 18, 2010).  In a collateral Sixth Amendment challenge, the defendant must point to some red flag that should have alerted counsel to investigate, because "[r]easonable and effective assistance of counsel does not require an attorney to sift through voluminous jury records every time his client requests that he challenge the array as unconstitutionally drawn." *Gustave*, 627 F.2d at 906.

████████████████████████████████████████████████████

████████████████████████████████████ ███

The discovery requested here (*see* Doc. 354 at 60)—including reams of court and jury records spanning more than 20 years—cannot properly be used to second-guess counsel's performance, as Lawrence has provided no prior justification that would cause a reasonable attorney to "sift through" those "voluminous jury records." *Id.*  Absent a pre-existing reason, Lawrence cannot use the benefit of hindsight and post-conviction discovery to rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (internal quotation marks omitted).[17]

---

████████████████████████████████████████████████████████

████████████████████████

[17] The cases Lawrence cites (Doc. 328 at 213) do not support his claims either for discovery or on the merits.  In *Goodwin v. Balkcom*, 684 F.2d 794, 810 & n.24 (11th Cir. 1982), the court  "[c]ombined" counsel's failure to object to jury composition with "other failings" to conclude that trial counsel held "a

Because none of the requested discovery could alter the conclusion that trial counsel performed reasonably in not objecting to the venires, Lawrence cannot show that he received ineffective assistance of counsel and his request for discovery should be denied.

Discovery is also unwarranted because Lawrence has not made any showing sufficient to believe that full development of the facts will demonstrate that he has suffered prejudice under *Strickland*. *Bracy*, 520 U.S. at 909. That is, the defendant has made no "specific allegations" of infirmities in the court's procedures to support a belief that any Fifth or Sixth Amendment claim would have had merit. "Ordinarily, [the courts] presume that public officials have properly discharged their official duties." *Bracy*, 520 U.S. at 909 (internal quotation marks omitted). In habeas proceedings, that presumption precludes a defendant from relying on conclusory pleadings that present a theory "too speculative to warrant discovery," and instead Lawrence must "support[ ] his discovery request by pointing to . . . evidence . . . that lends support to his claim" of a constitutional violation. *Id.* Under *Bracy*, a defendant cannot merely allege a hypothetical constitutional violation—untethered from the record and facts—in order to secure expansive discovery. To hold otherwise would condone the sort of fishing expedition that the "good cause" requirement of Rule 6 prohibits.

Here, Lawrence has not made any showing to rebut the *Bracy* presumption, as there is *no* factual basis to support a belief that discovery will uncover a meritorious fair-cross-section or equal protection claim. Instead, the § 2255 motion and discovery request contain only threadbare recitations of the elements of his underrepresentation claims. (Doc. 328 at 212–18.)

---

divided allegiance" that undermined his loyalty to the client, while noting that "the duty to investigate is not limitless." Similarly inapplicable, *Hollis v. Davis*, 912 F.2d 1343, 1346, 1348 (11th Cir. 1990), involved a conviction in Jim Crow Alabama, with uncontested evidence "that blacks were systematically excluded" from jury selection and that trial counsel "did not think in 1959 it was illegal systematically to exclude blacks from jury service."

In particular, Lawrence's § 2255 motion and discovery request rely only on assertions (Doc. 328 at 218) that (1) the representation of African Americans, Hispanics, and women in venires in this District is not "fair and reasonable," and (2) the alleged underrepresentation is due to "systematic underrepresentation . . . inherent in the particular jury-selection process utilized." *United States v. Darwich*, 574 F. App'x 582, 591–92 (6th Cir. 2014) (quoting *Duren v. Missouri*, 439 U.S. 357, 368 (1979)) (internal quotation marks omitted).  Moreover, as to the Fifth Amendment claim, Lawrence does not even suggest, let alone plausibly allege, that the district court's selection plan *intentionally* discriminated against African Americans, Hispanics, or women—an element that Lawrence concedes his Fifth Amendment claim requires.  (Doc. 328 at 216 n.103 (citing *Duren*, 439 U.S. at 368 n.26).)

