**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR et al.,

       *Plaintiffs*,

  and

DAVID RUNYON et al.,

       *Plaintiff-Intervenors*

  v.

DONALD J. TRUMP et al.,

       *Defendants*.

Civil Action No. 25-3742 (TJK)

**MEMORANDUM OPINION**

Plaintiffs are 20 federal prisoners who committed some of the most horrific crimes imaginable and were sentenced to death.[1] While awaiting that punishment, each was imprisoned on federal death row, in the Special Confinement Unit at United States Penitentiary in Terre Haute, Indiana. But in December 2024, then-President Biden commuted their death sentences—along with the death sentences of 17 others—to life in prison. So the Federal Bureau of Prisons, or BOP, undertook to redesignate them to be imprisoned elsewhere. Under the relevant BOP policies, that redesignation process starts with an individualized assessment of the facility security level, health, and other needs for each prisoner, leading to a referral to a particular facility. Then the prisoner has a hearing in which he can challenge whether the proposed new facility is appropriate, as well as a chance to appeal the hearing administrator's decision. And as that process began here, almost

---

[1] For simplicity, the Court uses "Plaintiffs" to refer to both Plaintiffs and Plaintiff-Intervenors, who bring identical claims and are procedurally separated only because of the timing of their administrative exhaustion. *See* Order, ECF No. 69.

all Plaintiffs appeared to be headed somewhere other than the United States Penitentiary, Administrative Maximum Facility, in Florence, Colorado, commonly known as ADX Florence.  The most restrictive prison in the federal system, ADX Florence—nicknamed "the Alcatraz of the Rockies"—is intended to house prisoners that cannot be safely imprisoned elsewhere.

Then President Trump—who had lashed out against the commutations when they happened—took office in January 2025.  On his first day, he issued an Executive Order directing the Attorney General to address the facilities to which the 37 death-row commutees were to be redesignated.  On her first day, Attorney General Bondi followed up with an implementing memorandum to BOP.  Almost immediately, counsel for all Plaintiffs were informed that they would be referred to ADX Florence.  In the following weeks, counsel for many Plaintiffs say that a BOP attorney told them, in substance, that senior Department of Justice officials had instructed BOP to send them all to ADX Florence, regardless of BOP's individualized assessments.  And after a hearing and appeal, each was redesignated there.

Plaintiffs sued and now seek to preliminarily enjoin their transfers to ADX Florence while this suit proceeds.  They bring several claims, most of which are longshots at best.  That said, for the reasons explained below, they have shown a likelihood of success on their claim that their transfers to ADX Florence violate the Fifth Amendment's Due Process Clause.  That is so because it is likely their redesignations were determined before their process even began, and that—despite their hearings and appeals—they had no meaningful opportunity to challenge them.  But the Constitution requires that whenever the government seeks to deprive a person of a liberty or property interest that the Due Process Clause protects—whether that person is a notorious prisoner or a law-abiding citizen—the process it provides cannot be a sham.  In addition, such a deprivation of constitutional due process amounts to irreparable harm, and the balance of the equities supports relief.

2

Thus, the Court will grant their motion to the extent it asks the Court to enjoin their transfers to ADX Florence while this suit proceeds.  At least for now, they will remain serving life sentences for their heinous crimes where they are currently imprisoned.

## I.      Background

### A.      The Bureau of Prisons' Referral and Designation Process to ADX Florence

Under 18 U.S.C. § 3621(b), BOP is authorized to "designate the place of [a] prisoner's imprisonment."  To guide those designations, BOP classifies its facilities into five security levels: minimum, low, medium, high, and administrative.  Fed. Bureau of Prisons, Program Statement 5100.08, ch. 4, p. 14 (2006) ("BOP Program Statement").  Prisoners also receive security classifications that are mainly based on the "level of security and supervision" they require, as well as the "inmate's program needs"—things like "substance abuse," "training," "counseling," and "medical/mental health treatment."  *Id.*, ch. 1, p. 1.  BOP then matches prisoners to facilities, selecting "any available penal or correctional facility" that it "determines to be appropriate and suitable" after accounting for several other factors.  *See* 18 U.S.C. §§ 3621(b)(1)–(5).

ADX Florence is only federal prison with an administrative security classification.  ECF No. 4-11 ¶ 14.  Designed for "MAXIMUM custody" inmates "who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution," it employs unique security and control procedures.  BOP Program Statement 5100.08, ch. 2, p. 3.  Because ADX Florence is meant only for "inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others," there are special procedures for transferring inmates there.  *Id.*, ch. 7, p. 17.

The first is that other "high security institution[s] should be considered first" before ADX Florence.  BOP Program Statement 5100.08, ch. 7, p. 17.  Only when those alternatives are not

3

appropriate can the staff at the inmate's current facility "initiate the referral process" by submitting an ADX Florence referral packet to the warden. ECF No. 4-9 at 4–5. An inmate must meet at least one of two criteria to warrant referral to ADX Florence: (1) his "placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety"; or (2) his "status" is such that he "may not be safely housed in the general population of another institution." *Id.* at 3.

After the initial referral to ADX Florence, three officials must concur with the referral for the process to continue: the warden of the inmate's current facility, the regional director, and the chief of the Designation and Sentence Computation Center. ECF No. 4-9 at 5. If they do, an administrative process unfolds that allows the inmate to challenge the referral and ultimate designation to ADX Florence. BOP schedules "a hearing on the appropriateness" of transferring the inmate to ADX Florence. *Id.* The hearing administrator must prepare a notice—including "[s]pecific evidence" forming "the basis for the referral"—and send it to the inmate, who has a chance to appear and present evidence against the referral. *Id.* at 8–9. After the hearing, if the hearing administrator finds it appropriate, he "prepare[s] a written recommendation" with "specific reasons" and "sufficient detail" supporting designation to ADX Florence. *Id.* at 9. That recommendation goes to the Assistant Director for the Correctional Programs Division for a "final decision." *Id.* at 9–10. The inmate may then challenge that decision through a two-step appeal process that ends up with BOP's Office of General Counsel. *See id.* at 10. If the inmate's appeals are unsuccessful, he can be designated to ADX Florence.

### B. Procedural History

On December 23, 2024, then-President Biden commuted the death sentences of 37 prisoners on federal death row. ECF No. 1 ¶ 2; ECF No. 4-3. Plaintiffs are 20 of those 37 commutees.