The lack of factual support for his claim that certain demographic groups are underrepresented and that such underrepresentation is systematic or intentional renders the "theory . . . too speculative to warrant discovery."  *Bracy*, 520 U.S. at 909; *see Brown v. United States*, No. 05-80101, 2010 WL 4942830, at *4–5 (E.D. Mich. Nov. 30, 2010) ("Petitioner has failed to show a prima facie violation with respect to the second and third [*Duren*] factors. . . . Thus, he has not shown that trial counsel was deficient for failing to make the objection, nor does he show any prejudice that resulted from the failure to object."); *Plaza-Uzeta*, 2010 WL 6826540, at *14 (denying § 2255 discovery on similar ineffective assistance claim as "Movant does not even suggest how these groups may have been systematically excluded from either the petit or grand jury.  Further, Movant does not suggest anything that should have alerted counsel to the need to pursue these issues.").

In accordance with *Bracy* and Rule 6, the Court should deny Lawrence's request for discovery in pursuit of a wholly conjectural claim.[18]  *Williams*, 380 F.3d at 974; *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003).

### I.      Discovery identified as relevant to § 2255 Motion, Claim XVI

Lawrence requests discovery regarding Claim XVI of his § 2255 motion, which alleges generally that trial counsel failed adequately to investigate and challenge evidence introduced by the United States regarding Lawrence's earlier bank robberies, another prior unadjudicated robbery of a check cashing establishment, and allegations by a former girlfriend that Lawrence had threatened her with a gun.  In connection with this claim, Lawrence broadly requests information from the Government, CDP, FBI, Sky Bank, Key Bank, and Fifth Third regarding each of these prior incidents.  (*See* Doc. 354 at 61.) [19]

Lawrence does not establish good cause for this discovery.  He makes no specific allegations whatsover in his discovery motion providing reason to believe that the requested discovery will support his claim of ineffectiveness.  (Doc. 354 at 61–62.) Nor does his § 2255 motion provide any specifics regarding what he claims counsel could or should have done to challenge the Government's evidence regarding these prior incidents.  (*See* Doc. 328 at 223–24.) The only exception is a claim that counsel should have raised a Confrontation Clause objection

---

[18] To the extent the Court disagrees and permits discovery as to this claim, the Government submits the requests are unduly broad as to time period.  Requests 1, 2, and 5 seek documents spanning from 1995 to 2006.  (Doc. 354 at 60.)  Such an expansive time frame is unwarranted and should be modified to include at most the years 2004 to 2006. *Cf. United States v. Tsarnaev*, No. CR-13-10200-GAO, Doc. 393 (D. Mass. June 26, 2014) (ordering production of three years of jury records for defendant to prepare challenge to jury selection procedures).

[19] Lawrence's informal discovery requests, to which the United States agreed and responded, included numerous categories of information regarding these same earlier robberies.  (*See* Doc. 354 at 10–12 (Requests 2, 3, 5, 6, 7, and 10) (including witness statements, FBI-302 reports, reports or documents prepared by other agencies, forensic reports or data, and photographs or recordings pertaining to these bank robberies).)

to claimed consideration of a police report during the sentencing phase. (*Id.*)  Such an objection would not have succeeded. *See Williams v. New York*, 337 U.S. 241 (1949); *see also, e.g., United States v. Fields*, 483 F.3d 313, 325–27 (5th Cir. 2007).  Nor would Lawrence's requested discovery be appropriate in connection with this purely evidentiary argument in any event. Lawrence's discovery motion argues only that his requests are "intended to establish that these records contained exculpatory or impeachment information that trial counsel could have utilized…" (Doc. 354 at 62.)  Lawrence's wishful thinking in this regard does not establish any reason to believe that development of the facts will allow him to establish either that counsel's performance in this regard was constitutionally deficient or that he was prejudiced thereby. Rather, his allegations are "too speculative to warrant discovery." *Bracy*, 520 U.S. at 909.