When Plaintiffs received their commutations, they were incarcerated in BOP's Special Confinement Unit in Terre Haute Penitentiary. ECF No. 1 ¶ 4. That section of the Terre Haute facility is reserved for prisoners awaiting execution, so BOP began the process of redesignating them to other facilities once their death sentences were commuted to life-in-prison sentences. *See id.*

BOP was determining the facility to which it would refer each commutee when the presidential administration changed. *See, e.g.*, ECF 4-27 ¶¶ 3–5. On January 20, 2025, President Trump issued Executive Order 14164, addressing the "37 murderers whose Federal death sentences were commuted" by then-President Biden. Restoring the Death Penalty and Protecting Public Safety, 90 Fed. Reg. 8,463 (Jan. 20, 2025) (codified Jan. 30, 2025). Among other things, President Trump directed the Attorney General to "take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." *Id.*

Attorney General Bondi acted to implement that part of Executive Order 14164 on February 5, 2025. In a memorandum titled "Restoring a Measure of Justice to the Families of Victims of Commuted Murderers," the Attorney General directed several Department of Justice components to take certain actions "to achieve justice for the victims' families of the 37 commuted murderers." Off. of the Att'y Gen., Memorandum for All Department of Justice Employees: Restoring a Measure of Justice to the Families of Victims of Commuted Murderers (Feb. 5, 2025), https://perma.cc/8JMU-F22V. Among those actions, the Bondi Memorandum directed BOP "to ensure that the conditions of confinement" for the 37 commutees reflected "the security risks" they "present because of their egregious crimes, criminal histories, and all other relevant considerations." *Id.*

By February 11, 2025—within a week—word had spread to Plaintiffs' lawyers that all

5

Plaintiffs would be referred to ADX Florence. *See, e.g.*, ECF No. 4-27 ¶ 31; ECF No. 4-28 ¶ 39. Indeed, it appears that a decision to refer Plaintiffs to ADX Florence may have been made even earlier, because the Health Services Administrator for BOP issued memoranda on February 12 for many Plaintiffs, concluding for each that no medical issues precluded them from transfer there. ECF No. 25-2 at 2; *see also id.* at 3–21. By early April, all Plaintiffs received a notice telling them that they had been "referred for a hearing before a Hearing Administrator . . . to determine if [they] should be transferred to" ADX Florence. *See, e.g.*, ECF No. 4-13 at 2; Dkt. No. 25-1161, ECF No. 40-1 ¶ 16. In the end, the result of each hearing turned out the same: the hearing administrator recommended transfer there. *See, e.g.*, ECF No. 4-24 ¶ 13.[2]

In May 2025, BOP Assistant Director Shane Salem, the BOP employee "charged with making the decision to accept or reject the Hearing Administrator's recommendation," "rendered a decision on each" Plaintiff and adopted the uniform recommendations of the hearing administrators, thereby designating all Plaintiffs to ADX Florence. ECF No. 24-1 ¶¶ 6, 9. Assistant Director Salem's decision was then forwarded to each Plaintiff in early June, and Plaintiffs were permitted to appeal the designation. *Id.* ¶¶ 10–11.

Plaintiffs and one other commutee first sued over their reassignments in April 2025. *See Taylor v. Trump*, 788 F. Supp. 3d 1, 5–7 (D.D.C. 2025) ("*Taylor I*") (recounting the facts of that

---

[2] Beyond the 20 Plaintiffs here, only one of the 37 commutees was not referred to ADX Florence. That prisoner was removed from the federal system and transferred to state authorities in Arizona for prosecution under state law, which may lead in the reimposition of the death penalty. ECF No. 24-1 ¶ 5 n.1. The remaining 36 commutees were referred to ADX Florence. *Id.* The 36 include Brandon Basham, the last commutee to be referred, who was initially transferred to the Medical Center for Federal Prisoners in Springfield Missouri due to urgent mental health needs. *Id.* ¶ 6. After Basham was transferred back to Terre Haute in December 2025, he was referred to ADX Florence the following month. *See* Dkt. No. 25-1161, ECF No. 71 ¶¶ 6–7. At this point, though, Basham has not exhausted his administrative remedies and is not a Plaintiff in this suit.

first suit). The *Taylor I* plaintiffs also moved for a preliminary injunction to prevent their transfer to ADX Florence. The Court denied their motion because they had failed to exhaust their administrative remedies, including the BOP appeals process—a mandatory threshold requirement—and therefore could not show that they were likely to succeed on the merits of their claims. *Id.* at 7–9.

On October 21, 2025, Plaintiffs here—20 *Taylor I* plaintiffs who had since exhausted their administrative remedies —voluntarily dismissed their claims in *Taylor I* and filed this suit.[3] Plaintiffs also moved for a temporary restraining order. *See* ECF No. 4. The Court held a hearing on their motion on October 28, 2025. At the hearing, the Court ordered Defendants to provide the Court 48-hours written notice before transferring any Plaintiff to ADX Florence. *See* Minute Entry of October 28, 2025. In addition, while Plaintiffs styled their motion as one for a temporary restraining order, the Court informed the parties that it intended to convert the motion to one for a preliminary injunction if time permitted, and no party objected to that approach. Hr'g Tr. at 68:14–21. The Court does so now. *See, e.g.*, *Corp. for Pub. Broad v. Trump*, 786 F. Supp. 3d 142, 149 (D.D.C. 2025).

## II.      Analysis

The standard for a preliminary injunction is formidable. "A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely

---

[3] Plaintiffs arrived in two waves. This suit was initially filed by 17 of the *Taylor I* plaintiffs. At the same time, three of the remaining *Taylor I* plaintiffs moved for preliminary relief in their case. Before the Court resolved the pending motions, the three *Taylor I* plaintiffs finished exhausting their administrative remedies and were added to this suit and the motion for preliminary relief as Plaintiff-Intervenors, making it 20 commutees in total. *See* ECF No. 69.

to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.  As explained below, at least with respect to one claim, Plaintiffs have cleared this bar.

### A. Plaintiffs Are Likely to Succeed on the Merits of their Due Process Claim

Plaintiffs bring four claims.  They assert that their redesignations and upcoming transfers to ADX Florence violate (1) the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559; (2) the Fifth Amendment's Due Process Clause and (3) implied Equal Protection Clause; and (4) the Eighth Amendment's prohibition on cruel and unusual punishment.  *See* ECF No. 4-1 at 19, 28, 34, 38.  The Court finds that they are likely to succeed on their due process claim, and so it need not consider their other claims.

### 1. The Court Has Subject-Matter Jurisdiction over Plaintiffs' Due Process Claim

A plaintiff seeking to show likelihood of success on the merits must first show that he is likely to clear jurisdictional hurdles.  *See Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015); *see also Murthy v. Missouri*, 603 U.S. 43, 58 (2024).  Defendants raise two such hurdles, so the Court begins there.

First, Defendants argue that Congress has explicitly precluded judicial review of all Plaintiffs' claims in the First Step Act of 2018.  ECF No. 24 at 28–31.  The relevant statutory provision reads: "Notwithstanding any other provision of law, a designation of a place of imprisonment [by BOP] is not reviewable by any court."  18 U.S.C. § 3621(b).  Defendants say that Plaintiffs seek review of the redesignation of ADX Florence as their place of imprisonment, so they run headlong into this statutory bar.  And no doubt, § 3621(b)'s sweeping language would appear, at first blush, to preclude all challenges to a prisoner's "designation of a place of imprisonment."  But as

8

explained below, the Supreme Court and the D.C. Circuit have held that this sort of language is not clear enough, on its own, to bar constitutional claims.

A longstanding presumption of statutory construction provides that "only the clearest evocation of congressional intent to proscribe judicial review of constitutional claims will suffice." *Ungar v. Smith*, 667 F.2d 188, 193 (D.C. Cir. 1981); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988). So even "when a statute's terms appear superficially to preclude review," courts must look to "canons of construction, statutory history and common sense" to determine whether Congress intended to take the "drastic step" of shielding the Executive Branch from constitutional scrutiny. *Ralpho v. Bell*, 569 F.2d 607, 617, 621 (D.C. Cir. 1977). Both the Supreme Court and D.C. Circuit have considered statutory provisions like § 3621(b) and concluded that they were insufficiently clear to preclude judicial review of constitutional claims. A few examples suffice to show why a faithful application of this precedent means that § 3621(b) should be treated the same way.