69



70





72



### K.  Discovery identified as relevant to § 2255 Motion, Claim XXVI

Claim XXVI of Lawrence's § 2255 motion asserts that the decision to charge and seek the death penalty in federal court was arbitrary and in violation of the Fifth and Eighth Amendments because it was allegedly motivated not by a legitimate "federal interest" but by a desire to take advantage of federal law concerning the admissibility of victim impact evidence. (Doc. 328 at 258–65.)  In connection with this claim, he now seeks discovery from the Government and the Franklin County Prosecutor's Office of information regarding the decision to prosecute Mr. Lawrence in federal rather than state court.  (Doc. 354 at 65–66.)

Discovery is unwarranted on this claim.  First, the claim is procedurally defaulted.  A § 2255 movant is barred from raising claims that could have been raised on direct appeal.  *See, e.g., Bousley v. United States*, 523 U.S. 614, 622 (1998).  While Lawrence challenged the victim impact evidence on direct appeal as beyond the scope permitted by the Federal Death Penalty Act and the Eighth Amendment, *see Lawrence*, 735 F.3d at 404, Lawrence at no time raised his

present argument challenging the decision to charge federally in the trial court or on direct review.[22] As such, he is barred from doing so now unless he can establish either "cause" for the waiver and "actual prejudice" from the alleged violation or "actual innocence." *Bousley*, 523 U.S. at 622. Lawrence demonstrates neither.[23]

Second, the claim is *Teague* barred. Neither Lawrence's discovery motion nor his § 2255 motion cite a single case at any level holding that considering advantages and disadvantages of state versus federal evidentiary rules as a factor in choosing to prosecute a case federally (whether a death penalty case or otherwise) would violate the Constitution. Nor does he cite any authority for judicial second-guessing of the strength of the federal interest at stake. On the contrary, courts have rejected related arguments that the federal death penalty must be cabined to correspond to the law of the state of the offense, *see, e.g.*, *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2011) (en banc); *United States v. Mitchell*, 502 F.3d 931, 949 (9th Cir. 2007) ("The federal government seeks and obtains FDPA death sentences in states that have long since abandoned the death penalty themselves"), and have declined invitations to question the strength of the federal interest where the death penalty has been legislatively authorized, *see, e.g., United States v. DesAnges*, 921 F. Supp. 349, 358 (W.D. Va. 1996) ("Congress defined the federal interest when it proscribed the conduct and made it punishable by death."). Certainly, Lawrence's desired rule "was not *dictated* by precedent existing at the time the defendant's

---

[22] As discussed *infra* at 63 n.15, on direct appeal, Lawrence also unsuccessfully contended that the Government's decision to try him federally was racially biased. 735 F.3d at 438–39. He did not contend that the decision had anything to do with the admissibility of victim impact evidence.

[23] Lawrence cites "remarks made to the press after Mr. Lawrence's trial" in support of his argument. Whatever relevance these reports would have to Lawrence's claim, however, they would not provide cause for the default. First, one of the cited press reports was in 2007, years before Lawrence's brief on direct appeal was filed. (*See* Doc. 328 at 264.) Second, Lawrence's own § 2255 motion asserts that the Government's emphasis on victim impact testimony at sentencing itself "plainly demonstrates the reason they charged the case in federal court." (Doc. 328 at 262.) As such, Lawrence's own arguments demonstrate that there is no basis to excuse his failure to raise this issue in earlier proceedings.

conviction became final." *Teague v. Lane*, 489 U.S. 288 (1989). Given the lack of any supporting precedent, Lawrence similarly fails to establish reason to believe that factual development could allow the claim to succeed on its merits even if not *Teague*-barred.