In *Johnson v. Robison*, the Supreme Court considered a statute that provided that "'the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans'" . . . "'shall be final and conclusive,'" and "'no . . . court of the United States shall have power or jurisdiction to review any such decision.'" 415 U.S. 361, 367 (1974) (quoting Pub. L. No. 85-857 § 211(a), 72 Stat. 1105, 1115 (Sept. 2, 1958)). Despite the statute's sweeping language—including phrases like "any question of law or fact" and "any such decision"—the Court held that the absence of an "explicit provision" barring constitutional claims, combined with the lack of any contextual reason to infer such a bar, meant that "the most reasonable construction" of the statute did not prohibit constitutional challenges. *Id.* at 367, 373.

9

The D.C. Circuit said much the same in *Ralpho v. Bell*, which involved the Micronesian Claims Act, Pub. L. No. 92-39, 85 Stat. 92 (1971). That statute set up a commission to adjudicate claims arising out of the United States's bombing of Micronesia in World War II and provided that "any such settlements made by such Commission . . . shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review." *Ralpho*, 569 F.2d at 613 (quoting Micronesian Claims Act § 201). Once again, despite the broad phrases "any such settlements" and "notwithstanding any other provision of law," the Circuit concluded that "challenges of constitutional stature impugning action by the Micronesian Claims Commission are cognizable in the federal courts." *Id.* at 622. The *Ralpho* court did not see sufficient evidence that Congress sought to "create a subordinate body free from [the] constraints" of the Constitution when there was nothing but "marked silence" in the text and statutory history on the matter. *Id.* at 620–21.

Much more recently, the Circuit took a similar approach in *Ralls Corp. v. Comm. On Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014). There, the Defense Production Act of 1950 included a provision stating that "such action[s] for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States" "shall not be subject to judicial review." *Id.* at 307–08 (quoting 50 U.S.C. §§ 4565(d)(1), (e)(1)). Once more, despite that unqualified language—this time, even in the realm of national security, with all the deference to the Executive that often entails—the court concluded, consistent with *Johnson* and *Ralpho*, that "neither the text of the statutory bar nor the legislative history of the statute" compelled the interpretation of § 4565(e)(1) to bar constitutional claims. *Id.* at 311.

So too here. Like all the statutes described above, "no explicit provision of [§ 3621(b)] bars judicial consideration of [Plaintiffs'] constitutional claims." *Johnson*, 415 U.S. at 367.

Thus, for Defendants to prevail, they must point to something beyond the text of § 3621(b) to convince the Court that it bars judicial review here. They come up well short. If anything, the context only confirms that this provision is best read to *exclude* constitutional claims. It appears in a section of the Act titled "Placement of Prisoners Close to Families." First Step Act of 2018, Pub. L. No. 115-391, § 601, 132 Stat. 5194, 5237 (2018). That section makes two amendments to the prior version of § 3621(b). *Id.* One adds the judicial review provision itself, and the other directs BOP to try to "place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence," as balanced with a host of other considerations, including "the prisoner's security designation" and "the prisoner's mental and medical health needs." *Id.* Nothing about this context—a directive to BOP to balance several considerations in its prison assignments and to shield that balancing from judicial review—suggests that the judicial review provision should be read to preclude constitutional challenges. That is especially so given both the general "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986), and the specific "presumption that the Congress would not . . . deny[] a forum in which to argue that government action has injured interests that are protected by the Constitution," *Ungar*, 667 F.2d at 193. If Congress sought to shield prisoner designations from constitutional scrutiny, it would not likely have tucked such an elephant away in a mousehole. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

For all these reasons, the Court concludes that § 3621(b) poses no bar to Plaintiffs' due process claim.[4]

Second, Defendants contend that they are shielded from Plaintiffs' claims by sovereign immunity. ECF No. 24 at 26–28. As a general matter, Defendants are right that "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). And Defendants say that no waiver applies here. They point out that the only waiver of sovereign immunity Plaintiffs identify is in the APA, which waives sovereign immunity for "action[s] in a court of the United States seeking relief other than money damages." 5 U.S.C. § 702; *see* ECF No. 24 at 26. The APA's waiver is unavailable here, Defendants argue, because Congress has explicitly revoked that waiver when it comes to BOP's prison assignments. *See* 18 U.S.C. § 3625; ECF No. 24 at 26.

Sovereign immunity does not bar Plaintiffs' constitutional claims. When a plaintiff seeks prospective injunctive relief against a federal official for allegedly unconstitutional acts, "*sovereign immunity does not apply* because an official who acts unconstitutionally is 'stripped of his official or representative character'" and is no longer considered an official of the state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984) (emphasis added) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). Though this scenario most commonly unfolds in cases involving violations of federal law by state officials, it applies as well "to violations of federal law by

---

[4] The Court also notes that another court in this District also recently concluded that § 3621(b) does not bar constitutional claims. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 85 (D.D.C. 2025).

federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).  Thus,

Plaintiffs' constitutional claims do not implicate sovereign immunity.[5]

### 2.    Plaintiffs Are Likely to Succeed on Their Due Process Claim

The crux of Plaintiffs' due process claim is their allegation that Defendants "carried out a

sham process solely to effectuate a predetermined result," thereby "imposing uniquely brutal con-

ditions . . . without any meaningful process."  ECF No. 4-1 at 28, 31.  Whether they are likely to

succeed on this procedural claim under the Due Process Clause is assessed in two steps.  "[T]he

first asks whether there exists a liberty or property interest which has been interfered with by the

State; the second examines whether the procedures attendant upon that deprivation were constitu-

tionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

First, Plaintiffs have shown that they likely have a liberty interest in avoiding the conditions

at ADX Florence.  No doubt, as the D.C. Circuit has held, this "first step is complicated" by Plain-

tiffs' incarceration, which limits the protections of due process.  *Aref v. Lynch*, 833 F.3d 242, 252

(D.C. Cir. 2016).  Given the complexities and dangers inherent to the prison system, prison ad-

ministrators "should be accorded wide-ranging deference in the adoption and execution of policies

and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  Thus, courts should

hesitate to wade into prison administration, for "the operation of our correctional facilities is

---

[5] Defendants also argue that commutees who have not exhausted their administrative rem-
edies lack standing because there is no sign that "any potential injury" from the transfer to ADX
[Florence] is "actual or imminent."  ECF No. 24 at 31 (quoting *Spokeo, Inc. v. Robbins*, 578 U.S.
330, 339 (2016)).  But that argument does not apply to any of the Plaintiffs here, all of whom have
now administratively exhausted.  And in any case, Defendants have now represented that BOP
"plans to transfer almost all the Plaintiffs . . . to the U.S. Penitentiary, Administrative Maximum
Facility (ADX) within the next several weeks."  ECF No. 63 at 1.

peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548.