Finally, Lawrence's § 2255 motion states that "should this Court believe that any principles of default apply to this claim," he alternatively asserts that his trial counsel was ineffective in failing to timely raise it. (Doc. 328 at 264–65.) But given that Lawrence cites not one case accepting his theory, he fails to establish reason to believe that factual development would allow him to establish that trial counsel was constitutionally deficient for not pursuing it or that he was prejudiced thereby. *See, e.g., Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005); *Engle v. Isaac*, 456 U.S. 107, 134 (1982); *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014).

**L.      Discovery identified as relevant to § 2255 Motion, Claim XXVII and Claim XXVIII**

*(This subsection responds to subsections L and M of Lawrence's discovery request (Doc. 354 at 66–70).)* Lawrence's final two categories of discovery requests pertain to his allegations that his death sentence is unconstitutional on grounds that it was imposed due to racial and/or geographical bias. (Doc. 354 at 66–70; Doc. 328 at 265–70.) In connection with these claims, Lawrence requests extensive discovery from the Government and Franklin County Prosecutor's office related to the nationwide administration of the death penalty over a 15-year period.[24] *See*

---

[24] More specifically, Lawrence seeks detailed information and prosecutorial records for every capital-eligible homicide in any federal jurisdiction over a span of 15 years (Doc. 354 at 68, Requests 1, 2, 3, and 5); Department of Justice records and communications regarding the decision to prosecute Lawrence in federal court and to seek the death penalty (*id.*, Requests 4, 6; *id.* at 70, Requests 1–2); and prosecutorial records regarding jury selection and theories of the case (*id.* at 68, Requests 7–8).

75

*United States v. Armstrong*, 517 U.S. 456, 463 (1996).  Lawrence's requests should be denied for numerous reasons.

First, the Sixth Circuit has already rejected Lawrence's claims. Lawrence argued on direct appeal

> that the process of charging and trying him in federal court rather than state court was racially biased and irrationally based on geography so as to dilute the presence of African Americans in the jury pool, thereby violating his Sixth Amendment right to a fair and impartial jury, his Fifth Amendment rights to equal protection and due process of law, and the Eighth Amendment prohibition against arbitrary use of the death penalty.

*Lawrence*, 735 F.3d at 438.  The Sixth Circuit rejected his arguments, observing that they were based largely on statistical evidence that did not establish discriminatory effect and that in any event, "Lawrence has undisputedly not shown that the Government prosecuted *him* with discriminatory purpose."  *Lawrence*, 735 F.3d at 439 (emphasis in original).  Accordingly, the Sixth Circuit found that the district court correctly denied discovery into his claim.  *Id.* at 439 n.3.  These conclusions control here.  *See generally Taylor v. United States*, 59 F. App'x 58, 60 (6th Cir. 2003).[25]

Second, the Government notes that many of Lawrence's arguments (particularly those in Claim XXVIII alleging geographic discrimination) are unsupported by legal authority.  To the extent Lawrence's claims seek to break new ground or were not dictated by precedent existing at the time his conviction became final on December 8, 2014, no discovery is warranted for the

---

[25] To the extent that Lawrence asserts that the claims of racial and geographic discrimination he now raises differ in some way from those raised at trial or on direct appeal, he has forfeited collateral review of them. *See, e.g., Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000). Lawrence's § 2255 motion appears to recognize this defect by alleging in the alternative that the failure constitutes ineffective assistance of counsel. (*See* Doc. 328 at 270.) Discovery remains unwarranted, however, as Lawrence has not provided any factual or legal support for that secondary contention whatsoever.

additional reason that the claims are *Teague* barred. *See Duncan v. United States*, 552 F.3d 442, 444–45 (6th Cir. 2009).