But the deference owed to prison administrators does not crop courts entirely out of the picture. Even within the prison setting, the Supreme Court has repeatedly held that conditions that "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life" encroach upon prisoners' liberty interests and are thereby subject to the requirements of due process. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005) (applying *Sandin*). In this Circuit, whether conditions are "atypical and significant" is measured "in relation to the most restrictive confinement conditions that prison officials . . . *routinely* impose on inmates serving similar sentences," *i.e.*, "administrative segregation." *Aref*, 833 F.3d at 254 (quoting *Hatch v. District of Columbia*, 184 F.3d 846, 856 (D.C. Cir. 1999)). The comparison to administrative segregation looks "not only to the nature of the deprivation . . . but also to its length." *Id.* (quoting *Hatch*, 184 F.3d at 856). The duration of the condition imposed is a "crucial element" of the analysis because "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.* (quotation omitted).

In *Aref*, the plaintiffs challenged their placement into "specially designated Communication Management Units (CMUs)," *Aref*, 833 F.3d at 246, where their confinement would "involve[] significantly *less* deprivation than administrative segregation," *id.* at 257 (emphasis added). In other words, CMU confinement would have permitted the *Aref* plaintiffs more interaction with fellow inmates, greater use of common spaces, additional access to educational and professional opportunities, and more social contact with the outside world than would administrative segregation. *See id.* at 256–57. Still, in an opinion authored by Judge Rogers Brown, the Circuit

14

found that CMU confinement implicated a liberty interest because the confinement was "exercised selectively" for a duration that was "indefinite and could be permanent" and impacted prisoners in a way that "necessarily increase[d] in severity over time . . . just as surely as a single drop of water repeated endlessly will eventually bore through the hardest of stones." *Id.* at 257 (quotation omitted).

The conditions at ADX Florence are close to what the plaintiffs faced in *Aref*, so Plaintiffs likely have a similar liberty interest at stake here. Like CMU confinement, assignment to ADX Florence is selective; obviously, most federal prisoners serving life sentences are incarcerated elsewhere. *See* ECF No. 4-1 at 31. In fact, ADX Florence is intended to selectively house prisoners who "have demonstrated an inability to function in a less restrictive environment." BOP Program Statement 5100.08, ch. 7, p. 17. As with CMU confinement, the conditions of ADX Florence will be imposed for a duration far longer than a usual stint in administrative segregation, which is only "a few weeks." *Aref*, 833 F.3d at 257. Indeed, Plaintiffs allege without contradiction that their redesignation to ADX Florence "is indefinite and could be permanent." *Compare* ECF No. 4-1 at 30, *with* ECF No. 24 at 42. And as noted below, Attorney General Bondi has publicly promised that Plaintiffs will spend the rest of their lives there. Finally, like CMU confinement, the conditions of ADX Florence substantially curtail the ability of a prisoner to "communicate with his family or the outside world." *Aref*, 833 F.3d at 257; *see* ECF No. 4-1 at 29–30.

If anything, the conditions at ADX Florence may be *more* onerous than those at issue in *Aref*. The record overflows with evidence describing the harshness of everyday life there. Plaintiffs have submitted declarations from those with firsthand experience that the way that ADX Florence "is physically constructed and operated" subjects its inmates to "conditions [that] are more socially isolating than those at any [other] correctional facility." ECF No. 4-11 ¶ 12a. The cells

15

are smaller and more cut off from the outside world "even in comparison to other solitary confinement units." *Id.* ¶¶ 15–17. A prisoner who spent 18 months in ADX Florence represented that he could barely communicate with anyone else "because you can't hear from cell to cell" and that when he first arrived, he "went 13 days without hearing another human talk." ECF No. 4-47 ¶¶ 13, 36. Communication with the outside world is highly limited, even relative to being held in solitary confinement at the Terre Haute facility. One Plaintiff, for example, currently makes six or seven 15-minute phone calls per *week* to his family from Terre Haute, *see* ECF No. 3-17 ¶ 36, but would only be able to make four such calls per *month* at ADX Florence, *see* ECF No. 4-11 ¶ 22. Given these conditions, it is little surprise that BOP regulations that govern referrals to ADX Florence instruct that "redesignation to another high security institution should be considered first." BOP Program Statement 5100.08, ch. 7, p.17.

In response, Defendants point out that the Tenth Circuit has concluded that inmates do "not have a liberty interest in avoiding confinement at ADX [Florence]." *Rezaq v. Nalley*, 677 F.3d 1001, 1016 (10th Cir. 2012). True enough. But this Court is bound by *this* Circuit's precedent, not the Tenth's. And in *Aref*, the Circuit acknowledged that the standard for finding a liberty interest varied among the circuits. *See Aref*, 833 F.3d at 253–55 (discussing precedent from the Second, Third, Fourth, Fifth, Sixth, Seventh, and Tenth Circuits). The *Aref* court even recognized that the D.C. Circuit's consideration of a condition's duration was "unique." *Id.* at 254 (discussing the D.C. Circuit's prior decision in *Hatch*, 184 F.3d at 856)).

Defendants also argue that finding a liberty interest under these circumstances would "mean that placement of any inmate with a life sentence at ADX [Florence] would raise a serious constitutional problem, which cannot be true." ECF No. 24 at 42 (internal citation omitted). Not so. As described above, the due process inquiry has two steps. The placement of an inmate with

16

a life sentence at ADX Florence raises no constitutional concerns so long as the inmate is afforded adequate process. Having concluded that, under *Aref*, the conditions at ADX Florence likely implicate Plaintiffs' liberty interests at the first step, the Court now turns to the second.

The second step of the due process inquiry asks, given the interests at stake, "what process is due" for a person who may suffer a deprivation of those interests. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). This step involves the familiar balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which requires the Court to consider "the risk of erroneous deprivation under existing procedures" and to weigh "the government's interest against the burdens any additional process would entail," *Aref*, 833 F.3d at 252. In the prison context, the contours of due process must flexibly account for the interests on both sides of the balancing, as the deference due to prison administrators and the constitutional protections for prisoners are both "significant." *Id.* But regardless of the exact process afforded, the "general rule" is that "individuals must receive notice and an opportunity to be heard before they are deprived of a constitutionally protected interest." *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995) (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993)).

Ordinarily, at the second step, the parties agree on the process a plaintiff received and dispute only whether that process was constitutionally sufficient. *See, e.g.*, *Mathews*, 424 U.S. at 332–33 ("[T]he Secretary contends that the existing administrative procedures, detailed below, provide all the process that is constitutionally due."). But here, Plaintiffs do not question whether the ordinary process BOP employs to redesignate prisoners—even to ADX Florence—is constitutionally adequate, and they admit that, at least on paper, they received that process. *Cf.* ECF No. 4-1 at 12–14. Rather, Plaintiffs argue that the process they received was a "sham" that was carried

17

out "solely to effectuate a predetermined result." *Id.* at 31.

To begin, Plaintiffs are right that if their redesignations to ADX Florence were predetermined—that is, fully decided at the beginning of the process rather than the end—their due process rights were violated. "The fundamental requirement of due process is the opportunity to be heard 'at a *meaningful* time and in a *meaningful* manner.'" *Mathews*, 424 U.S. at 333 (emphasis added) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). So the government may run afoul the Due Process Clause when, for example, it fails to provide any opportunity to be heard, *see, e.g.*, *Armstrong*, 380 U.S. at 550, or when the only opportunity is provided after the deprivation has happened, *see, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 261–62 (1970). But due process is not satisfied simply because the government provides a pre-deprivation opportunity in some form.