Third, even if these claims were not procedurally flawed, there would be no reason to believe that factual development would allow them to succeed. Under established Supreme Court precedent, a defendant who mounts a claim of selective prosecution—*i.e.*, "that the prosecutor has brought the charge for reasons forbidden by the Constitution"—faces a demanding standard of proof. *Armstrong*, 517 U.S. at 463. "[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (Mem.). In order to establish discriminatory effect, "the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465; *United States v. Thorpe*, 471 F.3d 652, 659 (6th Cir. 2006) (reversing district court's order granting discovery, as defendant did not make showing of similarly situated persons and could have "explore[d] state-court records that were available to him as well as to every other member of the public").

The Supreme Court's decision in *Bass* demonstrates that it would be reversible error to grant Lawrence's discovery requests. In *Bass*, the defendant sought discovery "of information relating to the Government's capital charging practices," but had "failed to submit relevant evidence that similarly situated persons were treated differently." *Bass*, 536 U.S. at 863–64. Instead of an individualized showing of discriminatory effect, the defendant sought to rely on the same statistics and Department of Justice study cited by Lawrence here. The Supreme Court summarily reversed the Sixth Circuit's authorization of discovery, holding that the defendant is not entitled to discovery unless and until he submits evidence showing a disparity affecting similarly situated defendants. *Id*.

77

In these post-conviction proceedings, Lawrence renews his claims of racial bias and geographic bias in the imposition of the death penalty. (Doc. 328 at 265–70.)  Yet, he still makes no attempt to show that similarly situated defendants of other races or in other jurisdictions were treated differently.  Instead he continues to rely on statistics in a September 2000 study on the death penalty issued by the Department of Justice.  Those statistics remain insufficient to justify discovery as to either of his alleged biases.  *Armstrong*, 517 U.S. at 465, 470 (race); *United States v. Sampson*, 486 F.3d 13, 25–26 (1st Cir. 2007) (race and geography); *United States v. Barnes*, 532 F. Supp. 2d 625, 636 (S.D.N.Y. 2008) (geography); *United States v. Bin Laden*, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (race and geography). Lawrence's remaining arguments— alleged improprieties in choosing a federal venue, jury selection, and closing argument—were all considered and rejected on direct appeal as well.  735 F.3d at 435, 438–39, 442–44.

Lawrence also has failed to allege (let alone make a credible showing) that any decisionmaker in his case acted with discriminatory purpose.  *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).   Again, Lawrence relies only on general statistics, which is contrary to "the general rule that in cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose."  *United States v. Olvis*, 97 F.3d 739, 746 (4th Cir. 1996) (quoting *McCleskey*, 481 U.S. at 297); *see also Barnett v. United States*, No. 3:12-cv-327, 2014 WL 234817, at *6–7 (W.D.N.C. Jan. 22, 2014) (denying discovery in § 2255 proceeding on same claims in similar circumstances).  The Sixth Circuit previously found that "Lawrence has undisputedly not shown that the Government prosecuted *him* with discriminatory purpose," and Lawrence offers no new evidence to challenge that conclusion.  *Lawrence*, 735 F.3d at 439 (emphasis in original); *Johnson v. Bobby*, No. 2:08-cv-55, 2010 WL 3909234, at *18 (S.D. Oh.

78

Sept. 30, 2010) (denying habeas discovery on selective-prosecution claim where petitioner provided no evidence of discriminatory intent).  His discovery requests related to Claims XXVII and XXVIII should be denied.

## CONCLUSION

For the reasons above, the United States respectfully requests that the Court deny Movant Daryl Lawrence's Initial Motion for Leave to Conduct Discovery (Doc. 354) and the accompanying request for oral argument.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney


s/Mary Beth Young
MARY BETH YOUNG (0073451)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
Mary.Beth.Young@usdoj.gov


## Certificate of Service

I hereby certify that a copy of the foregoing United States' Response to Movant Daryl Lawrence's Initial Motion to Conduct Discovery was served this 5th day of April, 2017, electronically on all parties of record.

s/Mary Beth Young
MARY BETH YOUNG (0073451)
Assistant United States Attorney