For example, when a process—even one with respect to a prisoner's liberty interests—is merely "perfunctory," there is no "*meaningful* opportunity to be heard." *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986). A prison administrator cannot merely go through the motions. Along those lines, several circuits have acknowledged that prison officials may violate due process when they "conduct[] . . . reviews" of prisoners' placements in harsher conditions "with the outcomes pre-ordained." *Proctor v. LeClaire*, 846 F.3d 597, 612 (2d Cir. 2017); *see also Toevs v. Reid*, 685 F.3d 903, 914–15 (10th Cir. 2012) (same). The bite of the word "meaningful" is illustrated by *Proctor*, in which the Second Circuit considered a due process challenge brought by a prisoner placed in solitary confinement for "twenty-two years." *Proctor*, 846 F.3d at 600. The prisoner alleged that although he received periodic reviews that "nominally afforded him" the opportunity to be released from solitary confinement, "none of the . . . reviews while he was confined in [solitary confinement] [were] 'meaningful.'" *Id.* at 604, 608. The record reflected that the prison officials in charge of the reviews understood movement into solitary confinement at the

18

prison was a one-way valve: "once an inmate is placed in [solitary confinement], they're never released." *Id.* at 605 (quotation omitted).  The Second Circuit concluded that a process of providing periodic review "without any hint of success" failed to be meaningful, as "hollow formalities . . . make a mockery" of due process.  *Id.* at 612 (applying the due process standard from *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *abrogated on other grounds by Sandin*, 515 U.S. at 482–84).

In a related line of cases, the D.C. Circuit has held that "at a minimum," an individual deprived of a liberty interest "must have a meaningful opportunity to present his case before a neutral decisionmaker." *Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991); *see also C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1564 n.15 (D.C. Cir. 1991) ("In the context of adjudicatory proceedings . . . due process requires . . . scrutiny of prejudgment bias and prejudice.").  Even in the prison environment, decisions require no less than "a 'neutral and detached' hearing body." *Morrissey*, 408 U.S. at 488–89 (prison parole decisions).  This neutrality requirement is violated, though, when the decisionmaker has "prejudg[ed]" the matter by coming to a firm conclusion beforehand. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Prejudgment may occur in various situations, such as when the decisionmaker has a "pecuniary interest in the outcome" or "has been the target of . . . criticism" from a party. *Id.*  But whatever its cause, the question is whether, "under a realistic appraisal of psychological tendencies and human weakness," *id.*, that the decisionmaker has "demonstrably made up her mind" and is "impervious to contrary evidence" before the party is heard, *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1209 (D.C. Cir. 1980).  If so, the prejudgment "amount[s] to a denial of due process." *Cinderella Career & Finishing Schs. v. Fed. Trade Comm'n*, 425 F.2d 583, 591 (D.C. Cir. 1970); *see also Fast Food Workers Comm. v. NLRB*, 31 F.4th 807, 815 (D.C. Cir. 2022) (applying *Cinderella*).

19

Here, Plaintiffs have shown that it is likely that their redesignations were predetermined—and thus violated their due process rights—because officials with authority over BOP made it clear that they had to be sent to ADX Florence to punish them, no matter what result the ordinary BOP process might have yielded. The Court does not reach this conclusion without careful consideration. But Plaintiffs have proffered an unusual array of evidence in support of their claim. That evidence, described below, shows it is likely that (1) officials with authority over BOP sought to punish Plaintiffs because then-President Biden had commuted their death sentences; and (2) those officials intervened in the BOP redesignation process that was already underway, dictating outcomes with which BOP officials subordinate to them were not genuinely free to disagree—and which resulted in a dramatic, uniform about-face in how the redesignations were handled.

As described above, after then-President Biden commuted Plaintiffs' death sentences in December 2024, BOP was required to redesignate each of them to another facility. From the start, as Plaintiffs argue, Defendants "have never tried to conceal" their desire to punish the commutees. ECF No. 4-1 at 37. Indeed, on Christmas Day 2024, just days after the commutations, President Trump took to social media to label them "the 37 most violent criminals who killed, raped, and plundered like virtually no one before them" and condemned Biden's "pardon" [sic] as "incredibl[e]." *See* Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://truthsocial.com/@realDonaldTrump/posts/113715169361854155. He concluded by telling them to "GO TO HELL." *Id.*

Still, while the prior administration was in charge, declarations from many of Plaintiffs' lawyers describe an individualized redesignation process that proceeded as usual. BOP attorney Christopher Synsvoll spoke with many of Plaintiffs' lawyers and other representatives during several meetings in the first half of January 2025 and discussed the referral process and possible

outcomes for them.  Although in a few cases, Synsvoll suggested that a Plaintiff might be considered for referral to ADX Florence—or noted that some other commutees had already been referred there—in most cases, he informed the lawyers that it was unlikely their clients would be sent there.

For example, Synsvoll told one lawyer in early January that "he was aware that [Plaintiff] is the oldest man on federal death row . . . [and] considered Medical Care Level 3," and thus "there was no way that [he] would go to ADX [Florence]."  ECF 4-34 at 6.  To another, he said that the options BOP was considering for his client were "across the board United States Penitentiaries," as opposed to ADX Florence.  ECF No. 4-24 ¶ 6.  Similarly, Synsvoll told another counsel that her client was "one of the ones we are looking at for [transfer to] . . . a mainline penitentiary." ECF No. 4-22 ¶ 4.  For other Plaintiffs, Synsvoll suggested the possibility of remaining in Terre Haute, where certain programming for which they appeared eligible, was available.  *See* ECF No. 4-30 ¶ 31; ECF No. 4-36 ¶ 9.  Synsvoll told another lawyer that one Plaintiff was "a strong candidate for placement at a BOP facility other than ADX [Florence] . . . [and] could go to a lower security or population-type setting depending on the programming."  ECF No. 4-27 ¶ 6.  He confirmed for another that her client "was not being considered for placement at ADX [Florence]." ECF No. 4-33 ¶ 1.  In yet another case, Synsvoll told counsel that "he did not think it was likely" that her client would be placed at ADX Florence.  ECF No. 4-23 ¶ 15.  And later, he told lawyers for two other Plaintiffs that before the process changed, BOP had decided to refer one Plaintiff "to a U.S. Penitentiary," as opposed to ADX Florence, ECF 4-29 ¶ 11, and that another Plaintiff "should not be designated to ADX," ECF No. 4-18 ¶ 10.  Defendants do not contest that Synsvoll made these representations, or that they were inaccurate.

The process abruptly changed after President Trump issued Executive Order 14164 on his first day in office.  Recall that this order directed the Attorney General to "evaluate the places of

21

imprisonment and the conditions of confinement for each [of the 37 commutees] and . . . to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." Restoring the Death Penalty and Protecting Public Safety, 90 Fed. Reg. 8,463 (Jan. 20, 2025) (codified Jan. 30, 2025).

The next week, on January 27 and 28, Synsvoll convened group videoconferences with Plaintiffs' lawyers and conveyed that the Executive Order signaled a change to the redesignation process for their clients. Synsvoll told them that "because of the EO, the individualized recommendations for designation would now have to be approved by the Office of the Deputy Attorney General" ("ODAG"). ECF No. 4-22 ¶ 8; *see also* ECF No. 4-18 ¶ 9 (same); ECF No. 4-24 at 5 (same); ECF No. 4-27 ¶ 18 (same); ECF No. 4-29 ¶ 9 (same); ECF No. 4-30 ¶ 37 (same); ECF No. 4-32 ¶ 10 (same); ECF No. 4-33 ¶ 7 (same). He added that "to his knowledge, the ODAG had never been involved in designations." ECF No. 4-27 ¶ 28. The unprecedented nature of ODAG's involvement is corroborated by a former BOP employee who spent "14 years working in United States Penitentiaries" and who "reviewed and signed off on hundreds, if not thousands, of transfer referrals, including numerous transfer referrals to place inmates at the ADX." ECF No. 4-10 at 6. That BOP employee states that he had "never known" of any transfer referral "to have been reviewed by any entity outside of the Bureau, including by the [Office of the Deputy Attorney General], the Attorney General or the President." *Id*. Again, Defendants do not contest these representations or challenge their accuracy.

During these same videoconferences in January 2025, Synsvoll had to explain away paperwork that some Plaintiffs had *already* received suggesting that they were being referred or considered for referral to ADX Florence. According to Synsvoll, BOP staff at Terre Haute had mistakenly—perhaps tellingly—interpreted Executive Order 14164 to mean that "everyone would go to

ADX" Florence. ECF No. 4-30 ¶ 38; *see also* ECF No. 4-22 ¶ 9; ECF No. 4-32 ¶ 10. But he assured the lawyers that such paperwork was inaccurate and that the Terre Haute staff "got way ahead of themselves." ECF No. 4-22 ¶ 9.

Less than a week later, on February 5, 2025, on her first day in office, Attorney General Bondi followed up Executive Order 14164 with a related memorandum. Echoing the order, the Attorney General characterized former President Biden's commutation as having "robbed the victims' families of the justice promised" and "subverted the rule of law." ECF No. 4-5. The Bondi Memorandum stated that its purpose was to "achieve justice for the victims' families of the 37 commuted murderers." *Id.* And it then directed BOP to house the 37 commutees in conditions of confinement "consistent with the security risks those inmates present because of their egregious crimes, criminal histories, and all other relevant considerations." *Id*. The Bondi Memorandum did not explain how review of the commutees prison designations would "achieve justice for the victims' families." *Id.* Still, within a few weeks, Synsvoll told one Plaintiff's counsel that "almost all of the commuted prisoners"—and all 20 Plaintiffs—"would be referred for placement" at ADX Florence. ECF No. 4-27 ¶ 32. Before the change in administrations, most of the 37 commutees were not slated for referral to ADX Florence; by February, "only two men, both with medical needs requiring their placement at a Medical Facility for Federal Prisoners, [] would not be referred" there. *Id.*

Over another series of meetings during February and early March, Synsvoll revealed to Plaintiffs' lawyers that the abrupt change in position came from "the Deputy Attorney General and Attorney General" who were "personally involved in making [the] decision." ECF No. 4-27 ¶ 34. Synsvoll recounted that, at a meeting between BOP and ODAG, "BOP had presented its spreadsheet of recommendations for each of the men to the ODAG, but the proposal had been rejected."

*Id.* ¶ 32; *see also* ECF No. 4-30 ¶ 52 (same). Instead, "BOP had been notified by the Attorney General's Office that all the commutees should be referred to ADX-Florence." ECF No. 4-28 ¶ 40; *see also* ECF No. 4-22 ¶ 10; ECF No. 4-37 ¶¶ 12–13. According to one attorney, Synsvoll said that the referral directive "was not based on the BOP's assessment of the prisoners' security needs or of institutional resources" but was instead due to "President Trump's Executive Order and a related memorandum issued by Attorney General Bondi." ECF No. 4-27 ¶ 34. That attorney added that Synsvoll told them that the "BOP committee members had been informed that the President and Attorney General's office were indicating that everyone needed to be referred to ADX." ECF No. 4-33 ¶ 8. According to another attorney, Synsvoll informed them that "following the Executive Order, the BOP committee was told to look at what the President and the AG were saying. The BOP committee members took that to mean that everyone needed to be referred to ADX [Florence]." ECF No. 4-32 ¶ 13. Again, Defendants do not contest that Synsvoll made these representations or that they were wrong.

By early April, all Plaintiffs received a notice telling them that they had been "referred for a hearing before a Hearing Administrator . . . to determine if [they] should be transferred to" ADX Florence. *See, e.g.*, ECF No. 4-13 at 2. The result of each hearing was the same: the hearing administrator recommended redesignation to ADX Florence. *See, e.g.*, ECF No. 4-24 ¶ 13. Then Assistant Director Salem adopted the hearing administrators' recommendations. *See* ECF No. 24-1 ¶ 6. And all Plaintiffs' appeals were denied. *See* ECF No. 4-69 at 2; ECF No. 41-2 ¶ 4; Dkt. No. 25-cv-1161, ECF No. 70 at 1.

As that process played out—before Plaintiffs had exhausted their appeals and a final decision was rendered by BOP—Attorney General Bondi was also transparent about seeking to punish Plaintiffs by sending them to ADX Florence. Plaintiffs cite reports that in May 2025, she held a

24

forum with the families of the victims of the 37 commutees. *See* ECF No. 4-1 at 21 (citing Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment.*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://perma.cc/5EJU-DRTX). That the commutees would be redesignated to ADX Florence was apparently treated as a foregone conclusion at the forum, where "some officials said they wished conditions at the prison . . . were even worse." Bravin, *Biden Spared 37 Killers* (2025). Attorney General Bondi herself later publicly confirmed this May forum with the victims' families. *See* Pam Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK. In that same social media post, Attorney General Bondi again attacked "Joe Biden's last-minute commutations of death row prisoners" as "a stain on our justice system and a betrayal of the families of victims." *Id.* She then announced that BOP had "begun transferring the monsters Biden commuted to Supermax prisons, where they will spend *the rest of their lives in conditions that match their egregious crimes*." *Id.* (emphasis added). She offered a similar statement in a televised public event with President Trump at the Oval Office. Video by Eric Daugherty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://perma.cc/M7RR-3DQA.

From all this largely consistent and unrebutted evidence, it is not hard to conclude that it is likely that "following the Executive Order, the BOP committee was told to look at what the President and the AG were saying," that "[t]he BOP committee members took that to mean that everyone needed to be referred to ADX [Florence]," and that in the end, BOP officials understood that Plaintiffs had to be transferred there. ECF No. 4-32 ¶¶ 12–13. It strains credulity to believe that subordinate BOP officials carrying out this process felt free to disagree with what had been demanded at the start by officials far senior to them, with authority over their careers and livelihoods. Thus, it is likely that there was no genuine opportunity for Plaintiffs—at their hearings, during their appeals, or at any other time—to oppose their transfers to ADX Florence.

25

Still, that is not all the evidence suggesting the redesignation process was predetermined. Other aspects of the record support Plaintiffs' due process claim as well.

For starters, that the process ended up with identical outcomes for all commutees that remain in the federal prison system suggests prejudgment. Although not all 37 commutees are Plaintiffs here, 35 of the 37 commutees were redesignated to ADX Florence on a similar time frame despite their varied histories and disciplinary records. *See* ECF No. 24-1 ¶¶ 5–6. The eventual outcome for the two other commutees illustrates the point too. As noted earlier, one of them, Brandon Basham, was initially transferred to the Medical Center for Federal Prisoners in Springfield Missouri due to urgent mental health needs. *Id.* ¶ 6. His transfer there was initially cited by Defendants as evidence that there was no predetermined, uniform outcome for all commutees. ECF No. 24 at 39 ("Yet, not all commuted inmates were actually transferred to ADX. One commuted inmate, Brandon Basham . . . was redesignated and transferred to . . . Springfield, Missouri."). But after Basham was transferred back to Terre Haute in December 2025, he was referred to ADX Florence the next month like the others. *See* Dkt. No. 25-1161, ECF No. 71 ¶¶ 6–7. And the last commutee, while not redesignated to ADX Florence, is no longer imprisoned in the federal system at all. He was transferred to the state authorities in Arizona for prosecution in compliance with the Bondi Memorandum's instruction that "the relevant U.S. Attorney's Offices are directed to assist local prosecutors in pursuing death sentences under state law against the 37 commuted inmates, where appropriate." ECF No. 4-5.

Moreover, while the Court is in no position to second-guess the merits of BOP's redesignation decisions, the redesignation paperwork (to the extent it is in the record) suggests a cookie-cutter process that yielded the same predetermined result. Take the Extraordinary Security Reviews conducted for those Plaintiffs flagged as potentially poor mental health fits for ADX

Florence.  Each recommendation form, without variation, concludes with these two sentences:

> Staff from the Psychology Services Branch, Correctional Programs Division, Designations & Sentence Computation Center, and Office of General Counsel (Committee) reviewed the inmate's security needs.  The Committee reviewed his history of disciplinary infractions, institutional adjustment, threat to staff and inmates, and current presentation, and it was determined his security concerns were extraordinary and he could be placed in the ADX.

ECF No. 25-4 at 3, 4, 7, 8, 10, 12, 14, 16, 18.  Maybe this identical language reflects an explainable shortcut.  But given the lack of coherent explanation and internal consistency in these documents, it suggests a perfunctory process that did not meaningfully grapple with each Plaintiff's individualized case.  The same recommendation form also has a section on the same page for "Security Factors Considered."  For several Plaintiffs, the question "Does the inmate have a history of serious assaults, murder, or escape while housed in secure environments and a continued risk of engaging in such conduct" is answered "No."  *Id.* at 4, 14, 16.  The documents do not try to reconcile these two sets of statements.

The lack of an individualized explanation in the relevant redesignation paperwork—thus, signaling a predetermined process—is most obvious in Plaintiff Julius Robinson's case.  Robinson has been incarcerated in Terre Haute since June 18, 2002.  ECF No. 3-5 at 16.  As far as the records before the Court reflect, in the intervening 23 years, he has received no disciplinary marks on his record.  *Id.* at 3, 19.  He has worked in the prison as an orderly for years apparently without incident, regularly engaging with both staff and fellow inmates.  *Id.* at 16–17, 29.  Far from causing trouble, he has spent his time taking advantage of the educational programming there, completing dozens of courses.  *Id.* at 17–18.  He was apparently baptized in prison as well.  *Id.* at 25.  Yet the hearing administrator listed the following as Robinson's basis for referral, without further explanation: "Institution staff believe Inmate ROBINSON's placement in other correctional facilities creates a risk to institutional security and good order and poses a risk to the safety of staff, inmates,

others, or to public safety"—the same basis given for every other Plaintiff. *Id.* at 26.

Against all this evidence, Defendants muster two objections. First, they note that neither Executive Order 14164 nor the Bondi Memorandum "purported to retract, overrule, or otherwise alter the designation factors outlined in 18 U.S.C. § 3621 or BOP Program Statement 5100.08, nor did they in any way purport to change the factors BOP has always considered for inmate designations." ECF No. 24 at 43. Fair enough. But this objection does not get Defendants very far. Indeed, the nature of Plaintiffs' due process claim is that there is a gap between what Defendants *say* and what Defendants *did*.

Second, Defendants refer the Court to the sworn declaration submitted by Assistant Director Salem, the BOP official who represents that he made the final decision in May 2025 to redesignate each Plaintiff to ADX Florence. *See* ECF No. 24-1 ¶¶ 6–9. Assistant Director Salem states emphatically that it "is not correct" that BOP predetermined the outcome of Plaintiffs' prison assignments or that the Executive Order and Bondi Memorandum resulted in a sham process. ECF No. 24-1 ¶¶ 7–8. Instead, he asserts that he "rendered a decision on each SCU inmate individually, weighing the factors outlined in the ADX Referral Memo and PS 5100.08 . . . in May 2025." *Id.* ¶ 9.

The Court does not lightly cast aside Assistant Director Salem's representations. But the Court "must make credibility determinations" and weigh all evidence before deciding whether to grant preliminary relief. *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). And "the question of how much weight an affidavit [is] given is left to the trial court's discretion and the quality of the affidavit [has] a significant effect on this determination." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2025). In the Court's view, the cursory Salem Declaration, by itself, does not outweigh all the other evidence described above suggesting

28

prejudgment. As the Supreme Court explained in considering an agency's explanation in a different context, the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quotation omitted).

The Salem declaration not only leaves much of Plaintiffs' evidence unrebutted, but it also says nothing about how others within BOP's redesignation process—from those who initiated the referrals to ADX Florence, to the hearing administrators, to those weighing Plaintiffs' appeals—carried out their duties. Indeed, one Plaintiff represents that at his hearing, his hearing administrator, whom he identified by name as "Joseph Brian Wilson," "admitted that . . . he had to do what [Attorney General Bondi] directed him to do." ECF No. 4-57 ¶ 8. That Plaintiff reported that he asked whether Wilson "would recommend me to ADX no matter what [Plaintiff] said to him during the hearing," and Wilson "said yes." *Id.* ¶ 7.

For these reasons, Plaintiffs have shown that it is likely their redesignations to ADX Florence were predetermined before they received any process at all, and they had no meaningful opportunity to be heard. *See Mathews*, 424 U.S. at 333. Thus, they are likely to prevail on the second step of the *Mathews* balancing test and succeed on the merits of their due process claim. *See id.* at 335. The Court emphasizes that this conclusion about their likelihood of success on this claim says nothing about where—including ADX Florence—BOP *should* have decided to transfer any of them. Nor does it necessarily suggest that there would have been no way for officials with authority over BOP to play a role in the redesignation process. The Court concludes only that on the record before it, it is likely that the process provided to Plaintiffs was an empty exercise to approve an outcome that was decided before it even began, thereby contravening their due process rights.

### B.  Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief

Plaintiffs must also show that they will suffer irreparable harm absent an injunction. *Winter,* 555 U.S. at 20. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id*. (cleaned up). In other words, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id*. Finally, the injury must be truly "irreparable"—*i.e.,* "beyond remediation." *Chaplaincy*, 454 F.3d at 297. As this Court has recognized many times recently, this high bar is not easily met. *See, e.g.*, *Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 80 (D.D.C. 2025) (denying preliminary injunction for lack of irreparable harm); *Planned Parenthood of N.Y. v. U.S. Dep't of Health and Human Servs.*, No. 25-1334, 2025 WL 1768100, at *6–8 (D.D.C. June 26, 2025) (same).

Plaintiffs seek to show irreparable harm in two independent ways. First, they argue that they will suffer a "tangible" injury if transferred to ADX Florence, because of the conditions of confinement there, their medical conditions, or some combination. *Chaplaincy*, 454 F.3d at 298. While the conditions at ADX Florence are very restrictive, the key questions are whether any such harm would qualify as truly irremediable and whether the harm would materialize during the pendency of this suit. For Plaintiffs who lack health problems, that would be a tall order. On the other hand, 14 of the 20 Plaintiffs—referred to as the "Health Care Plaintiffs" in the complaint, *see* ECF No. 1 at 64; ECF No. 41-1 at 5–6; ECF No. 55-1 at 5–6—make a more plausible claim of

30

irreparable harm. BOP's own psychiatric evaluations say that eight of them show "evidence of a severe mental illness that would preclude the inmate's placement at ADX Florence." *See, e.g.*, ECF No. 25-3 at 4; Dkt. No. 25-cv-1161, ECF No. 65-3 at 20–21. Two others suffer from serious medical conditions that could kill them without access to proper healthcare. ECF No. 3-2 at ¶¶ 23, 26. So for at least ten Plaintiffs, accessing adequate care could be a challenge. *See* ECF No. 4-49 at 11 ("Getting people to outside appointments is complex under ordinary circumstances and becomes even more so with people the BOP has classified as MAX custody.").

The Court need not parse though the medical evidence relating to each Plaintiff, though, because of Plaintiffs' second theory: that a violation of their constitutional rights suffices to meet the irreparable harm standard. *Chaplaincy*, 454 F.3d at 298-99 (rejecting an assertion of irreparable harm from "tangible injury" but accepting that a "violation of the Establishment Clause per se constitutes irreparable harm."). In this Circuit, it "has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). When constitutional harm is the basis for irreparable harm, the likelihood of success on the merits overlaps heavily with the irreparable harm inquiry. *See id.* (justifying a finding of irreparable harm by referring to the "discussion of the likelihood of success" and the conclusion that "appellants' constitutional rights are violated.").

Though this principle was first recognized in the First Amendment context, *see Elrod*, 427 U.S. at 373, the D.C. Circuit has applied it outside those circumstances. *See, e.g.*, *Mills*, 571 F.3d at 1312 (D.C. Cir. 2009) (Fourth Amendment). Indeed, the Circuit recently concluded that "the precise harm complained of here—a violation of Fifth Amendment due process rights" supports irreparable harm even when the plaintiff "stands to suffer only a procedural harm." *Karem v.*

31

*Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020); *see also Fuentes v. Shevin*, 407 U.S. 67, 82 (1972) ("[N]o later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."). So "[a]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)).

Thus, Defendants are right that "there is no *per se* rule" that the mere claim of constitutional violation "*automatically* constitutes irreparable harm." *Chaplaincy*, 454 F.3d at 301 (emphasis in original). In other words, courts "do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it *alleges* a violation of its rights." *See Hanson v. District of Columbia*, 120 F.4th 233, 244 (D.C. Cir. 2024) (quoting *Chaplaincy*, 454 F.3d at 302) (emphasis added). But Plaintiffs here have done more than merely allege a violation—they have shown that they are *likely to succeed* on their constitutional claim. For that reason, under the law of this Circuit that this Court must apply, Plaintiffs have shown that they are likely to suffer irreparable harm without preliminary injunctive relief.

### C.    The Balance of Equities and the Public Interest Favor Plaintiffs

The first two *Winter* factors, discussed above, are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Winter*, 555 U.S. at 24, and noting the "substantial overlap" between the factors for stays and injunctions). But the remaining two factors favor Plaintiffs as well. When considering a request for a preliminary injunction, the balance of equities and the public interest "merge when the Government is the opposing party." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Nken*, 556 U.S. at 435). So Plaintiffs need only show that their

interests outweigh those of Defendants.

The Court has already found that Plaintiffs' redesignations and transfers to ADX Florence would likely violate their constitutional due process rights, and the "perpetuation of unlawful agency action" does not serve the "public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, Plaintiffs have an interest in maintaining the status quo given that their transfer to ADX Florence would impose harsh restrictions on all of them, and, for some, additional health risks. On the other side, Defendants' interest in transferring Plaintiffs to ADX Florence at this moment seems modest, even putting aside that the Court has concluded doing so would be unlawful. Plaintiffs remain in Terre Haute, a facility that—but for the commutation of their death sentences—BOP had deemed appropriate for them for many years and was sufficiently protective of the public, BOP staff, and other inmates from any threat they might pose. Moreover, transferring prisoners to a new facility appears to be a costly and time-consuming process which ideally would happen only once. *See* ECF No. 24-3 ¶¶ 8–13.

### D.    Only Limited Relief Is Appropriate

As relief, Plaintiffs request that the Court "enjoin all Defendants except President Trump from implementing the categorical redesignations" to ADX Florence and "direct Defendants to enforce the placement designations reached by BOP before the Bondi Memo." ECF No. 4-1 at 55. The Court will order the former, but not the latter. Whatever the record suggests about the status of Plaintiffs' redesignations before Executive Order 14164 or the Bondi Memorandum, there is no basis for the Court to enforce those "placement designations" now. Thus, the Court provides relief only to the extent that it prevents a likely constitutional violation and preserves the status quo. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Court will therefore enjoin all Defendants except President Trump from transferring Plaintiffs to ADX Florence during the pendency of

33

this suit. Moreover, the "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" when it comes to a final judgment on the merits. *Id.* So Court's grant of preliminary relief is, as the name suggests, only preliminary.

**III.     The Court Will Require Plaintiffs to Post a Nominal Bond**

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Circuit has observed the "widely recognized discretion" of a district court "not only to set the amount of security but to dispense with any security requirement whatsoever." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Still, it has more recently expressed concern about how some courts have exercised this discretion. *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025). Thus, the Court considers whether and in what amount to require a bond. Given the lack of representation that Defendants will sustain any monetary injury from an injunction, the self-evidently limited financial resources of Plaintiffs, and the important rights they seek to vindicate, the Court will impose a nominal bond of $1.00. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (defendants had "not sufficiently demonstrated any likelihood of suffering costs or damages if they are later found to have been wrongfully enjoined.").

**IV.     Conclusion**

For all the above reasons, the Court will preliminarily enjoin all Defendants except President Trump, as well as their agents, representatives, and all persons or entities acting in concert with them, from transferring any Plaintiff to ADX Florence while this suit proceeds. The Court

will also require Plaintiffs to post a $1.00 nominal bond by February 17, 2026.  A separate order

will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 11, 2026